## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS - WORCESTER

IN THE MATTER OF:           :   Case No. 12-40944

SOUTHERN SKY AIR & TOURS,   :   Worcester, Massachusetts
LLC d/b/a DIRECT AIR,           **March 23, 2012**
                            :   11:07:04 a.m.
    Debtor.
                            :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : :


### TRANSCRIPT OF HEARING ON:
### (#9) MOTION OF JETPAY MERCHANT SERVICES, LLC FOR
### RELIEF FROM STAY TO CONTINUE PROCESSING
### CUSTOMER CHARGEBACKS FROM NON-ESTATE PROPERTY
### ESCROW ACCOUNT IN THE ORDINARY COURSE
### (TO THE EXTENT ANY SUCH RELIEF IS REQUIRED)
### BEFORE THE HONORABLE MELVIN S. HOFFMAN, J.U.S.B.C.


APPEARANCES:

<u>For the Debtor</u>:            Riemer & Braunstein, LLP
                            BY:  STEVEN E. FOX, ESQ.
                            Times Square Tower, Suite 2506
                            Seven Times Square
                            New York, New York 10036

                            Riemer & Braunstein, LLP
                            BY:  ALAN L. BRAUNSTEIN, ESQ.
                            Three Center Plaza
                            Boston, MA  02108



<u>Audio Operator</u>:            Madelyn Bedard, ECRO


Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
                            1133 Tanager Trail
                            Virginia Beach, VA  23451
                            (757) 422-9089


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1    **APPEARANCES** (Continued):

2    <u>For Creditor, Merrick</u>          Goodwin Procter LLP
     <u>Bank Corporation</u>:             BY:  GINA L. MARTIN, ESQ.
3                                     53 State Street, Exchange Place
                                      Boston, MA   02109
4
     <u>For Creditor, American</u>        Seder & Chandler, LLP
5    <u>Express Travel Related</u>       BY:  KEVIN C. McGEE, ESQ.
     <u>Services Co., Inc.</u>:                 J. ROBERT SEDER, ESQ.
6                                     339 Main Street
                                      Worcester, MA   01608
7
     <u>For Radixx Solutions</u>          Craig and Macauley PC
8    <u>International, Inc.</u>:         BY:  JOSEPH J. KOLTUN, ESQ.
                                      Federal Reserve Plaza
9                                     600 Atlantic Avenue
                                      Boston, MA   02210
10
     <u>For Creditor, JetPay</u>         Posternak Blankstein & Lund LLP
11   <u>Merchant Services, LLC</u>:     BY:  DAVID J. REIER, ESQ.
                                      Prudential Tower
12                                    800 Boylston Street
                                      Boston, MA   02199
13
     <u>For Interested Party,</u>         Duane Morris, LLP
14   <u>Valley National Bank</u>:       BY:  JEFFREY D. STERNKLAR, ESQ.
                                      100 High Street, Suite 2400
15                                    Boston, MA   02110

16
     <u>ALSO PRESENT</u>:                RICHARD T. KING
17                                    Assistant U. S. Trustee
                                      446 Main Street, 14th Floor
18                                    Worcester, MA   01608

19
     **APPEARANCES** (by telephone):
20
     <u>For Creditor, United</u>          U. S. Department of Justice
21   <u>States</u>:                     BY:  ANDREA H. HANDEL, AUSA
                                      Post Office Box 875
22                                    Ben Franklin Station
                                      Washington, DC   20044
23

24

25

     **#12-40944**                                          **3-23-2012**

1                                    INDEX

2    ARGUMENT:

3        On behalf of Creditor, JetPay, by Mr. Reier            5

4        On behalf of Debtor, by Mr. Fox                       28

5        On behalf of Valley National Bank, by Mr. Sternklar   48

6        On behalf of DOT, by Ms. Handel                       56

7        On behalf of Merrick Bank, by Ms. Martin              59

8        On behalf of AMEX, by Mr. McGee                       63

9        On behalf of the U. S. Trustee, by Mr. King           66

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1                    P R O C E E D I N G S

2            THE COURT:  Good morning, everyone.  Be seated,

3  please.

4            MR. STERNKLAR:  Thank you, Your Honor.

5            THE COURTROOM DEPUTY:  Southern Sky Air & Tours, LLC,

6  Case No. 12-40944.

7            Would the parties please identify yourselves for the

8  record, starting with the party on the line.

9            MS.  HANDEL:  Good morning, Your Honor.  This is

10  Andrea Handel with the Department of Justice for the United

11  States.

12            THE COURTROOM DEPUTY:  In the courtroom?

13            MR. FOX:  Good morning, Your Honor.  Steven Fox,

14  Riemer & Braunstein, and with me today is my partner, Alan

15  Braunstein, on behalf of Southern Sky Air Tour, otherwise known

16  and doing business as Direct Air.

17            MR. STERNKLAR:  Good morning, Your Honor.  Jeffrey

18  Sternklar from Duane Morris for Valley National Bank.

19            MS. MARTIN:  Good morning, Your Honor.  Gina Martin

20  from Goodwin Procter on behalf of Merrick Bank Corporation.

21            MR. KING:  Good morning, Your Honor.  Richard King for

22  the U. S. Trustee.

23            MR. REIER:  Good morning, Your Honor.  David Reier for

24  the moving party, JetPay Merchant Services, LLC.

25            MR. McGEE:  Good morning, Kevin McGee of Seder &

```
 1  Chandler for the American Express Travel Related Services.

 2          MR. SEDER:  Good morning, Your Honor.  J. Robert Seder

 3  for American Express.

 4          MR. KOLTUN:  Good morning, Your Honor.  Joseph Koltun

 5  on behalf of Radixx Solutions International.

 6          THE COURT:  I'm sorry.  The name of your client is?

 7          MR. KOLTUN:  Oh, I'm sorry.  Radixx Solutions

 8  International.

 9          THE COURT:  Got it.

10          Okay.  Thank you.

11          We are here on an emergency motion by JetPay for

12  relief from stay.

13          Mr. Reier?

14          MR. REIER:  Thank you, Your Honor.  Good morning and

15  thank you again for hearing JetPay Merchant Services on such

16  short notice.

17          And despite some of the facts that we've learned in

18  the past couple of days, which I will advise the Court as I

19  proceed, we view this still as an extremely urgent matter.  The

20  chargebacks that we continue to be liable for accrue on a daily

21  basis and we will eventually run out of cash if we don't have

22  access to at least our proportionate share of the, the escrow

23  account.  The -- currently, the current outstanding chargebacks

24  that have, that we've been responsible for is in the

25  neighborhood of $4 million at this point and continue to
```

1  accrue.

2        What I would like to do with my opportunity now to

3  address the Court is not simply to regurgitate what is in the

4  motion, nor simply to summarize what's in the motion that we

5  filed.  I believe that the Court and all the parties present

6  here have had a full opportunity to read the motion, including

7  the debtor, Merrick Bank, the United States Trustee, the escrow

8  agent, Valley National Bank, AMEX, and the Department of

9  Transportation, which is appearing through the United States

10  Attorney's Office in Washington, DC telephonically.

11        All of those are the sum of all the parties that seem

12  to have an interest in, in, potential interest in the escrow

13  account and they have, I believe, virtually all of them have

14  filed some sort of response to what we filed.  I understand

15  that the debtor filed an objection this morning.  That was

16  filed electronically while I was driving to the courthouse and

17  they apparently didn't have any extra copies.

18        So I haven't, I haven't seen their objection.  I'm

19  prepared to go forward and then they can make their objection

20  orally and we'll respond accordingly.  I don't know what the

21  grounds are right now for their objection.

22        THE COURT:  I --

23        MR. REIER:  So --

24        THE COURT:  I looked at everything, but does any --

25  did anybody tell me how much money is currently sitting in that

1 | escrow account?

2 |     MR. REIER:  I don't know if it's in the objection, but

3 | the, the debtor has, advised us yesterday that it's

4 | approximately $1 million, which means that there is a shortfall

5 | of many several millions of dollars which I'll discuss briefly

6 | today as well.  That was the big news that we learned just in

7 | the past day.

8 |     THE COURT:  The only other -- you mentioned all these

9 | parties.  What about the surety bond company?  Are they

10 | involved in any of this?

11 |     MR. REIER:  They -- their, their bond, I believe, was

12 | limited to $200,000.

13 |     THE COURT:  Right.

14 |     MR. REIER:  So it represents such a small fraction and

15 | we're not aware that they have a claim to the escrow.

16 |     THE COURT:  Okay.  Go ahead.

17 |     MR. REIER:  But the contents of the motion are

18 | familiar to all the parties.  They've been involved in one

19 | fashion or another in doing business with the debtor over the

20 | past five years.  And so they are well aware of what the facts

21 | are.  They should be well aware, generally, what the facts are,

22 | though there may be some nuances as to the exact mechanics of

23 | the way in which money is transferred from among the different

24 | accounts, but nothing -- I don't think there's anything new or

25 | surprising in our, in our motion and, and indeed, the, the

1    debtor and the Department of Transportation are very familiar

2    with, obviously are very familiar with their own regulations

3    and the account that is the subject of the hearing today was

4    set up pursuant to those regulations.

5         What I want to do is use my opportunity now to

6    articulate in a summary fashion the conceptual and legal

7    framework within which this entire matter is, has unfolded and

8    is now before the Court.  And then to -- and in the process of

9    doing that, I will supplement a couple of items in the motion

10   that was filed with some information that we learned over the

11   past two days as parties were contacting me and responding to

12   the motion that we filed.  And then I would like to end by

13   responding to the different limited objections that were filed

14   to the motion.  I can't respond to the debtor's objection

15   'cause I haven't seen it, although I did talk to them

16   yesterday.  And so I, I think I have some idea as to what --

17        THE COURT:  And in any case, I'll give you an

18   opportunity to respond after we hear all the objections.

19        MR. REIER:  Okay.

20        So the, the, the debtor, which does business as Direct

21   Air, is a charter which arranges for flights and contracts with

22   other companies, you know, which are the carriers who actually

23   do the flying, and they are to be distinguished from what we

24   call scheduled carriers which fly according to a schedule.

25   The, the debtor's business consisted very simply of, in its

1  most basic nature, was selling charter flights to customers.

2  Generally, this was done online and then arranging for those

3  flights to, to occur.

4       The Department of Transportation many years ago

5  promulgated a series of regulations that govern this entire

6  industry.  The purpose of many of these regulations, which, the

7  ones, particularly the ones that are relevant here, is to

8  provide a mechanism to protect customers who purchase a charter

9  and then for some reason or another the charter is cancelled

10  and it protects them to ensure that they can get their money

11  back.  That's the essence of the DOT regulations that are at

12  issue here and while my motion cited two sets of regulations,

13  14 CFR 212.8 and 14 CFR 380, I've been advised by the

14  Department of Transportation yesterday that for this particular

15  charter and this particular escrow account that's at issue the

16  relevant regulation is Section, is 14 CFR 380.  And I do have

17  copies of that.  I don't think I attached that to the motion,

18  but I do have copies of that for the Court, if it would like.

19       But in any event, the, the regulations require that

20  the debtor, and as a condition to doing business as a charter,

21  sets up a depository account and under the terms of the

22  depository account all of the, and under the terms of the

23  regulations, all of the customer transactions, all of the

24  customer funds for the, for, for the purchase of a charter are

25  to be deposited directly into the escrow account.  They are not

**10**

 1  to go through the charter, Direct Air, but they're to go

 2  directly into the escrow account and then, generally, either of

 3  two things happen.  Either the charter flies or it doesn't fly.

 4          If it flies and everything is okay, then through a

 5  series of mechanisms, which are not relevant here because this

 6  is for the case where the charter flies, the money eventually

 7  comes out of escrow upon a certification by the debtor made to

 8  the escrow agent, which is the bank holding the funds, that the

 9  charter flew, then money comes out of the escrow and goes

10  variously to the charter or to the carrier.  And that's

11  actually a complicated set of mechanisms and I really don't

12  believe it's at all relevant here because we're concerned now

13  with the instance where the charter does not fly.  If --

14          THE COURT:  So when you attached to your motion the

15  unsigned, exhibits to the unsigned depository agreement, that's

16  probably the wrong form?

17          MR. REIER:  That's correct.  The one that is attached

18  as a later exhibit is the form that we're operating under.

19          THE COURT:  The Public Charter Depository Agreement.

20  I was wondering --

21          MR. REIER:  Yes.

22          THE COURT:  -- about that.  Okay.

23          MR. REIER:  Yes.  And that was -- we were in the

24  urgency of trying to get something filed.  We, we filed both

25  and then the Department of Transportation advised us as to the

1   distinction between the 212 depository agreement and the 380

2   depository agreement.

3            THE COURT:  Okay.

4            MR. REIER:  So that is the one that's relevant in this

5   particular case.

6            And the, the one established under Section 380 of 14

7   CFR provides that if a charter is cancelled -- it really

8   provides that if the debtor notifies -- upon notification to

9   the escrow agent that the charter has been cancelled, the

10  escrow agent is required to remit the funds to the charter

11  participant.  And, and the way it is described -- and this is

12  in Section 2.1(c) of the depository agreement -- it describes

13  the escrow agent bank as sending a check to the charter

14  participant or some other mechanism that the escrow agent deems

15  appropriate to reimburse the charter participant.

16           Now what actually happened in this case, which is

17  common in the industry today, is that virtually every single

18  transaction by which a customer purchased a charter was done by

19  credit card and, and there's a whole series of mechanisms by

20  which different banks participate in a chain that establishes

21  each bank's liability to each other bank and the funding of the

22  credit card charge.

23           So when a customer, when a customer purchases by

24  credit card the credit card company or credit card processor --

25  in this case JetPay is a credit card processor -- funds the

1  escrow account directly.  The money is electronically

2  transferred from the credit card company or processor directly

3  into the escrow account.  Never passes through Direct Air's

4  hands, although even if one were to say that Direct Air had in

5  some fashion legal title at some point in the process, it goes

6  right into the escrow account.  That is required by the

7  Department of Transportation regulations.

8          In this particular case, JetPay processed a hundred

9  percent of the credit card transactions for Visa, MasterCard,

10 and Discover.  Now in our motion we left out Discover, but that

11 was a small fraction of the transactions.  It was almost all

12 Visa and MasterCard.  And every single credit card and debit

13 card transaction because the debit cards are also -- in the

14 industry they're really a form of credit and they're issued by

15 Visa or MasterCard.  So whether it's a, what we call a, in the

16 vernacular, a credit card or a debit card, if it's processed

17 through Visa, MasterCard, or Discover, then it goes, then it is

18 processed by our client, JetPay.

19         And the way JetPay processes it is that JetPay funds

20 it directly from an account at Merrick Bank, which is

21 represented here by Ms. Martin.  And the funds go directly from

22 Merrick Bank into the escrow account in accordance with wire

23 instructions that the escrow agent provided to JetPay at the

24 inception of the arrangement, which in this case would be late

25 2006.

Case 12-40944   Doc 57   Filed 04/02/12   Entered 04/02/12 10:47:50   Desc Main
Document      Page 13 of 70

**13**

```
 1           THE COURT:  There's also supposed to be

 2   identification, detailed identification of the charter flight

 3   and, and, and information that is supposed to accompany the

 4   money.

 5           How does that get to Valley Bank?

 6           MR. REIER:  Looks like --

 7           THE COURT:  I take it JetPay doesn't get involved in

 8   that?

 9           MR. REIER:  It's -- my understanding from the client

10   is that it is a service that our client does provide, but it

11   didn't provide it in this case.

12           So I don't -- I can't say I know.  I will only

13   speculate that it would be, come from the debtor.  But your --

14   but it is a very good question because the escrow agent is

15   responsible to establish an account for that charter.

16           THE COURT:  Right.

17           MR. REIER:  And the account doesn't have to be

18   literally a separate segregated bank account.  That can all be

19   done internally as an accounting matter.

20           So that's what we understand the escrow agent in all

21   events is required to do.  They don't get the information from

22   us to do that.

23           It turns out that they also -- AMEX also processed

24   credit card transactions.  AMEX does not have an independent

25   credit card processor.  My understanding is they do it
```

1   themselves.  And we've since learned, since we filed the

2   motion, we got more information about what fraction they

3   represented and in their limited opposition they indicate that

4   it's approximately 10 percent and we agree with that figure.

5   That's consistent with our analysis of some historical

6   transactions.

7           So it would appear that about 90 percent of all the

8   credit card transactions are processed by JetPay through

9   Merrick and about 10 percent are processed by, by AMEX.  And

10  we're not aware of anything but credit card transactions.  It

11  is always possible that somebody arranged to send a check or

12  showed up at some office with cash.  We don't know, but we

13  would imagine that that represents a very minute fraction, less

14  than 1 percent of the transactions.  We're actually not aware

15  of a single instance, but it's possible.  Since this was all

16  done online, it's possible that somebody showed up in an office

17  with a check.

18          So those are how those transactions occur.

19          Now at the time that Merrick funds from JetPay's

20  account into the escrow account, Merrick, through an

21  arrangement that Ms. Martin can probably describe much better

22  than I can, acquires the credit card receivable arising from

23  that and in acquiring the credit card receivable from the

24  credit card company member banks it becomes liable to those

25  banks for any reversal of the charge.

**#12-40944**                                      **3-23-2012**

1          So if there's a reversal of the charge or there's a

2    chargeback and somehow the credit card company determines that

3    the customer should not have been charged or it should be

4    reversed, then they can go to Merrick and demand some

5    indemnification from Merrick.  Under Merrick's arrangement with

6    JetPay, JetPay indemnifies Merrick.  So Merrick automatically

7    goes right into JetPay's account and pulls the money out of its

8    account.

9          So whenever's there a chargeback, within a matter of

10   about 24 hours this series of indemnifications occur and JetPay

11   is immediately hit.

12         Now the practice for the past five years with the

13   escrow account is that when JetPay's account was hit, let's

14   just say a typical case would be where a charter was cancelled

15   and the customer obtained either a refund, which would be a

16   reversal of the credit charge, or obtained a, obtained a, a,

17   was awarded or granted a chargeback from its credit card

18   company, then JetPay would be liable for that and would have to

19   pay that out of its account with Merrick and JetPay would

20   submit, make a submission to the escrow agent for that charge

21   and the escrow agent would honor it.  And this happened for

22   about five years.

23         And the way I think about this legally is simply that

24   whereas the escrow agent is required to pay the charter

25   participant, where we pay -- effectively -- "we," JetPay, paid

1   the charter participant through this indemnification.

2   Effectively, we're subrogated to the charter participant and

3   that's how the money comes back and that works very well for

4   credit card transactions and all of this happens virtually

5   instantaneously, within a business day.

6            So that's, that's how it worked for five years.  And

7   then when -- at some point in time -- and we don't know all the

8   circumstances surrounding it and I'm sure the debtor will have

9   something to say about it -- at some point in time the business

10  ceased operating and all the flights were cancelled and the,

11  and immediately, customers began to claim chargebacks.  At the

12  same time Direct Air filed this Chapter 11 petition and while

13  the petition was filed, you have all these customers trying to

14  get their money back in some way.

15           The Department of Transportation published a, what

16  they call Transportation Facts on, I believe this might have

17  been published even on Direct Air's website, but they published

18  it somewhere where it can be seen by anyone, advising people,

19  advising all customers of Direct Air to claim chargebacks.

20           So we had sort of a massive claim by customers of

21  chargebacks and they were entitled to that by their contracts

22  with their credit card companies and, and, as I understand, by

23  federal law they're, the credit card companies have to honor it

24  in, certainly, these kinds of circumstances, as far as we can

25  tell, and, as a result of that, JetPay's account has been

1   getting hit on a daily basis.  It will eventually run out of

2   money.  At some point when it runs out of money, it is

3   potentially out of business.  Merrick will then, of course, be

4   stuck at that point.

5        So -- so this -- that's what's happening right now and

6   the -- of course -- and the escrow agent at that point when

7   JetPay went back to the escrow agent to try to get reimbursed

8   the escrow agent essentially dishonored the, you know, failed

9   to honor the drafts that were submitted.  As we understood at

10  the time, although I think the reasons now have evolved, it was

11  because of the bankruptcy filing.  I think now, my

12  understanding is, the escrow agent is very uncomfortable with

13  the multiple claims that are being made on the escrow and the

14  insufficient funds that are available and are not as a

15  practical matter, whether or not relief from stay were granted

16  here, is not going to voluntarily make decisions about who to

17  pay and how much to pay the people making claims, certainly not

18  without some guidance from other parties, or an agreement, or a

19  court order, or something, and we have yet to -- I'll get to

20  that later on as to how that may evolve.

21       One of the things that's pretty clear from all of the

22  filings that have been made -- except I haven't seen the

23  debtor's objection -- is that there seems to be consensus among

24  every party having an interest in this that this is not

25  property of the estate and we have a First Circuit decision,

1   which is cited in the brief, which specifically holds that a

2   debtor's interest in an escrow account, if that interest has

3   been extinguished by the failure of a condition, is not

4   property of the estate.  And, and there's many other decisions

5   that are consistent with that.  And I believe that Merrick also

6   filed a joinder this morning and cited additional case law to

7   that effect.

8           There can be no question here that this is an escrow

9   arrangement apart -- it's not just because people called it an

10  escrow account or -- it's not just because the bank itself

11  called it an escrow account and people called it that and in

12  the bank's mailing instructions they refer to all mail has to

13  go to the bank, Attention: Global Escrow.  That's in the

14  correspondence.  That's attached to one of the exhibits.  It's

15  not just that.  I mean, it's that the -- it fits the classic

16  definition of an escrow.  Under -- I did cite Massachusetts

17  law, which the First Circuit had used, had applied.  Under

18  Massachusetts law, to deposit a sum in escrow is simply to

19  deliver it to a third party to be held until the performance of

20  a condition or the happening of a certain event.

21          That's exactly what we have here.  The conditions are

22  somewhat complicated, but that is a situation.  The escrow

23  agent has no authority to honor any request of any party for

24  the money in the escrow unless certain conditions are met and

25  only upon those conditions can Direct Pay [sic] get that money.

```
 1  In this case, the conditions can never occur because JetPay is
 2  -- Jet -- I'm sorry --
 3          THE COURT:  So, so segre --
 4          MR. REIER:  -- Direct Air -- excuse me --  Direct Air
 5  is grounded.
 6          THE COURT:  Segregation identification is not,
 7  according to that definition, a requirement for an escrow
 8  account under Massachusetts law?
 9          MR. REIER:  No.  No.  There's no requirement, no.
10          THE COURT:  Because I was struck by the, the language
11  in the charter agreement, which, which, which specifically
12  permits use, commingling of these funds into the general bank
13  funds and the ability of the bank to use these funds --
14          MR. REIER:  Yes.
15          THE COURT:  -- which to me seemed the antithesis --
16          MR. REIER:  Well --
17          THE COURT:  -- of an escrow.
18          MR. REIER:  -- our view about it is that from the
19  bank's point of view it's treated like a bank account.  It's
20  not -- the bank is not a custodian in that sense, but it's a
21  bank account and the bank is responsible to manage the account.
22  But just like any other bank account, a bank can take those
23  funds and commingle with its own funds in the same way that --
24  but, of course, a debtor cannot commingle this.  This is, this
25  is in one account at the bank and only one account at the bank.
```

1         So I -- in the end, when we reviewed that provision,

2    we understood that to mean nothing more than that the bank can

3    treat it like a bank account and take it in as, in, in that

4    fashion.  Of course, the bank is liable from its own funds to

5    honor the, the, its obligations under the escrow agreement.

6         The Black's Law Dictionary defines escrow as "the

7    general arrangement under which property is delivered to a

8    third person until the occurrence of a condition."  That's it.

9    And that's quoted in the -- that -- that -- that definition is

10   endorsed by the First Circuit as well in the case, Mercurius

11   Investment Holding v. Aranha, that we cited in our, in our

12   papers.

13        So in addition, the Department of Transportation sets

14   up this arrangement precisely to create an escrow.  That's the

15   very purpose of the regulation, which is 14 CFR § 380, and I'm

16   sure that the U. S. Attorney's Office can speak more to that,

17   obviously, when they have an opportunity to speak, but the very

18   -- that's the -- the purpose of the regulation is to create an

19   escrow and to protect the consumers, which, in our case, the

20   consumers are protected by their chargeback provision.

21        So the credit card companies or the credit card

22   processors are, therefore, by subrogation step into the rights

23   of, of the consumers and I think they can speak to that as

24   well.

25        So I don't see how under these facts that I've

1    described, which are substantially undisputed, I don't see how

2    any court could find that this is not an escrow.  The money is

3    deposited.  JetPay -- Direct Air's right to the money is

4    subject to a condition and in this particular case since the

5    condition cannot occur since all the flights are cancelled,

6    they're grounded, they have no authority to fly anymore --

7    they're not likely ever to fly again.  They're certainly not

8    going to fly on the, on the charters that were previously

9    scheduled -- their property interest, if they ever had a

10   property interest in the escrow, is extinguished and the escrow

11   funds are not property of the estate.

12           Now I just wanted to touch on a couple of the limited

13   objections that were filed by some of the other interested

14   parties.

15           One of them was filed by, by the escrow agent, Valley

16   National Bank, and as I read their limited objection, they

17   don't object in principle to the relief that we're seeking, a

18   determination that's property of the estate and a, and that the

19   automatic stay doesn't apply and the parties can proceed

20   accordingly.  They did object to the wording of the proposed

21   order that was submitted.  If the Court were inclined to grant

22   the relief that we're requesting, at least to grant it in

23   principle, I have no doubt that the parties can sit down and

24   work out, work out language that we can agree to.  Because even

25   the language that Valley National Bank suggested as being more

1    appropriate is very much all we're really asking for, anyway.

2    That's all we're trying to do.  We're not asking the Court to

3    say that JetPay has a right to it or, or AMEX has a right to

4    it, or anyone in particular has, has a right or doesn't have a

5    right, just that it isn't property of the estate.  It's not

6    part of the jurisdiction of this Court to adjudicate and bring

7    it in for general distribution to creditors.  It's not, it's

8    just not in the estate.

9          Now another limited objection was filed by AMEX.  I

10   think I've already addressed it in the, in, as a matter of

11   course, except for one point.  They, they note that they are 10

12   percent of the charges.  I mean, nobody knows exactly what the

13   percentages are, but we accept that as a fair approximation.

14   They're probably 10 percent of the charges.  I think that they

15   indicated -- I don't have the figure in front of me -- but I

16   think that they thought that they had approximately a $2

17   million liability, I believe, that's outstanding in current

18   chargebacks.

19         So, obviously, they're a claimant, too, just as we're

20   a claimant, to an escrow fund that isn't sufficient to satisfy

21   all the claims to it.

22         They, they indicated in their opposition that they

23   would -- they agree it's not property of the estate, but they

24   would like the Court to retain jurisdiction to resolve this.

25   And our view about it -- and I did discuss it with them before

1   the, the hearing -- our view about it is that they, is, is that

2   we're not completely confident that the Court has jurisdiction

3   to adjudicate a dispute over something that's not property of

4   the estate among non-parties.

5           So we, we would be a little bit concerned about the

6   Court entering a final order to adjudicate the dispute and then

7   only find that it, in the end, it, it, it's reversed on the

8   grounds that there's no subject matter jurisdiction.  But

9   obviously, we believe that if, all things being equal, this

10  would be a fine place to, to adjudicate it.

11          And, you know, our, our real reason is, to favor being

12  outside this Court, is that we believe that, that in the end

13  the only parties that really have an interest in this money and

14  in, and in recovering any money that was wrongfully, wrongfully

15  dissipated from the escrow fund, or any parties that might be

16  liable for it, are the parties that are the beneficiaries of

17  the escrow account.  And through the subrogation that I

18  mentioned before, that would be JetPay and possibly Merrick,

19  which is on the same side as JetPay, and, and AMEX.

20          Now there may be a dozen or so charter participants

21  out there that we don't know about that have, for whatever

22  reason, have lost the right to a chargeback or didn't have a

23  right to a chargeback and they've made a direct claim on the

24  escrow fund and we have no doubt that -- if that's the number.

25  I don't think we're dealing with thousands of people.  I mean,

1   this is -- we expect that there's a handful of individuals out

2   there that, in one way or another, kind of fell through the

3   cracks -- they'll be, they'll have to be dealt with.

4         And there's no reason why JetPay, Merrick, AMEX, if

5   the Department of Transportation believes that it is

6   appropriate to be involved and want to be involved -- nobody is

7   going to say, "You can't be involved" -- and the escrow agent

8   can't get together and figure out a resolution.  If we're

9   unable to, we'll have to find a court to do that and that might

10  happen or if -- but we assume that if the escrow agent dotted

11  its i's, crossed its t's and did what it was supposed to do as

12  an escrow agent, it would, there'd be no problem getting

13  information from it so we could figure out what happened and

14  divvy up the money in a fair and equitable way.

15        So, so we don't really see the need at this point for

16  any court supervision over that.  If we can't resolve it, we

17  can't resolve it.  But in the meantime, we just think it would

18  be better to, to take our issue and separate it from all the

19  other issues that may go on in this case.  However, whether

20  this case remains in a Chapter 11 or a Chapter 7, or whatever

21  happens, we don't want to be a part of this.  We just want to

22  figure out what to do with this, these funds, which are not

23  property of the estate.

24        Let me just see if I left out one of the, one of the

25  other limited objections that was filed.  I think I've caught

1  them all.

2        I note that Merrick had, Merrick Bank had, which is

3  our bank, filed a joinder.  They essentially are in the same

4  position that, that we're in.  And we may have our own issues

5  as to our own relationship and what our rights and obligations

6  are to one another, but that's immaterial here and we're not --

7  right now, today, we're on the exact same side.  We're in the

8  exact same position and I believe that they supplemented my

9  motion with some additional law to support the proposition that

10  this is not property of the estate.

11        So again, if the Court were, were inclined to grant

12  the relief that we're seeking, we believe that we could get

13  together with the other parties and hammer out an order that

14  the affected parties would, would agree to.

15        I have nothing more to add, Your Honor.

16        THE COURT:  What about getting together and hammering

17  out an order first and then coming back here once you have the

18  deal?  Is there any reason why you couldn't do it that way?

19        MR. REIER:  Oh, we, we would --

20        THE COURT:  What does getting relief from stay do for

21  you in terms of, of the objective, which is to see whether you

22  could come up with a global agreement to dispose of the money?

23        MR. REIER:  That may be weeks in the making.  I mean,

24  there's a lot of information we have to get.  We have to get

25  information from the bank.  We -- our view is let's get out of

1    the court now and let's just see what we can accomplish as

2    quickly as we can.  That, to us, is the most practical and, and

3    efficient way, rather than to continue to come back to this

4    Court.

5         THE COURT:  A couple of questions just to make sure I

6    understand the numbers.

7         You started out by saying that there were $4 million

8    in chargebacks.  Is that the estimated total universe of

9    chargebacks that Jet --

10         MR. REIER:  No, those are chargebacks just to date.

11         THE COURT:  Already?

12         MR. REIER:  Yes.  And there's still, we think, about

13    45 or 50 days remaining at least when customers have a right to

14    continue chargebacks.

15         THE COURT:  Do you have the ability to calculate what

16    the total potential chargebacks are?

17         MR. REIER:  No.  We -- we don't -- I, I don't think we

18    have that ability.

19         Is that --

20         No.  We, we do not have the ability.  And the reason

21    is that we do not have the flight information.  So we don't

22    know what flights were cancelled and which ones were flown.

23    We're not -- we, we don't have that information.  We can't make

24    that calculation.

25         THE COURT:  So --

1        MR. REIER:  We believe it's, it will approach in

2   excess of $10 million, at least.

3        THE COURT:  Right.  Because what's, what's puzzling me

4   is that you said that AMEX is a small percentage, 10 percent,

5   right, and yet you have four million and they have two million

6   in chargebacks.

7        So the, there is a disconnect in the percentages.  How

8   -- how --

9        MR. REIER:  We don't know.  It -- you know, I can only

10  say that it may be that their chargebacks get processed much

11  faster than ours.  But the 10 to 90 percent ratio is based upon

12  a history of the actual purchases of charter tickets.

13       So there may be all kinds of reasons that the

14  chargebacks come back differently.  I suppose it's possible

15  that the AMEX flights were all cancelled and ours, fewer of

16  ours were cancelled, but there's no reason to think that there

17  isn't, in the end, going to be a similar pro rata.  AMEX seems

18  to think that as well.  So I --

19       THE COURT:  Okay.

20       MR. REIER:  We don't really know at this point.

21       THE COURT:  All right.  Thank you.

22       MR. FOX:  Your Honor, good morning.  Steven Fox,

23  Riemer & Braunstein, on behalf of the debtor.

24       Your Honor, just a housekeeping matter, first, before

25  I begin.

1        Last evening, or late yesterday afternoon, debtor did

2    file an application with Your Honor, or with the Court, seeking

3    authorization to retain Riemer & Braunstein as counsel to the

4    debtor.  That filing was also accompanied by a series of *pro*

5    *hac vice* applications, which I do not believe Your Honor has

6    had an opportunity, given the timing, to address and, and deal

7    with.  We would appreciate the opportunity to be heard today in

8    connection with these matters on behalf of the debtor.

9        THE COURT:  I take it you're one of the subjects of

10   the *pro hac* --

11       MR. FOX:  I am, Your Honor.

12       THE COURT:  -- requests?

13       MR. FOX:  I have appeared before this Court before.

14   I'm a member of the bar of the State of New York in good

15   standing and have, as I said, been before the Judges in this

16   District on many occasion previously.

17       THE COURT:  Okay.  I'll hear you.  Go ahead.

18       MR. FOX:  Thank you very much, Your Honor.

19       Your Honor, we did have an opportunity, as I believe

20   Mr. Reier indicated in his introductory remarks, to have a

21   series of conversations and, and in-depth dialogue with both

22   his office as well as counsel to Merrick Bank concerning the

23   issues surrounding the motion before the Court today.

24   Regrettably, we were not able to arrive at a resolution of that

25   motion and we appear here today, Your Honor, first and

1    foremost, not to be an impediment to a process, but, rather, to

2    argue in favor of just that, a process.

3          I think, Your Honor, the best place to start because

4    Mr. Reier did it in a rather short-form manner and with the

5    Court's indulgence, I think it makes sense to start at the

6    beginning, put this motion in a little bit of context.  We do

7    have scheduled before the Court on April 7th our initial case

8    conference so this sort of predates that by about a week, but I

9    think it's best to put this in context by going back to the

10   beginning and again, with Your Honor's indulgence.

11         As Mr. Reier indicated, Direct Air is not a scheduled

12   air carrier.  It is not an airline.  It is, instead, a charter

13   tour operator.  It is governed by a different set of rules than

14   airlines in the common vernacular, such as an American Airlines

15   or a Delta Airlines, or the like that do provide scheduled

16   service, but the differences between the two types of

17   businesses is far greater and more in-depth than simply the

18   difference between one having a schedule and the other not.  In

19   fact, we do have a schedule, or did when we were operating have

20   a schedule, but for today's purposes the differences that are

21   relevant is the manner in which money received from customers

22   had to be handled.

23         Under 14 CFR 380, which is, in fact, the correct

24   regulation that we operate under, Direct Air, as distinguished

25   from a scheduled air carrier, was required by law, federal law,

```
 1   that is, to segregate and escrow supported by surety bonds

 2   funds received from charter participants, our customer, so to

 3   speak, until such time as we flew.  Once we flew, there were

 4   certain circumstances in which money could be released from the

 5   escrow that was established and certain conditions to those

 6   withdrawals from an escrow had to be met and those are set

 7   forth in our escrow agreement and under 14 CFR § 380.

 8            Direct Air has been operating for a period of years

 9   under this construct and as I'll address in a moment, the use

10   of the vernacular, or the term "escrow," or the denomination of

11   the agreement which is annexed to Mr. Reier's motion as an

12   escrow agreement may be subject to some sort of interpretation

13   or debate, as well as what law will ultimately apply to whether

14   or not it is, in fact, an escrow agreement or an escrow, for

15   that matter.

16            THE COURT:  Is the debtor taking the position that the

17   funds at Valley National Bank are not an escrow account?

18            MR. FOX:  Today, Your Honor, the debtor is not taking

19   the position that this is not an escrow account.  What the

20   debtor is going to suggest to Your Honor, it is premature to

21   make that determination.  The U. S. Trustee is going to,

22   hopefully, form a committee in this case.  The debtor believes

23   it is appropriate to consult with a committee as to exactly the

24   nature and function of this escrow and to assess with a

25   committee as to whether or not this is, in fact, an escrow.
```

1          Mr. Reier in his presentation made much about

2     Massachusetts law determining definitively that this is, in

3     fact, an escrow and that there is no possible alternative

4     interpretation.   To that, I do not necessarily disagree, but

5     would note the following:

6          First, it is clear that there is a shortfall in this

7     escrow.   The circumstances under which that shortfall has

8     arisen and why it is, in fact, the case may, indeed, impact

9     upon whether or not this is, in fact, a true escrow under

10    applicable law.   It is our belief, although we have not had an

11    opportunity to fully vet out all the facts and investigate the

12    applicable law and circumstances, that the escrow was invaded.

13    It may have been invaded in a wrongful manner.   There are

14    certain irregularities relating to the treatment of this escrow

15    and the use of the funds in the escrow and, therefore, there

16    may be circumstances in which the escrow was used and invaded

17    inconsistent with the conditions precedent that Mr. Reier

18    indicated which, thus, may defeat its existence or its

19    treatment as a true escrow.   And there's plenty of case law

20    across the country dealing with escrow agreements that while

21    denominated as such are not, in fact, escrows.

22         But I want to be clear, Your Honor.   We do not today

23    take the position it's not, but we'll caution and counsel the

24    Court to take, to show patience and proceed cautiously before

25    making a summary determination that it's not, certainly before

1    there are other constituencies in this case who may have an

2    interest in that determination who are not before the Court

3    today.

4           Separately, Your Honor, Mr. Reier in his --

5           THE COURT:  Is there a date scheduled for a formation,

6    committee formation meeting yet?

7           MR. KING:  Good morning, Your Honor.  Richard King for

8    the U. S. Trustee.

9           The answer is, no, not yet.  The 20 largest was just

10   filed on the 21st, Your Honor.  We'll probably be setting

11   something up the week after next.

12          THE COURT:  Okay.

13          MR. FOX:  I would also, Your Honor, if I may, point

14   out to the Court that Mr. Reier, and I believe Merrick Bank

15   also, do rely upon Massachusetts law and its treatment of

16   escrows.  The parties should and the Court should be aware that

17   the escrow agreement in question is not governed by

18   Massachusetts law but, instead --

19          THE COURT:  I saw that.

20          MR. FOX:  -- by New Jersey law --

21          THE COURT:  Yeah.

22          MR. FOX:  -- as well as implicated by federal law,

23   including but not limited to, 14 CFR 380.

24          Last, with respect to the is it or is it not property

25   of the estate question, Your Honor, and is it or is it not a

1   true escrow, certainly 14 CFR 380 contemplates and requires the

2   establishment of an escrow to protect the charter participants

3   and their deposit of funds in that escrow.  Saying it doesn't

4   necessarily make it so and, therefore, while it's contemplated

5   as a matter of statute and regulation that that's what was

6   supposed to happen, that doesn't necessarily dictate that, in

7   fact, did happen and there are a lot more facts that need to be

8   borne out, a lot more investigation by interested parties, some

9   of whom are here today, but not all of them are here today and

10  those parties are entitled to be heard from and spoken, and

11  speak to these issues.

12          Your Honor, just a little additional background on, on

13  some of these issues.

14          Direct Air's been operating for a period of years

15  under this construct.  It has been flying successfully on these

16  charter service and tours.  It has, as Mr. Reier said, had a

17  course of dealing both with the Department of Transportation,

18  it has a course of dealing with its customers, local airports,

19  suppliers, vendors, aircraft carriers and suppliers, as well as

20  the banking paradigm that Mr. Reier described between Merrick

21  Bank, JetPay, AMEX, and others.

22          In late September, there was a transaction in which

23  Avondale Partners acquired a controlling stake in the equity

24  interest of this debtor.  Under that transaction, old

25  management and the prior owners maintained a significant, yet

1   minority interest in the company.  They likewise maintained

2   continued operational control of the business and Avondale was,

3   in effect, a silent equity player not involved in the day-to-

4   day management.

5        Approximately three or four days before the

6   commencement of this case in this Court, prior operational

7   management, led by Ms. Tull and, and Marshall and Kay Ellison,

8   much like the Baltimore Colts, left under cover of darkness,

9   vacated the offices, packed up their offices, took with them

10  what they took, all of which we do not presently know, and

11  abandoned the debtor.

12       Upon learning of this waking up Monday morning before

13  the filing, Avondale Partners parachuted in a new team, started

14  a process to, of triage with, in cooperation with the

15  Department of Transportation, cancelling flights, notifying

16  customers as best they could, working with the DOT to

17  reschedule people who were stranded in various airports looking

18  to get home.  We furloughed employees.  We secured assets and

19  records, to the best of our ability, including, but not limited

20  to, the various bank accounts that were in existence and

21  including the Valley Bank escrow account.

22       We also started coordinating with the DOT over dealing

23  with customer issues, as described by Mr. Reier, which

24  ultimately led to a notification being issued by the Department

25  of Transportation to customers as to, among other things, their

1    potential rights to refunds.  The DOT, unlike Mr. Reier's

2    characterization, the DOT did not direct people in that

3    notification to any particular course or recourse, but, rather,

4    suggested various alternatives that may be available.  And

5    "may" is very important because that is covered not only by the

6    terms of the escrow agreement and federal law, but also their

7    individual contractual relationships with their personal credit

8    card issuers.  And it's important to note, as the DOT noted in

9    its notification to customers, that there are significant

10   differences between rights of parties who use debit card

11   transactions and credit card transactions, some of which are

12   protected by federal law and some of which are not and some of

13   which may have differing chargeback rights.

14        So where we're, where we started, Your Honor, was an

15   emergency situation.  We immediately went into a triage mode.

16   We replaced, because they had abandoned the debtor, old

17   management with a new management team whose responsibility was

18   to coordinate efforts, to safeguard assets and records, and

19   then begin the process of rebuilding.

20        First and foremost in that process is investigating as

21   to what happened here.  That is a process that is starting and

22   will continue, we suspect, for some time to figure out what

23   happened, not only what happened with the overall finances of

24   the company, what led to the circumstances for a, you know, a

25   summarily, a summary shutdown of operations, but also what

1   happened with this escrow.

2          What we can tell you is, insofar as our plans going

3   forward, Mr. Reier suggested that we are not going to fly the

4   charters that have since been cancelled.  That's likely true.

5   What we can also say in disagreement with Mr. Reier is that it

6   is our goal, it is our hope, and certainly we will be planning

7   in the coming days and weeks, to develop a plan which will

8   enable us to fly again.  We have new management who's committed

9   to this process.  We have a new team on the ground who is, who

10  has clean hands and who was not involved in the prior, any

11  prior potential irregularities or the like and in order to

12  preserve an investment that they made, are fully and purpoly

13  [sic] motivated to see if a business plan can be developed

14  which will enable us to get back in the air in the not too

15  distant future.

16         Now by saying that, Your Honor, I don't want to

17  suggest to you that we don't recognize that there are some

18  significant and material components to accomplishing that, not

19  all of which are within our control.  Just to name a few, we're

20  going to need money.  We are going to need aircraft, fuel.

21  We're going to need to rebuild some customer confidence because

22  we assume there is very little or none today.  We're going to

23  need to rebuild relationships with airports and not least,

24  we're going to need to establish some confidence with the

25  Department of Transportation so that they'll reissue a charter

1    and let us fly and let us issue charter reservations again.

2         All of these are significant.  Some of them may be

3    insurmountable, but there is no lack of desire on our part to

4    try and accomplish all of these things in a short period of

5    time and efforts are underway to accomplish that.  We believe,

6    of course, that we can't make these decisions on our own.  We

7    encourage the U. S. Trustee to appoint a committee as soon as

8    possible and we understand the circumstances and some of the

9    delays in that process resulted from us and our inability to

10   access records as expeditiously as we would have liked and

11   certainly as expeditiously as they would have liked to start

12   that process of committee solicitation.  But that information

13   is available now.  It will start.  A meeting will be set, a

14   committee will be formed, hopefully, and then we can start

15   having a dialogue with a committee and, hopefully, its

16   professionals as to where we go from here.

17        So that's kind of the background of how we got here

18   and where we hope to go.  Let's talk about the escrow.

19        Your Honor, the escrow is not, as Mr. Reier indicated,

20   the only source of recourse for the customers.  There is a

21   surety bond.  It is with Platte River Insurance Company, it is

22   in the amount of $200,000, and they are not here today.  And

23   they were not noticed on this motion, as far as we are aware,

24   and know nothing about it.  They certainly have an interest in,

25   in the mechanics of how customers' claims are reconciled

1   because, certainly, the, the Department of Transportation and

2   its alert and notification to customers did, in fact, indicate

3   that that surety bond is out there and furthermore, told people

4   how to go make claims and gave them an address to do so.

5        So there are competing interests with respect to how

6   refunds to customers are, are to be made and competing sources

7   of funds to do so.  And the surety bond process is entirely

8   independent and separate from the escrow process and entirely

9   different from the chargeback process with the customers, which

10  is a direct relationship between the credit card processor and

11  the credit card issuer and the customers themselves and not

12  necessarily directly related to the escrow agreement,

13  notwithstanding what the pre-bankruptcy course of conduct may

14  have been.

15       THE COURT:  But are you suggesting that if the surety

16  company were to pay a claim by a disappointed customer, that it

17  would not have rights in the escrow fund, in the Valley

18  National Bank account?

19       MR. FOX:  What I can tell you, Your Honor, is that

20  there is nothing in the escrow agreement itself which grants a

21  right directly to the surety company to reach into the escrow

22  account.

23       While we're on that subject, the same answer applies

24  with respect to Merrick Bank, JetPay, and AMEX.

25       THE COURT:  Right.  'Cause it all talks about --

```
 1            MR. FOX:  None of those --

 2            THE COURT:  All it says is the charterer or the

 3   customer has the right, but what does that mean?

 4            MR. FOX:  Well, it's an interesting question, Your

 5   Honor.  The escrow agreement does provide that charter

 6   participants have a right to be reimbursed when a charter is

 7   cancelled by check directly by the escrow bank, Valley

 8   National.  It grants no rights to reimbursement and grants no

 9   subrogation rights to JetPay, Merrick Bank, AMEX, or any, or

10   Discover, or anybody else.  They regrettably, I believe the

11   answer is, are creditors of this estate.

12            THE COURT:  Who?

13            MR. FOX:  JetPay, Merrick Bank, and others.

14            THE COURT:  But what about the course of conduct?

15   That's -- historically -- you don't disagree that historically

16   every time, before this collapse, every time a customer was

17   entitled to a refund on a transaction JetPay, the money flowed

18   right back through JetPay to Merrick?

19            MR. FOX:  Your Honor, what I -- my response --

20            THE COURT:  So Valley was releasing the funds not to

21   the customer.

22            MR. FOX:  My response to that, Your Honor, is the

23   follow, is as follows:  I don't know.  We don't know 'cause we

24   haven't had an opportunity in bankruptcy one week to examine

25   all of these details in less than 48 hours after this motion
```

1  was filed.  What we do know is we have safeguarded the money in

2  cooperation with the DOT and ensured that Valley does not issue

3  any more releases of funds from this account.

4        It is -- it may, in fact, have been the course of

5  dealing and I do not doubt Mr. Reier's statements and his

6  client is maybe more familiar than the people who are currently

7  in charge of the debtor's operations.  We'll find out and it

8  becomes more of a question of timing than it does a development

9  of the facts.  The facts are, will be what they will be, but

10  now that we are in bankruptcy and now that we have to assess

11  whether or not this is a true escrow and whether or not it is,

12  in fact, or not property of the estate and whether this Court

13  does or does not have jurisdiction to deal with it, it does,

14  that's a determination that doesn't have to be made now and in

15  particular, it doesn't have to be made now, given that not all

16  of the parties who are potentially interested in the outcome of

17  this proceeding are before the Court.

18        But what we also do know is that based upon our

19  preliminary calculations and a review of records, which is

20  still ongoing, that, as Mr. Reier indicated, there is a

21  shortfall and it's substantial and it's going to be in the many

22  multiples of millions of dollars.  I have heard numbers as

23  high, as low as 10 and maybe as high as 30.

24        So in this regard, Your Honor, there are quite a few

25  issues that need to be developed and the timing of this is

1   going to be quite important and if, in fact, the course of

2   dealing that Mr. Reier suggested existed prepetition did, in

3   fact, happen that way, there is question as to whether or not

4   that course of dealing undermined the treatment of this as a

5   true escrow.  Because certainly, that treatment did not comport

6   with the terms of the escrow, itself.

7           In addition, Your Honor, there's a real question in

8   our mind -- and again, it requires a significant and

9   substantial factual development -- as to whether or not the

10  debtor does, in fact, have an interest in the funds, albeit

11  less than we anticipated, but whether those funds that remain

12  do have any rights back into the debtor and its estate.

13          Your Honor correctly noted in your remarks earlier in

14  asking questions to Mr. Reier that the escrow agreement

15  contemplates that the money doesn't just go into the escrow,

16  but the debtor is supposed to provide the bank with information

17  concerning who the charter participants are, the nature of the

18  charter, when it's supposed to fly, and the like so that the

19  bank can identify with specificity who the charter participants

20  are who might be entitled to an escrow refund.  We're not

21  certain that happened in the level of detail that it did, that

22  it was supposed to.

23          The escrow agreement also contemplates that separate

24  accounts were supposed to be set up for each charter.  We don't

25  believe that took place.  And we don't assert any criticism on

1   Valley Bank with that regard, but the escrow agreement

2   certainly does not contemplate that it was supposed to be done

3   in the nature of an accounting practice, but, rather, by

4   setting up separate escrow, separate accounts for each charter.

5           Why I raise this point, Your Honor, is that until we

6   can figure out and trace back exactly what that million dollars

7   represents and the nature of, which is the approximate balance

8   of the escrow today, until we can trace back exactly where that

9   million dollars comes from, what charters it relates to, and

10  what charter participants have or have not already received

11  refunds through chargebacks or other means, right, and who has

12  or has not flown -- some charter participants may have flown

13  one leg of their trip and not the return trip, depending upon

14  where they stood at the time that operations ceased last week.

15          And just as an aside, when we booked a round-trip

16  charter for people, we booked each leg as a separate charter

17  trip.  So some people completed part of the, their charter and

18  not other parts and we may have an instance where there are

19  certain charters that were completed which may enable the

20  debtor to reach in and claim some of the funds in that escrow,

21  or maybe not.  We just don't know the facts yet.

22          So to permit a circumstance where Mr., that Mr. Reier

23  is advocating is that the people in this room go into a back

24  room and decide to whack it up themselves in the manner that

25  they think is equitable may not comport with what is, in fact,

1   truly equitable to all the stakeholders in the estate as

2   opposed to just the stakeholders within this room and with

3   regard to the escrow.  Because, as I said earlier, customers

4   aren't here, committee's not here, and the surety's not here.

5          It is our intention and our goal, Your Honor, to move

6   as expeditiously as possible with a committee to figure all

7   this out.  There is likely going to need, be a need for some

8   forensic accounting work to get down to the level of granular

9   detail necessary to figure this out.

10          Now I say all this but, you know, with a view to, as I

11   said earlier, to counsel the Court where, to the extent it's

12   not arrogance on my part to do so, but to suggest and urge this

13   Court to, to proceed cautiously and with patience.  We've been

14   here just a week.  We say that without, not without empathy and

15   sympathy to the circumstances being faced by our credit card

16   processors and, frankly, with Valley National Bank, who's

17   caught in the middle here, but we just don't know enough in

18   order to resolve all of the multitude of issues that relate to

19   this escrow account.

20          What we hope to avoid, as we put in our response filed

21   earlier this morning, is a run on the bank.  We hope to avoid,

22   as everybody should, inconsistent claims being made by multiple

23   parties and creating more chaos and more disagreement and more

24   confusion than may already exist.

25          There's a process in work right now, and it is

1    working.  Customers are processing chargebacks and they are

2    being responded to by JetPay, which is their contractual

3    obligations to those customers.  If we have a contractual

4    obligation to reimburse JetPay, Merrick Bank, AMEX, or others,

5    we have separate contractual obligations to do so with each of

6    those, those parties and they will be entitled to assert claims

7    in the estate.  If they have rights to claim by subrogation or

8    otherwise from the customers that they reimburse, those claims

9    may or may not go directly into the escrow or may be better

10   directed to the estate and through the claims process that will

11   unfold here.

12        I did not hear Mr. Reier, nor do I believe Merrick

13   Bank, AMEX, or anybody else is going to waive their claims

14   against this estate such that Your Honor won't have

15   jurisdiction over them at some point in time, if not already by

16   virtue of the filing of the motion, the joinder in that motion

17   by, by Merrick Bank.  They came to this Court.  They've asked

18   for relief.  They, therefore, submitted to the jurisdiction of

19   this Court and that's not limited.

20        THE COURT:  Mr. Reier was talking about subject matter

21   jurisdiction.

22        MR. FOX:  Understood, Your Honor, but in order to

23   determine subject matter jurisdiction you must rule on whether

24   or not this is, in fact, an escrow and property of the estate.

25   They have not cited correct law, they have not cited the

1  correct regulations, and I don't believe you have either the

2  facts or the law before you to make that determination, nor

3  would I submit do you need to make that determination today, as

4  I said, until all of the parties have had an opportunity to be

5  heard on that.  I stand on behalf of the debtor.  We have a

6  fiduciary duty to all parties in the estate, creditors,

7  shareholders, and the like, but we don't represent them all and

8  they are separately rep, or will be separately represented and

9  have a right to be heard on these issues.

10       I would also, Your Honor, point out that the process

11 that is advocated by JetPay today is to effectively treat them

12 as if they were a secured creditor so that they could reach

13 into the escrow account maybe by agreement of parties or other,

14 or otherwise pursue that through a different court.  The record

15 is clear, or should be clear and their documents made clear,

16 they are not a secured creditor with respect to that escrow

17 account.  There is no control agreement in place.  There's no

18 contractual relationship between them and the bank and,

19 therefore, until this Court determines that, in fact, it is not

20 an escrow and not property of the estate, they are asking you

21 to establish a priority scheme that doesn't otherwise exist by

22 contract or law.

23       In this particular instance, Your Honor, I would refer

24 the Court to a case entered, I should say issued or a decision

25 issued by the Seventh Circuit Court of Appeals some 40 years

1   ago dealing with the predecessor to 14 CFR 380 and the prior

2   Bankruptcy Act, but the facts and the guidance by the Seventh

3   Circuit, I think, is equally applicable under today's statutory

4   construct.  And that's <u>Civil Aeronautics Board</u> versus <u>Tour</u>

5   <u>Travel Enterprises, Inc.</u>, and that is 605 F.2d 998, a Seventh

6   Circuit 1979 case.

7          Your Honor, in that case the -- we were deal -- the

8   court dealt with, specifically, a charter carrier and operator,

9   as I said, under the prior statutory scheme, federal statutory

10  scheme, and under the prior Bankruptcy Act.  There was a

11  dispute over whether or not it was or was not property of the

12  estate.  The Seventh Circuit didn't reach that issue, but what

13  the Seventh Circuit did say was there are multiple parties who

14  have an interest and in reversing the bankruptcy court, or the

15  district court in that instance who had tried to establish a

16  priority scheme, in effect a back room deal among parties to

17  whack up an escrow that had a shortfall, or an apparent

18  shortfall -- the numbers were very different because of the

19  time, the time period but, nevertheless, a shortfall -- and the

20  Seventh Circuit basically said, "That's inappropriate," and

21  counseled the courts to be patient and make sure that all the

22  parties were present and had an opportunity and a right to be

23  heard.

24         We ask Your Honor to, to show the same patience and

25  enable us to work with the committee and all the constituencies

1   to figure out what happened here and, and, and why and then

2   enable us in the context of this case to figure out how it is

3   the escrow should be dealt with.

4          Your Honor, I think that concludes my remarks.  If

5   Your Honor has any questions, certainly available to, to

6   respond to them.

7          THE COURT:  I have a housekeeping question.

8          We're more than a week into this case and I don't

9   think there's been a creditor matrix filed yet, has there?

10          MR. FOX:  There -- Your Honor, we are working to

11   complete that as expeditiously as possible.  I said we're

12   facing a few challenges because of the, the change in the

13   management and the manner in which they left the estate and the

14   manner in which they left the recordkeeping of, of the debtor.

15   We do have people who are working on that as hard as possible

16   and we expect within the next day or so that that will be

17   completed.  I have seen a draft of it.  We're just trying to

18   make sure we have it as accurate and correct as possible.

19          THE COURT:  Right, because until you get the matrix,

20   there's no notice of 341 meeting that's gone out in this case,

21   right?

22          MR. KING:  That is correct.

23          THE COURT:  And did you ask for an extension of time?

24   Because I don't think I've seen one.

25          MR. FOX:  We have not asked for an extension of time,

1   Your Honor, with respect to the matrix.  We have asked for an

2   extension of time by motion yesterday filed with respect to our

3   schedules.

4           THE COURT:  All right.  I'm ordering --

5           MR. FOX:  Since --

6           THE COURT:  -- that the matrix be filed by no later

7   than Monday.

8           MR. FOX:  We will do that, Your Honor.

9           THE COURT:  Thank you.  Okay.

10          Let me hear from Mr. Sternklar, I think the man of the

11   hour.

12          What's Valley Bank's position here?

13          MR. STERNKLAR:  Well, Your Honor -- Jeffrey Sternklar

14   for Valley Bank.

15          When we filed the limited objection, our concern was

16   that neither by implication or directly should this Court enter

17   any orders that alter or affect my client's contractual rights.

18          So if -- we are indifferent to whether the stay is

19   lifted.  We're indifferent to whether this is determined to be

20   property of the estate but beyond that, we're concerned that

21   some of the relief you're being asked to give will have the

22   effect, even indirectly, of altering the rights of the parties,

23   to the extent they exist at all, under the applicable contract.

24          There's been a lot of talk about whether this is an

25   escrow account or not.  From my client's point of view, this is

1   not an escrow account.  My client is not an escrow agent.  My

2   client's rights and obligations are as set forth in a contract

3   and it's very limited.  The word "escrow" nowhere appears in

4   this contract.  There are three --

5         THE COURT:  The contract you're talking about is the

6   Public Charter Depository Agreement?

7           MR. STERNKLAR:  Yes, Exhibit E -- excuse me --

8           THE COURT:  F.

9           MR. STERNKLAR:  -- F to the motion.

10        There are three parties to that contract, the debtor,

11  an entity called Sky King, Incorporated, and my client.

12        Now the contract provides that if we receive certain

13  notices from one or the other of these people or in other,

14  certain cases a third party, we've got certain obligations, but

15  the contract is clear that there are no third-party

16  beneficiaries -- Section 7.12 of the contract makes that clear

17  -- and that no party gains any rights under this contract under

18  any circumstances other than the parties thereto.

19        So if we start loosely referring to this as an escrow,

20  you start opening the doors to, well, who has rights and where

21  do they come from.  They clearly don't come from this contract.

22        Your Honor, my client largely is a stakeholder, but

23  not entirely.  Section 5 of this contract provides that the

24  debtor indemnifies my client, including for attorney's fees,

25  and Section 5.4 of the contract grants my client a security

1   interest and lien on the funds it holds as collateral for that

2   indemnity obligation.  So we are a secured creditor, Your

3   Honor.

4          We don't understand entirely what the need is for

5   speed here because under Section 4.5 of the contract where

6   there's this kind of dispute my client is authorized to hold

7   the money and not disburse it and that's exactly what my client

8   intends to do, regardless of whether the stay is lifted,

9   regardless of whether this is found to be property of the

10  estate or not.  And as Mr. Reier correctly observed, this

11  process will not play out and money will not be distributed for

12  a period of time measured in weeks or months, if not longer,

13  not days.

14         So the money's not going anywhere.  We're not going to

15  do anything without consulting with the Department of

16  Transportation and without being absolutely sure that what

17  we're doing is consistent with our contractual obligations and

18  our obligations under various state and federal statutes and

19  regulations.

20         If the stay is lifted, Your Honor, and someone thinks

21  that's an improper thing to do, the contract also has a forum

22  selection clause.  It provides in Section 7. -- I don't have an

23  exact section.  I thought I did.

24         THE COURT:  7.13.

25         MR. STERNKLAR:  Yes.  -- that if -- thank you, Your

1    Honor.

2            -- that all actions arising from or related to this

3    contract, at least, have to be brought in New Jersey.  It's not

4    clear to me whether any of the credit card processors are bound

5    by that, or even have any rights under this contract, given the

6    fact that Section 7.12 makes it clear only the parties to this

7    contract have rights.

8            Nor is it obvious, Your Honor, that the course of

9    dealing changes anything.  Your Honor, if we're going to stray

10   from the four corners of this document to, to, to say what the

11   agreement of the parties is and what their rights and

12   obligations are, then I think we're going to need an

13   evidentiary hearing.  Because even if you accept as true for

14   purposes of today's hearing that there was a course of dealing

15   whereby we would receive notice from a credit card processor or

16   someone else and distribute money, that -- what that means is

17   not at all clear.  It could be as simple as the debtor

18   essentially acquiescing to us accepting notice from that

19   creditor instead of from it pursuant to Section 2.1(c), for

20   example, which says if we receive notice from a certain, either

21   the debtor or the Sky King we then distribute money under

22   certain conditions directly to customers.  That doesn't mean

23   they have, the customers have a direct claim under this

24   contract.  That doesn't mean we're an escrow agent for the

25   customer.

1          THE COURT:  So the -- what you're saying is a customer

2    couldn't show up at the bank and say, "My charter has been

3    cancelled.  I want my money.  You have my money"?

4          MR. STERNKLAR:  I see nothing in this contract that

5    even remotely suggests that and I think the contract by its

6    terms explicitly cuts off the rights of anyone by, anyone,

7    other than these three parties.  The credit card companies are

8    not by subrogation stepping into the shoes of anyone who's a

9    party to this contract.

10          So what I've heard today only raises the concerns that

11   animated the filing of the limited objection.  We don't know

12   what we don't know.  We don't know the facts.  All we know is

13   we're indifferent to whether the Court lifts the stay or

14   determines this is or isn't property of the estate, but it

15   should say or do nothing beyond that because given what we

16   don't know, we don't know whether and to what extent some other

17   court will say, "Well, if, if Judge Hoffman did that, it must

18   mean this and that's different from what the contract said."

19   We just don't know.

20          So if the Court is inclined to act on an expedited

21   basis, notwithstanding that money's not going anywhere at,

22   unless Your Honor orders us -- obviously, we'll comply with the

23   court order, but, but the money is not going anywhere anytime

24   soon -- then it should be limited, as we say in our limited

25   objection.  If Your Honor's determined it's not property of the

1   estate, that's fine, say that.  If Your Honor has determined

2   that the stay should be lifted or doesn't apply, fine, say

3   that, but period, hard stop.  Nothing more and we'll figure out

4   what this means in accordance with applicable non-bankruptcy

5   law.

6           THE COURT:  What about an interpleader?

7           MR. STERNKLAR:  Beg your pardon?

8           THE COURT:  What about an interpleader?

9           MR. STERNKLAR:  Well, we, we, we, we thought about

10  that, Your Honor, but, you know, again, we're trying to

11  understand -- and the pleadings, frankly, confuses us -- who it

12  is that's claiming rights in this fund who we'd have to name as

13  defendants.  There is no, as Your Honor noted, no, no matrix.

14  We don't, we don't know the universe of people even -- we don't

15  think -- there are parties who may on some theory claim a right

16  to this fund.

17          So we don't know who to name as defendants for an

18  interpleader.  But otherwise, we -- we -- I wouldn't be opposed

19  to that, I don't think, but, but, but that's our problem with

20  an interpleader, is we don't know the universe of potential

21  claimants and, and it would require a process at some point to

22  define that universe before we could interplead the money and

23  know that we've notified everyone who's within that universe.

24          We would submit that the only parties under the

25  contract who could have any claims would be the parties to the

1   contract, but obviously, others may disagree.  And again,

2   that's one of the things certainly, if not specifically

3   advocated, is implied even by loose language like an escrow.

4   Well, if it's an escrow, who are the parties or the

5   beneficiaries of the escrow?  We don't think this is an escrow,

6   but somebody seems to think it is and, and, and, and that opens

7   the door.  Well, okay.  Then, then who, who out there could we

8   have potential exposure to?

9         THE COURT:  I don't know Valley Bank.  Is, is this

10   some sort of a niche that it's in?  Does it have a lot of these

11   air, airline or charter escrow or --

12         MR. STERNKLAR:  I'm not sure I know --

13         THE COURT:  -- depository accounts?

14         MR. STERNKLAR:  -- either.  I'm told, although I

15   haven't confirmed, that we're one of two banks in the country

16   that actually hold these types of accounts, but I don't know

17   the details.

18         THE COURT:  So you don't -- I -- 'cause my -- I was

19   curious and maybe Ms. Handel can, can speak to it.

20         Is, is there a model -- this can't have come up, can't

21   be the first time this has come up -- is there a model for how

22   you deal with these problems?

23         MR. STERNKLAR:  There are regulations that talk about

24   it.  They're somewhat antiquated in the sense that they were

25   written before, written when, in the '70s and '80s, when people

1   didn't use the Internet, didn't use debit cards, or credit

2   cards anywhere near the extent they do today.

3          But essentially, what the contract provides in Section

4   4.5 is a process whereby we get certainty, either from the

5   Department of Transportation or a court of competent

6   jurisdiction, that we're releasing the funds to the right

7   people and that the -- that relieves us of our obligation.

8          There's a process, I believe -- I know the DOT, you

9   can see from the exhibit to this motion, has, has issued a

10  notice that, that informs consumers where they can file claims

11  and as Mr. Reier said, under most credit card agreements

12  there's at least a 60-day period from when the charge first

13  appears on their bill for them to file a claim for a chargeback

14  and, indeed, the practice may be that credit card companies

15  waive that 60-day deadline and extend the period beyond that.

16         So it's not quite clear to me exactly how long it's

17  going to take, but, but I don't think this is *sua generis*.  I

18  don't think this is the first time and I think that with the

19  help of the Department of Transportation we'll, we'll, we'll

20  get, get to the right solution, but it's certainly not

21  something that's going to happen, you know, anytime soon.

22         Thank you, Your Honor.

23         THE COURT:  All right.  Thank you.

24         MR. STERNKLAR:  Oh.  I would also say the amount of

25  money in the account, my client tells me, as of yesterday was

1   $1,016,862.03.

2           THE COURT:  And just again, that money is going

3   nowhere without a court order?

4           MR. STERNKLAR:  Well, well, let me say it this way:

5   It's going nowhere anytime soon other than in accordance with

6   the contract and in consultation with the DOT and that process

7   is going to take 60 or 90 days.  Whether we actually need to go

8   get a court order or not, I don't know.  But, but it's not

9   going to anywhere anytime soon other than in conformity with

10  the contract, conformity with DOT regulations, and in, pursuant

11  to, after consultation with the DOT.

12          THE COURT:  All right.  Thank you.

13          MR. STERNKLAR:  Thank you, Your Honor.

14          THE COURT:  Ms. Handel, are you still there?

15          MS. HANDEL:  Yes, I am, Your Honor.  Thank you.

16          I may not be able to address all of the Court's

17  questions about the background of this since the motion just

18  got filed, but maybe it will be easier if I simply explain

19  DOT's interest in this motion and then the specific issue, Your

20  Honor.

21          I believe, my understanding is, that DOT calls this an

22  escrow account, but whether one calls it an escrow account or a

23  different account, maybe that's not even relevant, Your Honor,

24  but the purpose of these accounts, the sole purpose of these

25  accounts -- and I'm not sure if any party in the courtroom

1   would disagree -- the sole party [sic] is for the protection of

2   the charter participants or the consumers, as DOT refers to

3   them.

4        In this specific case, Your Honor, where the flights

5   have not taken place and they are not likely to take place --

6   and no one disputes that -- the funds that are sitting there

7   that Valley Bank just referenced do not belong to the debtor,

8   whatsoever, Your Honor.  The debtor has absolutely no interest

9   in those funds since the, the flights did not take place.

10  For -- and debtor, for example -- what our concern was is that

11  that money does need to sit there.  The debtor cannot, for

12  example, tell Valley Bank, "Send me the $1 million so I can

13  start paying fuel claims," etc.  I'm not suggesting the debtor

14  would do that, but that's just to give an example.  A fuel

15  vendor can't go to Valley Bank and say, "Hey, give me the $1

16  million sitting there."  It's solely for the charter

17  participants.

18       One of our concerns was with the JetPay motion -- and

19  Valley Bank addressed it in their limited objection before the

20  Court -- is we at DOT were concerned that, that the money from

21  Valley Bank was going to now start being disbursed to others at

22  this stage and it, and what our concern is at this stage, we

23  don't know the universe of what all the chargebacks are.  We

24  don't know if every consumer has received their chargeback.  We

25  don't know if some consumers might have paid cash to someone.

1   It may be a small number, but a consumer could have paid cash.

2          So until we know that all the chargebacks and all the

3   consumers were taken care of, that we would be, we would never

4   endorse any process where the funds in the escrow account got

5   released to any specific party.  But our concern is, Your

6   Honor, the money exists to protect the consumers.  It's not the

7   debtor's property and especially, it's not the debtor's

8   property since the flight didn't take place.

9          We -- we are -- no money in that, in that -- what we

10  consider an escrow account -- should be disbursed until we know

11  -- and, as Valley Bank mentioned, that takes time -- every

12  consumer has received a chargeback.  It's not DOT's role, Your

13  Honor, to take that money and disburse the funds.  That's not

14  DOT's job, but what our concern is is that the consumer is

15  protected.  Until we know that every consumer's received a

16  chargeback, no money can be disbursed, for example, to AMEX

17  today.

18         And that, and that's where our concerns are, Your

19  Honor.

20         THE COURT:  Is, is there, though, a process that the

21  DOT engages in in these kinds of situations?

22         MS. HANDEL:  I did speak with DOT on this issue, Your

23  Honor, and my understanding is that DOT relies on the others

24  for that information.  For example, I believe DOT's requested

25  the reservation data from the debtor, which it sounds like they

1  were having trouble getting it for the, with the records issue

2  and officers fleeing, etc.

3       But what they really need is other parties to say,

4  "Here, here is," the credit card saying, "Here are all the

5  chargebacks,"  Now looking at the debtor's -- someone giving

6  them the debtor's reservation data and then someone doing the

7  cross-referencing, or even just doing a sampling.  But DOT,

8  it's almost if somebody reporting to DOT, either the credit

9  card companies or the debtor saying, "This is all the data and

10  it shows now that all the chargebacks have now been completed."

11  And it's difficult to put a timeline on that.

12       You know, the bank mentioned 60 to 90 days.  I wasn't

13  aware that you, you could actually pinpoint the exact time, but

14  it, it's information that people need to give to the Department

15  of Transportation so that everyone is now comfortable saying

16  everyone got their chargebacks.

17       But I believe DOT has not received the reservation

18  data and, and I don't believe it's actually DOT that does all

19  the cross-referencing.  I think it may be the debtor, it may be

20  the credit card companies, or some other party.

21       THE COURT:  All right.  Thank you.

22       Ms. --

23       MS. HANDEL:  Thank you, Your Honor.

24       THE COURT:  Ms. Martin?

25       MS. MARTIN:  Thank you, Your Honor.  Gina Martin from

 1  Goodwin Procter on behalf of Merrick Bank Corporation.

 2         Your Honor, I won't, I won't go through sort of

 3  Merrick Bank's relationship with JetPay 'cause I agree with

 4  Mr. Reier that it's largely irrelevant.  I will tell this Court

 5  for sake of clarification how the process worked in the past

 6  with respect to chargebacks, which is when a customer books a

 7  charter and charges their credit card it goes from what's

 8  called the issuing bank, essentially, to the acquiring bank.

 9  The acquiring bank issues, pays the funds or advances the funds

10  in respect of the purchase by the customer and that money goes

11  directly to Valley National Bank.

12         Now if there were a chargeback -- and, and JetPay is

13  essentially a middleman in this.

14         THE COURT:  Uh-huh.  (Indicating an affirmative

15  response)

16         MS. MARTIN:  And so when there's a chargeback, what

17  essentially happens is there is either a reverse, what's called

18  a reverse ACH.  So they just take the money from Valley

19  National Bank or there was a setoff between monies coming in in

20  respect of charters being booked and, and cancellations or

21  refunds.

22         THE COURT:  So it sounds like the, the process of,

23  for, for dealing with chargebacks is sort of outside of the

24  depository agreement.  It's more in typical banking and credit

25  card processing procedures, right?  I mean, it's like any other

1    chargeback, it sounds like.

2            MS. MARTIN:  Right, except that it doesn't --

3    typically, what it would do, it would go through an account

4    that the debtor maintained and that the debtor had, you know,

5    either through a control agreement or some deposit agreement

6    that the merchant had.  In this situation, it went directly

7    through Valley National Bank pursuant to that, the, what we'll

8    call the escrow agreement.

9            My point of this is that the debtor never had those

10   funds.  The debtor never had a right to those funds.  Its

11   rights to those funds only vested once it had actually flown

12   the charter.

13           THE COURT:  Right.  But that -- that's a --

14           MS. MARTIN:  Right.

15           THE COURT:  -- an inchoate right.  I mean, there's a,

16   they have a right to those funds at some point.

17           MS. MARTIN:  At some point, but it wasn't -- but they

18   didn't have a right to them when the customer purchased the, or

19   booked the charter.

20           And my only point is, Your Honor, I think if you look

21   at a 541 analysis, at the petition date those funds in the

22   escrow are not property of the estate, whatever you call the

23   escrow, whatever -- if you -- they just were never property of

24   the estate.

25           THE COURT:  What does Merrick Bank know about the

1   Public Charter Depository Agreement in this -- I mean, does

2   Merrick Bank get involved in at least being aware of the fact

3   that Valley Bank has this sort of special arrangement?

4             MS. MARTIN:  Yes, in the sense that all of the funds

5   in respect of, in respect of purchases went directly to the

6   Valley National Bank account in accordance with the directions

7   set forth in that agreement.

8             THE COURT:  Okay.  Thank you.

9             MS. MARTIN:  Your Honor, a couple of other points.

10            We believe that the chargebacks have reached 5.1

11  million as of yesterday afternoon and Merrick Bank has no, has

12  no quarrel with Valley National Bank's position.  You know,

13  our, our view is is that this isn't property of the estate and

14  obviously, if, our concern is, if it's not property of the

15  estate, we don't see how the bankruptcy court can retain

16  jurisdiction.  We don't see why it's necessary to have a

17  creditors' committee investigate.  If it's not property of the

18  estate, then it's not available to creditors.

19            THE COURT:  They might have a different version or a

20  different view about that issue and the question is whether the

21  creditors would not have an opportunity to weigh in on this

22  issue.

23            MS. MARTIN:  Your Honor, I mean, Merrick Bank will be

24  a creditor of, of this estate, given the amounts that are in

25  the, in the escrow.  My only point is the escrow is available

1    to, to people who a court or the parties determine it's

2    allocable to.  The debtor and general unsecured creditors of

3    the, of the debtor shouldn't have access to those funds.

4            THE COURT:  All right.  Thank you.

5            Mr. McGee?

6            MR. McGEE:  Good afternoon, Your Honor.  Kevin

7    McGee --

8            THE COURT:  Actually, hold on one second, please.

9        (Pause)

10           THE COURT:  Go ahead.

11           MR. McGEE:  Good afternoon, Your Honor.  Kevin McGee

12   for American Express Travel Related Services Company, Inc.

13           Your Honor, I'm finding myself agreeing a little bit

14   with everybody and disagreeing a little bit with everybody.

15           First off, as far as American Express' own

16   chargebacks, we estimated it to be about 10 percent of this, of

17   the, of the, the amounts that flowed through this account.

18   However, that was only an estimate.  It's not a definite

19   amount.  It could be $2 million, it could be $2.2 million, it

20   could be $2.5 million, or more.  We're not sure at this point.

21           THE COURT:  But it's 1.8, already?

22           MR. McGEE:  At least.

23           With respect to American Express' rights vis-à-vis its

24   customers and chargebacks, American Express has a common law

25   subrogation claim, but it also has a contract claim per its

1   customers.  In its credit card agreements, it has assignment of

2   claim provisions and once it does a chargeback and pays the

3   chargeback, it requires the customers to sign an assignment of

4   claim form.

5       So every customer that gets paid a chargeback from

6   American Express with respect to Direct Air and a Direct Air

7   flight that's been cancelled will have signed a claim over --

8   its claim -- his or her claim over to Direct, to American

9   Express for the purposes of asserting that claim against this

10  escrow account or against Direct Air, whoever American Express

11  can assert it against.

12      With respect to Mr. Sternklar's point about this being

13  only a contract matter between three parties, I think

14  Mr. Sternklar is ignoring the fact that this is a contract

15  that's been put forth pursuant to DOT regulations and I think

16  those regulations make it more than just the three parties.  I

17  think it makes, as Ms. Handel pointed out, a consumer issue

18  where the, the, the account is, is established by those three

19  parties for the protection of consumers.  American Express is a

20  subrogee of those consumers that it paid chargebacks to and has

21  rights against this account.

22      We do think that an appropriate process would be for

23  the Court to retain some jurisdiction over this matter until

24  the parties can work out who is going to be making a claim, an

25  appropriate claim against the account and the amounts.  The

1  debtor has to be involved in that process to some extent

2  because the debtor has the records.  We don't know -- we --

3  there has to be some reconciliation between the, the flights

4  that the debtor has booked and cancelled and the creditors, the

5  individual consumers who made, who purchased for those flights

6  and who the, who have received chargeback reimbursement from

7  Mr. Reier's client or from Ms. Merrill's [sic] client, or from

8  my client.

9         But I think in the grand, in the grand scheme of

10  things, the only parties that are really going to be making an

11  effective claim against this escrow agreement are claims,

12  either the individual consumers or the subrogees of those

13  consumers --

14         THE COURT:  Uh-huh.  (Indicating an affirmative

15  response)

16         MR. McGEE:  -- not necessarily the debtor, itself.

17  The debtor has to participate to the extent that we have to

18  figure out who is appropriately making a claim, but I don't

19  think the debtor will necessarily have any rights beyond that.

20         But we'd like to see the Court perhaps retain

21  jurisdiction over this particular matter since it's before the

22  Court now until the parties can work out those details and it

23  probably should be done behind the scenes without involving the

24  time of this Court and be presented to the Court as,

25  effectively, a fait accompli.

1           THE COURT:  Thank you.

2           Anybody want to be heard who has not yet spoken?

3           Mr. King. do you have anything you want to add?

4           MR. KING:  Thank you, Your Honor.  Just very briefly.

5           Like Mr. McGee, I find myself agreeing and disagreeing

6    with a number of statements that people have said.  I think a

7    couple of things.

8           Mr. Fox talked about the possibility of a creditors'

9    committee and I, I indicated that we would be holding a

10   formation meeting, possibly, the week after next, depending on

11   whether or not the motion to convert the case that we filed

12   this morning or for the appointment of a Chapter 11 trustee in

13   the alternative is held before then.

14          But it, it does seem to, to me, Your Honor, that in

15   light of those things and especially in light of the fact that

16   whether or not it's property of the estate, there's no money

17   going to be paid out, according to Mr. Sternklar, for months,

18   possibly, that the possibility, I would like the possibility

19   for either a creditors' committee, or a Chapter 11 trustee, or

20   a Chapter 7 trustee to weigh in on this issue at some point.

21          And that's the only concern that we have.

22          Thank you.

23          THE COURT:  Thank you.

24          Anyone else?

25      (No response)

1          THE COURT:  Mr. Reier, do you want to have the last

2    word?  Is there anything you want to respond to?  You said you

3    hadn't had a chance to hear the, the debtor, the basis for the

4    debtor's opposition.  I'll give you a chance if you want to add

5    anything now that you've heard it.

6          MR. REIER:  No.  We, we have nothing to add, Your

7    Honor.

8          THE COURT:  Okay.  All right.  Thank you.

9          As I see it, we can go in two directions here.  We

10   can, we can fight over whether or not this is property of the

11   estate.  I'm not prepared to make a ruling on that question

12   here and now.  I think there is enough ambiguity or uncertainty

13   on that subject to require additional hearings, possibly

14   evidentiary in nature.  I'm not sure.  I am interested in the,

15   the view of both a creditors' committee and the surety company

16   who apparently does not know about this hearing.

17         Or what I think really is important here is to come up

18   with a mechanism for whacking up, as someone has referred to

19   it, this, this fund and if we can, we can bypass the question

20   of whether it is or isn't property of the estate and go right

21   to working out a way for getting this money out of the hands of

22   Valley Bank sooner than later by proceeding on, essentially on

23   the merits of the disputes as to who's entitled to what piece

24   of this money, and I'm not going to require one or the other.

25   I think if you can agree on the latter, we can move forward on

1   it.  If you can't, then I'll deal with the issue of whether it

2   is property of the estate or not.

3          So what I'll do to try to advance this is I will

4   continue this for a hearing in April after the committee

5   formation.  Hopefully, that'll take place, according to the

6   U. S. Trustee, sometime during the week of April 2nd.

7          And there's a status conference in this case when?

8          MR. STERNKLAR:  April 2, Your Honor.

9      (Court confers with staff)

10          THE COURT:  All right.  We're going to have a -- we'll

11  have a continued hearing at 11:00 on April the 11th and the

12  status conference that is now scheduled for April 2nd will be

13  pushed over to that same time.

14          MR. KING:  I'm sorry,  Your Honor.  You say 11:00?

15          THE COURT:  Yes.

16          MR. KING:  Thank you.

17          MR. REIER:  Excuse me, Your Honor.

18          Would that be a continuation of the preliminary non-

19  evidentiary hearing?

20          THE COURT:  Yes.

21          And hopefully, by then we'll -- we'll have --

22          And, Mr. Reier, would you please serve -- now we have

23  the 20 largest.  I don't know if you had that when you filed

24  your motion -- serve the 20 largest creditors and this --

25          MR. REIER:  They were served.  We, we got it just --

1          THE COURT:  You did?

2          MR. REIER:  -- just as we were filing the motion.

3          THE COURT:  Okay.

4          Then the, what is it, Platte River Insurance Company,

5    the surety company.

6          MR. REIER:  I think we have an address for this.  So

7    I'll find it and we'll --

8          THE COURT:  Okay.

9          MR. REIER:  -- we'll serve them.

10         THE COURT:  Please serve them with your papers and a

11   notice of the hearing, please.

12         And you'll report back to me as to whether or not any

13   progress has been made and we'll see where we are at that

14   point --

15         MR. REIER:  Right.

16         THE COURT:  -- okay?

17         MR. REIER:  Thank you, Your Honor.

18         THE COURT:  Anything else I can do for anyone?

19         MR. STERNKLAR:  Thank you, Your Honor.  No.

20         THE COURT:  All right.  Have a nice day.

21         Thank you.

22         MS. HANDEL:  Thank you.

23         MR. FOX:  Thank you, Your Honor.

24         MR. KING:  Thank you, Your Honor.

25         (Proceedings concluded at 12:46:59)

1                           CERTIFICATE

2          I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    /s/ *Janice Russell*                    April 2, 2012

7    Janice Russell, Transcriber                  Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**#12-40944**                                   **3-23-2012**