UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Central Division)

In re:

SOUTHERN SKY AIR &TOURS
LLC, d/b/a DIRECT AIR,

Case No. 12-40944-MSH

Chapter 11

Debtor.

_____/

## CREDITOR, CHEMOIL CORPORATION D/B/A CHEMOIL AVIATION'S REPLY IN SUPPORT OF ITS JOINDER TO US TRUSTEE'S MOTION TO CONVERT CASE TO CHAPTER 7

Creditor, Chemoil Corporation d/b/a Chemoil Aviation ("Chemoil"), by and through undersigned counsel, hereby submits this Reply to the Debtor's Response in Opposition [D.E. 76] to the US Trustee's Motion to Convert Case to Chapter 7, or in the Alternative, for the Appointment of a Chapter 11 Trustee [D.E. 27] and Chemoil's Joinder to same [D.E. 53], and in support of its position, states as follows:

1. Creditor Chemoil filed a Joinder [D.E. 53] to the US Trustee's Motion to Convert [D.E. 27].

2. On April 10, 2012, the Debtor filed its Response [D.E 76] to the US Trustee's Motion to Convert. Interestingly, the Debtor did not dispute the facts raised by the US Trustee's Motion, specifically that:

   a. The Debtor has no current operations;

   b. The Debtor's "Prior Management" resigned on or about March 13, 2012;

    c. Debtor acknowledged that "several significant obstacles must be overcome before flight operations could be restored…which [obstacles] include, but are not limited to, securing access to sufficient funding, airports, aircraft, fuel, and payment processing, just to name a few." *See* Paragraph 16 of the Debtor's Response at p.5 [D.E. 76];

    d. There is a letter of investigation which has been issued by the DOT regarding, inter alia, the abrupt cessation of services and the handling of the Valley Account. Id.; and

    e. This matter is a core proceeding and this Court has jurisdiction to hear this matter.

3. The Debtor requests additional time, and believes that it is premature to convert on the basis that it will not be able to rehabilitate and propose a confirmable plan.

4. However, the fact is that there are MILLIONS OF DOLLARS missing from the depository account, which according to the United States Department of Transportation ("USDOT"), is the equivalent of an escrow account, despite the statements to the contrary by Jet Pay and Valley Bank. See Limited Objection of USDOT [D.E. 65] to the Emergency Motion of JetPay Merchant Services For Relief From Stay [D.E.9]. *See* D.E. 65, at pp.3-4 at footnote 5. According to the USDOT, the depository bank may not disburse funds from the depository account to the public charter operator until the flight is completed. *See* D.E. 65, at paragraph 6.

5. Since the Debtor is not a certified air carrier with either a 121 or 135 certificate, and given that a public charter operator requires the DOT's acceptance of a prospective charter operator's "public charter prospectus", it is highly unlikely that the Debtor, after the serious allegations regarding violations of the USDOT regulations, will be capable of getting the

2

USDOT's approval to "re-commence charter operations" any time in the foreseeable future—if ever. Prior to resuming operations as a public charter, the USDOT must accept the newly-filed public charter prospectus. *See* D.E. 65 at paragraphs 2 and 4.

6. Debtor has not even submitted for USDOT approval, nor can it realistically do so until the USDOT investigation is completed. There is no time frame for same, and therefore leaving this Debtor in Chapter 11 while attorney's fees for the Debtor, and other administrative expenses are accruing is simply not in the best interests of creditors.

7. Avondale I is trying to distance itself from "Prior Management" (as that term is defined on page 2, paragraph 7 of the Debtor's Response [D.E. 76]); however, upon information and belief, members of and/or affiliates of Avondale Aviation I, LLC ("Avondale"), including but not limited to Jeff Conry, were well aware of the negative balance of the escrow account in or about December 2011-January 2012 and were complicit in the continuing depletion of same by "Prior Management".

8. Avondale I and the Debtor would like this Court to believe that it had no knowledge of what was going on with the depository account and the finances of the Debtor from the date of its purchasing a majority membership interest in the Debtor in late September 2011 to the date of the assumption of management responsibilities on March 12, 2012 —which in and of itself is preposterous.

9. Upon information and belief, and based upon the Debtor's own financial statements, *see* **Exhibit "1"** attached hereto, all members of the Debtor, including Avondale I, were well aware of the depletion of the Depository Account and the reference to same as monies owed by principals to the Debtor well prior to the filing of bankruptcy by the Debtor.

10. This Court should immediately convert this Case to Chapter 7 and appoint a Chapter 7 Trustee, as well as to notify the US Trustee's office and the Department of Justice to make inquiry regarding the violations of 14 C.F.R Section 380.34 by Direct Air, its principals, and any potential third parties who assisted with and/or participated in the violations, whether they be processing financial institutions, depository banks, etc.

11. Furthermore, this is not the first time that such a breach of the escrow or trust arrangements involved in airline operations by principals of the Debtor has occurred. *See In re: Stanley Marshall Ellison, et al.*, 296 F. 3d 266 (4th Cir. 2002)(wherein the 4th Circuit affirmed the bankruptcy court's decision regarding non-dischargeability of Debtors/guarantors Kay and Marshall Ellison ("Ellisons"--who were the debtors in that case—who are also principals of the Debtor and part of "Prior Management" in this current Direct Air case), due to defalcation in a fiduciary capacity as officers and directors of a travel agency for not placing the deposits of the ticket sales in the trust account).

12. It is amazing how similar the two defalcations are to one another—both involve trust or escrow funds, both involve airline operations and both involve the Ellisons. And the purported "New Management" would nonetheless like the Court to believe that they knew nothing of all of this for over six (6) months, even though financial statements of the Debtor reflect this information—and "New Management" seeks for this Court to allow them to control the Debtor's operations, not convert the case to Chapter 7 and not appoint a Chapter 11 Trustee.

13. The Debtor also seeks to possibly avoid the appointment of a Trustee by virtue of agreeing to an Examiner pursuant to 11 USC Section 1104. *See* D.E. 76 at footnote 4 on page 7. This is both inefficient and contrary to the best interests of creditors, because it adds another layer of administrative expense, the Examiner cannot become the Trustee thereafter upon

conversion, and the Debtor's principals, including Avondale, should not have any further involvement with the operation of nor the books and records of the Debtor.

14. Creditor Chemoil believes that the Debtor's request for additional time and/or to appoint an Examiner rather than a Trustee is contrary to the best interests of the creditors and is merely pushing off the inevitable—since the Debtor has virtually no chance of confirming a plan in Chapter 11.

15. A Chapter 7 Trustee should be appointed and as such would be charged with the legal responsibility of getting to the bottom of the improprieties, who within the Debtor (i.e.-- "New Management", "Prior Management", principals of the Debtor, etc.) were aware of, involved in or participated in these USDOT violations and improprieties with regards to the escrow/depository account, and which (if any) third parties were participants in same.

16. Any Debtor who comes into bankruptcy with the issues referenced in the Debtor's pleadings and the facts and circumstances of this case cannot expect to be given any significant leeway by the Court. The Debtor chose to file bankruptcy and now that it has, the Court has the right to protect the best interests of creditors by converting the case and allowing an independent Chapter 7 Trustee (as well as the USDOT and the Department of Justice) to get to the bottom of this quagmire.

17. From the perspective of the creditor body, the sooner the investigations are started and the energy is spent on figuring out what went wrong, why, who participated, who looked the other way, and who has potential liability for these actions/omissions, the better it will be for the creditors.

18. The unrealistic belief of the part of the Debtor, Avondale and Debtor's counsel that there is some basis to keep this case in Chapter 11 and that there is a potential of a

confirmable plan, a charter operator which can obtain USDOT approval to start operations based upon a new public charter prospectus, and/or that there is a potential for "rehabilitation" of this Debtor, given the serious allegations of USDOT violations regarding charter air escrowed funds, is simply nothing short of pure fantasy.

19. While the Debtor, its counsel and Avondale don't want to acknowledge that this Debtor was DOA (dead on arrival) upon the filing of the Petition, the US Trustee was aware enough of the circumstances of this matter to immediately file a Motion to Convert.

20. Chemoil requests that this Court grant the Motion to Convert and refer this matter for further inquiry and investigation to the US Trustee's Office and the Department of Justice.

WHEREFORE, Creditor Chemoil Corporation requests that this Court grant the Motion to Convert to Chapter 7, deny the Debtor's request for additional time, or in the alternative, appoint a Chapter 11 Trustee, refer this matter to the US Trustee's Office and the Department of Justice for further inquiry and investigation and any other and further relief this Court deems just and proper.

DATED: April 11, 2012

Respectfully submitted,

By: /s/_____
DAVID B. HABER, ESQ.
Florida Bar No.: 435368
David B. Haber, P.A.
Counsel for Creditor Chemoil
Miami Center, Ste. 1205
201 South Biscayne Blvd.
Miami, Florida 33131
Telephone:   (305) 379-2400
Facsimile:    (305) 379-1106
E-mail: dhaber@dhaberlaw.com

## CERTIFICATE OF SERVICE

I HEREBY FURTHER CERTIFY that on this 11th day of April, 2012, a true and correct copy of the foregoing document has been served by electronic mail on all registered Parties on the Court's CM/ECF electronic filing system.

By: /s/ David B. Haber

DAVID B. HABER, ESQ.



# Direct Air – Financial Overview

*Summary Balance Sheet – December 31, 2011 – Direct Air was Acquired on September 29th, 2011*
*Direct Air is classified as a Part 380 Tour Operator.*

| | | |
|---|---:|---|
| **Assets** | | |
| Current Assets | | |
| Bank Accounts (1) | $ 94,929 | (1) The Bank Accounts include an escrow account which has a balance of $91,120 as of December 31, 2011 |
| Due from Partners (2) | $ 12,514,427 | |
| Other Current Assets | $ 33,030 | |
| Total Current Assets | $ 12,642,386 | (2) *Escrow Reserve and Equity* |
| Net Fixed Assets | $ 751,885 | The balance shown in the Due from Partners of $12,514,427 is guaranteed by the founding members of the LLC via personal guarantees (PG'S) and such supported by hard collateral pledged by the founding members. |
| **Total Assets** | **$ 13,394,271** | |
| **Liabilities and Owners Equity** | | |
| Liabilities | | Based on current burn rates, 86% of the escrow is expected to be burned off by May 2011 with the balance burned off by September 2011. |
| Current Liabilities | | |
| Accounts Payable | $ 2,108,156 | |
| FET Payable | $ 1,523,261 | (3) *Deferred Revenues* |
| Fuel Payable | $ 1,990,722 | Deferred revenues represent the unearned portion of revenues that will be realized upon the completion of the flights, which directly correlates with the escrow account reduction. |
| TSA Payable | $ 884,233 | |
| Avondale LOC | $ 210,050 | |
| Deferred Revenues (3) | $ 12,605,547 | |
| Other Current Liabilities | $ -955,334 | |
| Total Current Liabilities | $ 20,277,303 | |
| Long Term Liabilities | | |
| Note Payable | $ 225,000 | |
| Promissory Notes | $ 1,350,690 | |
| Total Long Term Liabilities | $ 1,575,690 | |
| Total Liabilities | $ 21,852,993 | |
| Equity | | |
| Equity (2) | $ 12,514,427 | |
| Retained Earnings | $ (11,064,360) | |
| Net Income | $ (9,908,789) | |
| Total Equity | $ (8,458,722) | |
| **Total Liabilities and Equity** | **$ 13,394,271** | |

King / Williams    Discussion Materials / February 2012        24



## Direct Air – Financial Overview



*Summary Income Statement – Direct Air was Acquired on September 29th, 2011*

| | Oct 2011 | Nov 2011 | Dec 2011 | Full Year 2011 | Jan 2012 |
|---|---|---|---|---|---|
| **Gross Revenue** | | | | | |
| Ticket Sales | $ 3,842,460 | $ 3,828,776 | $ 5,593,423 | $ 40,325,329 | $ 7,498,938 |
| Luggage Fees | $ 345,228 | $ 601,544 | $ 1,111,750 | $ 7,986,287 | $ 789,456 |
| Other Fees | $ 2,057,927 | $ 2,791,127 | $ 1,270,444 | $ 20,613,580 | $ 1,403,485 |
| Other Revenue | $ 66,921 | $ 17,885 | $ 94,982 | $ 571,302 | $ 25,284 |
| Total Gross Revenue | $ 6,312,535 | $ 7,239,332 | $ 8,070,599 | $ 74,627,965 | $ 9,717,162 |
| Tax Offset - FET | $ (203,325) | $ (79,894) | $ (105,073) | $ (1,273,788) | $ (204,135) |
| | | | | | |
| Net Revenue | $ 6,109,210 | $ 7,159,437 | $ 7,965,526 | $ 68,222,710 | $ 9,513,027 |
| | | | | | |
| **Expenses** | | | | | |
| Advertising | $ 89,407 | $ 75,679 | $ 85,522 | $ 732,408 | $ 6,750 |
| Bank Charges | $ 817,537 | $ 227,613 | $ 236,099 | $ 2,759,997 | $ 193,571 |
| Flight Operations Expenses | | | | | |
| Aircraft ACMI | $ 811,126 | $ 3,332,726 | $ 3,356,614 | $ 29,842,566 | $ 4,890,027 |
| Fuel | $ 2,737,175 | $ 2,840,446 | $ 3,781,759 | $ 32,477,428 | $ 3,612,622 |
| Ground Handling | $ 239,425 | $ 380,099 | $ 428,471 | $ 3,459,384 | $ 271,978 |
| Other Flight Operations Expenses | $ 407,907 | $ 368,022 | $ 54,439 | $ 3,123,369 | $ 114,903 |
| Payroll | $ 218,802 | $ 187,523 | $ 168,847 | $ 1,958,077 | $ 158,413 |
| Reservation Center | $ 475,195 | $ 90,667 | $ 84,652 | $ 1,206,680 | $ 79,368 |
| Other Operating Expenses | $ 1,334,120 | $ 84,300 | $ 116,346 | $ 2,571,591 | $ 77,541 |
| Total Expenses | $ 7,130,694 | $ 7,587,075 | $ 8,312,748 | $ 78,131,499 | $ 9,405,173 |
| | | | | | |
| Net Income | $(1,021,484) | $ (427,638) | $ (347,222) | $ (9,908,789) | $ 107,854 |

Full year 2011 income statement includes a change in financial policy of cash-to-accrual basis in the amount of $5.1 million that is reflected in net income.

# Direct Air
# Balance Sheet
As of June 30, 2011

|  | Total |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| Bank Accounts | |
| Crescent 2815 | 6,000 |
| Crescent Bank803 | 17,557 |
| Crescent159000512 | 141,144 |
| HCSB - 913009784 | 502 |
| Horry County State Bank | 4,841 |
| Valley National Bank (Escrow Sales) | 3,054,216 |
| Wells Fargo - 8179 | 1,362 |
| Wells Fargo 9754 | 228 |
| Wells Fargo8662 | 296 |
| **Total Bank Accounts** | **3,226,147** |
| Accounts Receivable | |
| Accounts Receivable | 432,479 |
| Acct. Receivable/Deposits | 25,000 |
| **Total Accounts Receivable** | **457,479** |
| Other Current Assets | |
| Deferred Expense | 1,101,255 |
| Employee Cash Advance | -1616.68 |
| Employee Cash Advances | 2,800 |
| **Total Other Current Assets** | **1,102,438** |
| **Total Current Assets** | **4,786,064** |
| Fixed Assets | |
| Equipment & Furniture | 816,241 |
| Leasehold Improvements | 1,885 |
| **Total Fixed Assets** | **818,126** |
| Other Assets | |
| Prepaid Expense | 820,853 |
| **Total Other Assets** | **820,853** |
| **TOTAL ASSETS** | **6,425,043** |
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| Accounts Payable | 352,103 |
| **Total Accounts Payable** | **352,103** |
| Credit Cards | |
| American Express 1 | 40,817 |
| Amex/Costco | 30,204 |
| **Total Credit Cards** | **71,021** |
| Other Current Liabilities | |
| FET Accural | 258,684 |

|  |  |
|---|---:|
| Payroll Clearing | -14622.06 |
| Payroll Tax Payable | 69,589 |
| TSA Payable | 509,965 |
| Virgin Settlement | 127,875 |
| Wachovia Line of Credit | 215,829 |
| **Total Other Current Liabilities** | **1,167,319** |
| **Total Current Liabilities** | **1,590,443** |
| **Total Liabilities** | **1,590,443** |
| Equity |  |
| Equity Loan | 10,126,965 |
| Investment | 1,700,000 |
| Opening Balance Equity | -772263.30 |
| Retained Earnings | -8971860.91 |
| Net Income | 2,751,761 |
| **Total Equity** | **4,834,601** |
| **TOTAL LIABILITIES AND EQUITY** | **6,425,043** |

Wednesday, Sep 07, 2011 12:30:06 PM GMT-4 - Cash Basis

# Direct Air
# Profit & Loss
January - June, 2011

|  | Total |
|---|---:|
| **Income** | |
| Income Earned | 36,363,473 |
| Escrow Sales | 3,054,216 |
| Tax Offset Accounts | -619326.10 |
| **Total Income** | 38,798,363 |
| **Gross Profit** | 38,798,363 |
| | |
| **Expenses** | |
| Advertising | 261,747 |
| Bank Charges | 978,507 |
| Consulting | 319,052 |
| Contract Labor | 4,068 |
| Flight Operations Expenses | 33,149,960 |
| Insurance | 76,802 |
| Internet Service | 41,285 |
| Legal & Professional Fees | 115,631 |
| Legal Settlement Expense | 87,906 |
| Main Office Travel Costs | 1,990 |
| Miscellaneous Costs | 45 |
| Office Expenses | 23,489 |
| Payroll Expenses | 428,791 |
| Printing | 649 |
| Rent | 49,028 |
| Reservation Services | 361,708 |
| Signage | 364 |
| Staff Development | 915 |
| Supplies | 84 |
| Systems Expense | 77,550 |
| T & E Costs | 9,138 |
| Taxes & Licenses | 50,762 |
| Telephone Costs | 1,825 |
| Travel Agent Commissions | 2,048 |
| Utilities | 3,261 |
| **Total Expenses** | 36,046,603 |
| **Net Operating Income** | 2,751,760 |
| **Net Income** | 2,751,760 |

Wednesday, Sep 07, 2011 01:02:10 PM GMT-4 - Cash Basis