## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - WORCESTER

| | | |
|---|---|---|
| IN THE MATTER OF: | : | Case No. 12-40944 |
| SOUTHERN SKY AIR & TOURS, | : | Worcester, Massachusetts |
| LLC d/b/a DIRECT AIR, | | **April 11, 2012** |
| | : | 11:07:04 a.m. |
| Debtor. | | |
| | : | |

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

### TRANSCRIPT OF HEARING ON:
(#9) MOTION OF JETPAY MERCHANT SERVICES, LLC
FOR RELIEF FROM STAY TO CONTINUE PROCESSING
CUSTOMER CHARGEBACKS FROM NON-ESTATE PROPERTY
ESCROW ACCOUNT IN THE ORDINARY COURSE (TO THE
EXTENT ANY SUCH RELIEF IS REQUIRED) AND LIMITED
OBJECTIONS OF #16 VALLEY NATIONAL BANK AND
#23 AMERICAN EXPRESS TRAVEL RELATED SERVICES
CO., INC.; (#26) OBJECTION OF DEBTOR;
(#65) LIMITED OBJECTION OF THE UNITED STATES
DEPARTMENT OF TRANSPORTATION; (#66) JOINDER OF
CHEMOIL CORPORATION TO #65; (#27) EXPEDITED
MOTION OF THE UNITED STATES TRUSTEE TO CONVERT
CASE TO CASE UNDER CHAPTER 7, OR, IN THE
ALTERNATIVE, FOR THE APPOINTMENT OF A CHAPTER 11
TRUSTEE; (#53) JOINDER OF CHEMOIL CORPORATION;
AND (#76) DEBTOR'S RESPONSE IN OPPOSITION
BEFORE THE HONORABLE MELVIN S. HOFFMAN, J.U.S.B.C.

**APPEARANCES:**

For the Debtor:                    Riemer & Braunstein, LLP
                                   BY:  STEVEN E. FOX, ESQ.
                                   Times Square Tower, Suite 2506
                                   Seven Times Square
                                   New York, New York 10036

                                   Riemer & Braunstein, LLP
                                   BY:  ALAN L. BRAUNSTEIN, ESQ.
                                   Three Center Plaza
                                   Boston, MA  02108

```
 1   APPEARANCES (Continued):

 2   For Creditor, Merrick          Goodwin Procter LLP
     Bank Corporation:              BY:  GINA L. MARTIN, ESQ.
 3                                  53 State Street, Exchange Place
                                    Boston, MA  02109
 4
     For Creditor, American         Seder & Chandler, LLP
 5   Express Travel Related         BY:  J. ROBERT SEDER, ESQ.
     Services Co., Inc.:            339 Main Street
 6                                  Worcester, MA  01608

 7   For Creditor, JetPay           Posternak Blankstein & Lund LLP
     Merchant Services, LLC:        BY:  DAVID J. REIER, ESQ.
 8                                  Prudential Tower
                                    800 Boylston Street
 9                                  Boston, MA  02199

10   For Interested Party,          Duane Morris, LLP
     Valley National Bank:          BY:  JEFFREY D. STERNKLAR, ESQ.
11                                  100 High Street, Suite 2400
                                    Boston, MA  02110
12
     For Creditor, Platte River     Hinshaw & Culbertson LLP
13   Insurance Company:             BY:  BRADFORD R. CARVER, ESQ.
                                    28 State Street, 24th Floor
14                                  Boston, MA  02109

15   For Interested Parties,        Rubin and Rudman, LLP
     Judy Tull, Kay Ellison,        BY:  DAVID C. FIXLER, ESQ.
16   and Marshall Ellison:          50 Rowes Wharf
                                    Boston, MA  02110
17

18
     ALSO PRESENT:                  RICHARD T. KING
19                                  Assistant U. S. Trustee
                                    446 Main Street, 14th Floor
20                                  Worcester, MA  01608

21

22

23

24

25
```

1  **APPEARANCES** (by telephone):

2  For Creditor, United            U. S. Department of Justice
   States:                         BY:  ANDREA H. HANDEL, AUSA
3                                  Post Office Box 875
                                   Ben Franklin Station
4                                  Washington, DC  20044

5  For Creditor, Chemoil           DAVID B. HABER, ESQ.
   Corporation:                    201 S. Biscayne Blvd., Ste. 1205
6                                  Miami, FL  33131

7

   Audio Operator:                 Alberto Barrera, ECRO
8

9  Transcript prepared by:         JANICE RUSSELL TRANSCRIPTS
                                   1133 Tanager Trail
10                                 Virginia Beach, VA  23451
                                   (757) 422-9089
11

12 Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.
13

14

15

16

17

18

19

20

21

22

23

24

25

**#12-40944**                                          **4-11-2012**

4

1                              <u>INDEX</u>

2    ARGUMENT ON MOTION FOR CONTINUANCE:

3         On behalf of Creditor, JetPay, by Mr. Reier         6

4         On behalf of Debtor, by Mr. Fox                     9

5         On behalf of DOT, by Ms. Handel                    12

6         On behalf of Valley National Bank, by Mr. Sternklar  13

7         On behalf of Chemoil, by Mr. Haber                 14

8         On behalf of AMEX, by Mr. Seder                    15

9
     THE COURT:    Finding                                   16
10

11
     ARGUMENT ON MOTION TO CONVERT:
12
          On behalf of the U. S. Trustee, by Mr. King        17
13
          On behalf of Chemoil, by Mr. Haber                 22
14
          On behalf of DOT, by Ms. Handel                    24
15
          On behalf of Ms. Tull, et al., by Mr. Fixler       27
16
          On behalf of Debtor, by Mr. Fox                    29
17

18   THE COURT      Finding                                  46

19

20

21

22

23

24

25

1                              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  All rise.

3              THE COURT:  Good morning, everyone.  Be seated,

4    please.

5              THE COURTROOM DEPUTY:  Southern Sky Air & Tours, LLC,

6    Case No. 12-40944.

7              Would the parties on the line please identify

8    yourselves for the record?

9              MS. HANDEL:  Good morning, Your Honor.  This is Andrea

10   Handel with the Department of Justice for the United States.

11             MR. HABER:  Your Honor, good morning.  David Haber on

12   behalf of Creditor, Chemoil Corporation d/b/a Chemoil Aviation.

13             THE COURTROOM DEPUTY:  In the courtroom?

14             MR. FOX:  Good morning, Your Honor.  Steven Fox and

15   Alan Braunstein from Riemer & Braunstein on behalf of the

16   debtor.

17             MR. STERNKLAR:  Good morning, Your Honor.  Jeffrey

18   Sternklar, Duane Morris, on behalf of Valley National Bank.

19             MR. REIER:  Morning, Your Honor.  David Reier on

20   behalf of JetPay Merchant Services, LLC.

21             MR. SEDER:  Good morning, Your Honor.  J. Robert

22   Seder, Seder & Chandler, for American Express Travel Related

23   Services Company, Inc.

24             MS. MARTIN:  Good morning, Your Honor.  Gina Martin

25   from Goodwin Procter on behalf of Merrick Bank.

1          MR. KING:  Good morning.  Richard King for the U. S.

2     Trustee.

3          MR. FIXLER:  Good morning, Your Honor.  David Fixler,

4     Rubin and Rudman, for Judy Tull, Kay Ellison, and Marshall

5     Ellison.

6          MR. CARVER:  Bradford Carver, Hinshaw & Culbertson,

7     for Platte River Insurance Company.

8          THE COURT:  Okay.  Unless anybody has a different

9     agenda, I think we should take care of JetPay first.  There was

10    a motion to continue that came in late yesterday.

11         Mr. Reier, can you speak to that, please?

12         MR. REIER:  Thank you, Your Honor.

13         The reason that we had filed the motion yesterday to

14    continue the hearing is that the parties have, the parties that

15    are interested in claiming an interest in the depository or

16    escrow account, have been working to gather facts, crunching a

17    lot of numbers, processing a lot of chargebacks, and, in

18    particular, following the suggestion of Your Honor at the last

19    hearing, JetPay and Merrick Bank have been working, together

20    with American Express, to exchange information and to reach

21    some sort of agreement between them as to how, as to what their

22    respective interest should be in that account.  We continue to

23    believe that when the dust settles, so to speak, in this matter

24    the only parties that will be shown to have any property

25    interest whatsoever in the funds that are being held by Valley

1    National Bank are the two credit card processing, the two

2    credit card companies, their processors, which would be JetPay

3    and, and AMEX.  It is possible that there are a handful of

4    charter participants who, for some reason, didn't pay by credit

5    card and they may yet to have a claim, although we believe that

6    there'll be few, if any, of those and that it's ultimately

7    going to be 99 to a hundred percent belong to JetPay and, and

8    AMEX.

9         We also continue to believe and would be prepared to

10   argue or present evidence to the Court, schedule an evidentiary

11   hearing, to establish that none of the funds represents

12   property of the estate.  Don't want to, obviously, repeat all

13   the discussion that we had at the last hearing, but again, in a

14   summary fashion, we know that all of the money in that account

15   never passed through the debtor in this case.  It all went

16   directly from either charter participants or their credit card

17   companies directly into the account and that the debtor never

18   had an interest in those funds and the interest in those funds,

19   to the extent that the debtor would ever have an interest, it

20   depended entirely on the completion of flights that the funds

21   were paying for.  The flights have all been cancelled and, of

22   course, we all know that there's a multi-million dollar

23   shortfall in that account.

24        So there's no circumstance that the debtor would have

25   an interest in those funds.  We believe it would be useful for

1  all the parties, rather than to focus on continued contested

2  hearings over those funds, to continue to work together to

3  establish all of the facts and understand the money that went

4  into the account, the money that went out of the account before

5  proceeding on a contested matter because there is a possibility

6  that we could reach some sort of an agreement.

7        We acknowledge, also, I think at the last hearing,

8  that Valley National Bank would also claim an interest in the

9  funds themselves to secure their legal fees.  We don't -- we

10  have not evaluated that position and we don't have a view about

11  that at this time.

12        But that would be our hope and our expectation.

13        THE COURT:  And the request is for a 30-day

14  continuance?

15        MR. REIER:  That, that was what we suggested would be

16  helpful and then as we approached that 30th day, or whatever

17  the date of the hearing is, we'll evaluate where we are at that

18  time.

19        THE COURT:  Does anyone want to be heard on the, on

20  JetPay's motion for a continuance

21        MS. HANDEL:  Your Honor, this is Andrea Handel with

22  the Justice Department for the United States.

23        THE COURT:  Yes.

24        MS. HANDEL:  May I briefly be heard?

25        THE COURT:  Sure.

9

1          MS. HANDEL:  The United States has no objection to

2    JetPay's motion to continue.  I'm assuming, though -- and if

3    anyone could confirm -- that during this continuance no funds

4    in the, in the escrow account will be touched.  Is that

5    accurate?

6          THE COURT:  Well, let's find out.

7          MS. HANDEL:  Thank you, Your Honor.

8          MR. FOX:  Your Honor, good morning.  Steven Fox from

9    Riemer & Braunstein on behalf the debtor.  Just briefly.

10         We have no objection to the adjournment request.  We,

11   as Mr. Reier indicated, have begun a process, quite an

12   interactive one, with both JetPay, American Express, and

13   others.  Following the last hearing on the JetPay motion, we

14   engaged in a process with Radixx International, who controls

15   the reservations software which was the source data that we

16   required in order to start to build the model and access the

17   data points necessary to assess the extent of outstanding

18   charges, flight reservations, payments made, and the like.

19   Yesterday, we started making the data that we've received from

20   Radixx available to both JetPay and AMEX and it is also

21   available to Valley, if they so desire.

22         That is going to be the source data.  That was the

23   first step, getting the data.  We've now provided access to it

24   and now Step 2 in the process will be working with both JetPay

25   and with AMEX, Discover, others, who have an interest to, to

1   drill down to what exactly the conclusions can be drawn from

2   that data.

3         THE COURT:  What about, what about just an accounting

4   from the bank?  This is how much money we took in, this is how

5   much money went out.

6         MR. FOX:  Well --

7         THE COURT:  Isn't that really the issue here?

8         MR. FOX:  Well, Step 3 of the process, Your Honor.

9         First, there's identifying the universe of customers

10  'cause JetPay wants to know who has legitimate chargeback

11  rights and who doesn't and they've got a defined period within

12  which to determine that.  We've started providing the source

13  data to facilitate that process and we will continue to work

14  with them in order to assist them in determining who's entitled

15  to a chargeback and who's not.

16        We do have access to the bank statements relating to

17  the Valley account.  We can trace money in.  We can trace money

18  going out.  It's a far more complex process to determine what

19  the money coming out was used for and then matching it to

20  specific charters and charter participants and fees in order to

21  determine whether funds were removed prematurely from the

22  escrow account and why.

23        THE COURT:  Uh-huh.  (Indicating an affirmative

24  response)

25        MR. FOX:  We suspect that's the case.  We understand

1    there are certain parties in interest who may dispute that, but

2    the fact remains we believe there's far less money in the

3    escrow than there should be.

4         And Step 3 of the process is going to figure out

5    through a forensic analysis how much and why and how that

6    happened.  And I think we'll have an opportunity to speak to

7    that more in connection with the second matter on the calendar,

8    the U. S. Trustee's motion, today.

9         I did want to, however, make just two brief remarks

10   regarding Mr., Mr. Reier's initial presentation and not to

11   revisit the arguments that were made at the last hearing, but

12   for today's purposes I do want the record to be clear that the

13   debtor does not agree that it necessarily follows that simply

14   because JetPay and/or Merrick and/or AMEX populated the Valley

15   account with the payments from charges by charter participants

16   or others that it necessarily flows as a matter of law that

17   they are parties entitled to those funds and that they are the

18   only parties entitled to those funds.  And that is a question

19   separate and distinct from whether or not it is or is not an

20   escrow, which is an issue that was discussed, albeit briefly,

21   at the last hearing and as to which today the debtor doesn't

22   assert a formal position.  As we've noted previously, they are

23   not a party to that contract and they were a source of funding

24   for the account, but they have no direct pay rights out of that

25   account, prior pre-bankruptcy custom and, and practice

1    notwithstanding.  We will have to figure out what the

2    legalities are relating to that aspect of the claim, but that

3    can wait, in our opinion, until after we do the reconciliation

4    and when we figure out who did what to whom.

5         With respect to the, the Government's question, Your

6    Honor, I can confirm for the Court and other parties that the

7    debtor will not access that account and will not invade that

8    account before there's a resolution of this motion.

9         So I can confirm that those monies, approximately 1.1

10   or $1.2 million as of the last hearing will stay where they

11   are.

12        THE COURT:  Does that satisfy you, Ms. Handel?

13        MS. HANDEL:  Yes, it does, Your Honor.

14        I just, very briefly, Your Honor, we had filed a

15   limited objection to JetPay's motion -- it's at Docket No.

16   65 -- and just very briefly, we had filed the limited objection

17   to address some of the issues that were raised at the last

18   hearing.

19        And I don't want to take up the Court's time if the

20   Court's going to continue the matter, but just very briefly,

21   Your Honor, there was issues about whether the Bank had, had

22   questioned whether the use of the term "escrow" is appropriate.

23   And, Your Honor, as we state in our limited objection these are

24   depository accounts, but they're commonly referred to in the

25   industry as escrow accounts.  But regardless how Valley Bank

1  chooses to characterize the account, it doesn't change that the

2  sole purpose of the account is to protect the participant

3  payments.  It also doesn't change, Your Honor, the conditions

4  upon which Valley Bank can disburse the funds and Valley Bank

5  can only disburse the funds to the debtor, the public charter

6  operator, upon certification that the flights were completed

7  and the flights were not completed here, Your Honor.

8           We agree with JetPay that the debtor has no interest

9  in the funds, but we filed the limited objection to JetPay's

10 motion to the extent that JetPay was seeking at this time to

11 have the funds be remitted to it.  We were concerned that not

12 all charter participants have been refunded and that's the

13 purpose of the whole account, is for their benefit.  It appears

14 that there is a reconciliation taking place, Your Honor, so

15 that is all positive, Your Honor, and until all participants

16 have had an opportunity to file claims for refunds, we're

17 requesting that Valley Bank not disburse any funds from the

18 account at this time.

19          Thank you.

20          THE COURT:  You're welcome.  I am aware of the, of the

21 Government's limited objection.  I did see that.

22          MS. HANDLE:  Thank you, Your Honor.

23          THE COURT:  Mr. Sternklar?

24          MR. STERNKLAR:  Good morning, Your Honor.  Jeffrey

25 Sternklar for Valley National Bank.

1          I want to confirm what I said before that my client

2    will not disburse funds other than in accordance with the

3    contract and in consultation with the Department of

4    Transportation, no matter how hard others try to make us do

5    something different.  Our goal is to do the right thing.  We

6    have no present intention of disposing of the money.  Thirty

7    days, it's inconceivable to me that we'll be in a position to

8    dispose of it, but we're going to do exactly what the contract

9    requires, what the law requires, and we will consult with DOT.

10   My client has, I'm informed, retained separate counsel who's

11   dealing directly with DOT on these issues and is in

12   communication with them.

13          MR. HABER:  Your Honor, this is Mr. Haber on the

14   phone.

15          THE COURT:  Hold on, Mr. Haber.  Let Mr. Sternklar

16   finish up, okay?

17          MR. HABER:  Oh, I apologize, Your Honor.

18          MR. STERNKLAR:  So -- I think I'm done --

19          THE COURT:  Okay.

20          MR. STERNKLAR:  -- actually.

21          Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Sternklar.

23          Now, Mr. Haber, go ahead.

24          MR. HABER:  Thank you, Your Honor.

25          The only thing I would like to add to this discussion

1   is if there is going to be a reconciliation of that account,

2   based upon documents that we've seen that reflect that in

3   excess of $2.7 million was paid out in bank charges we would

4   request that the accounting also delineate who received those

5   monies between the various entities, whether it be JetPay,

6   AMEX, or Valley National Bank, for purposes of understanding

7   all of the money that went in and went out of the account,

8   whether it has gone out to the debtor, the third parties, or to

9   the people who are holding the funds.

10          THE COURT:  All right.  Well, that, that request will,

11  I think in the first instance, should be made to the various

12  parties in interest and can be brought back here at the

13  appropriate time, which this is not.

14          So for, for today's purposes, what I'm hearing is that

15  the consensus --

16          Mr. Seder, did you want to say something?  I'm sorry.

17          MR. SEDER:  J. Robert Seder for American Express

18  Travel Related Services.

19          Your Honor, only that we would support the continuance

20  because it was only last night, late in the day yesterday

21  afternoon, that we received the first data, which will help us

22  as well as JetPay determine the credit card amounts that were

23  deposited to this account and the pro rata share if it is

24  determined that the fund, in addition to the consumers that may

25  have paid cash, if the sum is, is to be --

1          THE COURT:  Uh-huh.  (Indicating an affirmative

2    response)

3          MR. SEDER:  -- divided between JetPay and American

4    Express.  We would at least be able to work on our pro rata

5    share but having received the data, some of the data, late last

6    night, we would support the motion, which I guess is remade

7    today, for a continuance.

8          Thank you.

9          THE COURT:  As I was saying, everyone seems to be in

10   agreement that a continuance is appropriate and I will grant

11   the motion by JetPay to do that.

12     (Pause)

13         MR. HABER:  Your Honor, we can no long -- I can no

14   longer hear you on the phone.  I don't know if we've been cut

15   off or not.

16         THE COURT:  No.  We're just consulting the calendar to

17   come up with a continuance.

18         MR. HABER:  Oh, I apologize.

19         THE COURT:  It's okay.

20     (Pause)

21         THE COURT:  All right.  We're going to continue the

22   JetPay motion for relief from stay to May 22nd at 10:00 a.m.

23         MR. STERNKLAR:  I'm sorry.  You said the 27th, Your

24   Honor?

25         THE COURT:  22nd.

1        MR. STERNKLAR:  To 22nd.

2        THE COURT:  Now that brings us to the United States

3  Trustee's motion to convert.

4        Mr. King.

5        MR. KING:  Good morning, Your Honor.  Richard King and

6  the, on behalf of the United States Trustee.

7        Your Honor, the United States Trustee brought the

8  motion to convert, or, in the alternative, for the appointment

9  of a Chapter 11 trustee back on March 23rd for a number of

10  different reasons.

11        Principally, we alleged that, among other things, the

12  debtor had ceased operations, had very limited cash, excess

13  liabilities, and that there appeared at that point to be a

14  significant underfunding of the escrow account.  At that time,

15  Your Honor, there was about, I believe, about $45,000 in cash

16  on hand and the administrative expenses continued to grow.

17        The debtor has since filed a response to the motion to

18  convert, which acknowledges, among other things, that the

19  debtor would face significant obstacles in terms of restarting

20  operations.  Certainly, practical concerns, money, for one

21  thing, aircrafts, airports, fuel, payment processing, and the

22  like.

23        In addition, Your Honor, the, the DOT -- and

24  Ms. Handel's on the phone and I don't want to say too much on

25  her behalf -- but the DOT is conducting some investigation and

1   while -- in my motion to convert on the 23rd I mentioned that

2   they had, that the DOT had revoked the charter or revoked the

3   authorization to fly.  Whether or not that's technically true,

4   it certainly seems that at a minimum that there is some type of

5   application process that would have to be done by the debtor.

6   That would make, again, at a minimum, the debtor's claims that

7   it could start flying by May 15th to be, frankly, impossible.

8   And accordingly, it appears that the debtors could not start

9   any operations within the foreseeable future.

10          Moreover, Your Honor, at this point, well, at the time

11  of the, at the time of the filing there appeared to be $45,000

12  in cash.  While the debtor claims that they have made some,

13  that they've restructured their operations to try to minimize

14  the amount of their administrative expenses, their burn rate is

15  such that, at a minimum -- in their response they say they

16  could go till the end of the month -- but without an infusion

17  of new cash at the, even if we accept what the debtor says in

18  his response, in its response, then this case is effectively,

19  is effectively, is effectively over in terms of any viable

20  reorganization.

21          And more importantly, Your Honor, is, is the, is the

22  escrow account.  The -- at the time we filed the motion it

23  appeared that the escrow account was significantly underfunded.

24  Since that time we have come across two financial statements

25  uncertified, one of which has been actually attached by

1   Mr. Haber in his joinder that he filed this morning.

2          THE COURT:  Uh-huh.  (Indicating an affirmative

3   response)

4          MR. KING:  That one that Mr. Haber includes in his

5   joinder, Your Honor, was prepared by King/Williams at the time

6   of the, and I believe it includes a balance sheet.  And looking

7   at Exhibit 1 to Mr. Haber's joinder, or response, I believe he

8   calls it, that he filed this morning, you'll see, Your Honor,

9   that the, it says "Due from Partners," with a Footnote No. 2.

10  It says $12,514,000.

11         THE COURT:  Where are you looking?

12         MR. KING:  I'm looking at Mr. Haber's -- the --

13  Exhibit 1 --

14         THE COURT:  Yes.

15         MR. KING:  -- done by Mr. Haber.  And it, it purports

16  to be a balance sheet as of December 31, 2011.

17         THE COURT:  Right.  And what's the item on the balance

18  sheet?

19         MR. KING:  It's under Current Assets, Your Honor, Due

20  from Partners, 12,514,000.

21         THE COURT:  Yes.

22         MR. KING:  That -- and what it says is, "The balance

23  shown in the Due from Partners of 12,514,000 is guaranteed by

24  the founding members of the LLC via personal guaranties and

25  such supported by hard collateral pledged by the founding

1  members."

2       You'll note, Your Honor, that at the bottom it says

3  that King, King/Williams is the discussion -- and then it says

4  "Discussion materials, February 2012."  The, the King/Williams

5  is related to Avondale 1, which is the, I want to say, 50,

6  certainly the majority shareholder of the debtor since the

7  closing acquisition date of September 29, 2011.

8       In addition, Your Honor, the U. S. Trustee's Office

9  had received from the debtor itself another, again, uncertified

10  balance sheet that indicates something different from what

11  Mr. Haber had received from the creditors presumably at some

12  point in either January or February 2012.  And we had received

13  a balance sheet from Direct Air as of January 31, 2012 at the

14  creditor committee formation meeting last week and it was

15  presented to us that this had been prepared by, what, the group

16  that's either called the prior owners or the founding partners.

17  And in that it indicates that the -- under the Assets it

18  includes that there is in the Valley National Bank the sum of

19  $14,200,353.  However, later on in the balance sheet there is a

20  sum under Liabilities called Escrow Liability of

21  $12,024,580.52.  That amount corresponds fairly, fairly closely

22  with the amount that's Due from Partners in the financial

23  information received from Chemoil by the U. S. Trustee's

24  Office, but interestingly, in the balance sheet that we had

25  received from the debtor there is no mention of a Loans from

1    Shareholder.

2         So we have drawn the conclusion -- and I think it's a

3    reasonable inference -- that the amount of the Escrow Liability

4    is about, at least $12,000,000.

5         I think further, Your Honor, it at least raises the

6    inference that since King/Williams prepared the, the financial

7    statement received by Chemoil back in, I'm assuming it would

8    have been early January -- it's effective December 31st, but

9    Mr. Haber may be able to speak to that --that it, it raises the

10   possibility, at least, that, in terms of, as Mr. Fox said, who

11   did what to whom and when, that, that it's possible at least

12   that the founding members could claim, as I think they have in

13   the press, that, that Avondale at least knew about some of the

14   problems with the escrow account and I think it militates in

15   favor, Your Honor, of a, of a conversion immediately as opposed

16   to what I think the debtor would ask for, which is a

17   continuance of a couple weeks while they try to infuse new cash

18   in this.

19        And so I believe that a Chapter 7 trustee needs to be

20   appointed for a couple of reasons.  One, the case is moribund.

21   It's not operating.  It has no reasonable prospects for

22   operating.  The burn rate that they have, they're going to run

23   out of cash very, very quickly and I think someone needs to be,

24   a Chapter 7 needs to, trustee needs to be appointed to

25   investigate the financial affairs of the debtor, including the

1   escrow fund.

2         THE COURT:  All right.  Thank you.

3         MR. KING:  Thank you.

4         THE COURT:  Mr. Fox.

5         MR. FOX:  Your Honor, do you want to hear from the

6   debtor or from Mr. Haber?

7         THE COURT:  You're right.  Let me hear from anyone who

8   supports the Trustee's motion first.

9         Mr. Haber?

10         MR. HABER:  Your Honor, this is Mr. Haber --

11         THE COURT:  Yep.

12         MR. HABER:  -- on the phone representing Chemoil.

13         We filed a joinder at Docket Entry 53 to the U. S.

14   Trustee's motion to convert.  U. S. Trustee's motion to convert

15   was Docket Entry 27.  The debtor filed a response pursuant to

16   the extension granted by the Court yesterday and while I

17   apologize that I couldn't file it till this morning, we only

18   received the response of the debtor yesterday.

19         We reiterate what the U. S. Trustee has stated.  We

20   think it's obvious by the facts of this case that there is no

21   potential for a reorganization of this particular debtor for

22   all of the reasons stated.

23         We also agree that there are significant issues with

24   respect to this, whether you call it escrow account, depository

25   account, any way you want to slice it, there's money missing

1    and the question is how large the net gets cast and to whom is

2    something that the debtor cannot reasonably protect the

3    creditors with respect to those issues and we believe that the

4    only party that could possibly do so would be a trustee.  And

5    since we don't believe we have an operational debtor or a

6    viable debtor, it should be a Chapter 7 trustee.

7           Despite the debtor's response, which states that

8    there's a distinction between new management and prior

9    management, or at least they try to make that distinction, our

10   reply, which we filed at Docket Entry 80, attaches documents,

11   specifically Exhibit A, and I cannot personally state whether

12   it was prepared by Direct Air or King/Williams,  It does say on

13   the bottom February 2012.  It was provided to my clients on or

14   about that time and it references the acquisition on September

15   29 and clearly raises the question of how much Avondale 1 knew,

16   how much King/Williams knew, as well as the principals of those

17   entities.  And since those entities and/or their principals are

18   now the parties in control of the debtor's management, given

19   that they're the majority shareholder, we believe that they are

20   not going to undertake investigation as against themselves and

21   what knowledge, involvement, or participation they had with the

22   continuation of what we believe to have been a fraud by Direct

23   Air and its principals.

24          So we believe for that reason as well the motion to

25   convert should be granted pursuant to the Court's ability to do

1   so under the statute cited by the U. S. Trustee as well as

2   under Section 105.

3         Thank you, Your Honor.

4         THE COURT:  Thank you.

5         MS. HANDEL:  Your Honor, this is Andrea Handel.  May I

6   briefly be heard?

7         THE COURT:  Yes, go ahead.

8         MS. HANDEL:  Thank you, Your Honor.

9         First of all, thank you, Your Honor, for allowing me

10   to appear by telephone.

11         The United States doesn't take a formal position on

12   the U. S. Trustee's motion to convert, but I do need to stress

13   for the Court's benefit that the United States does have

14   serious concerns about this case, Your Honor.  At this time the

15   debtor's not operating and if it wants to resume operations as

16   a public charter operator, it will need to submit to DOT a new

17   charter prospectus, which has not yet done.  And in reviewing

18   the prospectus, once the debtor decides to submit one to DOT,

19   DOT's going to need to consider whether accepting its

20   prospectus and permitting the debtor to operate as a public

21   charter operator is in the public interest, Your Honor.  And at

22   this time it's clear that there's an underfunded escrow

23   account.

24         The DOT has issued Letters of Investigation.  To date,

25   the debtor has not yet responded to that letter and the

 1   response deadline has passed.  My understanding is the debtor

 2   has not yet sought a formal extension of time with DOT to

 3   respond to that Letter of Investigation.

 4          Another point, Your Honor, is, in addition to

 5   representing DOT, I also represent the Transportation Security

 6   Administration, TSA.  I don't have all the information at this

 7   time, Your Honor, but my understanding is that the debtor owes

 8   TSA a significant amount of security fees.  I believe the

 9   number is excess of 800,000.  This money, Your Honor, is

10   collected by the debtor from passengers and it's required to be

11   remitted by federal statute and regs to TSA.  I don't have any

12   information as to why the fees were not remitted or what

13   happened to the fees.

14          So, Your Honor, for those reasons, we do have serious

15   concerns about the case, Your Honor.

16          Thank you.

17          THE COURT:  Ms. Handel, you said that the time for the

18   debtor to respond to the DOT's letter has expired?

19          MS. HANDEL:  Yes.  I believe it was the other day and

20   they had not yet responded, nor did they seek a formal

21   extension of time with DOT as to when they will be providing a

22   specific response date.

23          THE COURT:  What was the letter about?

24          MS. HANDEL:  Your Honor, the letter went to -- trying

25   -- for DOT to try to gather information about the funds that

1   were deposited in the escrow account.  I --

2            THE COURT:  Anything else?

3            MS. HANDEL:  It was -- excuse me.  What, Your Honor?

4   I'm actually looking at the letter as we speak.  I apologize.

5            THE COURT:  Go ahead.

6            MS. HANDEL:  Looking for accounting records, looking

7   for accounting statements.  It was basically letters to see if

8   they were complying with Part 380 of the DOT regs.  And so it

9   was general specific information they were requesting about

10  what funds were deposited in the escrow account, trying to get

11  information about customer refunds, trying to get copies of

12  accounting records maintained by Direct Air with respect to

13  each of the charter programs, accounting records of salaries

14  that were paid to the principals, and steps that Direct Air was

15  taking to notify all the passengers about cancellations.

16  Because in the consumer section of DOT it's very important and

17  you just don't want to leave passengers stranded.

18           So it was things of that nature, Your Honor, and they

19  had a specific time when they were supposed to respond and that

20  response deadline has passed and I know DOT has been in

21  communications with their, Direct Air's regulatory attorney to

22  find out when they are going to be responding to this letter.

23           And I should point out, Your Honor, that Direct Air

24  was not the only one to receive a Letter of Investigation,

25  also.

1          THE COURT:  Okay.  And I need some guidance on the

2   process of getting approval of a new charter prospectus.

3          In the best case/worst case, what's the timeframe for

4   that to occur once the application --

5          MS. HANDEL:  Your Honor, that's a very fair question

6   and I, and I apologize in advance to being vague.

7          It's difficult to answer that because, one thing, they

8   haven't submitted the prospectus yet.

9          Second, they also haven't responded to the DOT's

10  Letter of Investigation.  My understanding is, if there are

11  zero problems in the case, it doesn't take long.  However, in

12  this case there are serious problems.

13         So it would be unfair for me to say one day or several

14  months when the debtor has not even responded to the Letter of

15  Investigation, nor has the debtor even submitted a new charter

16  prospectus to DOT.  So I very much apologize, Your Honor.  It's

17  just difficult to give a timeframe when we're missing those

18  pieces of information.

19         THE COURT:  Okay.  Thank you.

20         Mr. Fixler.

21         MR. FIXLER:  Good morning, Your Honor.  David Fixler,

22  Rubin and Rudman, for Judy Tull, Kay Ellison, and Marshall

23  Ellison.  I was formally retained yesterday evening, so I'll be

24  filing my appearance today.

25         Your Honor, I've been retained for the sole reason of

1   coming into this court and saying that my clients

2   wholeheartedly support and welcome the Trustee's motion to

3   convert the case.  It's pretty clear from a quick review of the

4   pleadings in this case that, particularly the pleading that was

5   filed yesterday by the debtor, that Avondale Aviation's

6   strategy is to blame my clients for all the financial problems

7   and for the demise of Direct Air without regard to what the

8   actual facts may be.  They are -- they seek a two-week

9   extension to continue their blame campaign, but that's really

10  not the purpose of a Chapter 11.  There's nothing in their

11  pleading about how this company is going to get back in the air

12  and what they want to seek to do is, while they're in control

13  of the books and records, to continue to investigate and blame

14  my clients in an attempt to exonerate themselves.

15       We don't believe that's the appropriate course.  We

16  believe that an independent fiduciary should be appointed who

17  can take any actions that are appropriate and necessary and my

18  clients endorse that approach and welcome such an appointment.

19       Thank you.

20       THE COURT:  Before you go, tell me what standing your

21  clients have to take a position here.

22       MR. FIXLER:  Well, they are -- I believe they, they

23  are creditors.  They may be owed some money and they're,

24  they've been sort of the absent party in this room being blamed

25  and they had, there's going to be an effect on them for this

1    investigation that the debtors are, are making and we just want

2    it to be done by a independent fiduciary who's beholden to no

3    one.

4              THE COURT:  Thank you.

5              MR. FIXLER:  Thank you, Your Honor.

6              THE COURT:  Does anybody else want to be heard in

7    support of the U. S. Trustee's motion to convert?

8       (No response)

9              THE COURT:  Okay, Mr. Fox.  You're up.

10             MR. FOX:  Thank you, Your Honor.

11             THE COURT:  What I want you to focus on is, is

12   satisfying me that there will be absolutely no prejudice to any

13   party in giving the debtor two more weeks to see if something

14   can be pulled together.  Speak to that, please.

15             MR. FOX:  I can do that in two specific ways, Your

16   Honor.  First, I can give you our assurance that no funds will

17   depart the estate except in connection with the usual and

18   customary expenses of payroll, rent, insurance, and the like.

19             THE COURT:  And is there money to pay those expenses?

20             MR. FOX:  They -- those expenses are covered through

21   the end of this month, Your Honor, and to the extent that we

22   seek to go beyond this month with Your Honor's approval, we

23   will assure the Court before we go beyond any period of

24   extension that we have the available funds to do so.

25             Second, Your Honor, I can assure you that while this

1   current management team is in control of the debtor's

2   operations and books and records, that no books and records

3   will be destroyed, no books and records will be removed, and

4   that were you to at the end of our requested extension or

5   adjourned period to direct either conversion and the

6   appointment of a Chapter 7 trustee, or, alternatively, as

7   requested by the U. S. Trustee, a Chapter 11 trustee, that all

8   of those books and records would be made available.  All of the

9   assets of the debtor will be preserved, and made available to a

10  trustee, be it a Chapter 7 or a Chapter 11 trustee.

11          There were two primary themes within our response

12  filed yesterday afternoon.  The first was we will do no further

13  harm and we felt that was very important to make clear to the

14  Court and to the U. S. Trustee's Office.  We will do no further

15  harm.  That is quite different, though, than saying that there

16  has not been harm done before we entered Chapter 11 and we were

17  quite clear when we appeared at the last hearing in this case

18  that we don't know what the nature or the source of the harm

19  that has happened, although we do know that there is harm.  And

20  while Mr. Fixler believes that this has all been about a smear

21  campaign on his clients and that they are the sort of

22  unrepresented party within the room, the truth of the matter

23  here, Your Honor, is the unrepresented party in the room are

24  the charter participants whose expectations were not met and

25  who may ultimately lose substantial sums because there is a

1   shortfall in the escrow and if it's not the charter

2   participants, it may be JetPay, American Express, or others who

3   stepped into their shoes by providing chargeback relief in

4   accordance with their credit card processing.  What we can say

5   is there is approximately 1.1 or $1.2 million in the Valley

6   account and that, as we've committed previously today, will not

7   move.

8          So there will be no further harm with respect to that

9   escrow account.  That is safeguarded and is preserved, as

10  Valley's counsel has indicated and as the Government has

11  indicated and as we have committed.  So there will be no

12  further prejudice to any party in interest here.

13         The second part of our response, Your Honor, is not so

14  much to take issue with some of the facts mentioned by Mr. King

15  in his motion, but, rather, to quarrel with the conclusions

16  reached from those facts.

17         We do not dispute that we are not flying aircraft

18  today.  We do not dispute that we have whittled down our staff

19  to the bare minimum necessary to safeguard records, as we've

20  previously indicated, safeguard accounts, and to start the

21  process of doing the analysis necessary to figure out who's

22  owed what and why.

23         We have also dedicated that staff to doing the

24  critical things necessary to meet our obligations under Title

25  11 in order to administer these cases in an orderly and

1    efficient manner.  Those obligations, we have been meeting to

2    date, and I don't believe there's any dispute with respect to

3    that.  We have filed the papers required.  Our schedules are

4    due next week and we fully expect that those will be filed on

5    time.  We have met with the U. S. Trustee's Office at their

6    request.  We appeared at the organizational meeting, although

7    there was not sufficient interest in the formation for a

8    committee.  We do have our 341 meeting coming up that we will

9    attend.

10          So we will meet our obligations during this, any

11   additional period of time you grant us with respect to our

12   obligations under Title 9 --

13          THE COURT:  But none of --

14          MR. FOX:  -- Title 11.

15          THE COURT:  But none of that really deals with Chapter

16   11.  You're out -- you've been out of business since the

17   petition date on March 15th.  Tell me -- tell me -- give me

18   some insight as to the likelihood as we stand here today that

19   Direct Air will be able to restart operations in any, like, a

20   reasonable period of time.

21          MR. FOX:  Your Honor, two responses to that.  First,

22   as we, as we state in our response to, to the U. S. Trustee's

23   motion, we acknowledge, as we did at the last hearing, that

24   there are some significant hurdles.  We don't believe today,

25   however, that they are necessarily insurmountable.  We have

1  since we last appeared before the Court been meeting with

2  various local municipalities and airport authorities.  We have

3  had very constructive meetings with certain members of Congress

4  whose constituents and their districts have a significant

5  interest in seeing the air service restored within their

6  districts.  We have started the process of having dialogue with

7  third parties about funding, including with some of the airport

8  authorities who have an interest in seeing our charter service

9  restored.

10        We do acknowledge in our papers that we have received

11  the Letter of Investigation from the DOT and our special

12  counsel who's dealing with the regulatory matters is preparing

13  the appropriate responses and is in regular communication with

14  the DOT on that.  I cannot answer why a response hasn't been

15  filed yet.  I cannot answer why a formal extension request has

16  not been made.  That was news to me this morning.  I will

17  investigate that further and be able to respond to that at a

18  later hearing, but I can assure the Court we are working

19  towards providing a response.  We are mindful of the need to do

20  so, but truthfully, most of the information, if not all of the

21  information, requested in that Letter of Investigation is

22  historical and is not materially different than the information

23  that we've been gathering to deal with our friends at JetPay,

24  Merrick Bank, and, and AMEX as to the historical information

25  relating to the charter participants and the amounts owed to

1    them.

2          We -- so in terms of probability of our ability to get

3    back in the air, I can't offer Your Honor any assurances, nor

4    can I offer you any probabilities except to say that it is our,

5    one of our foremost focuses.

6          The other focus and the other significant component of

7    this case, it is no secret -- we're the first ones to say it at

8    our last hearing -- is there needs to be a determination made

9    as to why this happened.  I recognize that Chemoil would like

10   to say, as Mr. King suggests, that one can draw a, a reasonable

11   inference from a single financial statement that has a legend

12   on the bottom that Avondale, the primary equity holder here,

13   knew.  We dispute that.

14         What we would say to Your Honor with respect to that

15   is whatever happened here with respect to this escrow account

16   and we will find out either by ourselves or in cooperation with

17   the U. S. Trustee's Office, perhaps, as we suggest in the

18   papers, through the use of an independent third party such as

19   an examiner, if that proves to be an appropriate course.  It's

20   not an issue that's before the Court today, but it's certainly

21   something that we all need to discuss about how to go about it.

22   We thought that would be a discussion that would be had with a

23   creditors' committee, but they're not, they don't exist.  So

24   we'll have to do it separately with the U. S. Trustee.

25         There needs to be a determination made and it doesn't

1   require a Chapter 7 trustee and it doesn't require a Chapter 11

2   trustee to do it.  There are other vehicles available and there

3   doesn't seem to be any reason why that an investigation can't

4   be directed by the debtor here.  The truth -- and it's

5   inescapable here -- is that nobody associated with Avondale had

6   access to this account.  Nobody associated with Avondale was a

7   signatory.  Nobody at Avondale ever signed a certification to

8   Valley Bank to withdraw any money from that account.

9         And the financial statement that is attached to the

10  Chemoil statement filed this morning was delivered in

11  connection with meetings, as I understand it, that took place

12  between not the debtor and Chemoil, but affiliates of the

13  debtor, of the debtor's ownership looking to continue the

14  business relationship which ultimately resulted in there being

15  certain guaranties of payment provided to Chemoil.

16        But also, importantly, Your Honor, if you look at the

17  dating associated with that financial statement, one, it's

18  historical in nature.  If you look at the delivery dates in

19  February, the damage had already been done and once it was

20  clear that the escrow account was reflecting a significant

21  shortfall as of that date, it is that point in time when

22  Avondale started airlifting people down to the debtor to try

23  and figure out what happened.  That ultimately is what led us

24  into Chapter 11 and this company hitting a wall.  As soon as

25  the Ellisons and Ms. Tull left the employ of the debtor,

1   Avondale put in a new team and Avondale, as we understand it,

2   made the quick and responsible decisions to discontinue

3   operations before any further damage was done.

4          I would also point out to Your Honor that, you know,

5   while it's, it's Chemoil's view that an investigation needs to

6   be done, you know, it was, I sat here with some interest during

7   our discussion about the JetPay matters and Chemoil's request

8   that an accounting be prepared with respect to the bank charges

9   that were supposedly paid out of the Valley account.  I would

10  note, Your Honor, it is our belief that, based upon the

11  information we've had access to so far, that Chemoil itself may

12  be the single largest recipient of payments out of that account

13  on account of fuel charges and that Chemoil itself may be the

14  single largest preference defendant in this estate.

15         So clearly, Chemoil has an interest in seeing somebody

16  other than this management team investigate these matters as a

17  way to potentially insulate themselves.  I would also note that

18  at the same time that Chemoil is seeking to have this case

19  converted Chemoil is pursuing its separate efforts to collect

20  on various guaranties provided by King/Williams for unpaid fuel

21  charges.  So they clearly have a separate agenda and they have

22  a separate interest in seeing this case get converted, which

23  has nothing to do with what the future prospects are of

24  restarting operations.

25         Also with respect to the financial statement

1  referenced by Mr. King and Mr. Haber, one thing that is clear

2  to me from that -- and we can quibble about what the source of

3  that information was, who prepared it, when it was delivered,

4  and what its authenticity may, in fact be -- it doesn't show a

5  difference in the math.  It, it is clear that the math is

6  substantially the same, although its presentation may be a

7  little bit different.  It's still the same 12 plus million

8  dollars that somebody is suggesting at that time is a shortfall

9  in the escrow account as of Feb, as of approximately two to

10  three weeks before this case was commenced.

11        So there doesn't seem to be any nefarious behavior

12  with respect to the delivery of the financial statement and,

13  therefore, in my view, it doesn't serve as the proverbial

14  smoking gun that Mr. Haber would like to make it out to be.

15        I would also suggest that if one were to review Mr.

16  Haber's statement filed this morning it is not only the debtor

17  who is, has suggested that there were irregularities with

18  respect to this escrow account, or call it what, what you will,

19  but Mr. Haber also takes the luxury and the opportunity to

20  sling some arrows as the Ellisons and Mr. Fixler's clients as

21  being a repeat offender with respect to issues like this by

22  citing into the Fourth Circuit's opinion and the Ellisons'

23  personal bankruptcy back in 2002.

24        So that was something that was clearly not known at

25  the time that the transaction closed back in the end of

1    September to Avondale and, perhaps, they may have taken a very

2    different view about what to, whether to invest in this

3    business or not.

4         So as I said, Your Honor, earlier, it is not so much

5    facts that we, we quarrel with with the U. S. Trustee 'cause

6    there are certain undeniable facts here, but we do quarrel with

7    the conclusions that those facts lead you to.  But at the same

8    time I would say to you we are not delusional.  We, we have not

9    drank the Kool-Aid just yet.  We're not asking you for an

10   extended period of time.  We are asking you for a little more

11   rope to hang ourselves with while we continue to explore with

12   various constituencies that we have to to see whether there is,

13   in fact, an opportunity to restart this business within a

14   reasonable period of time and put together the building blocks

15   to do that.

16        So in our view, we don't think it's an extraordinary

17   request on our part to ask for approximately two weeks more

18   time, particularly when, as I suggest, there's not prejudice

19   that will befall any party from doing that.

20        THE COURT:  Let me stop you there for a second and,

21   and explore the prejudice a little bit further.

22        There are customers out there who have purchased air

23   travel that have not, for the future.  Their -- the dates of

24   travel has, have not yet arrived --

25        MR. FOX:  Uh-huh.  (Indicating an affirmative

1    response)

2         THE COURT:  -- right?  Do you have any sense -- can

3    you give me any order of magnitude of how much money that

4    consists of in unflown charter flights that have already been

5    paid for?

6         MR. FOX:  Based upon some of the data I saw as

7    recently as this morning, Your Honor, the number appears to be

8    for post-March 13th, which is at or about the time of the

9    commencement of this case, collectively, approximately 25 to

10   $30 million.  And that's a combination of a multitude of

11   different components, including charter flight segments and we

12   would account for each segment separately, I understand.

13   There's been discussion in, in prior proceedings about voucher

14   programs that the debtor sponsored where people could purchase

15   a voucher for future travel without tying it necessarily to a

16   particular flight segment.  One could prepay baggage fees and

17   the like.  There were certain club or membership points that

18   could be purchased and the like and, you know, all --

19         THE COURT:  And all of that would be wrapped into that

20   number?

21         MR. FOX:  I believe all of that -- and there -- it

22   includes some taxes and fees --

23         THE COURT:  Uh-huh.  (Indicating an affirmative

24   response)

25         MR. FOX:  -- and other things.  All of that rolls up

1   into that number.  That is part of the analysis we have to

2   undertake with JetPay, AMEX, and others over what their

3   allocable portion of those, how much of it was charged on Visa,

4   MasterCard, Discover versus American Express, how much was paid

5   in cash or through another means.  I can confirm to Your Honor

6   that based upon the information we've received from Radixx that

7   there are customers who did, in fact, pay certain charges in

8   cash and, therefore, persons who would have a direct right to

9   reimbursement from the Valley account distinct from the

10  position that JetPay, Merrick, and AMEX take.  We're still

11  working on how much that would be, who it is, and the like.

12       And there's also a painful reconciliation that needs

13  to be done in tying back, as I suggested in a prior hearing,

14  between matching specific charter participants and specific

15  charter legs and to deposits in the account to determine

16  whether, in fact, any of the money in that account separate and

17  apart from the presence of a shortfall relates to a prior

18  charter that did entitle the debtor to remove funds and,

19  therefore, whether or not the debtor may have an interest in

20  any of those funds.  We haven't gotten that far in the

21  analysis, so I can't speak to it as to whether or not it's, in

22  fact, a reality, but it's part of the analysis that needs to be

23  done.

24       And it's a separate question, Your Honor, is if, in

25  fact, as a matter of law, as I suggested earlier, that Jet,

1    neither JetPay, Merrick, nor AMEX have the right to reach

2    directly into that account, as they suggest they, they should,

3    and if the total number of charter participants whose dollar

4    entitlements to reimbursement from the Valley account totals

5    less than 1.1 or $1.2 million, the balance today in that

6    account, where that differential ultimately goes, whether it

7    goes into the general funds of the estate available for all

8    creditors or whether JetPay and others are correct that they

9    have a right to those funds ahead of everybody else.

10          THE COURT:  Right.  But, but if the number you're,

11   you're using of 25 -- let's take the low end -- $25 million, is

12   it possible that 11, $12 million of that number represents

13   things like vouchers and memberships, things that would not

14   ordinarily have to go into the escrow account?  'Cause if it,

15   if it's not that much money, then the escrow account should

16   have been a lot more than $12 million, to begin with.

17          MR. FOX:  Well, it raises an interesting question,

18   Your Honor, one I don't have the answer to today, although

19   it's, it is a question I asked this morning as we try and drill

20   down and I can -- if you can give me two seconds, I can try and

21   see if I got a, an answer to that question, which it does not

22   appear I did.

23          But, Your Honor, a signif -- there is a significant

24   portion, although I can't tell you in order of magnitude

25   whether it's half, or less, or more, of the total shortfall,

 1  but it is -- the voucher program was, apparently, significant

 2  and stretched over a period of time, as did the membership

 3  program and the like.

 4        I would also not want to mislead Your Honor into

 5  reaching the conclusion that merely because you represented a

 6  voucher, payment for a voucher or for baggage fees or the like

 7  that it wouldn't necessarily have to go into the Valley

 8  account --

 9        THE COURT:  Uh-huh.  (Indicating an affirmative

10  response)

11        MR. FOX:  -- and be maintained under the terms of the

12  depository account agreement and the DOT regs.  And before the

13  Government jumps on me for that issue, there's room for debate,

14  I understand from talking to regulatory counsel, as to what the

15  proper interpretation of Part 30 of the DOT regs, Part 380 --

16  I'm sorry -- of the DOT regs are as to what has to or has, what

17  constitutes an amount that must go into the escrow.  That will

18  ultimately flesh itself out in our discussions with the DOT as

19  we continue down the, the reconciliation process.  I -- I -- it

20  is my understanding that the prior management believed that

21  there was more flexibility in the interpretation of the DOT

22  regs than the DOT believes is the case now.

23        THE COURT:  Focusing, though, on the customers again,

24  please, those folks who have bought travel, who -- who --

25  whose, whose travel date has not yet arrived are in a purgatory

1   situation where they don't know whether they're going to be

2   able to fly and they can't make plans.  They can't get their

3   money back.  Why should I keep this case open any longer for

4   those people to continue to be left in that position when a

5   conversion will at least, I think, give them the ability to

6   seek refunds and go on with their lives?

7          MR. FOX:  First of all, Your Honor, one thing that we

8   did immediately upon the changeover in the management here is

9   we cancelled all charters through May 15th.  So clearly, those

10  people who had planned to fly through May 15th have a clear and

11  definitive answer that there will not be flights --

12         THE COURT:  Uh-huh.  (Indicating an affirmative

13  response)

14         MR. FOX:  -- through that date.  Whether we can

15  commence flying after that date is a question that's still

16  open.  And we've talked at some length between the two hearings

17  as to what we have to do in order to do that, not the least of

18  which is, as the Government suggests, satisfy the DOT that

19  we're going to be an honest broker and we're going to be able

20  to conform to the DOT's regs as a charter carrier.

21         I do not believe that there is any, you know -- the

22  interesting part about the charter business is it only goes on

23  for so long and you're only permitted to schedule charters out

24  so long.  So our selection or management's selection of the May

25  15th date was reasonably calculated to cover as many, pretty

1  much predominantly the universe of potential customers who had

2  scheduled flights some 60 days out from when we, when we

3  announced the discontinuation of flight operations.  There have

4  been communications all throughout the communities in which we

5  conducted business.  There -- both, you know, in the press,

6  through the DOT, on our website, and separate inquiries from

7  customers themselves who have been given direction as to how to

8  deal with that issue.  You've heard previously from both JetPay

9  and AMEX's counsel that people have not been shy about

10  exercising their rights to chargebacks.  So --

11        THE COURT:  But how -- how -- do you know what the,

12  what the outside date is for the, for the last charter that you

13  have already taken money from?

14        MR. FOX:  I don't have that answer before me today,

15  Your Honor, but I do believe it was reasonably calculated to be

16  at or about the May 15th date.  I don't recall whether there

17  were any charters that went out beyond that, but I can

18  certainly in a supplemental filing, Your Honor, find out that

19  information and provide it to the Court.

20        MR. BRAUNSTEIN:  Your Honor, if I may.

21        At the 341 meeting or at the 340, the meeting of

22  creditors, the formation meeting where I attended -- Mr. Fox

23  didn't -- Mr. King and Mr. Doherty asked that question.  I

24  think they were quite satisfied with the response of the debtor

25  that it did not, there was not much by way of any significance

1  beyond the May 15th deadline.  I believe that was the answer

2  that the principal of the debtor made, who was at that meeting.

3          Again, we can find that answer out readily.

4          MR. KING:  I believe -- I'm not sure my memory differs

5  that much from Mr. Braunstein, but I believe that, that the

6  principal of Avondale said that there were some flights out --

7  and I think it was confirmed by Ms. Russell --

8          MR. BRAUNSTEIN:  Yeah.

9          MR. KING:  -- that there were some flights out into

10  August, but that most of them, that they believed that most of

11  them were around the --

12          THE COURT:  Uh-huh.  (Indicating an affirmative

13  response)

14          MR. KING:  -- May 15th deadline, but that there were

15  some after.

16          THE COURT:  Thank you.

17          MR. FOX:  I think that's reasonably consistent with

18  what I said.

19          But as I said, Your Honor, the May 15th date was

20  selected with some, some rationality behind it.

21          THE COURT:  Uh-huh.  (Indicating an affirmative

22  response)

23          MR. FOX:  Now -- and the May 15th date also was at the

24  time our good faith belief at that time as to what our best

25  case scenario might be for restarting operations and getting

 1   back in the air and we are not likely to meet that date, but

 2   it's not going to be for lack of trying and we continue to work

 3   very diligently to, through the company's principals to try and

 4   put in place the necessary building blocks to make that happen.

 5          THE COURT:  All right.  Thank you.

 6          Anyone else want to be heard?

 7      (No response)

 8          THE COURT:  I note for the record that there is no

 9   party that supports the debtor's request to continue in Chapter

10   11 and my guidance here is Section 1112 of the Code, which sets

11   forth the ground rules for, grounds for converting cases and

12   the, I think the, the applicable one in this case is the

13   absence of a reasonable likelihood of rehabilitation.  I think

14   everybody would agree with that.

15          And the flipside is that in order for me not to

16   convert the debtor has to establish that there is a reasonable

17   likelihood that a plan will be confirmed within the timeframes

18   that are set forth in the Code.  That's 1112(b)(1) -- (b)(2) --

19   (b)(2)(A).  The case has been in Chapter 11 now for almost a

20   month with a non-operating debtor and had the debtor been able

21   to come in here with something that indicated that there was a

22   tangible prospect for getting back in the air, I would have

23   been willing to consider another extension.

24          I understand that two weeks is not a long time, but it

25   seems to me that the, that there is prejudice to the public who

1   have purchased travel from this airline and who cannot at this

2   point request a refund because their charter travel has not

3   actually been cancelled.  We don't know what the universe of

4   that number is, but based on what was stated at the 341 meeting

5   there are customers out there who cannot get their money back

6   and who cannot make plans and do not know what the future holds

7   for them and they're being prejudiced by even a two-week

8   extension.  We're coming up to summer.  People need to make

9   their summer plans and they can't.  And the debtor just hasn't

10  given me anything that I can grab on to in terms of a possible

11  exit strategy.

12         The Department of Transportation's counsel has

13  indicated there's a process that needs to go, be gone through

14  before the company can get back into the air.  That process

15  takes time and based on past history -- and that's where the --

16  the -- that's one of the impacts of the escrow shortage on this

17  whole process.  That situation has now, I think, put any

18  request by Direct Air to go back into business under

19  extraordinary scrutiny by the Government before it will reissue

20  a charter.  That means more time will go by before there's

21  going to be operations here.

22         Mention was made of smoking guns and I don't think

23  that the financial information that was provided by Chem, Chem

24  -- is it Chemoil -- is persuasive one way or the other in terms

25  of whether there should be a conversion, but there is a smoking

1   gun here and the smoking gun is this disappeared funds in the

2   escrow account, which I don't believe that whatever happens the

3   debtor should be permitted to orchestrate the investigation

4   into what happened to those funds.  An independent fiduciary is

5   critical because of the magnitude of the discrepancy of the

6   shortfall and again, because of the, the nature of the business

7   as a charter company, which is supposed to be highly regulated

8   by the Government to avoid just this kind of situation.  It's

9   imperative that what, that, that we get to the bottom of it and

10  it's done in a way that at least the parties and the public

11  will have confidence they can rely on.

12          So for all those reasons, I am going to reluctantly,

13  but, nevertheless, grant the United States Trustee's motion and

14  convert this case to Chapter 7.

15          MR. FOX:  Your Honor, if I may be heard for just one

16  moment.

17          THE COURT:  Okay.

18          MR. FOX:  Your Honor, I understand your ruling,

19  certainly, and I, I would only suggest to the extent that one

20  draws conclusions from some of the things that were said today

21  with regard to the prospect of a successful reorganization and

22  our ability to confirm a plan here, those are uniquely factual

23  findings and, Your Honor, this is, as, I think, everybody

24  recognizes, was scheduled and is a non-evidentiary hearing.  I

25  think at a minimum the debtor should be afforded the

1    opportunity to present evidence on those things and have its

2    principals appear and be heard with respect to the efforts

3    being undertaken.

4         Since this was scheduled as a non-evidentiary hearing

5    they're certainly not present and we weren't prepared to

6    present evidence along those lines, which is, you know, I think

7    consistent with our request for, for an extension of this

8    matter and if Your Honor would be inclined to accommodate that

9    request, we'd love to, and we think it would be appropriate --

10   not love -- but we think it would be appropriate procedurally

11   for us to be afforded that opportunity.

12        THE COURT:  Well, I'm going to deny the request.  I

13   think that there are enough admissions in the debtor's own

14   paperwork concerning the fact that it's out of business and the

15   fact that May 15th is not a realistic deadline for getting back

16   into the air that, and the fact that the, the shortfall in the

17   escrow account exists that I have adequate grounds upon which

18   to make my ruling.  So it stands.

19        MR. FOX:  We respect that.

20        THE COURT:  Thank you.

21        Anything else I can do for you?

22    (No response)

23        THE COURT:  All right.  Thank you all.

24        MR. BRAUNSTEIN:  Thank you, Your Honor.

25        MR. KING:  Thank you, Your Honor.

1          MS. HANDEL:  Thank you, Your Honor.

2      (Proceedings concluded at 12:29:45)

3

4

5

6

7

8                         CERTIFICATE

9          I, court approved transcriber, certify that the

10   foregoing is a correct transcript from the official electronic

11   sound recording of the proceedings in the above-entitled

12   matter.

13   */s/ Janice Russell*                    May 14, 2012

14   Janice Russell, Transcriber                 Date

15

16

17

18

19

20

21

22

23

24

25