

U.S. Department
of Transportation

**Federal Aviation
Administration**

Office of the Associate
Administrator for Airports

800 Independence Ave., SW.
Washington, DC 20591

FILED
IN CLERK'S OFFICE

2012 APR -2 P 12: 23

U.S. BANKRUPTCY COURT
DISTRICT OF MASS.

**MAR 3 0 2012**

Ms. Kay Ellison
Managing Partner
Direct Air
1600 Oak Street North, Suite B
Myrtle Beach, SC 29577

Dear Ms. Ellison:

I am writing to ensure that Direct Air, as a covered air carrier under title 49 United States
Code, 40117(m)(7) and title 14 Code of Federal Regulations, §158.3, complies with the
statutory mandate for treatment of passenger facility charges (PFCs) during their bankruptcy
proceedings. Under Federal law, PFCs are accorded trust fund status, and the air carriers
must hold PFCs in trust for the beneficial interest of the airports imposing the PFCs. The air
carriers do not hold legal or equitable interest in PFCs (other than permitted handling fees or
authorized interest) (title 49 U.S.C., §§ 40117(m)(2) and (5); 14 CFR, § 158.49(b)).

As you know, title 49 U.S.C. § 40117(m), imposes requirements for air carriers in
bankruptcy, such as Direct Air, to employ in their handling of PFCs. These provisions were
incorporated in title 14 CFR, part 158, as amended on May 23, 2007 (effective June 22,
2007). Copies of both provisions are enclosed for your convenience.

The basic features of title 49 U.S.C., § 40117(m), and title 14 CFR, § 158.49, require that an
air carrier, on entering a bankruptcy proceeding:

- remove any PFCs commingled with its corporate revenues;
- establish for the duration of the proceeding a separate segregated corporate account
  ("PFC Account") and place within the account revenues equal to its average monthly
  PFC collections; and
- refrain from commingling future PFCs with any other corporate monies (by also placing
  them in the PFC Account) title 49 U.S.C., §§ 40117(m)(1) and (m)(6); title 14 CFR,
  § 158.49).

Direct Air, having filed a joint voluntary Chapter 11 bankruptcy petition in the Bankruptcy
Court for the District of Massachusetts (Case No. 12-40944), must establish the PFC
Account, and this account must be funded immediately. The average month's PFC balance

placed in the PFC Account should be calculated from the average of the air carrier's past 12 months of PFC collections prior to entering bankruptcy. Any PFCs collected by Direct Air, but not yet remitted to airports, must also be placed immediately into the PFC Account. The minimum PFC Account balance should never fall below the average monthly amount.

If necessary, the air carrier may continue to deposit its ticket sales revenue into its general operating accounts combined with PFCs. However, at least once every business day, all PFC revenue should be accounted for, removed from those accounts, and transferred to the new and separate PFC Account. The PFC Account is solely for PFC transactions. No separate PFC account for each airport need be established.

Please be advised that, in addition, Direct Air cannot pledge PFCs as collateral in any financial transaction title 49 U.S.C., § 40117(m)(3); title 14 CFR, § 158.49. Moreover, the other PFC requirements under 14 CFR, part 158, continue to apply.

Please provide to the Federal Aviation Administration (FAA) by April 22, 2012, a copy of the air carrier's quarterly PFC reports prepared under title 14 CFR, § 158.65, and include a list of any airports owed outstanding PFC obligations. In addition, the FAA now requires a monthly PFC Account statement, delivered by the 5th day of each month. That statement should include the following:

- the amount representing the air carrier's average one-month PFC collections;
- the amount representing any unremitted PFCs; and
- the total funds disbursed during the month.

Please review closely the applicable PFC provisions for Direct Air and provide the FAA with verification that the carrier is in full accord and compliance with them. Your monthly and quarterly PFC reports, as well as your verification, should be directed to:

Mr. Joseph Hebert
Federal Aviation Administration
Manager, Financial Analysis and Passenger Facility Charge Branch
Office of Airport Planning and Programming, APP-510
800 Independence Avenue, SW.
Washington, DC  20591

Again, please provide your verification, as well as initial PFC reports, by April 22, 2012.

Thank you in advance for your cooperation. Please contact Mr. Hebert, at (202) 267-8375 if you have any questions. I am also sending a copy of this letter to the Bankruptcy Court to be placed in the case docket as information for interested parties, particularly airports served by Direct Air.

I trust this information is helpful.

Sincerely,

Christa Fornarotto
Associate Administrator
 for Airports

Enclosures

cc: Clerk of the Court,
     Case 12-40944, MSH
     United States Bankruptcy Court
     District of Massachusetts
     595 Main Street, Room 211
     Worcester, MA 01608


     Alan L. Braunstein, ESQ
     Riemer and Braunstein, LLP
     Three Center Plaza
     Boston, MA 02108

**(B)** the amount of revenue from passenger facility fees that is proposed to be collected for each project; and

**(C)** the level of the passenger facility fee that is proposed.

**(4) Acknowledgement of receipt and indication of objection.—** The Secretary shall acknowledge receipt of the notice and indicate any objection to the imposition of a passenger facility fee under this subsection for any project identified in the notice within 30 days after receipt of the eligible agency's notice.

**(5) Authority to impose fee.—** Unless the Secretary objects within 30 days after receipt of the eligible agency's notice, the eligible agency is authorized to impose a passenger facility fee in accordance with the terms of its notice under this subsection.

**(6) Regulations.—** Not later than 180 days after the date of enactment of this subsection, the Secretary shall propose such regulations as may be necessary to carry out this subsection.

**(7) Sunset.—** This subsection shall cease to be effective beginning on April 1, 2009.

**(8) Acknowledgement not an order.—** An acknowledgement issued under paragraph (4) shall not be considered an order issued by the Secretary for purposes of section 46110.

**(m) Financial Management of Fees.—**

**(1) Handling of fees.—** A covered air carrier shall segregate in a separate account passenger facility revenue equal to the average monthly liability for fees collected under this section by such carrier or any of its agents for the benefit of the eligible agencies entitled to such revenue.

**(2) Trust fund status.—** If a covered air carrier or its agent fails to segregate passenger facility revenue in violation of the subsection, the trust fund status of such revenue shall not be defeated by an inability of any party to identify and trace the precise funds in the accounts of the air carrier.

**(3) Prohibition.—** A covered air carrier and its agents may not grant to any third party any security or other interest in passenger facility revenue.

**(4) Compensation to eligible entities.—** A covered air carrier that fails to comply with any requirement of this subsection, or otherwise unnecessarily causes an eligible entity to expend funds, through litigation or otherwise, to recover or retain payment of passenger facility revenue to which the eligible entity is otherwise entitled shall be required to compensate the eligible agency for the costs so incurred.

**(5) Interest on amounts.—** A covered air carrier that collects passenger facility fees is entitled to receive the interest on passenger facility fee accounts if the accounts are established and maintained in compliance with this subsection.

**(6) Existing regulations.—** The provisions of section 158.49 of title 14, Code of Federal Regulations, that permit the commingling of passenger facility fees with other air carrier revenue shall not apply to a covered air carrier.

**(7) Covered air carrier defined.—** In this section, the term "covered air carrier" means an air carrier that files for chapter 7 or chapter 11 of title 11 bankruptcy protection, or has an involuntary chapter 7 of title 11 bankruptcy proceeding commenced against it, after the date of enactment of this subsection.

## §158.49    Handling of PFCs.

(a)    Collecting carriers shall establish and maintain a financial
management system to account for PFCs in accordance with the
Department of Transportation's Uniform System of Accounts and
Reports (14 CFR part 241). For carriers not subject to 14 CFR part
241, such carriers shall establish and maintain an accounts payable
system to handle PFC revenue with subaccounts for each public
agency to which such carrier remits PFC revenue.

(b)    Collecting carriers must account for PFC revenue separately. PFC
revenue may be commingled with the air carrier's other sources of
revenue except for covered air carriers discussed in paragraph (c)
of this section. PFC revenues held by an air carrier or an agent of
the air carrier after collection are held in trust for the beneficial
interest of the public agency imposing the PFC. Such air carrier or
agent holds neither legal nor equitable interest in the PFC revenues
except for any handling fee or interest collected on unremitted
proceeds as authorized in §158.53.

(c)(1)    A covered air carrier must segregate PFC revenue in a
designated separate PFC account. Regardless of the
amount of PFC revenue in the covered air carrier's account
at the time the bankruptcy petition is filed, the covered air
carrier must deposit into the separate PFC account an
amount equal to the average monthly liability for PFCs
collected under this section by such air carrier or any of its
agents.

    (i)    The covered air carrier is required to create one PFC
account to cover all PFC revenue it collects. The
designated PFC account is solely for PFC
transactions and the covered air carrier must make all
PFC transactions from that PFC account. The
covered air carrier is not required to create separate
PFC accounts for each airport where a PFC is
imposed.

    (ii)    The covered air carrier must transfer PFCs from its
general accounts into the separate PFC account in an
amount equal to the average monthly liability for
PFCs as the "PFC reserve." The PFC reserve must
equal a one-month average of the sum of the total
PFCs collected by the covered air carrier, net of any
credits or handling fees allowed by law, during the
past 12-month period of PFC collections immediately
before entering bankruptcy.

34

(iii) The minimum PFC reserve balance must never fall below the fixed amount defined in paragraph (c)(1)(ii) of this section.

(iv) A covered air carrier may continue to deposit the PFCs it collects into its general operating accounts combined with ticket sales revenue. However, at least once every business day, the covered air carrier must remove all PFC revenue (Daily PFC amount) from those accounts and transfer it to the new PFC account. An estimate based on 1/30 of the PFC reserve balance is permitted in substitution of the Daily PFC amount.

    (A) In the event a covered air carrier ceases operations while still owing PFC remittances, the PFC reserve fund may be used to make those remittances. If there is any balance in the PFC reserve fund after all PFC remittances are made, that balance will be returned to the covered air carrier's general account.

    (B) In the event a covered air carrier emerges from bankruptcy protection and ceases to be a covered air carrier, any balance remaining in the PFC reserve fund after any outstanding PFC obligations are met will be returned to the air carrier's general account.

(v) If the covered air carrier uses an estimate rather than the daily PFC amount, the covered air carrier shall reconcile the estimated amount with the actual amount of PFCs collected for the prior month (Actual Monthly PFCs). This reconciliation must take place no later than the 20th day of the month (or the next business day if the date is not a business day). In the event the Actual Monthly PFCs are greater than the aggregate estimated PFC amount, the covered air carrier will, within one business day of the reconciliation, deposit the difference into the PFC account. If the Actual Monthly PFCs are less than the aggregate estimated PFC amount, the covered air carrier will be entitled to a credit in the amount of the difference to be applied to the daily PFC amount due.

(vi) The covered air carrier is permitted to recalculate and reset the PFC reserve and daily PFC amount on each successive anniversary date of its bankruptcy petition using the methodology described above.

(2) If a covered air carrier or its agent fails to segregate PFC revenue in violation of paragraph (c)(1) of this section, the

trust fund status of such revenue shall not be defeated by an inability of any party to identify and trace the precise funds in the accounts of the air carrier.

(3)     A covered air carrier and its agents may not grant to any third party any security or other interest in PFC revenue.

(4)     A covered air carrier that fails to comply with any requirement of paragraph (c) of this section, or causes an eligible public agency to spend funds to recover or retain payment of PFC revenue, must compensate that public agency for those cost incurred to recover the PFCs owed.

(5)     The provisions of paragraph (b) of this section that allow the commingling of PFCs with other air carrier revenue do not apply to a covered air carrier.

(d)     All collecting carriers must disclose the existence and amount of PFC funds regarded as trust funds in financial statements.

## §158.51     Remittance of PFCs.

Passenger facility charges collected by carriers shall be remitted to the public agency on a monthly basis.  PFC revenue recorded in the accounting system of the carrier, as set forth in §158.49 of this part, shall be remitted to the public agency no later than the last day of the following calendar month (or if that date falls on a weekend or holiday, the first business day thereafter).

## §158.53     Collection compensation.

(a)     As compensation for collecting, handling, and remitting the PFC revenue, the collecting air carrier is entitled to:
(1)     $0.11 of each PFC collected;
(2)     Any interest or other investment return earned on PFC revenue between the time of collection and remittance to the public agency.

(b)     A covered air carrier that fails to designate a separate PFC account is prohibited from collecting interest on the PFC revenue.  Where a covered air carrier maintains a separate PFC account in compliance with §158.49(c), it will receive the interest on PFC accounts as described in paragraph (a)(2) of this section.

(c)(1)     Collecting air carriers may provide collection cost data periodically to the FAA after the agency issues a notice in the **Federal Register** that specifies the information and deadline for filing the information.  Submission of the information is voluntary.  The requested information must include data on interest earned by the air carrier on PFC

36

TABLE 7.—MATERIAL INCORPORATED BY REFERENCE ON JULY 25, 2003—Continued

| Service Bulletin | Revision level | Date |
|---|---|---|
| C&D Aerospace Service Bulletin B221001–52–03 ......................................................... | 3 ................................ | March 25, 2003. |
| C&D Aerospace Service Bulletin B231001–52–02 ......................................................... | 4 ................................ | March 19, 2003. |

(3) Contact Boeing Commercial Airplanes, P.O. Box 3707, Seattle, Washington 98124–2207; Boeing Commercial Airplanes, Long Beach Division, 3855 Lakewood Boulevard, Long Beach, California 90846, Attention: Data and Service Management, Dept. C1–L5A (D800–0024); or C&D Aerospace, 5701 Bolsa Avenue, Huntington Beach, California 92647–2063; for a copy of this service information. You may review copies at the FAA, Transport Airplane Directorate, 1601 Lind Avenue, SW., Renton, Washington; or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal-register/cfr/ibr-locations.html.*

Issued in Renton, Washington, on May 7, 2007.

**Stephen P. Boyd,**

*Acting Manager, Transport Airplane Directorate, Aircraft Certification Service.*

[FR Doc. E7–9842 Filed 5–22–07; 8:45 am]

BILLING CODE 4910-13-P

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 158

[Docket No. FAA–2006–23730; Amendment No. 158–4]

RIN 2120–AI68

### Passenger Facility Charge Program, Debt Service, Air Carrier Bankruptcy, and Miscellaneous Changes

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends FAA regulations dealing with the Passenger Facility Charge (PFC) program to add more eligible uses for revenue, protect such revenue in bankruptcy proceedings, and eliminate charges to passengers on military charters. These changes respond to the Vision 100—Century of Aviation Reauthorization Act. This final rule also revises current reporting requirements to reflect technological improvements, and to clarify and update existing references and regulations. This final rule further streamlines the existing policies of the PFC program.

**DATES:** This amendment becomes effective June 22, 2007.

**FOR FURTHER INFORMATION CONTACT:** For technical questions concerning this final rule, contact Sheryl Scarborough, Airports Financial Analysis and Passenger Facility Charge Branch, APP–510, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; *telephone:* (202) 267–8825; *facsimile:* (202) 267–5302; *e-mail: sheryl.scarborough@faa.gov.* For legal questions concerning this final rule, contact Beth Weir, Airports Law Branch, AGC–610, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; telephone (202) 267–5880; facsimile (202) 267–5769.

**SUPPLEMENTARY INFORMATION:**

### Authority for This Rulemaking

The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the United States Code. Subtitle I, Section 106 describes the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority.

This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40117. Under that section, the FAA is charged with prescribing regulations to impose a passenger facility fee to finance eligible airport-related projects. This regulation is within the scope of that authority because Vision 100 requires the FAA to change the PFC program. Many actions in this document are in response to Vision 100.

### Background

On March 23, 2005, the FAA published a final rule establishing a 3-year pilot program for non-hub airports to test new application and application approval procedures for the PFC program (70 FR 14928). The 2005 final rule contains several changes designed to streamline the PFC application and amendment procedures for all PFC applications and amendments, thereby improving the entire PFC program.

The FAA published the 2005 final rule to address Congressional mandates in the Vision 100—Century of Aviation Reauthorization Act (Vision 100). The non-hub pilot program, with the PFC application streamlining procedures, however, was only one of six mandates specified in Vision 100. The FAA

separated the non-hub program and related changes from the other mandates because Congress had required the FAA to publish proposed rules on the pilot program within 180 days of enactment of Vision 100.

On February 1, 2006, the FAA published the notice of proposed rulemaking (NPRM), "Passenger Facility Charge Program, Debt Service, Air Carrier Bankruptcy, and Miscellaneous Changes" (71 FR 5188) to address the remaining mandates in Vision 100. These mandates include:

(1) Making low-emission airport vehicles and ground support equipment eligible for PFC funding,

(2) Using PFCs to pay debt service on projects that are "not an eligible airport-related project" when there is a financial need at an airport,

(3) Clarifying the PFC status of military charters,

(4) Structuring PFC account requirements for carriers in bankruptcy, and

(5) Making eligible the use of PFC revenue as local share for projects under the air traffic modernization cost-sharing program.

In addition, the FAA is adopting other changes that streamline benefits beyond those contained in the 2005 final rule. These changes will:

(1) Provide for the electronic filing of notices and reports,

(2) Provide a process for periodic review and change of the carrier compensation level, and

(3) Modify the content and due date for some public agency reports and notices.

### Summary of Comments

The FAA received 12 comments. All of the commenters generally support the proposed changes. These comments include suggested changes, as discussed below.

Seven of the comments are from public agencies: Allegheny County Airport Authority, Pittsburgh, PA; Charlottesville-Albemarle Airport Authority, Charlottesville, VA; City and County of Denver, Denver, CO; Mahlon Sweet Field, Eugene, OR; Port Authority of New York and New Jersey, New York, NY; Norman Y. Mineta San Jose International Airport, San Jose, CA; and City of St. Louis, St. Louis, MO. Two comments are from aviation industry

**28838**   Federal Register / Vol. 72, No. 99 / Wednesday, May 23, 2007 / Rules and Regulations

groups: The Air Transport Association of America and the Airports Council International—North America. Two comments are from private citizens: Steven E. Myers and Kanisha K. Carty. One comment was submitted anonymously.

*In the discussion of comments below, the following applies:*

(1) *Acronyms:* The FAA uses the following acronyms or shortened names to identify the associated commenters:

• Air Transport Association of America (ATA)
• Airports Council International—North America (ACI)
• Allegheny County Airport Authority (Pittsburgh)
• Charlottesville-Albemarle Airport Authority (Charlottesville)
• City of St. Louis (St. Louis)
• City and County of Denver (Denver)
• Mahlon Sweet Field (Eugene)
• Norman Y. Mineta San Jose International Airport (San Jose)
• Port Authority of New York and New Jersey (PANYNJ)

**General Comments**

The FAA received general comments about the PFC program from Pittsburgh, ACI, and Charlottesville.

Pittsburgh believes the FAA has not gone far enough to make the PFC program a much more efficient and effective capital funding source for all domestic commercial service airports. Pittsburgh contends there should be an increase in the PFC level with the maximum level indexed on a yearly basis to inflation. Pittsburgh also claims the use of PFCs should be expanded to any airport-related capital project.

ACI believes the PFC program should become an "impose and audit" program where an airport would make the local decision to impose a PFC and then certify to the FAA the airport used the PFC revenues on eligible capital projects or debt service. ACI would also like to see the non-hub pilot program (§ 158.30) expanded to more airports.

ACI also expressed concern about potential administrative problems which could arise from the lengthy payout process for projects financed by debt instruments. ACI argued it is concerned about the potential for an "administrative accident" that could impair the ability of an airport to continue to make its debt service payments for the full term of the indebtedness.

Charlottesville is concerned about airlines requiring airports to accept PFC remittances by wire transfer. Charlottesville stated its bank charges the airport $0.26 per wire received. Charlottesville requested the FAA

consider adding language to the proposed rulemaking to make the method of PFC remittance the airport's choice, not the airline's requirement.

Pittsburgh's and ACI's comments regarding recasting the PFC program as an "impose and audit program" and expanding the non-hub pilot program to additional airports address areas outside the scope of this rulemaking. The proposals suggested by Pittsburgh and ACI would require changes to the PFC statute (49 U.S.C. 40117).

ACI was unclear in its comments as to who, public agencies or the FAA, might have caused the "administrative accidents" during the closeout process. The FAA recently completed development and implementation of a program management system that should prevent the FAA from prematurely closing a PFC decision. The database requires the charge expiration date to be reached, and all projects to be physically and financially completed before the FAA can close a decision. Financial completion occurs after the approved amount of PFC revenue has been collected and the PFC portion of the project, including any debt instruments, paid. Public agencies may access and use the system to better monitor their PFC programs, thus minimizing administrative problems.

Charlottesville's comments regarding the method of PFC remittance are also outside the scope of this rulemaking and were not included in the economic analysis. The FAA may consider this issue in a future rulemaking. However, it is unlikely that the FAA would consider a $0.26 charge for each wire transfer as burdensome on the airport. Such a charge would cost the airport no more than $3.12 per air carrier each year. Weighed against the systematic convenience of a wire transfer which could reduce the chance of loss or delay, this cost appears reasonable.

The FAA made no changes to part 158 because of these general comments.

**Changes Mandated by Vision 100**

*Low-Emission Airport Vehicles and Ground Support Equipment*

This provision makes low-emission airport vehicles and ground support equipment eligible for PFC funding if the airport is located in an air quality nonattainment or maintenance area.

Kanisha Carty recommended, for a future rulemaking, that airport projects to reduce emissions from vehicles and ground support equipment be made mandatory.

PANYNJ does not agree with the low emission standards contained in the Voluntary Airport Low Emission

(VALE) Technical Guidance document. PANYNJ argued the current VALE criteria are inflexible and unrealistic. PANYNJ believes there is a gap between the equipment the FAA has determined is eligible for VALE funding and the equipment actually available for purchase.

ACI requested clarification of the eligibility for PFC funding of safety and security vehicles. ACI believes these types of vehicles were already eligible for full PFC funding and this preexisting eligibility is not clearly discussed in the NPRM. ACI also believes it would be beneficial to extend the eligibility to areas covered by Early Action Compacts. (Early Action Compacts are areas for which the effective date of the nonattainment designation has been deferred because the area is expected to reach or maintain attainment status by December 31, 2006. Note 6, List of U.S. Commercial Service Airports and Their Nonattainment and Maintenance Status.) ACI also pointed out a typographic error in § 158.15(b)(8).

Ms. Carty's recommendation would be a fundamental change in the PFC program that could require a statutory change, as the PFC program does not enforce Federal priorities for project selection. Even if the proposal does not require statutory changes, public comment would be required before the FAA could adopt such a change. Therefore, the proposal to make the VALE Program mandatory is not included in this rulemaking.

The FAA's Airports Planning and Environmental Division and the Environmental Protection Agency, as directed by Vision 100, determined the types of equipment eligible under the VALE Program jointly. This guidance, found in the VALE Technical Report at *http://www.faa.gov/airports_airtraffic/ airports/environmental/vale/media/ VALE_TR_v3_092206.pdf*, was developed outside the parameters of this rulemaking. PANYNJ's comments have been forwarded to FAA's Airports Planning and Environmental Division for its consideration.

This final rule adds a definition of "Ground Support Equipment" to § 158.3 to cover those vehicles that are eligible for the VALE Program but are not otherwise eligible for PFC funding. Aircraft rescue and firefighting, security, and snow removal vehicles are not included in this definition because these vehicles are already PFC-eligible under § 158.15(b)(1). To ease confusion over which vehicles are eligible for the VALE Program, the FAA is revising proposed § 158.15(b)(8) to clarify that the references to "vehicles" mean vehicles eligible under § 158.15(b)(1).

The FAA is also correcting the typographic error identified by ACI in paragraph § 158.15(b)(8).

Vision 100 specifically limits VALE projects to airports located in air quality nonattainment areas or maintenance areas as defined by sections 171(2) and 175A of the Clean Air Act, respectively. A statutory change is required to add areas covered by Early Action Compacts to this eligibility.

*Use of PFC Revenue To Pay for Debt Service for Non-Eligible Projects*

This provision allows the use of PFC revenue to pay debt service on projects that are not eligible airport-related projects when there is a financial need at the airport.

Eugene argued, in the case of an airline bankruptcy which results in the rejection of a significant portion of air carrier gate leases, "significant" should be defined as rejection of 20 percent or more of the airport's leased gates. Eugene further holds that a significant reduction in air service should be defined as anything greater than a 10 percent reduction in enplanements at the airport.

Eugene also believes that this provision should be geared towards something less than catastrophic changes in the airport's financial position. Eugene maintained the triggering events should include an airport having difficulty meeting industry standards for financial stability. Eugene suggested indicators of financial instability should include high airline rates and charges, a high percentage of reliance on airline revenue, reductions in force, deferred maintenance, negative equity, insufficient capital reserves, and other negative impacts created by a significant change.

Finally, Eugene suggested that requests for use of PFCs to pay debt service for otherwise ineligible projects be treated differently than other requests for PFC collection authority. Eugene suggested, under circumstances in which the airport asserts that a financial need has been demonstrated and the incumbent carriers unanimously agree the existing part 158 criteria have been met, the FAA should grant extraordinary flexibility in the application of this rule. Eugene requested that, if the application is denied under this process, the FAA's decision include an explanation of the denial.

PANYNJ believes airports should be given the flexibility to use PFCs for any airport project that is connected to the movement of people and cargo for the purposes of commerce, trade, travel, and

tourism. PANYNJ also argued airports should be given the flexibility to use PFCs to pay debt service on non-eligible projects if the airport determines this use would be good fiscal management and would enable airport management to effectively maintain and operate the airport.

ATA pointed out three inconsistencies between the statute and the proposed regulatory language. ATA noted that 49 U.S.C. 40117(b)(6) refers to "debt service on indebtedness" but §§ 158.13(e) and 158.18 refer to "debt service or indebtedness." ATA expressed concern that the proposed language in §§ 158.13(e) and 158.18 referring to "indebtedness incurred to carry out an airport project" could be interpreted to permit the use of PFC funds for projects located off airport property. Finally, ATA noted that 49 U.S.C. 40117(b)(6) refers to "the financial need of the airport" but proposed §§ 158.13(e) and 158.18 refer to "the financial need of the public agency." ATA is concerned this change from the statutory language could result in approval of debt service even if the financial need is not related to the airport.

ACI requested clarification of the term "reserve fund" as it is used within the definition of "financial need." ACI also requested clarification of the statement "cannot meet its operational or debt service obligations." ACI is concerned the FAA meant an airport had to miss a required payment in order to qualify.

ACI asked that several events be added to the list of events, provided in the NPRM preamble, which might contribute to a financial crisis at an airport. The first of ACI's suggested events is an airport being found in violation (including technical violation) of its bond covenant, trust indenture, or other financing requirements. ACI also would like to add the failure of an air carrier, whether or not in bankruptcy, to use the facilities at the airport for a significant period of time to the list of events contributing to a financial crisis at the airport. Two final triggering events suggested by ACI are the failure of a carrier to make timely payments to the airport and the failure of a carrier to collect or remit PFCs. ACI would also like the FAA to clarify when discussing air carriers in this context that the FAA means both domestic and foreign air carriers.

ACI would also like to alter the proposed procedures airports must use to gain approval to use PFCs under this provision. ACI argued an airport should be allowed to use PFCs under this provision if the airport could demonstrate it otherwise would not be

able to pay its debt service, meet coverage requirements, or otherwise be in violation of bond covenants based on prospective calculations. ACI argued if airports cannot rely on prospective calculations, PFCs would not be available for debt service until after a financial crisis. ACI also recommended airports not be required to go through the normal application process. Rather ACI recommended the following four-step process:

(1) The airport declares that it is experiencing a financial crisis;

(2) The airport notifies the FAA of the basis of the crisis;

(3) The airport applies (existing) PFCs to the immediate need; and

(4) The FAA reviews the application within 60 days of submission and either "ratifies" the airport's use of PFCs or requires some modification of the airport's use of PFCs.

ACI concluded its comments on this provision by requesting that the proposed prohibition on an airport issuing new debt be revised. The first suggested revision would allow an airport to issue new debt to refund outstanding debt. The second revision would allow an airport to issue new debt if it can be shown that failure to do so would have greater financial repercussions.

The comments submitted anonymously argued the proposed rule unnecessarily limits the use of PFCs to pay debt service on ineligible projects. The commenter also argued the FAA has not undertaken a substantive alternatives analysis on this provision. The commenter believes the FAA should provide "significant justifications" beyond the statutory mandate for the proposed rulemaking.

In order to provide the maximum flexibility to each airport, the FAA has elected not to specify percentages with respect to a significant number of gates or reduction in air service since the appropriate percentage could vary from airport to airport. The FAA suggests an airport applying to collect and use PFCs under this provision determine what percentage of gates or air service is significant for its operations and defend that choice in its application.

The FAA suggested several events in the preamble of the NPRM that might result in an airport finding itself in financial need. The FAA did not consider this listing to be comprehensive. An airport seeking to demonstrate its financial need is welcome to discuss any triggering events applicable to its unique situation.

The FAA does not agree that all of the proposed indicators of financial instability provided by Eugene and ACI

are, in fact, indicators of instability. Some of these indicators, including reductions in force and deferred maintenance, could be indicators of prudent financial management and/or changing priorities. Furthermore, terms such as "high airline rates and charges," "a high percentage of reliance on airline revenue," "the failure of an air carrier to use airport facilities for a significant period of time," and "failure of a carrier to make timely payments to the airport" are vague and subjective and must be considered on an airport-by-airport basis. The FAA encourages each airport applying to use PFC revenue under this provision to thoroughly discuss in its application those factors it believes most clearly indicate its financial need.

After reviewing ATA's comments on §§ 158.13(e) and 158.18(a), the FAA has concluded that an unintended consequence of the wording "indebtedness incurred to carry out an airport project" could be airports applying to use PFC revenue to pay the debt services costs for projects located off airport property if those projects were labeled as "airport projects." The FAA does not believe that Congress intended for this provision to be used on off-airport projects. Therefore, the FAA has returned to the statutory language, "indebtedness incurred to carry out an airport project," in this final rule. The FAA also acknowledges the typographic error, "debt service or indebtedness," and has returned this rule language to "debt service on indebtedness." Finally, the FAA acknowledges that the term "financial need of the public agency" could lead to requests to use PFCs to pay debt service on an otherwise ineligible project due to a financial crisis unrelated to the airport. The FAA does not believe Congress intended for this provision to be on a non-airport related financial need. Therefore, the FAA has returned to the statutory language "financial need of the airport," in this final rule.

The term "reserve fund" used within the new definition of "financial need" refers only to the operational or capital reserve fund required under financing documents. The FAA's definition of financial need as it concerns this provision concentrates on the ability of an airport to maintain airport/flight operations. However, the FAA does not intend that an airport miss required payments in order to demonstrate that it "cannot meet its operational or debt service obligations." Rather, the FAA expects an airport attempting to demonstrate that it faces a financial crisis to discuss factors likely to affect its ability to make required payments in the future. Projections of revenue streams and cash flow would be relevant to that demonstration.

The discussion in the preamble to the NPRM regarding the issuance of new debt does not prohibit the issuance of new debt. Rather, the FAA believes any airport that is granted authority to collect and use PFC revenue under this provision should use this revenue to help it return to a position of financial stability as quickly as possible. Therefore, as a part of its deliberations on the application, FAA will consider the airport's plans to return to financial stability. If an airport believes incurring new debt (for any purpose) will help it return to financial stability as soon as possible, it should discuss this factor in the application.

The various proposals submitted by Eugene, PANYNJ, and ACI for the FAA on processing requests to collect and use PFC revenue to pay debt service for otherwise ineligible projects and defining eligibility are not being adopted in this final rule. Vision 100 clearly requires the FAA (representing the Secretary of Transportation) rather than the airport itself to determine that an airport is in financial need. Furthermore, Vision 100 does not provide any special processing language for this provision. Therefore, the processing provided for in 49 U.S.C. 40117, which requires the FAA make its decision prior to an airport collecting or using PFC revenue, must be applied to this provision. Similarly, proposals for defining eligibility go beyond the scope of the statute and cannot be implemented by rulemaking. The FAA has, since the beginning of the PFC program, included its reasons for every partial approval and disapproval of a project in its decisions. The FAA will continue this practice for any requests submitted under this provision that are denied.

The anonymous commenter's argument appears to be based on the assumption that the FAA would not consider alternatives in its financial needs analysis of an airport's proposal. The FAA stated in the preamble to the NPRM that we will analyze each proposal on a case-by-case basis. This provision responds to a statutory mandate that is based on an airport's financial need. A structured model has the potential to be overly restrictive in a financial needs analysis. The FAA has chosen to make this provision flexible in order to allow each airport to tailor its application to its particular circumstances.

*Clarification of Applicability of PFCs to Military Charters*

This provision clarifies the PFC status of military charters.

ACI expressed concern that § 158.9(a)(6), as written, would allow individual passengers flying on scheduled commercial air carrier flights to be exempt from paying PFCs.

The FAA reviewed the proposed language in § 158.9(a)(6) and does not agree with this comment. Section 158.9(a)(6) reads as follows: "Enplaning at an airport if the passenger did not pay for the air transportation that resulted in the enplanements because of Department of Defense (DOD) charter arrangements and payment." By the use of the word "and," the language, as written, imposes two conditions for the exemption—the passenger is on a flight chartered by DOD and the flight is paid for by DOD. This language does not apply to individuals who pay for their own transportation nor does it apply to individuals who are not traveling under DOD charter arrangements.

Accordingly, the FAA made no changes to § 158.9(a)(6).

*Financial Management of Passenger Facility Fees*

This provision structures PFC account requirements for air carriers in bankruptcy.

Denver expressed concern that the changes to the regulation proposed in the NPRM do not address who enforces compliance with the PFC statute and regulation when an air carrier files for bankruptcy protection.

Denver requested that the regulations be modified to state that an airport has the legal standing to protect its PFCs. Denver requested the regulation specifically state an airport has a sufficient stake in the PFC program such that it is entitled to seek legal protection from a court with appropriate jurisdiction to compel an air carrier's compliance with the PFC regulation. In support of this request, Denver cited a recent bankruptcy case in which the bankrupt air carrier argued public agencies had no standing to enforce this provision of Vision 100.

Denver also requested § 158.49 be modified to state that any party that holds PFCs for a public agency holds such PFCs in trust for the benefit of the public agency. Denver contended this relationship should extend to third parties, including credit card companies. Denver would also like the regulation to describe which parties beyond the covered air carrier shall be subject to the PFC regulations. Denver contended that § 158.49(b) recognizes

the concept of an agent of the air carrier but does not define which third parties would be considered agents.

Denver is concerned the proposed § 158.49(c) does not require a separate trust account for PFCs but leaves open the possibility that an air carrier could simply create a sub-account within an existing trust account and claim compliance with the "designate separate PFC account" requirement. Denver is concerned sub-accounts in existing trust fund accounts are typically controlled by the secured creditors and are subject to provisions in complex agreements not made available to the public agencies.

Denver claimed the regulation should clarify post-petition accounting requirements and require covered air carriers to demonstrate how the "PFC reserve" for each affected airport was calculated. Denver also requested that the regulation make clear that any funds in the PFC reserve are in the nature of trust funds. Denver holds that these PFC reserve funds should be available to pay PFCs in the event a covered air carrier fails to make its PFC payments. Denver contended funds in the PFC reserve should only be released for non-PFC purposes after all affected airports have received the appropriate PFC remittances. Denver also argued the funds in the PFC reserve should be equitably allocated to all affected airports if a covered air carrier ceases operations.

In addition, Denver requested the regulation provide the procedure to allow an airport to recover its costs when an airport is forced to protect its PFCs. Denver claimed it has expended funds to hire outside and local counsel, file motions, appear in court, and otherwise incur costs to protect its PFC revenues in four bankruptcy cases since Vision 100 was enacted. Denver believes it is unclear from the proposed regulation whether it should invoice a non-compliant carrier, seek recovery through the FAA, or file a motion or complaint in the appropriate court. Denver suggests the regulation clarify that the right to compensation is a post-petition claim which should be treated as an administrative expense entitled to priority under 11 U.S.C. 503(b). Denver further suggests that the regulation provide that the claim should be allowed irrespective of any requirement in the Bankruptcy Code that the airport prove a "benefit to the estate." Denver also suggests that the claim should be allowed in the event the bankruptcy case converts from Chapter 11 to Chapter 7. Denver would also like clarification regarding which costs are eligible for reimbursement.

ACI recommended the definition of "covered air carrier" be expanded beyond the category specified by Vision 100 to include air carriers in financial distress, even if they have not yet declared or been forced into bankruptcy. ACI goes on to recommend that an air carrier which fails to remit PFCs in a timely manner or fails to properly report PFC collections to any airport be required, from that point forward, to place its PFC collections daily into a segregated escrow account or trust fund absolutely dedicated to the airports for which the air carrier collected them.

ACI also argued that an air carrier that "cannot prove it can provide accurate accounting, on an airport-by-airport basis" should be required to establish separate PFC trust accounts for each airport.

ACI also requested clarification of § 158.49(c)(1)(v), regarding reconciliation of an estimated PFC monthly balance. ACI is concerned this paragraph does not cover air carriers to reconcile the amounts in the PFC account if they deposit PFC revenues directly into the segregated PFC account.

ACI also argued the word "unnecessarily" should be deleted from § 158.49(c)(4). ACI believes Vision 100 clearly states that any failure by a carrier to comply with any provision of subsection (m) of Vision 100 that causes an airport to spend money to recover or retain its PFCs imposes an obligation on that carrier to compensate the airport for such costs.

St. Louis is concerned with the language in § 158.49(c)(3) regarding the prohibition on covered air carriers granting security or other interests in PFC revenues to third parties. St. Louis claimed it has been told by air carriers that this language would prevent the carrier from granting a security interest in the PFCs to the airports on whose behalf the charges are collected. St. Louis requested the FAA clarify § 158.49(c)(3) since this section does not apply to public agencies but rather applies to banks and other airline creditors.

ATA is concerned the definition of "covered air carrier" is overly broad because it does not protect air carriers from frivolous involuntary bankruptcy filings. ATA asserts that contracts which contain involuntary bankruptcy provisions typically include a grace period (usually 30 to 90 days) to obtain dismissal of any involuntary petition. ATA believes this grace period gives an air carrier time to resolve "illegitimate bankruptcy petitions and petty disputes." ATA requested the definition of "covered air carrier" be modified to

state an air carrier ceases to be a covered air carrier upon its exit from bankruptcy protection. ATA also requested the FAA allow for some flexibility in § 158.49(c) to reflect the complex nature of airline financial management.

Neither 49 U.S.C. 40117 nor 14 CFR part 158 restricts the legal remedies available to public agencies. Since the beginning of the PFC program, public agencies have had legal rights with respect to PFC revenue. Public agencies are entitled to avail themselves of all legal remedies to ensure they receive the PFC revenue to which they are entitled. Specific enforcement responsibilities are not described in the existing PFC statute, 49 U.S.C. 40117, and further clarification to assist public agencies would require legislative action. The FAA believes the air carriers' assertion that airports have no standing with regard to PFC revenue in bankruptcy cases is ill-founded. However, in the case of PFC collection issues, the FAA works with all air carriers to bring them into compliance with PFC collection, handling, and remittance requirements so that the public agencies need not resort to legal challenges. On those occasions where, for whatever reason, the air carrier has insufficient PFC revenue in its accounts to meet all of its PFC obligations, the FAA works with the affected public agencies to ensure they are treated equally and receives their proportionate share of the available revenue.

In the context of the PFC regulation, an "agent" of an air carrier is a third party who is authorized to issue airline tickets for the air carrier. Credit card companies, banks, and other secured creditors that are not authorized to issue airline tickets are not agents of the air carrier. Collecting air carriers are statutorily prohibited (49 U.S.C. 40117(m)(3)) from granting any third party an interest in trust moneys such as PFCs. If, through an agreement with an air carrier, a third party holds 100 percent of ticket revenue (which would include applicable PFCs), it would appear that the air carrier is violating this statutory prohibition. The only authorized holders of PFC revenue are air carriers and public agencies.

Section 158.49(c)(1) specifies that a covered air carrier must segregate its PFC revenue in a designated separate PFC account. This PFC account is intended to hold all PFC revenue separate from any other air carrier revenue so that it is easier to identify in bankruptcy proceedings. A subaccount within an existing account would not meet this requirement for a separate PFC account.

The "PFC reserve fund" is not calculated on an airport-by-airport basis. Rather, the reserve is equal to the one-month average of the air carrier's total PFC collections for the 12 months preceding its filing for bankruptcy protection. The FAA is adding language to § 158.49(c)(1)(ii) to indicate that, in the event a covered air carrier ceases operations while still owing PFC remittances, the PFC reserve fund could be used to make those remittances. The FAA is also adding language that the remaining balance, after all PFC obligations are met, will be returned to the air carrier's general account after the carrier emerges from bankruptcy and ceases to be a covered air carrier.

The FAA is removing the word "unnecessarily" from § 158.49(c)(4). As mentioned above, this provision applies only to the reasonable and necessary costs incurred by a public agency seeking to recover or retain payment of PFCs when a covered air carrier refuses to remit the PFCs.

Vision 100 does not contain formal instructions for public agencies on how to recover funds expended to recover or retain PFCs from a covered air carrier. Federal oversight has served to assist public agencies in the initial recovery of PFCs. However, public agencies are entitled to avail themselves of all legal remedies, to include filing of a post-petition administrative claim to recoup funds used for recovery or retaining PFCs with the appropriate Bankruptcy Court. The FAA takes this opportunity to clarify that the public agency's expenses discussed in § 158.49(c)(4) apply to those expenses that a public agency may incur when a covered air carrier refuses to remit PFCs. Bankruptcy law makes participation in a bankruptcy proceeding unavoidable for public agencies seeking to assure a carrier implements the PFC financial management requirements of Vision 100. Participation may be necessary even when the air carrier is willing to implement the provision. Expenses a public agency may choose to incur to generally represent its claims in a bankruptcy proceeding are not included in this provision.

The FAA is not granting ACI's request to expand the definition of covered air carrier beyond those carriers filing for bankruptcy protection. ACI's request to include carriers in financial distress within the covered air carrier definition would require a statutory change. In addition, the FAA is not modifying part 158 to require an air carrier (not just a covered air carrier) that fails to remit PFCs or report PFC collections in a timely manner to place all PFC revenue daily in a segregated escrow account or

a dedicated trust fund. This proposal goes beyond the scope of the NPRM and would require the opportunity for public comment before it could be adopted.

The FAA did not include a requirement in § 158.49(c)(1)(iv) that a covered air carrier undertake a monthly reconciliation of actual monthly PFC amount for those carriers that are depositing the daily PFC amount in the segregated PFC account. Covered air carriers that deposit the daily PFC amount are depositing the actual amount collected less the air carrier compensation fee. The FAA is requiring covered air carriers that opt for the estimated monthly collection amount in § 158.49(c)(1)(v) to undertake a monthly reconciliation. We are adopting this requirement because the actual amount could be different from the estimated amount and we want to ensure the PFC account contains the funds necessary for the covered air carrier to meet its PFC obligations.

The FAA is partially granting the relief sought by ATA with regard to frivolous involuntary bankruptcy filings. The FAA is modifying the definition of covered air carrier to provide a 90-day grace period to allow an air carrier to seek dismissal of an involuntary bankruptcy filing before the air carrier becomes a covered air carrier. However, this grace period will be limited to those air carriers that are current on their PFC remittances. The FAA is also revising the definition of "covered air carrier" to indicate that an air carrier ceases to be a covered air carrier when it emerges from bankruptcy protection.

**Changes Associated With Technological Improvements**

This provision updates various PFC procedures to take advantage of technological improvements since the PFC program's inception in 1990 including the use of electronic or paperless airline ticketing, the use of electronic mail to send documents, and Web sites to post information.

ATA argued that the proposed definition of the point of issuance of airline tickets would result in negative unintended consequences including extensive airline ticketing programming changes and unequal tax treatment for international passengers depending on the form of payment.

ATA also supported the database development discussed in the NPRM. ATA recommended that the FAA work with a committee of airport and airline representatives to design airport and airline modules. ATA suggested that having the airports and airlines

participate in the design of the modules they will use would help to achieve widespread buy-in to this new database. ATA also recommended the FAA develop standards and procedures for airports, airlines, and other reporting entities that need access to reports, summaries, and other information necessary to ensure accurate information is being input in the database.

The FAA proposed the definition of point of issuance of airline tickets as part of a strategy to ensure PFCs collected for tickets with wholly U.S. itineraries are collected using the procedures in § 158.45 rather than the procedures in § 158.47. A second part of this strategy was a proposal to insert language in § 158.47 regarding tickets for wholly U.S. travel. Based on the concerns raised by ATA, the FAA has decided to drop the proposed definition of point of issuance of airline tickets in § 158.3. The FAA believes that the proposed revisions to § 158.47 are sufficient to ensure that all applicable PFCs will be collected.

Since the NPRM was published, the FAA has completed development of the public agency module of the PFC database. The module was deployed in June 2006. The FAA plans to work closely with air carriers regarding design and development of the air carrier module, and welcomes ATA's participation.

As each module of the database is developed and deployed, the FAA is gathering business rules and data standards applicable to that module. The FAA will work with all system users to determine the most effective method of publication for these rules and standards.

**Changes To Streamline PFC Procedures, Codify PFC Policies, or Address Issues or Questions About the PFC Program**

*PFC Administrative Costs*

This provision directs public agencies wishing to use PFC revenue to pay for allowable PFC administrative support costs to treat those costs as a separate and distinct PFC project in a PFC application or notice of intent.

San Jose believes that PFC administrative support costs should be a part of the project costs. San Jose suggests that its administrative costs are minimal compared to its overall PFC program. San Jose also argued that it would not be cost effective to submit and maintain a separate application for PFC administrative support costs.

ACI requested that the FAA clarify that the costs of administering a PFC

project; *i.e.*, managing a construction project, remain eligible and should continue to be included in the general projects.

The FAA agrees with San Jose that it would not be cost effective for a public agency to submit and maintain a separate application for PFC administrative support costs. However, the proposal in the NPRM does not require public agencies to submit and maintain a separate PFC application for these costs. Rather, the proposal would require that PFC administrative support costs be treated as a separate project in an application, not a separate application, if the public agency wishes to reimburse itself for these costs using PFC revenue. PFC administrative support costs include the cost to prepare a PFC application or notice of intent as well as amendments, and other actions associated with that application or notice; prepare and distribute quarterly reports; and annual audits of its PFC program. PFC administrative support costs do not include construction or project management associated with a specific development project. Construction or project management costs may be treated either as an incidental cost within the development project or as a separate stand-alone project within an application.

The FAA made no changes to part 158 because of the comments received on this section.

*Duration of Authority To Impose a PFC Before Project Implementation*

This provision clarifies the required timing of PFC project implementation.

ACI believes the proposed revisions are confusing and recommends alternate language. ACI also argued the time period for when the decision date is used rather than the charge effective date should be 30 days rather than the 60 days specified in the NPRM due to other recent or proposed changes regarding charge effective dates.

The FAA has reviewed the proposed revision in the NPRM and ACI's suggested alternative language. As a result of this review, the FAA has made minor revisions to the regulatory language to reduce confusion. However, the FAA has retained the 60-day time period as proposed. Section 158.43(b)(3), as revised in this rulemaking, requires the charge effective date be the first day of the month and at least 30 days after the approval date. For example, an application approved April 2, would have a charge effective date of June 1, 59 days after the decision date. Thus, the FAA has concluded that a 60-day time period is the correct

differential between the charge effective and decision dates.

*Amendment of Approved PFC*

This provision modifies the PFC amendment procedures to set a minimum dollar threshold for amendments requiring additional air carrier consultation and public notice and comment. For projects with original approved amounts at or above this threshold and for projects that are amended to or above this threshold, an increase of more than 25 percent would trigger the need for consultation and public comment. For projects with original approved amounts below this threshold, public agencies would not need to consult with air carriers and provide the opportunity for public comment, regardless of the percentage increase in costs proposed.

ATA recommended that, for projects with an original approved amount under $1 million, a limit of 50 percent be placed on the percentage of increase in the approved project amount allowed before the public agency is required to undertake additional airline consultation and public notice and comment. ATA also recommended that public agencies be required to undertake additional airline consultation and public notice for any project with an original approved amount of less than $1 million whenever the approved amount for that project is amended to over $1 million.

The FAA understands the concerns underlying ATA's comments and recommendations. Our intention in proposing a consultation-triggering threshold is to eliminate the burden on public agencies and air carriers that is related to the required consultation for low-cost projects. In the NPRM, the FAA attempted to devise a threshold that would capture significant changes to projects without also capturing small projects. The FAA is aware of only a few projects in the entire history of the PFC program that have been approved as low-cost projects and later amended to significantly over $1 million. After further review and consideration, the FAA concludes that the threshold proposed in the NPRM is reasonable and practical.

However, in addition to the threshold proposed in the NPRM, the FAA has decided to adopt ATA's proposal to require additional air carrier consultation and public notice and comment when the PFC amount of a project is amended to over $1 million.

The FAA declines to adopt ATA's proposal regarding a 50 percent limit on the amendment amount for projects under $1 million at this time. However,

the FAA will closely monitor future amendments. The FAA will also pay particular attention to projects originally approved for low PFC amounts and later increased significantly. The FAA may undertake future rulemaking on amendments if it concludes public agencies are using the amendment thresholds to deliberately avoid future air carrier consultation and public notice.

*Nonrefundable Tickets*

This provision clarifies that failure to travel on a nonrefundable or expired airline ticket is not a change in itinerary. Ticket purchasers holding nonrefundable or expired tickets are not entitled to a refund of any associated PFCs if the ticket purchaser is not entitled to any fare refund.

Steven Myers is concerned the proposal regarding nonrefundable tickets is based on ticket costs. Mr. Myers argued PFCs should be refundable or nonrefundable to all travelers regardless of the airfare. Mr. Myers is also concerned this proposal would disproportionately affect minority and low-income travelers. He argued that, if this proposal disproportionately affects minority and low-income travelers, it should be subject to appropriate National Environmental Policy Act (NEPA) analysis.

While the FAA agrees with Mr. Myers that nonrefundable tickets tend to cost less than refundable tickets, the FAA does not agree that nonrefundable tickets tend to be used disproportionately by lower income travelers. Most travel web sites provide an initial sort of ticket options by fare. Generally, most travelers' first review of flights shows the more restricted or nonrefundable fares; therefore, most travelers searching for coach class tickets are likely to have been presented with the option of purchasing a nonrefundable ticket.

However, the FAA's proposed clarification that passengers holding nonrefundable or expired tickets are not entitled to a refund of any associated PFCs is not based on ticket price. Rather it is based on proposed travel in conjunction with air carrier fare and refund rules. Air carriers offer many different fare types with specific rules associated with each fare type. Some of those fare rules specify that a passenger is not entitled to a cash refund of the fare if the passenger does not travel as ticketed. The FAA is ensuring that PFCs are treated similarly. Mr. Myers is reminded that where a fare is applied to another ticket, so too is the PFC.

This provision applies to all travelers and thus does not disproportionately affect minority or low-income travelers. Under the circumstances, NEPA is not triggered.

*Air Carrier Collection Compensation*

This provision establishes a procedure for the FAA to periodically review and set the air carrier collection compensation level.

ATA requested clarification of the term "audited air carrier collection" in § 158.53(c)(1). It questions whether the FAA would require an opinion from the carriers' auditors as to the accuracy of the costs. ATA further questioned whether the air carriers' auditors would be able to provide this opinion if the carriers' accounting systems do not capture this information specifically for PFC collection, handling, and remittance.

ATA also requested the regulations state that any future handling fee revision adopted as a result of the FAA's periodic review of collection compensation may not be reduced below the current $0.11. Alternatively, ATA suggested the submission of cost data be made mandatory to ensure the FAA has a complete set of industry data to use as the basis for re-setting the handling fee. ATA also suggests the FAA establish a 5-year cycle for review of the handling fee, establish a set of air carrier data points that will be used in establishing the fee, and publicize this endeavor so that air carriers can track the data prospectively rather than having to look back every 5 years.

ACI is concerned that any change in the carrier compensation level may have an adverse affect on public agencies that have pledged their PFCs to bond payments. ACI is also concerned that escrow costs may be interpreted as being the cost a carrier in bankruptcy incurs to set up trusts for PFCs in accordance with § 158.49(b).

ACI argued § 158.53 should be modified so that any carrier, whether or not in bankruptcy, which has failed to properly remit PFCs to any airport would not be entitled to receive compensation for the collection or remittance of any PFCs for any airport until that carrier has "made good the PFCs it owes."

ACI also argued that, when considering any adjustment to the collection compensation level, the FAA should disregard any costs submitted by carriers that have failed to properly collect or remit PFCs. ACI believes the FAA should deduct the aggregate amount the airports have had to expend to collect PFCs from carriers that have improperly withheld them along with

the amount of PFCs improperly withheld.

The FAA mistakenly used the term "audited costs" in the preamble to the NPRM. Rather, the FAA intended to indicate costs submitted by a carrier should include a certification from the airline's Chief Financial Officer or independent auditor that the costs submitted are accurate.

The FAA also mistakenly used the term "escrow costs" in the preamble to the NPRM. The FAA does not intend to allow the inclusion of costs related to the provisions of § 158.49(c) in the calculation of the carrier compensation rate.

The FAA is not aware of any adverse affects experienced by public agencies as a result of previous changes in the carriers' compensation rate. However, the FAA's proposed procedures for review of compensation rates will provide the opportunity for public agencies to comment on how any proposed change to the rate might affect the public agency before that proposed change goes into effect.

Under 49 U.S.C. 40117, the FAA is required to calculate the carriers' collection compensation rate based on an average of the carriers' reasonable and necessary costs of collecting, handling, and remitting the PFCs. Therefore, the FAA cannot agree to set the current compensation rate of $0.11 per PFC collected as the permanent minimum rate as requested by ATA. Nor can the FAA agree to forgo consideration of certain carriers' costs when determining the average of their costs, as requested by ACI.

The FAA continues to keep the submission of cost data by carriers as a voluntary effort. However, the FAA agrees it would be less burdensome on the carriers if the FAA published a schedule well in advance of the next FAA review of the compensation rate. Therefore, the FAA expects to publish a **Federal Register** notice at an appropriate time in the future providing this information. As for specific data elements air carriers should consider tracking, § 158.53(c)(1) includes a list of cost categories applicable to the FAA's calculation of the air carrier PFC compensation rate. The FAA has added a new § 158.53(c)(2). The FAA will review data submitted by air carriers, if data represents at least 75 percent of PFCs collected nationwide. Based on analysis of this data, the FAA may set a new compensation level. This paragraph will ensure that the FAA does not make a decision based on grossly incomplete industry data.

The FAA has determined that ACI's proposal that a carrier not be entitled to

compensation until it properly remits all PFCs it owes is not practical given the collection, handling, and remittance procedures in place. First, carriers are entitled to keep the interest earned on the PFC revenue between the time the PFC is collected from the passenger and the time it is remitted to the airport. A carrier could not be identified as failing to properly remit PFCs to any airport until after the carrier earned this interest. Second, the airports would need to set up some sort of clearinghouse to process payments to carriers and to monitor carrier remittances to all airports. Finally, carriers are entitled to compensation based on the PFCs collected. This compensation is currently taken at the time of ticket issuance. ACI's proposal would appear to delay this compensation by at least two months due to the need to determine if a carrier had remitted the PFCs properly (remittance occurs at the end of the month following collection) and then collect all compensation payments from the airports. Any significant change to part 158 such as this must first be subject to public scrutiny and comment. This proposal has not been subject to such scrutiny. The FAA is accordingly not adopting ACI's proposal regarding withholding carrier compensation in this rulemaking.

*Environmental Analysis*

Steven Myers stated he could not locate paragraph 3f of FAA Order 1050.1E, referred to in the Environmental Analysis section of the NPRM. FAA mistakenly referred to an incorrect paragraph number. The correct reference should have been paragraph 312d of FAA Order 1050.1E. The FAA corrected the paragraph reference in the Environmental Analysis section of the final rule.

*Corrections and Other Minor Changes to the Proposed Rule*

This final rule also corrects typograpgical errors that appear in the rule text of the proposed rule. The following is a list of these corrections to the rule text.

1. § 158.3, Notice of intent—Put "/" between "and" and "or."
2. § 158.13(c)—Put "§" before "§ 158.15(b)."
3. § 158.13(d)(2)—Change "§ 158.13(b)(1)" to "§ 158.13(d)(1)."
4. § 158.13(g)—Change "Airport Improvement Program" to "Airport Grant Program."
5. § 158.15(b)(6)—Delete "or" at the end of this paragraph.
6. § 158.15(7)—Delete punctuation after "Projects."

7. § 158.18(a)—Change "PFC on payments" to "PFC to make payments."

8. § 158.20(b)—Start paragraph "Once the database development is completed, with air carrier capability, public."

9. § 158.37(b)(1)(ii)(C)—Add "or" at the end of the paragraph.

10. § 158.37(b)(1)(ii)(D)—Add "; or" at the end of the paragraph.

11. § 158.37(b)(5)—Change "a change" to "an increase."

12. § 158.39(a)—Add "the" between "use" and "excess."

13. § 158.47(c)(3) should be § 158.47(c)(4).

14. § 158.49(c)(1)(iv)—Change "its PFCs" to "the PFCs it collects."

15. § 158.53(b)—Change "account" at the end of the first sentence to "PFC Revenue."

16. § 158.53(c)(1)—Change "file in the first sentence to "provide."

17. § 158.53(c)(2)—Change "filed" to "provided."

18. § 158.65(b)(2) Add "following" between "the" and "month" at the end of the first sentence.

19. § 158.67(c)(2)—Change "PFC is specifically addressed by the auditor" to "auditor specifically addresses the PFC."

**Paperwork Reduction Act**

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the FAA submitted a copy of the new information collection requirement(s) in this final rule to the Office of Management and Budget (OMB) for its review. OMB approved the collection of this information and assigned OMB Control Number 2120–0557. This final rule addresses the remaining mandates in Vision 100. Part 158 recordkeeping/reporting requirements affect two groups of respondents—air carriers and public agencies. There are 450 respondents who will respond an estimated 2,400 times annually. It should be noted that air carriers have been collecting, keeping records and reporting on other aviation related fees (passenger tax, customs user fees, international transportation tax and immigration user fees) for many years. As a result, various sophisticated manual and computer systems are currently in place and have been modified to implement the PFC program. The total reporting burden hours is 22,805. The total recordkeeping burden is 1,220 hours. There were no comments directed to the information collection burden.

An agency may not collect or sponsor the collection of information, nor may it impose an information collection requirement unless it displays a currently valid OMB control number.

**International Compatibility**

In keeping with U.S. obligations under the Convention on International Civil Aviation, it is FAA policy to comply with International Civil Aviation Organization (ICAO) Standards and Recommended Practices to the maximum extent practicable. The FAA has determined that there are no ICAO Standards and Recommended Practices that correspond to these final regulations.

**Regulatory Evaluation, Regulatory Flexibility Determination, International Trade Impact Assessment, and Unfunded Mandates Assessment**

Changes to Federal regulations must undergo several economic analyses. First, Executive Order 12866 directs that each Federal agency shall propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs. Second, the Regulatory Flexibility Act of 1980 (Pub. L. 96–354) requires agencies to analyze the economic impact of regulatory changes on small entities. Third, the Trade Agreements Act (Pub. L. 96–39) prohibits agencies from setting standards that create unnecessary obstacles to the foreign commerce of the United States. In developing U.S. standards, this Trade Act requires agencies to consider international standards and, where appropriate, that they be the basis of U.S. standards. Fourth, the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4) requires agencies to prepare a written assessment of the costs, benefits, and other effects of proposed or final rules that include a Federal mandate likely to result in the expenditure by state, local, or tribal governments, in the aggregate or by the private sector, of $100 million or more annually (adjusted for inflation with base year of 1995). This portion of the preamble summarizes the FAA's analysis of the economic impacts of this final rule. We suggest readers seeking greater detail read the full regulatory evaluation, a copy of which we have placed in the docket for this rulemaking.

In conducting these analyses, FAA has determined this rule: (1) Has benefits that justify its costs; (2) is not an economically "significant regulatory action" as defined in section 3(f) of Executive Order 12866; (3) is not "significant" as defined in DOT's Regulatory Policies and Procedures; (4) will not have a significant economic impact on a substantial number of small entities; (5) will not create unnecessary obstacles to the foreign commerce of the United States; and (6) will not impose

an unfunded mandate on state, local, tribal governments, or on the private sector by exceeding the threshold identified above. These analyses are summarized below.

This final rule addresses the remaining provisions not addressed in previously issued final rules mandated by Vision 100-Century of Aviation Reauthorization Act (Vision 100) and will include changes to administrative procedures to improve the efficiency of the PFC program.

The total cost of this final rule is estimated to be $1.1 million ($983,000 present value), and the quantified cost savings are estimated to be $3.6 million ($2.5 million present value). In addition, a number of unquantified benefits will be attributable to the Vision 100 statutory provisions and streamlining procedures. The net cost savings of this final rule are estimated to be $2.5 million ($1.6 million present value) over the ten-year analysis period.

**Regulatory Flexibility Determination**

The Regulatory Flexibility Act of 1980 (Pub. L. 96–354) (RFA) establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." The RFA covers a wide-range of small entities, including small businesses, not-for-profit organizations, and small governmental jurisdictions.

Agencies must perform a review to determine whether a rule will have a significant economic impact on a substantial number of small entities. If the agency determines that it will, the agency must prepare a regulatory flexibility analysis as described in the RFA.

However, if an agency determines that a rule is not expected to have a significant economic impact on a substantial number of small entities, section 605(b) of the RFA provides that the head of the agency may so certify and a regulatory flexibility analysis is not required. The certification must include a statement providing the factual basis for this determination, and the reasoning should be clear.

The FAA uses the size standards from the Small Business Administration (SBA), which classifies "small" entities based on either annual revenues or

employment. An airport operator (North America Industry Classification System (NAICS) 488119) is classified as a small entity if it has annual revenues of $6 million or less. According to financial reports filed with the FAA in 2003, 195 airports received PFC revenues with annual operating revenues of $6 million or less. These small airports account for over 60 percent of all airports receiving PFC revenues and, therefore, constitute a substantial number of small entities. The average revenue for these airports was $1.7 million and the median revenue was $1.1 million for 2003. The entire cost to all airports is estimated to be $17,100, thus no small airport could experience a significant economic impact. Small airports will benefit proportionately from the establishment of the national internet database, and could also benefit from section 158.13(g), which permits the use of PFC revenues to fund the non-Federal share of air traffic modernization projects, thus easing the local financial burden. Four airports at which military enplanements exceed one percent of all enplanements are small entities. The deferred collection of PFC will result in an extension of the period of collection but will not result in any loss of revenue. The FAA has determined the final rule will not have a significant economic impact on small commercial airports.

The SBA standard classifies a scheduled and nonscheduled passenger air carrier (NAICS 481111) to be a small entity if it has 1,500 employees or less. FAA has identified 57 air carriers with authorization to carry passengers that meet this classification. These small air carriers provide scheduled services under their own code at nearly 100 airports that have PFCs. In addition, some small entities provide air service on behalf of a large air carrier under a code sharing agreement. The large carrier handles all the ticketing and accounting procedures. There are a number of provisions of the PFC program that mitigate any impact on a small air carrier. Section 158.9 prohibits the imposition of a PFC on Essential Air Services (EAS) routes on flights between two or more points in Hawaii or Alaska aboard an aircraft with less than 60 seats. There are 150 EAS routes, a number of which are served by small carriers. Section 158.11 also permits airports to request that a class of carriers that constitutes not more than one percent of total enplanements not collect PFCs. Thus some small carriers will not be affected by the final rule under these provisions. Since no small carrier voluntarily submitted PFC

collection compensation information to the NPRM issued on November 20, 2002, the FAA assumed none of the small carriers will incur the cost of participating in the final compensation collection provision. In addition, small carriers that do collect PFCs will not be adversely affected. Any adjustments to modify ticketing or other administrative costs that small air carriers may incur as a result of this final rule are at least partially if not fully recoverable under the existing compensation provisions of the rule. The FAA has determined the final rule will not have a significant economic impact on small air carriers.

Therefore, as the Administrator of the FAA, I certify that this final rule will not have a significant economic impact on a substantial number of small entities.

## International Trade Impact Assessment

The Trade Agreements Act of 1979 prohibits Federal agencies from establishing any standards or engaging in related activities that create unnecessary obstacles to the foreign commerce of the United States. Legitimate domestic objectives, such as safety, are not considered unnecessary obstacles. The statute also requires Federal agencies to consider international standards and, where appropriate, use the foreign standards as the basis for U.S. standards. Foreign carriers would be required to collect PFCs on wholly domestic U.S. travel that U.S. carriers are already required to collect, and the foreign carriers will be entitled to the same compensation provisions as U.S. carriers. The FAA has assessed the potential effect of this final rule and determined that it will impose the same costs on domestic and international entities and thus have a neutral trade impact.

## Unfunded Mandates Assessment

The Unfunded Mandates Reform Act of 1995 (the Act) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on state, local, and tribal governments.

Section 202(a) (2 U.S.C. 1532) of Title II of the Act requires that each Federal agency, to the extent permitted by law, prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in the expenditure by state, local, tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year; such a mandate is deemed to be a "significant regulatory action." The FAA currently uses an inflation-adjusted value of $128.1 million in lieu of $100 million. Section 203(a) of the

Act (2 U.S.C. 1533) provides that before establishing any regulatory requirements that might significantly or uniquely affect small governments, an agency shall have developed a plan under which the agency shall: (1) Provide notice of the requirements to potentially affected small governments, if any; (2) enable officials of affected small governments to provide meaningful and timely input in the development of regulatory proposals containing significant Federal intergovernmental mandates; and, (3) inform, educate, and advise small governments on compliance with the requirements. With respect to (2), Section 204(a) of the Act (2 U.S.C. 1534) requires the Federal agency to develop an effective process to permit elected officers of state, local, and tribal governments (or their designees) to provide the input described.

This final rule does not contain such a mandate. The requirements of Title II do not apply.

## Executive Order 13132, Federalism

The FAA has analyzed this final rule under the principles and criteria of Executive Order 13132, Federalism. We determined that this action will not have a substantial direct effect on the States, or the relationship between the national Government and the States, or on the distribution of power and responsibilities among the various levels of government, and therefore does not have federalism implications.

## Environmental Analysis

FAA Order 1050.1E identifies FAA actions that are categorically excluded from preparation of an environmental assessment or environmental impact statement under the National Environmental Policy Act in the absence of extraordinary circumstances. The FAA has determined this rulemaking action qualifies for the categorical exclusion identified in paragraph 312d and involves no extraordinary circumstances.

## Regulations That Significantly Affect Energy Supply, Distribution, or Use

The FAA has analyzed this final rule under Executive Order 13211, Actions Concerning Regulations that Significantly Affect Energy Supply, Distribution, or Use (May 18, 2001). We have determined that it is not a "significant energy action" under the executive order because it is not a "significant regulatory action" under Executive Order 12866, and it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

## Availability of Rulemaking Documents

You may get an electronic copy using the Internet by:

(1) Searching the Department of Transportation's electronic Docket Management System (DMS) web page (http://dms.dot.gov/search);

(2) Visiting the FAA's Regulations and Policies web page at http://www.faa.gov/regulations_policies/; or

(3) Accessing the Government Printing Office's web page at http://www.gpoaccess.gov/fr/index.html.

You may also get a copy by sending a request to the Federal Aviation Administration, Office of Rulemaking, ARM–1, 800 Independence Avenue SW., Washington, DC 20591, or by calling (202) 267–9680. Make sure to identify the amendment number or docket number of this rulemaking.

Anyone is able to search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). You may review DOT's complete Privacy Act statement in the Federal Register published on April 11, 2000 (Volume 65, Number 70; Pages 19477–78) or you may visit http://dms.dot.gov.

## Small Business Regulatory Enforcement Fairness Act

The Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996 requires FAA to comply with small entity requests for information or advice about compliance with statutes and regulations within its jurisdiction. If you are a small entity and you have a question regarding this document, you may contact your local FAA official, or the person listed under the **FOR FURTHER INFORMATION CONTACT** heading of this preamble. You can find out more about SBREFA on the Internet at http://www.faa.gov/regulations_policies/rulemaking/sbre_act/.

## List of Subjects in 14 CFR Part 158

Air carriers, Airports, Passenger facility charge, Public agencies, Collection compensation.

## The Amendment

■ Because of the above, the Federal Aviation Administration amends part 158 of Title 14, Code of Federal Regulations, as follows:

## PART 158—PASSENGER FACILITY CHARGES (PFC'S)

### Subpart A—General

■ 1. The authority citation for part 158 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40116–40117, 47106, 47111, 47114–47116, 47524, 47526.

■ 2. Amend § 158.3 as follows:

■ a. Revise the definitions for *Air travel ticket, Approved project,* and *State* to read as set forth below.

■ b. Add definitions for *Covered air carrier, Financial need, Ground support equipment, Notice of intent (to impose a PFC or use PFC revenue),* and *PFC administrative support costs* in alphabetical order to read as set forth below.

### § 158.3 Definitions.

\* \* \* \* \*

*Air travel ticket* includes all documents, electronic records, boarding passes, and any other ticketing medium about a passenger's itinerary necessary to transport a passenger by air, including passenger manifests.

\* \* \* \* \*

*Approved project* means a project for which the FAA has approved using PFC revenue under this part. The FAA may also approve specific projects contained in a single or multi-phased project or development described in an airport capital plan separately. This includes projects acknowledged by the FAA under § 158.30 of this part.

\* \* \* \* \*

*Covered air carrier* means an air carrier that files for bankruptcy protection or has an involuntary bankruptcy proceeding started against it after December 12, 2003. An air carrier that is currently in compliance with PFC remittance requirements and has an involuntary bankruptcy proceeding commenced against it has 90 days from the date such proceeding was filed to obtain dismissal of the involuntary petition before becoming a covered air carrier. An air carrier ceases to be a covered air carrier when it emerges from bankruptcy protection.

\* \* \* \* \*

*Financial need* means that a public agency cannot meet its operational or debt service obligations and does not have at least a 2-month capital reserve fund.

\* \* \* \* \*

*Ground support equipment* means service and maintenance equipment used at an airport to support aeronautical operations and related activities. Baggage tugs, belt loaders, cargo loaders, forklifts, fuel trucks, lavatory trucks, and pushback tractors are among the types of vehicles that fit this definition.

\* \* \* \* \*

*Notice of intent (to impose or use PFC revenue)* means a notice under § 158.30

from a public agency controlling a non-hub airport that it intends to impose a PFC and/or use PFC revenue. Except for §§ 158.25 through 30, "notice of intent" can be used interchangeably with "application."

\* \* \* \* \*

*PFC administrative support costs* means the reasonable and necessary costs of developing a PFC application or amendment, issuing and maintaining the required PFC records, and performing the required audit of the public agency's PFC account. These costs may include reasonable monthly financial account charges and transaction fees.

\* \* \* \* \*

*State* means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, and Guam.

\* \* \* \* \*

■ 3. Amend § 158.9 by revising paragraphs (a)(4) and (5) and by adding paragraph (a)(6) to read as follows:

### § 158.9 Limitations.

(a) \* \* \*

(4) On flights, including flight segments, between 2 or more points in Hawaii;

(5) In Alaska aboard an aircraft having a certificated seating capacity of fewer than 60 passengers; or

(6) Enplaning at an airport if the passenger did not pay for the air transportation that resulted in the enplanement due to Department of Defense charter arrangements and payments.

\* \* \* \* \*

■ 4. Amend § 158.13 by revising paragraphs (b), (c), (d), and (e) and adding paragraphs (f), (g), and (h) to read as follows:

### § 158.13 Use of PFC revenue.

\* \* \* \* \*

(b) *PFC administrative support costs.* Public agencies may use PFC revenue to pay for allowable administrative support costs. Public agencies must submit these costs as a separate project in each PFC application.

(c) *Maximum cost for certain low-emission technology projects.* If a project involves a vehicle or ground support equipment using low emission technology eligible under § 158.15(b), the FAA will determine the maximum cost that may be financed by PFC revenue. The maximum cost for a new vehicle is the incremental amount between the purchase price of a new low emission vehicle and the purchase

price of a standard emission vehicle, or the cost of converting a standard emission vehicle to a low emission vehicle.

(d) *Bond-associated debt service and financing costs.* (1) Public agencies may use PFC revenue to pay debt service and financing costs incurred for a bond issued to carry out approved projects.

(2) If the public agency's bond documents require that PFC revenue be commingled in the general revenue stream of the airport and pledged for the benefit of holders of obligations, the FAA considers PFC revenue to have paid the costs covered in § 158.13(d)(1) if—

(i) An amount equal to the part of the proceeds of the bond issued to carry out approved projects is used to pay allowable costs of such projects; and

(ii) To the extent the PFC revenue collected in any year exceeds the debt service and financing costs on such bonds during that year, an amount equal to the excess is applied as required by § 158.39.

(e) *Exception providing for the use of PFC revenue to pay for debt service for non-eligible projects.* The FAA may authorize a public agency under § 158.18 to impose a PFC for payments for debt service on indebtedness incurred to carry out an airport project that is not eligible if the FAA determines that such use is necessary because of the financial need of the airport.

(f) *Combination of PFC revenue and Federal grant funds.* A public agency may combine PFC revenue and airport grant funds to carry out an approved project. These projects are subject to the record keeping and auditing requirements of this part, as well as the reporting, record keeping and auditing requirements imposed by the Airport and Airway Improvement Act of 1982 (AAIA).

(g) *Non-Federal share.* Public agencies may use PFC revenue to meet the non-Federal share of the cost of projects funded under the Federal airport grant program or the FAA "Program to Permit Cost-Sharing of Air Traffic Modernization Projects" under 49 U.S.C. 44517.

(h) *Approval of project following approval to impose a PFC.* The public agency may not use PFC revenue or interest earned thereon except on an approved project.

■ 5. Amend § 158.15 by revising paragraphs (b)(5) and (6) and adding paragraphs (b)(7) and (8) to read as follows:

**§ 158.15   Project eligibility at PFC levels of $1, $2, or $3.**

\* \* \* \* \*

(b) \* \* \*

(5) Noise compatibility measures eligible for Federal assistance under 49 U.S.C. 47504, without regard to whether the measures are approved under 49 U.S.C. 47504;

(6) Construction of gates and related areas at which passengers are enplaned or deplaned and other areas directly related to the movement of passengers and baggage in air commerce within the boundaries of the airport. These areas do not include restaurants, car rental and automobile parking facilities, or other concessions. Projects required to enable added air service by an air carrier with less than 50 percent of the annual passenger boardings at an airport have added eligibility. Such projects may include structural foundations and floor systems, exterior building walls and load-bearing interior columns or walls, windows, door and roof systems, building utilities (including heating, air conditioning, ventilation, plumbing, and electrical service), and aircraft fueling facilities next to the gate;

(7) A project approved under the FAA's "Program to Permit Cost-Sharing of Air Traffic Modernization Projects" under 49 U.S.C. 44517; or

(8) If the airport is in an air quality nonattainment area (as defined by section 171(2) of the Clean Air Act (42 U.S.C. 7501(2)) or a maintenance area referred to in section 175A of such Act (42 U.S.C. 7505a), and the project will result in the airport receiving appropriate emission credits as described in 49 U.S.C. 47139, a project for:

(i) Converting vehicles eligible under § 158.15(b)(1) and ground support equipment powered by a diesel or gasoline engine used at a commercial service airport to low-emission technology certified or verified by the Environmental Protection Agency to reduce emissions or to use cleaner burning conventional fuels; or

(ii) Acquiring for use at a commercial service airport vehicles eligible under § 158.15(b)(1) and, subject to § 158.13(c), ground support equipment that include low-emission technology or use cleaner burning fuels.

\* \* \* \* \*

■ 6. Add § 158.18 to read as follows:

**§ 158.18   Use of PFC revenue to pay for debt service for non-eligible projects.**

(a) The FAA may authorize a public agency to impose a PFC to make payments for debt service on indebtedness incurred to carry out at the airport a project that is not eligible if the FAA determines it is necessary because of the financial need of the airport. The FAA defines financial need in § 158.3.

(b) A public agency may request authority to impose a PFC and use PFC revenue under this section using the PFC application procedures in § 158.25. The public agency must document its financial position and explain its financial recovery plan that uses all available resources.

(c) The FAA reviews the application using the procedures in § 158.27. The FAA will issue its decision on the public agency's request under § 158.29.

■ 7. Add § 158.20 to read as follows:

**§ 158.20   Submission of required documents.**

(a) Letters and reports required by this part may be transmitted to the appropriate recipient (the public agency, air carrier, and/or the FAA) via e-mail, courier, facsimile, or U.S. Postal Service.

(1) Documents sent electronically to the FAA must be prepared in a format readable by the FAA. Interested parties can obtain the format at their local FAA Airports Office.

(2) Any transmission to FAA Headquarters, using regular U.S. Postal Service, is subject to inspection that may result in delay and damage due to the security process.

(b) Once the database development is completed with air carrier capability, public agencies and air carriers may use the FAA's national PFC database to post their required quarterly reports, and, in that case, do not have to distribute the reports in any other way.

**Subpart B—Application and Approval**

■ 8. Revise § 158.29(a)(1)(ii) and (b)(1)(ii) to read as follows:

**§ 158.29   The Administrator's decision.**

(a) \* \* \*

(1) \* \* \*

(ii) The project will achieve the objectives and criteria set forth in § 158.15 except for those projects approved under § 158.18.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

(ii) The project will achieve the objectives and criteria set forth in § 158.15 except for those projects approved under § 158.18.

\* \* \* \* \*

■ 9. Amend § 158.30 by revising the section heading to read as follows:

**§ 158.30   PFC Authorization at Non-Hub Airports.**

\* \* \* \* \*

■ 10. Amend § 158.31 by revising the introductory text and paragraph (b) to read as follows:

### § 158.31  Duration of authority to impose a PFC after project implementation.

A public agency that has begun implementing an approved project may impose a PFC until—

\*    \*    \*    \*    \*

(b) The total PFC revenue collected plus interest earned thereon equals the allowable cost of the approved project;

\*    \*    \*    \*    \*

■ 11. Amend § 158.33 by revising paragraphs (a)(2), (c)(1) introductory text, and (c)(2), and adding paragraph (a)(3) to read as follows:

### § 158.33  Duration of authority to impose a PFC before project implementation.

(a) \* \* \*

(2) 5 years after the charge effective date; or

(3) 5 years after the FAA's decision on the application (if the charge effective date is more than 60 days after the decision date) if an approved project is not implemented.

\*    \*    \*    \*    \*

(c) \* \* \*

(1) 3 years after the charge effective date; or 3 years after the FAA's decision on the application if the charge effective date is more than 60 days after the decision date unless—

\*    \*    \*    \*    \*

(2) 5 years after the charge effective date; or 5 years after the FAA's decision on the application (if the charge effective date is more than 60 days after the decision date) unless the public agency has obtained project approval.

\*    \*    \*    \*    \*

■ 12. Amend § 158.37 by revising the section heading, revising paragraphs (b)(1)(i)(A), (b)(1)(ii)(C), (b)(1)(ii)(D), (b)(1)(ii)(E) and (b)(5), redesignating paragraphs (b)(1)(i)(B) and (C) as (b)(1)(i)(C) and (D), and adding new paragraphs (b)(1)(i)(B) and (b)(1)(ii)(F) to read as follows:

### § 158.37  Amendment of approved PFC.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) \* \* \*

(i) \* \* \*

(A) Amend the approved PFC amount for a project by more than 25 percent of the original approved amount if the amount was $1,000,000 or greater, (B) Amend the approved PFC amount for a project by any percentage if the original approved amount is below $1,000,000 and the amended approved amount is $1,000,000 or greater,

\*    \*    \*    \*    \*

(ii) \* \* \*

(C) To institute an increase of 25 percent or less of the original approved amount if the amount was more than $1,000,000; or

(D) To institute an increase of any amount if the original approved amount of the project was less than $1,000,000 and if the amended approved amount of the project remains below $1,000,000; or

(E) To establish a new class of carriers under § 158.11 or amend any such class previously approved; or

(F) To delete an approved project.

\*    \*    \*    \*    \*

(5) Justification, if the amendment involves an increase in the PFC amount for a project by more than 25 percent of the original approved amount if that amount is $1,000,000 or greater, an increase in the PFC amount by any percentage if the original approved amount was less than $1,000,000 and the amended approved amount is $1,000,000 or greater, a change in the approved project scope, or any increase in the approved PFC level to be collected from each passenger.

\*    \*    \*    \*    \*

■ 13. Amend § 158.39 by revising paragraphs (a) and (d) to read as follows:

### § 158.39  Use of excess PFC revenue.

(a) If the PFC revenue remitted to the public agency, plus interest earned thereon, exceeds the allowable cost of the project, the public agency must use the excess funds for approved projects or to retire outstanding PFC-financed bonds.

\*    \*    \*    \*    \*

(d) Within 30 days after the authority to impose a PFC has expired or been terminated, the public agency must present a plan to the appropriate FAA Airports office to begin using accumulated PFC revenue. The plan must include a timetable for submitting any necessary application under this part. If the public agency fails to submit such a plan, or if the plan is not acceptable to the Administrator, the Administrator may reduce Federal airport grant program apportioned funds.

### Subpart C—Collection, Handling and Remittance of PFCs

■ 14. Amend § 158.43 by revising paragraphs (b)(3) and (c) to read as follows:

### § 158.43  Public agency notification to collect PFCs.

\*    \*    \*    \*    \*

(b) \* \* \*

(3) The charge effective date will always be the first day of the month;

however, it must be at least 30 days after the date the public agency notified the air carriers of the FAA's approval to impose the PFC.

\*    \*    \*    \*    \*

(c) The public agency must notify air carriers required to collect PFCs at its airport and the FAA of changes in the charge expiration date at least 30 days before the existing charge expiration date or new charge expiration date, whichever comes first. Each notified air carrier must notify its agents, including other issuing carriers, of such changes.

\*    \*    \*    \*    \*

■ 15. Amend § 158.45 by revising paragraph (a)(3) to read as follows:

### § 158.45  Collection of PFCs on tickets issued in the U.S.

(a) \* \* \*

(3) Issuing carriers and their agents shall collect PFCs based on the itinerary at the time of issuance.

(i) Any change in itinerary initiated by a passenger that requires an adjustment to the amount paid by the passenger is subject to collection or refund of the PFC as appropriate.

(ii) Failure to travel on a nonrefundable or expired ticket is not a change in itinerary. If the ticket purchaser is not permitted any fare refund on the unused ticket, the ticket purchaser is not permitted a refund of any PFC associated with that ticket.

\*    \*    \*    \*    \*

■ 16. Amend § 158.47 by revising paragraphs (a) and (c)(4) to read as follows:

### § 158.47  Collection of PFCs on tickets issued outside the U.S.

(a) For tickets issued outside the U.S., an air carrier or foreign air carrier may follow the requirements of either § 158.45 or this section, unless the itinerary is for travel wholly within the U.S. Air carriers and foreign air carriers must comply with § 158.45 where the itinerary is for travel wholly within the U.S. regardless of where the ticket is issued.

\*    \*    \*    \*    \*

(c) \* \* \*

(4) Issuing carriers and their agents shall collect PFCs based on the itinerary at the time of issuance.

(i) Any change in itinerary initiated by a passenger that requires an adjustment to the amount paid by the passenger is subject to collection or refund of the PFC as appropriate.

(ii) Failure to travel on a nonrefundable or expired ticket is not a change in itinerary. If the ticket purchaser is not permitted any fare refund on the unused ticket, the ticket

purchaser is not permitted a refund of any PFC associated with that ticket.

\*    \*    \*    \*    \*

■ 17. Amend § 158.49 by revising paragraph (b), redesignating paragraph (c) as (d) and revising it, and adding new paragraph (c) to read as follows:

### § 158.49   Handling of PFCs.

\*    \*    \*    \*    \*

(b) Collecting carriers must account for PFC revenue separately. PFC revenue may be commingled with the air carrier's other sources of revenue except for covered air carriers discussed in paragraph (c) of this section. PFC revenues held by an air carrier or an agent of the air carrier after collection are held in trust for the beneficial interest of the public agency imposing the PFC. Such air carrier or agent holds neither legal nor equitable interest in the PFC revenues except for any handling fee or interest collected on unremitted proceeds as authorized in § 158.53.

(c)(1) A covered air carrier must segregate PFC revenue in a designated separate PFC account. Regardless of the amount of PFC revenue in the covered air carrier's account at the time the bankruptcy petition is filed, the covered air carrier must deposit into the separate PFC account an amount equal to the average monthly liability for PFCs collected under this section by such air carrier or any of its agents.

(i) The covered air carrier is required to create one PFC account to cover all PFC revenue it collects. The designated PFC account is solely for PFC transactions and the covered air carrier must make all PFC transactions from that PFC account. The covered air carrier is not required to create separate PFC accounts for each airport where a PFC is imposed.

(ii) The covered air carrier must transfer PFCs from its general accounts into the separate PFC account in an amount equal to the average monthly liability for PFCs as the "PFC reserve." The PFC reserve must equal a one-month average of the sum of the total PFCs collected by the covered air carrier, net of any credits or handling fees allowed by law, during the past 12-month period of PFC collections immediately before entering bankruptcy.

(iii) The minimum PFC reserve balance must never fall below the fixed amount defined in paragraph (c)(1)(ii) of this section.

(iv) A covered air carrier may continue to deposit the PFCs it collects into its general operating accounts combined with ticket sales revenue.

However, at least once every business day, the covered air carrier must remove all PFC revenue (Daily PFC amount) from those accounts and transfer it to the new PFC account. An estimate based on ¹⁄₃₀ of the PFC reserve balance is permitted in substitution of the Daily PFC amount.

(A) In the event a covered air carrier ceases operations while still owing PFC remittances, the PFC reserve fund may be used to make those remittances. If there is any balance in the PFC reserve fund after all PFC remittances are made, that balance will be returned to the covered air carrier's general account.

(B) In the event a covered air carrier emerges from bankruptcy protection and ceases to be a covered air carrier, any balance remaining in the PFC reserve fund after any outstanding PFC obligations are met will be returned to the air carrier's general account.

(v) If the covered air carrier uses an estimate rather than the daily PFC amount, the covered air carrier shall reconcile the estimated amount with the actual amount of PFCs collected for the prior month (Actual Monthly PFCs). This reconciliation must take place no later than the 20th day of the month (or the next business day if the date is not a business day). In the event the Actual Monthly PFCs are greater than the aggregate estimated PFC amount, the covered air carrier will, within one business day of the reconciliation, deposit the difference into the PFC account. If the Actual Monthly PFCs are less than the aggregate estimated PFC amount, the covered air carrier will be entitled to a credit in the amount of the difference to be applied to the daily PFC amount due.

(vi) The covered air carrier is permitted to recalculate and reset the PFC reserve and daily PFC amount on each successive anniversary date of its bankruptcy petition using the methodology described above.

(2) If a covered air carrier or its agent fails to segregate PFC revenue in violation of paragraph (c)(1) of this section, the trust fund status of such revenue shall not be defeated by an inability of any party to identify and trace the precise funds in the accounts of the air carrier.

(3) A covered air carrier and its agents may not grant to any third party any security or other interest in PFC revenue.

(4) A covered air carrier that fails to comply with any requirement of paragraph (c) of this section, or causes an eligible public agency to spend funds to recover or retain payment of PFC revenue, must compensate that public

agency for those cost incurred to recover the PFCs owed.

(5) The provisions of paragraph (b) of this section that allow the commingling of PFCs with other air carrier revenue do not apply to a covered air carrier.

(d) All collecting air carriers must disclose the existence and amount of PFC funds regarded as trust funds in their financial statements.

■ 18. Revise § 158.53 to read as follows:

### § 158.53   Collection compensation.

(a) As compensation for collecting, handling, and remitting the PFC revenue, the collecting air carrier is entitled to:

(1) $0.11 of each PFC collected.

(2) Any interest or other investment return earned on PFC revenue between the time of collection and remittance to the public agency.

(b) A covered air carrier that fails to designate a separate PFC account is prohibited from collecting interest on the PFC revenue. Where a covered air carrier maintains a separate PFC account in compliance with § 158.49(c), it will receive the interest on PFC accounts as described in paragraph (a)(2) of this section.

(c)(1) Collecting air carriers may provide collection cost data periodically to the FAA after the agency issues a notice in the **Federal Register** that specifies the information and deadline for filing the information. Submission of the information is voluntary. The requested information must include data on interest earned by the air carriers on PFC revenue and air carrier collection, handling, and remittance costs in the following categories:

(i) Credit card fees;

(ii) Audit fees;

(iii) PFC disclosure fees;

(iv) Reservations fees;

(v) Passenger service costs;

(vi) Revenue accounting, data entry, accounts payable, tax, and legal fees;

(vii) Corporate property department costs;

(viii) Training for reservations agents, ticket agents, and other departments;

(ix) Ongoing carrier information systems costs;

(x) Ongoing computer reservations systems costs; and

(xi) Airline Reporting Corporation fees.

(2) The FAA may determine a new compensation level based on an analysis of the data provided under paragraph (c)(1) of this section, if the data is submitted by carriers representing at least 75 percent of PFCs collected nationwide.

(3) Any new compensation level determined by the FAA under

paragraph (b)(2) of this section will replace the level identified in paragraph (a)(1) of this section.

## Subpart D—Report, Recordkeeping and Audits

■ 19. Amend § 158.63 by revising paragraphs (a) and (c) to read as follows:

### § 158.63  Reporting requirements: Public agency.

(a) The public agency must provide quarterly reports to air carriers collecting PFCs for the public agency with a copy to the appropriate FAA Airports Office. The quarterly report must include:

(1) Actual PFC revenue received from collecting air carriers, interest earned, and project expenditures for the quarter;

(2) Cumulative actual PFC revenue received, interest earned, project expenditures, and the amount committed for use on currently approved projects, including the quarter;

(3) The PFC level for each project; and

(4) Each project's current schedule.

\*        \*        \*        \*        \*

(c) For medium and large hub airports, the public agency must provide to the FAA, by July 1 of each year, an estimate of PFC revenue to be collected for each airport in the following fiscal year.

■ 20. Revise § 158.65 to read as follows:

### § 158.65  Reporting requirements: Collecting air carriers.

(a) Each air carrier collecting PFCs for a public agency must provide quarterly reports to the public agency unless otherwise agreed by the collecting air carrier and public agency, providing an accounting of funds collected and funds remitted.

(1) Unless otherwise agreed by the collecting air carrier and public agency, reports must state:

(i) The collecting air carrier and airport involved,

(ii) The total PFC revenue collected,

(iii) The total PFC revenue refunded to passengers,

(iv) The collected revenue withheld for reimbursement of expenses under § 158.53, and

(v) The dates and amounts of each remittance for the quarter.

(2) The report must be filed by the last day of the month following the calendar quarter or other period agreed by the collecting carrier and public agency for which funds were collected.

(b) A covered air carrier must provide the FAA with:

(1) A copy of its quarterly report by the established schedule under paragraph (a) of this section; and

(2) A monthly PFC account statement delivered not later than the fifth day of the following month. This monthly statement must include:

(i) The balance in the account on the first day of the month,

(ii) The total funds deposited during the month,

(iii) The total funds disbursed during the month, and

(iv) The closing balance in the account.

■ 21. Amend § 158.67 by revising paragraph (c)(2) to read as follows:

### § 158.67  Recordkeeping and auditing: Public agency.

\*        \*        \*        \*        \*

(c) \* \* \*

(2) Conducted as part of an audit under Office of Management and Budget Circular A–133 (the Single Audit Act of 1984, Pub. L. 98–502, and the Single Audit Act Amendments of 1996, Pub. L. 104–156) provided the auditor specifically addresses the PFC.

\*        \*        \*        \*        \*

## Subpart E—Termination

■ 22. Revise § 158.81 to read as follows:

### § 158.81  General.

This subpart contains the procedures for termination of PFCs or loss of Federal airport grant funds for violations of this part or 49 U.S.C. 40117. This subpart does not address the circumstances under which the authority to collect PFCs may be terminated for violations of 49 U.S.C. 47523 through 47528.

### § 158.97  [Removed]

■ 23. Remove § 158.97.

■ 24. Amend appendix A to part 158 by revising paragraphs 10 and 12 of section B of this appendix to read as follows:

## Appendix A to Part 158—Assurances

\*        \*        \*        \*        \*

\* \* \*

10. Recordkeeping and Audit. It will maintain an accounting record for audit purposes for 3 years after physical and financial completion of the project. All records must satisfy the requirements of 14 CFR part 158 and contain documentary evidence for all items of project costs.

\*        \*        \*        \*        \*

12. Compliance with 49 U.S.C. 47523 through 47528. It understands 49 U.S.C. 47524 and 47526 require that the authority to impose a PFC be terminated if the Administrator determines the public agency has failed to comply with those sections of the United States Code or with the implementing regulations published under the Code.

Issued in Washington, DC, on May 14, 2007.

**Marion C. Blakey,**
*Administrator.*

[FR Doc. E7–9941 Filed 5–22–07; 8:45 am]
BILLING CODE 4910–13–P

---

## FEDERAL TRADE COMMISSION

### 16 CFR Part 4

### Access Requests From Foreign Law Enforcement Agencies for Consumer Protection Materials

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule amendment.

**SUMMARY:** The Federal Trade Commission is amending Rule 4.11 of its Rules of Practice, which addresses disclosure requests, to add a new provision, Rule 4.11(j). The new provision conforms the agency's rules to its authority to share confidential information in non-antitrust matters with foreign law enforcers, with appropriate confidentiality assurances and subject to certain restrictions, as provided for under the recently-enacted U.S. SAFE WEB Act of 2006, Pub. L. No. 109–455, 120 Stat. 3372 (2006). The Commission is also amending Rules 4.10(d) and (e), which describe certain materials subject to prohibitions on disclosures and exceptions for specified circumstances, to cross-reference the new Rule 4.11(j).

**DATES:** *Effective Date:* May 23, 2007.

**FOR FURTHER INFORMATION CONTACT:** Joannie T. Wei, Attorney, Office of the General Counsel, Federal Trade Commission, 600 Pennsylvania Avenue, NW., Washington, DC 20580, (202) 326–2840, *jwei@ftc.gov.*

**SUPPLEMENTARY INFORMATION:** The Undertaking Spam, Spyware and Fraud Enforcement With Enforcers beyond Borders Act of 2006 (U.S. SAFE WEB Act), Pub. L. No. 109–455, 120 Stat. 3372 (2006), was enacted to enhance the Federal Trade Commission's enforcement activities against a range of practices that harm U.S. consumers, including illegal spam, spyware, cross-border fraud and deception, misleading health and safety advertising, privacy and security breaches, and other law violations. The practices the FTC enforces against are increasingly global in nature, and the U.S. SAFE WEB Act improves the FTC's ability to cooperate with its foreign counterparts to combat such practices.

*Authority to share certain materials with foreign law enforcement agencies.* Information sharing is one area in which the U.S. SAFE WEB Act strengthens the

# Rules and Regulations

Federal Register

Vol. 72, No. 110

Friday, June 8, 2007

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 1

[Docket No. FAA–2007–27160; Amendment No. 1–56]

RIN 2120–AI97

### Changes to the Definition of Certain Light-Sport Aircraft

**AGENCY:** Federal Aviation Administration (FAA), DOT.
**ACTION:** Disposition of comments on direct final rule; confirmation of effective date.

**SUMMARY:** On April 19, 2007, the FAA published a Direct Final Rule to amend the definition of a light-sport aircraft (LSA) in two areas. The changes permit development of lighter-than-air (LTA) LSA, and allow retractable landing gear for LSA intended for operation on water.

**ADDRESSES:** The complete docket for the Direct Final Rule on the LSA definition may be examined through the Department of Transportation's Docket Management System at http://www.dms.dot.gov. Use the Simple Search selection and type in the docket number, 27160.

**FOR FURTHER INFORMATION CONTACT:** Larry Werth, ACE–114, Small Airplane Directorate, Aircraft Certification Service, Federal Aviation Administration, 901 Locust, Room 301, Kansas City, MO 64106; telephone (816) 329–4147; fax: 816–329–4090; e-mail: larry.werth@faa.gov.

**SUPPLEMENTARY INFORMATION:**

### Background

On July 27, 2004, the FAA issued the "Certification of Aircraft and Airmen for the Operation of Light-Sport Aircraft" final rule (69 FR 44772). That rule established a definition for the term

"Light-Sport Aircraft" (LSA). Since we adopted that rule, the FAA has been working with the LSA industry in evaluating the overall LSA program. The past two years have seen remarkable growth in the overall LSA program. Over 600 new factory-built airplanes, powered parachutes, and weight-shift control aircraft have received airworthiness certificates. The exceptions to this rapid growth are lighter-than-air (LTA) LSA and LSA intended for operation on water.

In the first area, the FAA determined the current LTA LSA maximum takeoff weight (MTW) of 660 pounds (300 kilograms) precluded the desired effect of industry design and development of safe LTA LSA. The Direct Final Rule increased the LTA MTW to 1,320 pounds. In the second area, the FAA determined the physical differences between LSA intended for operation on water (amphibious LSA) and land-based LSA justify allowing retractable landing gear for amphibious LSA.

The Direct Final Rule containing these changes were issued April 9, 2007, and was published on April 19, 2007 (72 FR 19661). The public comment period closed May 21, 2007.

### Discussion of Comments

The FAA received two comments from individuals in response to the Direct Final Rule.

One commenter suggested the regulation be amended to restrict the use of LSA to only unpopulated areas. This rulemaking is limited to the definition of LSA and changing the areas where LSA may operate is clearly beyond the scope of the Direct Final Rule.

The other commenter fully supports the revised definition and recommended consideration of design changes to facilitate egress from LSA should they crash and submerge inverted. The FAA has determined that this comment has merit; however, it is also beyond the scope of this rulemaking.

Committee F37 of ASTM International (originally formed as the American Society for Testing and Materials) developed the LSA design consensus standards. We will share the commenter's design change recommendations with the LSA industry through Committee F37 which has an ongoing responsibility to

continually review LSA consensus standards.

### Conclusion

After consideration of the comments submitted in response to the Direct Final Rule, the FAA has determined that no further rulemaking action is necessary. Amendment 1–56 remains in effect as adopted and is effective June 4, 2007.

Issued in Washington, DC, on June 4, 2007.

**John J. Hickey,**
*Director, Aircraft Certification Service.*
[FR Doc. 07–2835 Filed 6–7–07; 8:45 am]
**BILLING CODE 4910–13–M**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 158

[Docket No. FAA–2006–23730; Amendment No. 158–4]

RIN 2120–AI68

### Passenger Facility Charge Program, Debt Service, Air Carrier Bankruptcy, and Miscellaneous Changes

**AGENCY:** Federal Aviation Administration (FAA), DOT.
**ACTION:** Final rule; correction.

**SUMMARY:** When the FAA issued a final rule which amended FAA regulations dealing with the Passenger Facility Charge (PFC) program to add more eligible uses for revenue, protect such revenue in bankruptcy proceedings, and eliminate charges to passengers on military charters, we erroneously stated a paragraph reference in the regulatory text. This correction removes the erroneous paragraph reference and replaces it with the correct paragraph reference.

**DATES:** This correction is effective June 22, 2007.

**FOR FURTHER INFORMATION CONTACT:** For technical questions concerning this final rule, contact Sheryl Scarborough, Airports Financial Analysis and Passenger Facility Charge Branch, APP–510, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; telephone: (202) 267–8825; facsimile: (202) 267–5302; e-mail: sheryl.scarborough@faa.gov. For legal questions concerning this final

rule, contact Beth Weir, Airports Law Branch, AGC–610, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; telephone (202) 267–5880; facsimile: (202) 267–5769; e-mail: *beth.weir@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

On May 23, 2007, the FAA published the final rule, "Passenger Facility Charge Program, Debt Service, Air Carrier Bankruptcy, and Miscellaneous Changes." (72 FR 28837) In it, we revised section 158.53 to incorporate procedures that were established for the FAA to periodically review and set the air carrier collection compensation level. Upon review of the regulatory text on page 28851, first line, of this final rule, we discovered an incorrect paragraph reference in Section 158.53. This correction removes the incorrect paragraph reference and inserts the correct paragraph reference.

**Correction**

**PART 158—[AMENDED]**

■ In final rule FR Doc. FAA–2006–23730, published on May 23, 2007 (72 FR 28837), make the following correction:

**§ 158.53  [Corrected]**

■ On page 28851, in the first column, line one, remove the phrase "paragraph (b)(2) of this section will" and add in its place paragraph (c)(2) of this section will".

Issued in Washington, DC, on June 1, 2007.

**Pamela Hamilton-Powell,**
*Director, Office of Rulemaking Aviation Safety.*

[FR Doc. 07–2836 Filed 6–7–07; 8:45 am]
**BILLING CODE 4910–13–M**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 71**

[Docket No. FAA–2006–25852; Airspace Docket No. 06–AAL–29]

**RIN 2120–AA66**

**Modification to the Norton Sound Low, Woody Island Low, Control 1234L and Control 1487L Offshore Airspace Areas; Alaska**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action amends the following four Offshore Airspace Areas in Alaska: Norton Sound Low, Woody

Island Low, Control 1234L and Control 1487L. This action describes the airspace west of 160° W. longitude as it is currently depicted on aeronautical charts. Some of the existing controlled airspace is described as domestic Class E5 airspace around Kodiak, AK. This airspace instead will be listed within the Woody Island Low Offshore Airspace Area. The FAA is taking this action to provide additional controlled airspace for aircraft instrument flight rules (IFR) operations, and to correctly describe the existing offshore airspace areas in FAA Order 7400.9P, Airspace Designations and Reporting Points, dated September 1, 2006, and effective September 15, 2006.

**EFFECTIVE DATE:** 0901 UTC, August 30, 2007. The Director of Federal Register approves this incorporation by reference action under 1 CFR part 51, subject to the annual revision of FAA Order 7400.9 and publication of conforming amendments.

**FOR FURTHER INFORMATION CONTACT:** Ken McElroy, Airspace and Rules, Office of System Operations Airspace and AIM, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

**History**

On Tuesday, March 13, 2007, the FAA published in the **Federal Register** a notice of proposed rulemaking to modify four Alaskan Offshore Airspace Areas: Norton Sound Low, Woody Island Low, Control 1234L and Control 1487L (72 FR 11305). Interested parties were invited to participate in this rulemaking effort by submitting written comments on the proposal. No comments were received.

These airspace areas are published in paragraph 6007 of FAA Order 7400.9P, dated September 1, 2006, and effective September 15, 2006, which is incorporated by reference in 14 CFR 71.1. The Offshore Airspace Areas listed in this document will be published subsequently in the Order.

**The Rule**

This action amends Title 14 Code of Federal Regulations (14 CFR) part 71 to modify the Norton Sound Low, Woody Island Low, and Control 1487L Offshore Airspace Areas, AK, by lowering the floor to 1,200 feet mean sea level (MSL) within a 45-mile radius of Hooper Bay Airport, within an 81.2-mile radius of Perryville Airport, within a 73-mile radius of Homer Airport, and within a 73-mile radius of St. Michael Airport. This action also modifies Control 1234L

Offshore Airspace Area, AK, by lowering the floor to 1,200 feet above the surface within an 81.2-mile radius of Perryville Airport, AK. Additionally, this action establishes controlled airspace to support IFR operations at the Hooper Bay, Perryville, Homer and St. Michael Airports, AK. Additionally, controlled airspace extending upward from the surface, from 700 feet above the surface, and from 1,200 feet above the surface, is established in Control 1234L Offshore Airspace Area. The following will correct an error in the Control 1234L Offshore Airspace description in FAAO 7400.9N. The Offshore Airspace Area Control 1234L begins at and extends west of 160°00′00″ W. longitude. This airspace covers all the land west of this longitude including the Aleutian Island chain and the Pribilof Islands. Control 1234L Offshore Airspace around or near the Alaskan airports of Adak, Atka, Cold Bay, Dutch Harbor (Unalaska), Nelson Lagoon, Sand Point, Eareckson Air Station, St. George, Port Heiden, Homer, and Chignik, is being lowered from the current 2,000 feet AGL floor to incorporate Class E domestic airspace. This action is concurrent with Airspace Docket No. 06–AAL–34, revoking the domestic airspace descriptions for these airports. Additionally, the airspace description in FAA Order 7400.9P for Control 1234L referring to altitudes the airspace associated with Chignik Airport, AK, is amended to describe it from 1200 feet "above the surface." Additionally, some of the current Class E5 controlled airspace around Kodiak Airport, AK, will be listed within Woody Island Offshore Airspace in order to be correctly described.

Offshore Airspace Areas are published in paragraph 6007 of FAA Order 7400.9P, dated September 1, 2006, and effective September 15, 2006, which is incorporated by reference in 14 CFR 71.1. The Offshore Airspace Areas listed in this document will be published subsequently in the Order.

The FAA has determined that this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this regulation: (1) Is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under Department of Transportation (DOT) Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is