## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## (CENTRAL DIVISION)

IN RE:

**SOUTHERN SKY AIR & TOURS, LLC
d/b/a DIRECT AIR,**

Debtor.

**Chapter 7
Case No. 12-40944-MSH**

## MOTION OF HORRY COUNTY DEPARTMENT OF AIRPORTS
## TO DETERMINE INAPPLICABILITY OF THE AUTOMATIC STAY OR, IN THE
## ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

To the Honorable Melvin S. Hoffman, United States Bankruptcy Judge:

The Horry County Department of Airports (the "Department"), a department of Horry
County (the "County"), a political subdivision of the State of South Carolina, hereby moves the
Court to determine that the automatic stay is inapplicable to, or alternatively, for relief from the
automatic stay (the "Motion") pursuant to 11 U.S.C. § 362, with respect to payment under a
performance bond issued in favor of the County.  In support of this Motion, the County presents
the Declaration of Pat Apone in Support of the Motion of Horry County Department of Airports
to Determine Inapplicability of the Automatic Stay or, in the Alternative, for Relief from the
Automatic Stay, filed herewith, and further respectfully represents the following:

### Parties, Jurisdiction and Venue

1.      On March 15, 2012 (the "Petition Date"), the debtor, Southern Sky Air & Tours,
LLC d/b/a Direct Air ("Debtor" or "Direct Air"), filed a voluntary petition for relief pursuant to
chapter 11 of title 11, 11 U.S.C. §§ 101, et seq. ("Bankruptcy Code"), commencing these
proceedings.

2.      On March 7, 2012, Richard King, the Assistant United States Trustee, filed an

Expedited Motion to Convert Case to Case Under Chapter 7, or in the Alternative, for the

Appointment of a Chapter 11 Trustee.  The Court granted the Motion on April 11, 2012.

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

### Statement of Facts

5.      The movant owns, operates and is the sponsor of the Myrtle Beach International

Airport (the "Airport") located in Myrtle Beach, South Carolina.  The movant is a department of

the County, a political subdivision of the State of South Carolina.  The Department operates the

Airport to facilitate commercial passenger and cargo aircraft operations and service to the Grand

Strand area in South Carolina.

6.      Direct Air was a low-cost, discount charter airline, that flew various routes in the

United States that included, without limitation, flights to and from the Airport.

7.      On July 1, 2007, the County, acting through the Department, and Direct Air

entered into the Indirect Air Carrier Contract and Airport Use Agreement (the "Agreement"),

which allowed Direct Air to use and lease certain premises and facilities at the Airport, and

which required Direct Air to provide contract security guaranteeing performance of the

Agreement by Direct Air.  By its terms, the Agreement terminates on June 30, 2012.

8.      On January 25, 2007, Direct Air posted a performance bond, Bond # 41087482

(the "Bond"), in the amount of one hundred and sixteen thousand dollars ($116,000.00) as the

security guaranteeing its performance under the Agreement.[1]  The Bond is underwritten by Platte

---

[1] The Bond states that an agreement entitled "Ground Handling Services, Aircraft Landings and Terminal and Office Space Usage Agreement" between Horry County and Direct Air requires security guaranteeing performance by Direct Air under the agreement.  No agreement by this name exists.  The Indirect Air Carrier

2

River Insurance Company, the surety.  Direct Air designated the County as the obligee.  The

Bond continues in full force and effect indefinitely, subject to cancelation at the surety's election.

9.    On March 14, 2008, Direct Air increased the amount of the Bond to one hundred

and fifty one thousand dollars ($151,000.00).

10.    On December 7, 2011, Platte River Insurance Company executed and mailed a

Verification Certificate to the County confirming that the Bond was still in full force and effect

in the amount of one hundred and fifty one thousand dollars ($151,000.00).

11.    Debtor owes the Department three hundred and twenty five thousand, nine

hundred and twelve dollars and fifty nine cents ($325,912.59) under the Agreement and the

Horry County Department of Airports Equipment Lease Agreement.  Under Section 8.1.5 of the

Agreement, payments due under the latter agreement are included in amounts owed under the

Indirect Air Carrier Contract and Airport Use Agreement because "the County reserves the right

to assess and collect ... fees and charges for service or facilities not enumerated in this

Agreement, but provided by the County and accepted by [Direct Air]."

12.    Additionally, the Debtor owes the Department a Passenger Facility Charge

("PFC") balance of one hundred and fifteen thousand, three hundred and fifty four dollars and

fifty eight cents ($115,354.58) pursuant to the Agreement and 49 U.S.C. § 40117. A PFC is paid

by passengers enplaning at an airport under 49 U.S.C. § 40117.  PFCs are collected by the airline

that issues the ticket and are to be held in trust, separate and apart from all other assets of the

airline, other than a nominal amount paid to the carrier as compensation for collecting the PFC,

and remitted monthly to the airport.  Section 7.1 of the Agreement, pursuant to which the surety

---

Contract and Airport Use Agreement covers the subject matter ("Ground Handling Services, Aircraft Landings and
Terminal and Office Space Usage") in that agreement.  Both the County and Direct Air operate under the
understanding that the Bond covers the Agreement.

was issued, requires that contract security be provided to cover, among other things, two months

of PFCs.

13.    All amounts due under the Agreement are covered by the bond.

14.    The movant has not yet filed a claim against the performance bond.

## Relief Requested

15.    Section 362(d) of the Bankruptcy Code provides, in part, as follows:

 (d)    On request of a party in interest and after notice and a hearing, the
court shall grant relief from the stay provided under subsection (a) of this section,
such as by terminating, annulling, modifying, or conditioning such stay:

  (1)    for cause, including the lack of adequate protection of an interest in
        property of such party in interest….

16.    Cause exists to lift the automatic stay in this case because the property at issue

here, the proceeds of a performance bond issued by a third party to guarantee the debtor's

contractual commitment to the movant, are not property of the Debtor's estate. See *In re

McLean Trucking Co.,* 74 B.R. 820, 821 (Bankr. W.D.N.C. 1987) (Court held that proceeds of a

surety bond were not property of the estate and denied debtor's motion seeking both a

preliminary injunction restraining defendants from collecting on the bond and declaratory

judgment that the automatic stay applied); *In re Pine Tree Electric Co.*, 34 B.R. 199, 201 (Bankr.

D. Me. 1983) ("A letter of credit or its proceeds is not property of the estate," and neither calling

nor honoring the letter of credit violates the automatic stay); *In re M.J. Sales & Distributing

Company, Inc.*, 7 C.B.C. 2d 884, 25 B.R. 608 (Bankr. S.D. N.Y. 1982) (same). Rather, the

surety owes an independent obligation to the creditor under the performance bond and all

proceeds are payable directly to the movant. See *In re Bell Redevelopment, Inc.,* 2002 WL

32000663, at *2. The automatic stay does not extend to actions to collect funds between non-

4

debtor parties, such as this one. *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 26 B.R. 405, 409 (Bankr. S.D.N.Y. 1983).

17.     In *In re Bell Redevelopment, Inc.*, the court granted a motion for relief from the automatic stay where the creditor sought to "pursue payment under a performance bond underwritten by… [an] Insurance Company…, regarding a construction project…, in which [the creditor] was a subcontractor of the Debtor." 2002 WL 32000663, at *2.  The debtor objected to the motion and argued that "the payment under the performance bond to [the creditor], is property of the bankruptcy estate, thus precluding the requested relief from the automatic stay." *Id*.  The court held that "there is clearly an independent obligation which arises under the terms of the performance bond underwritten by [the insurance company]." *Id*.  That obligation was between the insurance company and the creditor.  It did not run to the estate.  As such, the court found "that it would be inequitable to deny materialmen and subcontractors... to proceed to directly enforce their rights under the performance bond. Thus, the Court conclude[d] that, pursuant to 11 U.S.C. § 362(d)(1), [the] Creditor, ...ha[d] shown cause to support the allowance of the Motion for Relief from the Automatic Stay." *Id*.

18.     Similarly, here, the Platte River Insurance Company owes the County an independent obligation under the terms of the Bond to provide security guaranteeing the agreement.  The amounts due under a bond are not property of the debtors estate and are not subject to the automatic stay.  The County can directly enforce its rights under the Bond without causing any diminution of the estate.  Additionally, if permitted to collect the amounts due under the Bond, the County will not pursue a claim against the Debtor for the amounts collected under the Bond, thereby also benefitting the estate.

WHEREFORE, the County, respectfully requests that the Court determine that the automatic stay does not apply, or alternatively, grant relief from the automatic stay imposed by § 362 of the Bankruptcy Code to permit the County to collect payment under the Bond and grant the County such other and further relief as the Court may deem necessary or appropriate.

Dated this 20 day of June, 2012.

/s/ Lawrence M. Kraus
Lawrence M. Kraus BBO No. 564561
David Y. Bannard BBO No. 552559
Foley & Lardner LLP
111 Huntington Avenue
Suite 2600
Boston, MA 02199-7610
Telephone:  617-342-4000
Facsimile:  617-342-4001
lkraus@foley.com

4843-6129-6143.1

# EXHIBIT A

4843-6129-6143.1

# SIGNATORY

# INDIRECT AIR CARRIER

# CONTRACT AND AIRPORT USE

# AGREEMENT

# BY AND BETWEEN

# HORRY COUNTY

# AND

# MYRTLE BEACH DIRECT
# AIR & TOURS

229

# TABLE OF CONTENTS

**ARTICLE 1    DEFINITIONS** ................................................................................ 1

Section 1.1          Airport Arrival(s) ................................................................. 1

Section 1.2          Aircraft Loading Bridge(s) or Boarding Bridge(s) .................. 2

Section 1.3          Aircraft Operator .................................................................. 2

Section 1.4          Aircraft Parking Position(s) ................................................... 2

Section 1.5          Airfield ................................................................................ 2

Section 1.6          Airfield Requirement ............................................................ 2

Section 1.7          Airport ................................................................................. 2

Section 1.8          Airport Capital Expense ........................................................ 2

Section 1.9          Airport Cost Centers ............................................................. 2

Section 1.10         Airport Master Plan .............................................................. 2

Section 1.11         Airport Renewal and Replacement (R&R) Fund ..................... 3

Section 1.12         Airport Revenue Bonds ......................................................... 3

Section 1.13         Ancillary Airfield Requirements ............................................ 3

Section 1.14         Ancillary Airfield Revenues ................................................... 3

Section 1.15         Bond Ordinance .................................................................... 3

Section 1.16         Capital Component ................................................................ 3

Section 1.17         Certified Maximum Gross Landing Weight (CMGLW) ............. 3

Section 1.18         Concourse ............................................................................ 3

Section 1.19         Concourse Gate Position ........................................................ 3

Section 1.20         County ................................................................................. 3

Section 1.21         Deplaned Passengers ............................................................. 3

Section 1.22         Depreciation Fund ................................................................ 3

Section 1.23         Director of Airports, Airport Director or Director .................... 4

Section 1.24         Enplaned Passengers ............................................................ 4

Section 1.25         Exclusive Use Premises ......................................................... 4

Section 1.26         Existing Terminal Complex .................................................... 4

Section 1.27         Federal Aviation Administration (FAA) ................................... 4

Section 1.28         Fiscal Year ........................................................................... 4

Section 1.29         General Aviation ................................................................... 4

Section 1.30         Hazardous Material ............................................................... 4

Section 1.31         Joint Use Formula ................................................................ 4

Section 1.32         Joint Use Premises ............................................................... 4

Section 1.33         Landing Fee ......................................................................... 4

230

Section 1.34          Landing Fee Rate ............................................................................. 4
Section 1.35          Maintenance and Operating Expense Reserve Account .................. 4
Section 1.36          Maintenance and Operating (M&O) Expenses ............................... 5
Section 1.37          Maintenance and Operating (M&O) Rate ...................................... 5
Section 1.38          Net Airfield Requirement .............................................................. 5
Section 1.39          Non-Indirect Air Carrier ............................................................... 5
Section 1.40          Passenger Facilities Charge (PFC) ................................................ 5
Section 1.41          Passenger Facility Charge Revenue .............................................. 5
Section 1.42          Passenger Hold Room ................................................................... 5
Section 1.43          Passenger Security Reimbursements .............................................. 5
Section 1.44          Preferential Use Space and Facilities ............................................ 5
Section 1.45          Premises ........................................................................................ 5
Section 1.46          Project(s) ...................................................................................... 5
Section 1.47          Public Space ................................................................................. 5
Section 1.48          Reserve Account Deposits ............................................................. 6
Section 1.49          Indirect Air Carriers ..................................................................... 6
Section 1.50          Terminal Building .......................................................................... 6
Section 1.51          Terminal Complex ......................................................................... 6
Section 1.52          Terminal Use Fees ........................................................................ 6
Section 1.53          Total Landed Weight ..................................................................... 6
ARTICLE 2       EFFECTIVE DATE AND TERM OF AGREEMENT .......................... 6
Section 2.1           Term .............................................................................................. 6
Section 2.2           Holding Over ................................................................................. 7
ARTICLE 3       RIGHTS OF AIR CARRIER ........................................................... 7
Section 3.1           Rights of Air Carrier ..................................................................... 7
Section 3.1.1         Right to Use Airport ..................................................................... 7
Section 3.1.2         Right to Operate Aircraft .............................................................. 7
Section 3.1.3         Right to Provide Services .............................................................. 7
Section 3.1.4         Right to Provide Training .............................................................. 7
Section 3.1.5         Right to Sell Its Aircraft, Equipment and Supplies ....................... 7
Section 3.1.6         Right to Purchase from Person or Company of Its Choice ........... 8
Section 3.1.7         Right to Service Aircraft and Other Equipment ............................ 8
Section 3.1.8         Right to Handle Persons, Property and Mail ................................ 8
Section 3.1.9         Right to Install Signs ..................................................................... 8
Section 3.1.10        Right to Install and Operate Communications Equipment ............ 8
Section 3.1.11        Ingress and Egress ........................................................................ 9

231

Section 3.1.12    No Other Business Authorized ........................................ 9

Section 3.2    Air Carrier Premises ................................................. 9

Section 3.2.1    Exclusive or Preferential use of Space ........................... 9

Section 3.2.2    Upon Effective Date ............................................... 9

Section 3.2.2.1    Exclusive Premises ............................................. 9

Section 3.2.2.2    Preferential Use Space and Facilities ......................... 9

Section 3.2.2.3    Joint Use Premises ............................................ 10

Section 3.2.2.4    Joint Use of Aircraft Parking Positions ...................... 10

Section 3.2.2.5    Boarding Bridge User Charge .................................. 10

Section 3.2.2.6    Boarding Bridge User Agreements ............................. 10

Section 3.3    Efficient Use of Premises .......................................... 10

ARTICLE 4    MAINTENANCE, OPERATION, USE AND CONDITION OF AIRPORT ...................... 11

Section 4.1    Maintenance and Operation by County ................................ 11

Section 4.2    Costs of Maintenance and Operation ................................. 11

Section 4.3    Finishes for Exclusive Premises .................................... 12

Section 4.4    Terminal Complex Alteration or Expansion ........................... 12

Section 4.5    Airport Security/Federal Aviation Regulations
Passenger Security Reimbursements ................................................. 12

ARTICLE 5    PRINCIPLES RELATING TO FEES AND CHARGES ................................ 13

Section 5.1    General Concepts ................................................... 13

Section 5.2    Accounting Principles .............................................. 13

Section 5.3    Employee Ground Vehicle Parking .................................... 14

Section 5.4    Additional Capital Projects ........................................ 14

ARTICLE 6    AIR CARRIER'S FEES AND CHARGES ......................................... 14

Section 6.1    Landing Fees ....................................................... 14

Section 6.2    Collection of PFCs ................................................. 14

Section 6.3    Effective Date and Preparation of Calculations & Adjustments ....... 14

Section 6.4    County Accounting Records .......................................... 15

Section 6.5    Terminal Complex Fees and Charges .................................. 15

Section 6.5.1    Calculation and Payment of County Landing Fees ................... 15

Section 6.5.2    Special Adjustments to Landing Fee Rates and Charges ............ 15

Section 6.5.3    Annual Adjustment of Landing Fees and Rates and Charges ......... 15

Section 6.6    Payments ........................................................... 16

ARTICLE 7    CONTRACT SECURITY ...................................................... 16

ARTICLE 8    OTHER FEES AND CHARGES ................................................. 17

Section 8.1    Rights of County ................................................... 17

232

Section 8.2          Permits and Licenses................................................................18

Section 8.3          No Further Charges................................................................18

ARTICLE 9      STATISTICAL INFORMATION ....................................................18

Section 9.1          Statistical Information ............................................................18

ARTICLE 10     INDEMNITY AND INSURANCE ..................................................18

Section 10.1         Indemnity ............................................................................18

Section 10.2         Environmental Indemnification................................................19

Section 10.3         Release of Liability for Property Loss.......................................19

Section 10.4         Air Carrier Public Liability Insurance .......................................19

Section 10.5         County Public Liability Insurance............................................20

Section 10.6         County Fire and Extended Coverage Insurance-Terminal Complex ..........20

Section 10.7         Air Carrier Insurance for Property Loss ....................................20

Section 10.8         Air Carrier Insurance on Automobiles & Other Ground Vehicles .............20

Section 10.9         Certificate(s) of Insurance .....................................................20

ARTICLE 11     QUIET ENJOYMENT................................................................20

Section 11.1         Quiet Enjoyment....................................................................20

ARTICLE 12     INSPECTION BY COUNTY .......................................................21

Section 12.1         Inspection by County..............................................................21

ARTICLE 13     RULES AND REGULATIONS ....................................................21

Section 13.1         Compliance with County Laws, Rules and Regulations...................21

Section 13.2         Payment of County Penalties and Fines .....................................21

Section 13.3         Compliance with Federal, State & Local Laws, Rules & Regulations .......21

ARTICLE 14     ASSIGNMENT AND SUB-USE ...................................................22

Section 14.1         Assignment and Sub-Use .......................................................22

ARTICLE 15     SURRENDER OF POSSESSION ................................................22

Section 15.1         Surrender of Possession.........................................................22

ARTICLE 16     TAXES ................................................................................23

ARTICLE 17     DEFAULT AND CANCELLATION ..............................................23

Section 17.1         Events of Default....................................................................23

Section 17.2         Remedies Upon Default .........................................................24

Section 17.3         Cancellation by Air Carrier .....................................................24

Section 17.4         Late Charges.........................................................................25

ARTICLE 18     DAMAGE OR DESTRUCTION ..................................................25

Section 18.1         Damage of Destruction...........................................................25

ARTICLE 19     PROHIBITED USES ................................................................25

Section 19.1         Prohibited Uses.....................................................................25

233

Section 19.2          Oil, Fuel and Other Materials ..................................................... 26

ARTICLE 20      ALTERATIONS AND ADDITIONS .................................................... 26

Section 20.1          Alteration and Additions ............................................................ 26

ARTICLE 21      FEDERAL GRANTS AND NON-DISCRIMINATION ......................... 26

Section 21.1          Non-Discrimination ................................................................... 26

Section 21.2          Federal Grants ........................................................................... 27

ARTICLE 22      TITLE TO FIXTURES AND EQUIPMENT INSTALLED BY AIR CARRIER ........ 27

Section 22.1          Title to Fixtures and Equipment Installed by Air Carrier ......................... 27

ARTICLE 23      MISCELLANEOUS ........................................................................ 27

Section 23.1          Non-Waiver of Rights ................................................................ 27

Section 23.2          Invalidity of Clauses ................................................................. 27

Section 23.3          Approval by the Parties ............................................................ 27

Section 23.4          Headings ................................................................................. 27

Section 23.5          Performance and Labor and Material Payment Bonds ...................... 27

Section 23.6          Remedies ................................................................................. 28

Section 23.7          Governing Law ........................................................................ 28

Section 23.8          Non-Liability ........................................................................... 28

Section 23.9          Notices .................................................................................... 28

Section 23.10         Agreement Not to Grant More Favorable Terms ........................... 28

Section 23.11         Entire Agreement ..................................................................... 29

234

STATE OF SOUTH CAROLINA )       SIGNATORY
                          )    INDIRECT AIR CARRIER CONTRACT
COUNTY OF HORRY          )      AND AIRPORT USE AGREEMENT

THIS INDIRECT AIR CARRIER CONTRACT AND AIRPORT USE AGREEMENT made and entered into as of the 1st day of July, 2007 by and between Horry County (hereinafter the "County"), a political subdivision of the State of South Carolina and Southern Sky Air & Tours d/b/a Myrtle Beach Direct Air & Tours (hereinafter, "Air Carrier"), a business entity organized and existing under the laws of the State of South Carolina and having its principal place of business in Myrtle Beach, South Carolina.

WHEREAS, the County is the sponsor and operator of the Myrtle Beach International Airport; and

WHEREAS, County has constructed on the Premises an aircraft parking apron, taxiways, a cargo building, a passenger terminal building, public parking facilities, public access roadways and other appurtenant facilities, the aggregate of which along with the Airfield are referred to herein as the "Myrtle Beach International Airport" or "Airport"; and

WHEREAS, the County operates the Airport to facilitate commercial passenger and cargo aircraft operations and service to the Grand Strand area in South Carolina; and

WHEREAS, Air Carrier is engaged in the business of commercial air transportation of persons, property, cargo and mail ("Air Transportation"); and

WHEREAS, County has the right to permit the use of the Airport by Air Carrier for the operation of Air Carrier's Air Transportation business; and

WHEREAS, the parties desire to enter into this Agreement for the use and lease of certain premises and facilities at the Airport all as more fully herein set forth;

NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein contained to be observed and performed, the parties hereto do hereby covenant, agree and bind themselves as follows:

# ARTICLE 1

## DEFINITIONS

The following words, terms or phrases, whenever used in this Agreement, shall have the meanings respectively ascribed to them in this Article, except as otherwise clearly indicated by the context, in which event, the word, term, or phrase shall have the meaning usually and customarily ascribed to it by general usage.

1.1    _Aircraft Arrival(s)_ - shall mean the arrival at the Airport of any aircraft engaged in the carriage for hire of persons, property, cargo or mail, including charters. Aircraft Arrivals shall

1



not include any flight that returns to the Airport because of mechanical, meteorological or other precautionary reason.

1.2   **Aircraft Loading Bridge(s)** or **Boarding Bridge(s)** - shall mean the enclosed, movable walkways leading from the Passenger Hold Rooms in the Terminal Complex to parked aircraft permitting passengers to enplane and deplane.

1.3   **Aircraft Operator** - shall mean the Operator of any Aircraft engaged in the scheduled carriage of passengers and/or cargo for compensation or hire, including those companies providing aircraft to Indirect Air Carriers.

1.4   **Aircraft Parking Position(s)** - shall mean the locations designated by an authorized representative of the County where Aircraft are required to park for the purpose of enplaning and deplaning passengers.

1.5   **Airfield** - shall mean those portions of the Airport which provide for the landing, takeoff, taxiing, movement or staging of Aircraft including navigational aids, hazard designations and warning devices, airfield security roads, fencing, lighting, clear zone areas, aviation easements or interests in property utilized in connection therewith.

1.6   **Airfield Requirement** - shall mean an amount equal to the direct and indirect maintenance and non-capital improvements and operating expenses allocable to the Airfield plus the Airport Capital Expenses for the Airfield.

1.7   **Airport** - shall mean the Myrtle Beach International Airport.

1.8   **Airport Capital Expense** - shall mean the costs incurred by the County for capital improvements to the Airport, including property acquisition, plus the annual expense resulting from (1) debt service associated with the County's revenue bonds or other debt issued to fund capital improvements at the Airport, and (2) the amortization of any of the County's funds invested in capital improvements to the Airport amortized over the useful life of the improvements with interest. For property acquisitions, amortization shall commence upon the date the property is placed in service to benefit a cost center of the Airport and shall be for a period of 25 years. Airport Capital Expense shall not include costs associated with funds invested by the County in any other airport owned or operated by County.

1.9   **Airport Cost Centers** - shall mean the cost centers to be used in accounting for Airport expenses and for calculating and adjusting certain fees and charges described herein as set forth on Exhibit A, attached hereto, and as may be amended by County.

1.10   **Airport Master Plan** - shall mean the plan, as it may be amended from time to time, required by the Federal Aviation Administration to be submitted by the County for review and approval showing the current and projected requirements of the Airport and the current and projected uses of the facilities located at the Airport.

236

1.11    **Airport Renewal and Replacement (R&R) Fund** - shall mean the Contingent Fund established pursuant to any Bond Ordinance duly authorized by the County to contain the reserves maintained for the renewal and replacement of the Airport capital facilities.

1.12    **Airport Revenue Bonds** - shall mean the revenue bonds issued by Horry County, South Carolina, as a means of financing improvements at the Airport.

1.13    **Ancillary Airfield Requirements** - shall mean an amount equal to the direct and indirect maintenance and non-capital improvements and operating expenses allocable to the Airfield plus the Airport Capital Expenses for the Airfield required to sustain Aircraft operations other than those of the Air Carrier and other Aircraft Operators.

1.14    **Ancillary Airfield Revenues** - shall mean those revenues received by County for use of the Airfield other than Fees from Indirect Air Carriers and other Aircraft Operators. For the purpose of this Agreement, Ancillary Airfield Revenues shall not include revenues generated by the FBO/General Aviation Cost Center except that $.05 per gallon of fuel pumped by the FBO, excluding fuel provided under the County's military contract with the United States of America, shall be allocated to Ancillary Airfield Revenues as the FBO/General Aviation allocation for Airfield operating expenses.

1.15    **Bond Ordinance** – shall mean the Bond Ordinance of Horry County, South Carolina, as it may be amended from time to time, authorizing the issuance by County of special revenue bonds with respect to the Airport.

1.16    **Capital Component Rate** - shall mean that component of the annual per square foot rental rate payable by Air Carrier for its use and occupancy of the Premises which is the portion of annual Airport Capital Expense allocable to the Terminal Building.

1.17    **Certified Maximum Gross Landing Weight (CMGLW)** - shall mean the current maximum allowable gross landing weight, expressed in 1,000 pound units or fraction thereof, of aircraft operated by Air Carrier as certificated by the Federal Aviation Administration.

1.18    **Concourse** - shall mean those areas of the Terminal Building used to enplane and deplane passengers.

1.19    **Concourse Gate Position** - shall mean an area in the Concourse used by Air Carrier or another Aircraft Operator for the purposes of enplaning and deplaning passengers.

1.20    **County** – shall mean the County of Horry, South Carolina.

1.21    **Deplaned Passengers** - shall mean the revenue passengers actually disembarked from aircraft operated by Air Carrier or other Aircraft Operator at the Airport

1.22    **Depreciation Fund** – shall mean the fund established pursuant to any Bond Ordinance duly authorized by the County to accumulate amounts maintained by the County to establish a reserve for depreciation of Airport assets.

237

1.23   **Director of Airports, Airport Director** or **Director** - shall mean the person designated by County from time to time to manage the Airport for County and to act for County with respect to the rights and obligations of County under this Agreement.

1.24   **Enplaned Passengers** - shall mean the revenue passengers actually boarded upon aircraft provided through Air Carrier or other Aircraft Operator using the facilities at the Airport.

1.25   **Exclusive Use Premises** - shall mean the premises, which Air Carrier has the right to use exclusively pursuant to this Agreement.

1.26   **Existing Terminal Complex** - shall mean the passenger terminal building and adjacent areas as of the effective date hereof.

1.27   **Federal Aviation Administration (FAA)** - shall mean the Federal Aviation Administration created under the Federal Aviation Act of 1958 or such successor agency as may from time to time have similar jurisdiction over Air Carrier or its business.

1.28   **Fiscal Year** - shall mean the 12-month period beginning on the 1st day of July of any year.

1.29   **General Aviation** - shall mean non-scheduled, civilian Aircraft, operated pursuant to the terms of Parts 91 and/or 135 of the FAA's regulations, the operations associated therewith and the facilities associated therewith.

1.30   **Hazardous Material** – Any substance that is listed, defined or regulated as a "hazardous substance," hazardous waste," or otherwise classified as a hazardous, toxic or dangerous waste, substance or material by any federal, state or local government entity or any agency or department thereof including, but not limited to, the items set forth in Section 13.3.

1.31   **Indirect Air Carrier** - also referred to as Air Carrier herein, shall mean a company meeting the appropriate definition as contained in Title 49 of the United States Code and Code of Federal Regulations and that contracts aircraft and crew services from a certificated air carrier or commercial operator as defined by the FAA but does not engage in control over the operational function of any flight. The advertising of an Indirect Air Carrier must make it clear that a certificated air carrier or commercial operator provides the transportation.

1.32   **Joint Use Formula** - shall mean the formula used to prorate certain specified charges among the Aircraft Operators such that 10% of the charge to be prorated shall be apportioned equally among the Aircraft Operators who have enplaned passengers or maintain space at the Airport, and the remaining 90% of such charge shall be apportioned among such users in the same proportion that the number of each such Aircraft Operator's Enplaned Passengers at the Airport during the most recent month for which such information is available bears to the total number of Enplaned Passengers during the same month.

1.33   **Joint Use Premises** - shall mean the areas and facilities in the Terminal Complex to be used jointly by Air Carrier and other Aircraft Operators.

1.34   **Landing Fee** - shall mean the monthly payment required of Aircraft Operators for the use of the Airfield.

1.35   **Landing Fee Rate** - shall mean the rate used to calculate Landing Fees.

4

*238*

1.36   **Maintenance and Operating Expense Reserve Account** - shall mean the account established pursuant to any Bond Ordinance duly authorized by the County to account for the funds and moneys deposited therein and reserved from the general Airport funds for the purpose of providing emergency funds to continue Airport Operations when needed.

1.37   **Maintenance and Operating (M&O) Expenses** - shall mean County's actual expenses of maintaining, operating, repairing and administering the Airport. M&O Expenses shall not include any expenses incurred by the County at, for or on any other airport owned or operated by County.

1.38   **Maintenance and Operating (M&O) Rate** - shall mean that component of the annual per square foot rental rate payable by Air Carrier for its use and occupancy of the Premises which is the annual M&O Expenses allocable to the Terminal Building and further allocated to each category of Premises.

1.39   **Net Airfield Requirement** - shall mean an amount equal to the Airfield Requirement less the amount of any Ancillary Airfield revenues.

1.40   **Non-Signatory Air Carrier**- shall mean the Air Carriers serving the Airport which have not entered into agreements with County that are substantially the same as Signatory Air Carrier Agreements or have not qualified for Signatory Air Carrier Status. Those Aircraft Operators shall enter into Non-Signatory Air Carrier Use Agreements with County.

1.41   **Passenger Facilities Charge (PFC)** - shall mean that charge permitted by law and regulation to be imposed and collected from passengers enplaning or deplaning commercial flights at the Airport.

1.42   **Passenger Facility Charge Revenue** – shall mean any revenue resulting from the imposition of a Passenger Facility Charge at the Airport.

1.43   **Passenger Hold Room** - shall mean the areas of the Concourse used by Aircraft Operators for the assembly and processing of passengers.

1.44   **Passenger Security Reimbursements** – shall mean those amounts payable by the Air Carrier for the law enforcement officers stationed at the Passenger Terminal Complex pursuant to Transportation Security Administration Regulations, 49 Code of Federal Regulations ("CFR") Sections 1500 through 1550 and 14 CFR Part 129, or any successor document, or the Airport's TSA-approved security plan, and for any cost incurred pursuant to future regulations, directives and requirements.

1.45   **Preferential Use Space and Facilities** - shall mean the areas of the Terminal Complex assigned to Air Carrier on a non-exclusive but preferential use basis which Air Carrier has a first right to use but which County may authorize others to use when not in use by the Air Carrier, subject to Article 3 of this Agreement.

1.46   **Premises** - shall mean the Exclusive Use Premises, the Preferential Use Space and Facilities, and the Joint Use Premises.

1.47   **Project(s)** - shall mean any improvements or series of improvements to the Airfield and/or Terminal Complex contemplated by the County in pursuit of implementation of the Airport Master Plan.

239

1.48   **Public Space** - shall mean those areas in the Terminal Building not leased or available for lease or use on an exclusive, preferential or joint use basis, or otherwise, to any person, company, or corporation, and that are open to the general public.

1.49   **Reserve Account Deposits** - shall mean the sum of deposits made to the Airport Renewal and Replacement Fund, the Depreciation Fund, and the Maintenance and Operating Expense Reserve Account.

1.50   **Signatory Air Carrier** – A Signatory Air Carrier shall have entered into agreements with the County that are substantially the same as this Agreement.   Eligibility for Signatory Air Carrier status requires that the company provide the same level of certificated air carrier / commercial operator service required to obtain Signatory Airline status (three (3) regularly scheduled flights and two hundred (200) available seats for at least five (5) calendar days of every week).  Failure to maintain the required level of service may result in the loss of Signatory Air Carrier status, at County's exclusive option.

1.51   **Terminal Building** - shall mean the facility located on the Airfield designated by County as the location where Aircraft Operators may gather, process, enplane or deplane passengers.

1.52   **Terminal Complex** - shall mean the Terminal Building, terminal roadway, public parking areas and other areas and facilities designated by County for serving and/or supporting the Terminal Building.

1.53   **Terminal Use Fees** - shall mean the sum of all payments by Air Carrier to County for its use of the Terminal Complex in any Fiscal Year of County, including rentals for Exclusive Use Premises and Preferential Use Space and Facilities, payments pursuant to the Joint Use Formula, and payments for Airport Security

1.54   **Total Landed Weight** - shall mean the sum of the Certified Maximum Gross Landing Weights for all Aircraft, including charters, operated by Air Carrier arriving at the Airfield over a stated period of time.

Additional words and phrases used in this Agreement but not defined herein shall have the meanings as set forth in the Bond Ordinance or, if not set forth, shall have their usual and customary meaning.


# ARTICLE 2

## EFFECTIVE DATE AND TERM OF AGREEMENT

2.1   **Term.**   This agreement shall become effective as of July 1, 2007 ("Effective Date") and shall terminate at midnight on June 30, 2012, so long as Signatory Airline Agreements in their current form are in effect at the Airport, unless earlier terminated pursuant to the provisions herein.  In the event new Signatory Airline Agreements are entered into at the Airport, with terms and conditions different from those currently in existence in both this and Signatory Airline Agreements, Air Carrier shall have the option of modifying this Agreement to incorporate changes to those provisions, to avoid termination of this Agreement.

240

2.2   **Holding Over.**   At the discretion of County, Air Carrier may hold over on a month-to-month basis upon termination of this Agreement; such holding over, however, shall not be construed to renew this agreement for any further term but may be terminated by County or Air Carrier, at its will at any time, upon thirty (30) days advance written notice; all other terms and conditions provided herein shall remain in full force and effect to any such hold over tenancy.

## ARTICLE 3

## RIGHTS OF AIR CARRIER

3.1    Subject to the provisions herein, Air Carrier is hereby granted and accepts the following rights with respect to the Airport:

3.1.1 **Right to Use Airport** - Air Carrier, its directors, employees, passengers, guests, contractors, and invitees, shall have the non-exclusive right to use (in common with other duly authorized users) the Airfield and the public areas of the Terminal Complex, together with all facilities, improvements, equipment, and services that have been or may be provided for common use of such facilities and areas.

3.1.2 **Right to Operate Aircraft** - Air Carrier shall have the non-exclusive right to land, take off, taxi, push and tow, aircraft in areas of the Airport designated for such purpose by the Director (subject to the limitations imposed by the Director of such areas). Air Carrier shall have the non-exclusive right to park, load and unload such aircraft at the Aircraft Parking Position(s) assigned to Air Carrier by the Director.

3.1.3 **Right to Provide Services** - Within areas designated hereunder, Air Carrier shall have the right to operate its Air Transportation business including the right to sell tickets and services; to process passengers and their property for air travel; to sell, handle, and provide mail and cargo services. Air Carrier shall have the non-exclusive right to perform other similar activities directly related to the operation of Air Carrier's Air Transportation business. Subject to the provisions of Article 14 hereof and the approval of the Director, Air Carrier shall have the right to perform ground-handling services for other Air Carriers engaged in air transportation.

3.1.4 **Right to Provide Training** - Air Carrier shall have the right to provide ground training of its employees or candidates for employment, provided that such training shall be directly related to the Air Carrier's Air Transportation business. Such training shall not hamper or interfere with the use of the Airport by other users and shall be in compliance with the Airport security plan.

3.1.5 **Right to Sell Its Aircraft, Equipment and Supplies** - Air Carrier shall have the right to sell, dispose of or exchange Air Carrier's surplus equipment or supplies bought for its own use and not for resale. This right shall not imply that Air Carrier has the right to conduct a separate business related to such sales and shall be exercised by Air Carrier only in connection with the operation of Air Carrier's Air Transportation business at the Airport. Air Carrier shall not sell gasoline, jet fuel or other propellants, greases or lubricants to other Aircraft Operators except to Aircraft Operators that are affiliated with or subsidiaries of Air Carrier. Air Carrier shall comply with all Airport quality standards pertaining to the handling of fuels or other propellants, greases and lubricants.

7

24l

**3.1.6 Right to Purchase from Person or Company of its Choice** - Air Carrier shall have the right to purchase at the Airport or elsewhere from any person or company authorized by the County to do business at the Airport, its requirements of aviation fuel; ground vehicle fuel; lubricating oil; greases; food, beverage, and other passenger supplies; and all other materials, supplies and services it requires for the operation of its Air Transportation business; provided, however, Air Carrier shall comply with all Airport quality standards pertaining to the handling of fuel, other propellants, greases and lubricants.

**3.1.7 Right to Service Aircraft and Other Equipment** - Air Carrier shall have the right to have its aircraft and other equipment serviced by suppliers of its choice. Such suppliers may provide materials and services, including, but not limited to: aviation fuel; ground vehicle fuel; lubricating oil; greases; parts; and all other materials, supplies and services required by Air Carrier in the conduct of its Air Transportation business. This right shall not imply that Air Carrier has the right to conduct a separate business related to such servicing and shall be exercised by Air Carrier only in connection with the operation of Air Carrier's Air Transportation business at the Airport. Storage of all such materials shall be in compliance with all federal, state and Airport laws, rules and regulations.

**3.1.8 Right to Handle Persons, Property and Mail** — to the extent permitted by federal regulation, Air Carrier shall have the right to load and unload persons, property and mail by motor vehicles or other means of conveyance at such areas designated for said use by County as Air Carrier may reasonably require in the operation of its Air Transportation business. Air Carrier may designate the particular ground carrier, or carriers, that may transport Air Carrier's employees, property and mail to, from and on the Airport.

**3.1.9 Right to Install Signs** - Air Carrier shall have the right to install signs; provided, however, Air Carrier's signage will be of an informational nature only and shall not be of the nature so as to advertise Air Carrier's Air Transportation business. The number, size, type, design and location of such signage shall be subject to the prior written approval and in the sole and exclusive discretion of the Director.

**3.1.10 Right to Install and Operate Communications Equipment** - Air Carrier shall have the non-exclusive right to install, maintain and operate such telecommunications (including radio antennae), meteorological and aerial navigation equipment and other facilities as may be reasonably necessary or convenient for the proper performance and operation by Air Carrier of its Air Transportation business. Such equipment and facilities shall be located in areas assigned to Air Carrier for such purposes by the Director. Air Carrier shall be provided with reasonably adequate access for the installation of communications controls, teletype, telephone, interphone, pneumatic tubes and power lines in and between the Terminal Complex and other points at the Airport; provided, however, the manner of such installations and the location of such access shall be subject to the County's approval, in the sole and exclusive discretion of the Director. Air Carrier shall indemnify and hold County harmless from any claim, loss, cause of action or any form of legal right or action whatsoever, resulting from the use of said equipment and Air Carrier shall be responsible for any damage caused by the installation or removal of same. Air Carrier shall install, operate and repair such equipment in a manner consistent with recognized standards of prudence and safety as set forth by the manufacturer, and any generally recognized standard for such equipment or the laws or regulations of any governmental agency relating to such equipment.

242

3.1.11 **Ingress and Egress** - County hereby grants to Air Carrier, its agents, employees, passengers, guests, invitees, contractors and suppliers of materials and services the right to reasonable access, ingress and egress to the Premises and the Public Areas and facilities of the Airport. Such right shall be exercised in accordance with Airport rules and regulations and shall at all times be exercisable without charge to Air Carrier, its agents, employees, guests, passengers, invitees, contractors and suppliers of materials and services; provided, however, that this provision shall not be construed to prevent County from imposing the additional rentals, fees, taxes, security and charges uniformly applied to other Aircraft Operators serving the Airport.

3.1.12 **No Other Business Authorized** - Nothing contained in this contract shall be construed to authorize Air Carrier to conduct a business of any kind at the Airport except its Air Transportation business, and nothing herein contained shall be construed as authorizing Air Carrier in its conduct of its Air Transportation business to interfere unreasonably with other persons or tenants leasing or lawfully using Airport facilities.

3.2 **Air Carrier Premises** - Air Carrier is hereby granted the right to use and occupy the following premises and facilities in the Terminal Complex:

3.2.1 Air Carrier specifically covenants that its exclusive or preferential use space shall be conditioned upon the level of activity of Air Carrier at the Airport. Air Carrier understands and agrees that it may have its Premises increased, decreased and/or moved predicated upon the number of flights to and from the Airport operated by Air Carrier and/or the number of enplaned passengers boarded by Air Carrier.

3.2.2 **Upon Effective Date**

3.2.2.1 **Exclusive Premises** - Air Carrier is granted the right to occupy and use for its exclusive purposes the following areas, which are further depicted and captioned "Air Carrier Exclusive Space" on Exhibit B attached hereto and as maybe amended by County:

Airport Ticket Office

Baggage Office

Operations Office

Designated Storage Space

3.2.2.2 **Preferential Use Space and Facilities** - Subject to the rights of County and other Aircraft Operators as set forth herein, Air Carrier is hereby granted the preferential right to use the following areas and facilities of the Terminal Complex which are further depicted and captioned "Air Carrier Preferential Use Space and Facilities" on Exhibit C attached hereto and as maybe amended by County:

Ticket Counter

Baggage Make-up

9



**3.2.2.3 Joint Use Premises** - Air Carrier is hereby granted the right to use, jointly with other Airlines and other Aircraft Operators, the following areas and facilities, which are further depicted and captioned "Airline Joint Use Space" on Exhibit D attached hereto and as maybe amended by County:

Airside Walkway

Aircraft Parking Position(s)

Baggage Claim

Baggage Drop-off

Concourse Gate Position(s)

Departure Lounge and Associated Areas

Loading Bridges

Passenger Hold Room

Passenger Screening

**3.2.2.4 Joint Use of Aircraft Parking Positions** - County retains the right to assign Aircraft Operators who need an Aircraft Parking Position to use one or more Aircraft Parking Position(s) along with the Concourse Gate Position and the associated Loading Bridge (if any). In making such assignments, County will consider input and requests from Aircraft Operators regarding their preferences and requirements based upon their flight schedules. Whenever an Aircraft Operator is required to move its aircraft from an Aircraft Parking Position, County shall provide paved aircraft parking areas designated by County for such purposes to accommodate such aircraft.

**3.2.2.5 Boarding Bridge** - Air Carrier shall not have the right to have a boarding bridge at the Airport; however, should the County allow Air Carrier to have a boarding bridge in the future, such will be under the same terms and conditions as those for Signatory Airlines.

**3.2.2.6 Boarding Bridge User Agreements** - County may require that any Boarding Bridge User, as a condition precedent to using any of Airport's owned boarding bridges, execute an agreement containing indemnity and liability insurance provisions. Said Agreement may contain, at County's discretion, a provision for indemnification of County for any claim arising out of or in connection with the Boarding Bridge User's use of such Boarding Bridge(s).

**3.3.**   **Efficient Use of Premises** – Air Carrier and County agree that efficient use of the Terminal Complex space and facilities is a common goal. During the term of this Agreement:

1.   New entrant Air Carriers and/or Airlines initiating service at the Airport may need facilities.

244

2.   Existing Airlines and/or Air Carriers may wish to expand their operations at the Airport.

3.   Conditions may materialize within the Terminal Complex where it would be prudent to relocate Airlines and/or Air Carriers within the facility.

4.   Due to capital projects, it may be necessary to relocate Airlines and/or Air Carriers.

In the event of any of a combination of these or other conditions occur, County may request, in writing, cooperation and assistance of Air Carrier, in conjunction with other Airlines and/or Air Carriers as appropriate, to determine solutions for handling of passengers, baggage and aircraft in a manner that maximizes and assures efficient use of the Terminal Complex.  Air Carrier agrees to cooperate fully with County and use its best efforts to determine satisfactory solutions.

In the event that County and the Air Carriers are unable to reach a mutually agreeable satisfactory solutions accommodating the needs of new entrants or Airlines and/or Air Carriers seeking to expand service, County may require that Air Carrier supply information regarding past and planned utilization of Airport facilities.  Based on information supplied by Air Carrier and other available information, County may determine that Air Carrier has capacity available to accommodate any requested shared use and may require such sharing of leased premised.  If Air Carrier refuses to provide required information, County may presume that Air Carrier has such capacity available.  County may, after considering information provided by Air Carrier, require Air Carrier to adjust its leased premises to permit County to assure the most efficient use of the Terminal Complex.

# ARTICLE 4

## MAINTENANCE, OPERATION, USE AND CONDITION OF AIRPORT

4.1   **Maintenance and Operation by County** - Subject to the provisions of this Article, County will operate, improve, repair and maintain the Airport and all appurtenances, facilities, and services now or hereafter connected therewith, in the usual and customary manner for airports of a similar size and utilization.  County shall maintain the Airport in all respects in a manner at least equal to an acceptable standard or rating for similar-use airports as established by the Federal Aviation Administration.

4.2   **Costs of Maintenance and Operation** - The responsibility for maintaining, operating and repairing the Airport shall be divided between the County and the Air Carrier in accordance with this Agreement.  Air Carrier shall pay the cost of maintenance, operations and repairs for its Exclusive Use and Preferential Use facilities.  Air Carrier shall pay a maintenance and operations rate ("M&O Rate") for those items and facilities designated herein that are indirectly attributable to it.  The M&O Rate shall be included as an increment of the fees and charges set forth herein.  County and Air Carrier shall undertake their respective maintenance and operating responsibilities in such a manner as to maintain the Terminal Building, including the Premises, in a reasonably good, sanitary, safe and presentable order and condition.  In fulfilling said respective responsibilities, County and Air Carrier may each act on its own behalf using its own personnel or may contract with third parties.



4.2.1  In the event County shall elect to meter utilities or energy consumption for any of Air Carrier's Exclusive Premises, Air Carrier shall pay County for all such use at the rates charged County by the public utility company serving the area  Charges shall be paid by Air Carrier within twenty (20) days of the County's invoice date, and the quantity consumed shall be measured by a meter or meter(s) installed by County for such purpose.  Such charges shall be taken into account in computing the M&O Rate for the metered areas.

4.2.2  If for any reason such meter(s) shall become inoperative for any period of time, the consumption during such period will be invoiced at the same rate as the consumption for the immediately preceding like period of time.

4.3    **Air Carrier Finishes** - Air Carrier shall bear the cost of finishing its Premises at its sole and exclusive expense.  Air Carrier may use such signage, color schemes and paint as are distinctive to the image of Air Carrier.  The Director shall determine, in his sole and exclusive discretion, that all signage is consistent with the overall concept of the Terminal Building and appropriate for the County's image prior to the installation of any signage.

4.4    **Terminal Complex Alteration or Expansion** - County may alter, remodel, expand, remove or improve any of the facilities of the Terminal Complex or any of its appurtenances, including Premises assigned to Air Carrier pursuant to this Agreement or other agreements related to such facilities at any time during the term hereof.

4.4.1  If County should require any portion of Air Carrier's exclusive or preferential use Premises to be relocated within the existing terminal, then, County shall give Air Carrier reasonable advance written notice of such action.  County shall make reasonable efforts to make available replacement Premises that are of a comparable or higher quality to the Premises being surrendered.  County shall not require Air Carrier to lease space of a larger size (as measured in square feet) than it possesses at the time of the relocation, nor shall County require Air Carrier to pay higher rentals, fees or charges, on a square foot basis, as a result of such relocation.  Air Carrier shall provide, at its expense, all specifications and drawings necessary for the relocation and notice of any other costs to be incurred by Air Carrier in such relocation. Upon approval of Air Carrier's specifications and drawings, and submission of costs, County shall pay all costs of relocation allowable under this Section.

4.4.2  County agrees that during Project construction and any alteration, remodeling or expansion of the Terminal Complex, it will plan and phase the construction in a manner calculated to minimize disruption of Air Carrier's use and enjoyment of the Premises and the Terminal Complex.

4.5    **Airport Security/Federal Aviation Regulations/Passenger Security Reimbursements** Air Carrier shall not do or permit its agents, directors or employees to do any act or thing upon the Airport that conflicts with or violates the requirements of the FAA, and shall comply fully with applicable provisions of the Transportation Security Administration Regulations, 49 Code of Federal Regulations ("CFR") Sections 1500 through 1550 and 14 CFR Part 129, or any successor document, or the Airport's FAA-approved security plan.

4.5.1  Air Carrier shall reimburse County monthly for Air Carrier's pro rata share of the cost of providing Law Enforcement Officers ("LEO's") in support of security measures in the Terminal Complex as required by 49 CFR 1500 through 1550 and 14 CFR Part 129, and such



other regulations as may be applicable from time to time. Air Carrier's Passenger Security Reimbursement shall be based upon Air Carrier's enplanements at the Terminal Building compared to total enplanements of Aircraft Operators at the Terminal Building for the month in question. Air Carrier shall also reimburse County for Air Carrier's pro rata share of the cost, if required by Federal law or regulations, of security screening, explosives detection, and other security measures at the Airport. If County is reimbursed by the Transportation Safety Administration for such security screening, explosives detection or other security measures at the Airport, these payments will be reflected in the next calculation of Air Carrier rates and charges.

4.5.2 Air Carrier shall directly reimburse County for any fines or penalties or other charges imposed on or assessed against the Airport or County for security violations that are due to the actions or inactions of Air Carrier, its employees, and/or contractors. Said reimbursement shall be made within thirty (30) days of the date of written notice from the Airport Director setting forth the amount of such fine or penalty; provided, however, that such payment shall not be construed as waiving Air Carrier's right to contest such fine or penalty.

4.5.3 Air Carrier agrees to indemnify and hold County harmless for any loss, claim, cause of action or liability of any kind whatsoever arising from the operation of said security measures for which Air Carrier is responsible.

# ARTICLE 5

## PRINCIPLES RELATING TO FEES AND CHARGES

5.1   **General Concepts** - The following principles shall apply with respect to the fees and charges payable by Air Carrier pursuant to this Agreement:

5.1.1 The Air Carrier, shall pay fees, rentals and charges at the same rate as established for Signatory Airlines.

5.1.2 Concessionaires at the Airport shall compensate County for its costs incurred in providing, operating and maintaining the areas and facilities leased to and used by concessionaires.

5.1.3 The administration and control of all concessions (including, without limitation, vending machines and pay telephones) in the Terminal Complex and elsewhere on the Airport are exclusively reserved to the County. Air Carrier shall not install or operate pay telephones, vending machines or amusement machines and devices of any kind in the Terminal Complex or elsewhere on the Airport. Subject to County's approval, however, Air Carrier may have such machines and devices installed in Air Carrier's Exclusive Premises by concessionaires having agreements with the County. Each vending machine installed by Concessionaire must be approved in writing by the County and shall be permitted by the County upon receipt of a $100.00 permitting fee per machine per calendar year of this Agreement. Only vending machines dispensing food, water, soft drinks, or juice drinks shall be allowed on the premises. All revenue payable by concessionaires pursuant to such machines and devices shall be Airport Revenues.

5.2   **Accounting Principles** - Generally accepted accounting principles, consistently applied, recognizing the special requirements of airports, will be used by the County for keeping the

13

247

books, accounts and records of the Airport required by any Bond Ordinances and for the computation of all fees and charges. Separate accounts shall be maintained for the Airport which exclude expenses and revenues of other airport(s) owned and operated by County, as well as other County departments.

5.3    **Employee Ground Vehicle Parking** - County shall make available to Air Carrier's employees during the period they are assigned to duty at the Airport reasonably adequate automobile parking facilities. County may, at its discretion, charge employees of Air Carrier and others a reasonable vehicular parking fee based on County's actual costs of providing, operating, and maintaining such facilities. So long as County does not charge a fee for employee parking, Air Carrier agrees to be responsible for insuring that its employees use said parking facilities only during the times that they are actually working at the Airport or traveling at the Air Carrier's direction for Air Carrier's business. So long as County does not charge a fee for employee parking, Air Carrier shall use reasonable efforts to ensure that its employees do not use the employee parking facilities for personal business, when traveling for convenience or when traveling for pleasure.

5.4    **Additional Capital Projects** - Projects on or at the Airport that are required or may be required by the FAA for safety will be undertaken by County when it determines it is prudent to do so. Projects on or at the Airport that are included in the FAA-approved Airport Layout Plan may be undertaken by County when it determines that it is prudent to do so. Air Carrier acknowledges that County has heretofore furnished Air Carrier with a copy of the current Airport Layout Plan.


## ARTICLE 6
## AIR CARRIER'S FEES AND CHARGES

6.1    **Landing Fees** - Commencing on the Effective Date hereof and continuing through the term of this Agreement, Air Carrier shall pay to County for its use of the Airfield, Landing Fees at the rate paid by Signatory Airlines. Air Carrier shall report its monthly landed weights to the Director in the form required by the Director and shall remit its monthly Landing Fees in accordance with the provisions herein.

6.2    **Collection of PFCs** - Air Carrier shall collect such PFCs as are now or as may hereinafter be enacted by County and authorized by law. The PFCs collected by Air Carrier are held in trust by Air Carrier and do not constitute property of Air Carrier. Such PFCs are the property of the County, no matter where located or commingled. The County shall have the right, although not the obligation, to record this Agreement in order to show its rights as owner of the PFCs.

6.3    **Effective Date and Preparation of Calculations and Adjustments** - The fees and charges payable by Air Carrier for its use and occupancy of the Premises and the Landing Fees shall be adjusted annually during the term of this Agreement in accordance with adjustments made to Signatory Airline rates. Such adjustments shall be effective on the first day of the Fiscal Year to which they apply.


248

6.4    **County Accounting Records** - County shall establish and maintain accounting records separately designating expense cost centers at the Airport (to the extent that the same exist from time to time). Expenses shall be allocated to such cost center according to the principles set forth herein. The Terminal Building and Airfield cost centers shall initially include appropriate accounts to identify the Maintenance and Operating Expense Component and the Capital Component necessary to calculate the Landing Fees and Terminal Use fees and charges referred to herein.

6.5    **Terminal Complex Fees and Charges** - Commencing on the Effective Date hereof and continuing through the term of this Agreement, Air Carrier shall pay to County for its use of the terminal complex, Fees and Charges at the rate and to the same extent as paid by Signatory Airlines. Air Carrier shall report its monthly passenger activity to the Director in the form required by the Director and shall remit its monthly Landing Fees in accordance with the provisions herein.

6.5.1    **Calculation and Payment of County Landing Fees** - Air Carrier agrees to pay to County monthly a Landing Fee for use of the Airfield which shall be calculated at a Landing Fee Rate per one thousand (1,000) pounds of Certified Maximum Gross Landing Weight ("CMGLW") of Air Carrier's Aircraft Arrivals at the Airport. Without any demand therefore, Air Carrier shall furnish the County on or before the fifth (5th) work day of each and every month a written report in the form referred to in Section 9.1 hereof. Upon receipt of such report County shall invoice Air Carrier for such Landing Fees which shall be computed by multiplying the CMGLW of all Air Carrier's Aircraft Arrivals at the Airport during the preceding calendar month by the Signatory Airline Landing Fee Rate. Notwithstanding the foregoing, if Air Carrier fails to furnish County with the report required by Section 9.1 hereof by the date specified, Air Carrier's Landing Fee shall be determined by reference to the published schedule for Air Carrier for such month. Any necessary adjustment in such Landing Fee shall be calculated after delivery by Air Carrier of an accurate report to County for the month in question, and the resulting deficits or credits shall be applied to Air Carrier's Landing Fee for the next succeeding month. Notwithstanding the foregoing, the minimum charge payable by Air Carrier hereunder shall not be less than the Air Carrier Aircraft Arrival rate based on 12,500 pounds.

6.5.2    **Special Adjustments to Landing Fee Rates and Charges** - County may make reasonable adjustments to the Landing and Terminal Use Fees during the Fiscal Year to account for changes in activity levels and budget changes upon thirty (30) days notice of the change and the reason therefore to Air Carrier.

6.5.3    **Annual Adjustment of Landing Fees and Rates and Charges** - As soon as possible after the close of each Fiscal Year and the submission of the recalculation of fees and charges by the Signatory Airlines, the Director will advise Air Carrier of the recalculated rates applicable to the fees and charges payable by Air Carrier for its use of the Airfield and the Premises for the preceding Fiscal Year. If such recalculation indicates that Air Carrier has underpaid such fees and charges, the amount of such underpayment shall be paid by the Air Carrier in the next successive monthly payment of its monthly payments required hereunder as additional fees and charges. If such recalculation indicates that Air Carrier has overpaid such fees and charges such overpayment shall be credited to the Air Carrier as a reduction of the fees

15

249

and charges payable by Air Carrier hereunder in the next successive months after such recalculation is submitted to the Signatory Airlines until such credit is exhausted.

6.6    **Payments.** All payments for fixed monthly rents, fees and charges are due the first of the month, in advance, without demand or invoice, and shall be paid not later than the 10th of each month and shall be deemed delinquent on the 11th day of the month. All payments for nonfixed rents, fees and charges that require an invoice shall be paid not later than the 20th day from the invoice date and shall be deemed delinquent on the 21st day after the date of the invoice.

## ARTICLE 7
## CONTRACT SECURITY

7.1    Air Carrier shall provide County on the execution of this Agreement with a contract bond, irrevocable Letter of Credit or other security acceptable to County ("Contract Security") in an amount equal to two (2) months fees and charges, PFC's (if such is in effect) and estimated Landing Fees (based on Air Carrier's proposed schedules) payable to County to guarantee the faithful performance by Air Carrier of its obligations under this Agreement and the payment of all fees and charges due hereunder. Air Carrier shall be obligated to maintain such Contract Security in effect until the termination of this Agreement and for a two (2) month period after expiration or earlier termination thereof.

7.2    Contract Security provided by third parties, including bonding companies and financial institutions, shall be in such form and with company(ies) properly licensed to do such business in the State of South Carolina and shall be acceptable to County in its discretion. In the event that any such Contract Security shall be for a period of less than the full period required by this Agreement, or if such Contract Security shall be canceled, Air Carrier shall provide a renewal or replacement Contract Security for the period following the expiration or cancellation of such Contract Security previously provided at least sixty (60) days prior to the effective date of such cancellation. If at any time Air Carrier fails to make timely payment or otherwise commits an Event of Default under this Agreement, County may draw on the Letter of Credit or Contract Security or any portion of it for payment or to compensate County for any damages sustained by County resulting from Air Carrier default. Air Carrier shall immediately on demand provide County with another irrevocable Letter of Credit or other form of acceptable Contract Security equal to that prior of the Letter of Credit or Contract Security expended or applied by County to bring payments current or cure such default as to maintain an irrevocable Letter of Credit or Contract Security in the sum initially provided to County. County's obligations to Air Carrier with respect to the Letter of Credit or Contract Security are those of a beneficiary and not a creditor or trustee.

7.3    Air Carrier's failure to provide Airport with a Letter of Credit within the period stated herein shall be deemed a material default of this Agreement's terms, covenants, and conditions and upon the happening of same this Agreement shall be terminated without further notice to Air Carrier. County's rights under this paragraph shall be in addition to all other rights and remedies provided to County under this Agreement and the law.

16



7.4    If at any time during the Agreement term, the County deems the amount of surety insufficient as a result of an increase in Air Carrier's service levels, Air Carrier shall, after receipt of notice, increase the surety to the amount required based upon the increased activity levels.

## ARTICLE 8

## OTHER FEES AND CHARGES

8.1    **Rights of County** - County expressly reserves the right to assess and collect the following:

8.1.1    County has the right to make a separate and additional charge to Air Carrier for additional premises or facilities leased to it for its exclusive, or preferential use, or for common use with other Airlines and/or Air Carriers, or other users, not expressly leased herein, which will be as set forth in written agreements.

8.1.2    County reserves the right to impose and collect a PFC if such PFC should be permitted or mandated under federal, state or local laws to the extent such PFC should be enforceable at law. The proceeds from such PFC's shall always be used only at the Airport for Airport purposes.

8.1.3    County reserves the right to charge Air Carrier or its employees a reasonable and non-discriminatory fee based on County's cost of providing services and facilities for the employee parking areas provided at the Airport.

8.1.4    County reserves the right to levy reasonable catering fees on in-flight food and beverage companies which cater Air Carrier's flights departing from Airport, regardless of whether such companies have kitchens located on, or off Airport,  and to charge reasonable rentals for any facilities which such caterers may lease on Airport.

8.1.5    County reserves the right to assess and collect reasonable and non-discriminatory fees and charges for services or facilities not enumerated in this Agreement, but provided by County and accepted by Air Carrier.

8.1.6    County reserves the right to assess and collect reasonable and nondiscriminatory fees on all contractors and businesses doing business at the Airport.

8.1.7    County reserves the right to assess and collect pro rata shares of any charges for the provision of any services or facilities which County is required to provide by any governmental entity (other than County acting within its proprietary capacity) having jurisdiction over the Airport.

8.1.8    Air Carrier shall pay charges for other services or facilities provided by County to Air Carrier.  Such services or facilities may include, but are not limited to, special maintenance of Air Carrier Premises, 400 Hertz charges, or equipment/vehicle storage areas.

251

8.2    Air Carrier shall pay the required fees for all permits and licenses necessary for the conduct of its Air Transportation Business at the Airport.

8.3    <u>No Further Charges</u>-Except as provided in this Agreement, no further rentals, fees or charges shall be charged against or collected from Air Carrier, its passengers, employees, shippers and receivers of freight, suppliers of material, contractors or furnishers of services or materials, by County for the premises, facilities, rights, licenses and privileges granted to Air Carrier herein.

## ARTICLE 9

## STATISTICAL INFORMATION

9.1    Air Carrier shall furnish to County on or before the seventh (7th) work day of each month a written report in form satisfactory to County showing the number of revenue and non-revenue enplaned and deplaned passengers, Air Carrier's total number of Aircraft Arrivals by type of aircraft, Certificated Maximum Gross Landing Weight and Certified Maximum Gross Take-off Weight of each type of aircraft, the available passenger seats of all Air Carrier's Aircraft Arrivals (including charters), Air Carrier Schedule, and the weight of air mail (if any) and cargo, including express, loaded and unloaded by Air Carrier at the Airport during the immediately preceding month. Such report shall also state the number of Aircraft Arrivals, by type of aircraft for which Air Carrier provided ground handling services of any kind for other Aircraft Operators, and the names and addresses of the operators of such aircraft so that County may submit to such operators appropriate invoices for Landing Fees and other charges; it is understood, however, that Air Carrier shall be responsible for the payment of Landing Fees and fees and charges subject to the application of the Joint Use Formula for all charter or other non-scheduled Aircraft Operators for which Air Carrier provides ground handling services. Upon the request of the Director, but not more than annually, Air Carrier shall provide the Director with a certification of the then current Certificated Maximum Gross Landing Weight and Certified Maximum Gross Take-off Weight for each aircraft type then operated by Air Carrier.

## ARTICLE 10

## INDEMNITY AND INSURANCE

10.1    <u>Indemnity</u>-Air Carrier shall protect, defend, indemnify, and hold County, and County's Council Members, its commissioners, directors, agents, officers and employees completely harmless from and against any and all liabilities, losses, suits, claims, judgments, fines or demands arising by reason of injury or death of any person or damage to any property, (including but not limited to attorney fees, court costs, and expert fees), of any nature whatsoever arising out of or incidental to this Agreement and Air Carrier's use or occupancy of the Premises or the acts or omissions of Air Carrier's directors, officers, agents, employees, contractors, subcontractors or licensees; however, the above indemnity shall not apply to any injury, death or damage caused by the negligence or willful misconduct of any Non-Preferential User of Air Carrier's Aircraft Parking Position(s) or the sole negligence of County, its officers, directors, agents, employees, contractors, sub-contractors. County shall give reasonable notice of any such

18

252

claims or actions. The provisions of this section shall survive the expiration or early termination of this Agreement for claims or actions occurring prior to the termination of this Agreement.

10.2   **Environmental Indemnification-** Air Carrier shall also indemnify, defend (with counsel satisfactory to County), and hold County, its Council Members, officers, employees, agents, assigns, and any successors to County's interest in the leased Premises, harmless from and against any and all loss, cost, damage, expense (including reasonable attorney's fees), claim, cause of action, judgment, penalty, fine or liability, directly or indirectly, relating to or arising from the use, storage, release, discharge, handling, or presence of Hazardous Materials on, under, or about the leased Premises or the Airport in violation of Air Carrier's obligations under this Agreement ("Hazardous Materials Release"). This indemnification shall include without limitation (a) personal injury claims, (b) the payment of liens, (c) diminution in the value of the leased Premises or Airport, (d) damages for the loss or restriction on use of the leased Premises or the Airport, (e) sums paid in settlement of claims, (f) actual attorney's fees, consulting fees, and expert fees, (g) the cost of any investigation of site conditions, (h) the cost of any repair, cleanup, remedial, removal, or restoration work or detoxification if required by any Governmental Authorities or deemed necessary in County's reasonable judgment, and (i) any fines associated with Air Carrier's activities. County shall have the right but not the obligation to join and participate in, and control, if it so elects, any legal proceedings or action initiated in connection with the Hazardous Materials Release. County may also negotiate, defend, approve, and appeal any action taken or issued by any applicable Governmental Authorities with regard to a Hazardous Materials Release. Any costs or expenses incurred by County for which Air Carrier is responsible under this Paragraph or this Lease Agreement and for which Air Carrier has indemnified County (i) shall be paid to Lessor on Demand, during the term of this Lease Agreement as additional rent; and (ii) from and after the expiration or earlier termination of the Lease Agreement shall be reimbursed by Air Carrier on demand. Air Carrier's obligations pursuant to the foregoing indemnity shall survive the expiration or termination of this Agreement and shall bind Air Carrier's successors and assignees and inure to the benefit of County's successors and assignees.

10.3   **Release of Liability for Property Loss-** County and Air Carrier hereby mutually release and discharge each other from all claims or liabilities arising from or caused by fire or other casualty covered by the aforementioned insurance on the Terminal Complex or contents and personal property in, at or on the Terminal Complex. All such policies shall include a waiver of subrogation with respect to the provisions of this Agreement to the extent permitted by each party's insurance carrier.

10.4   **Air Carrier Public Liability Insurance-** Air Carrier agrees to require that all aircraft operators engaged by it to provide service at the Airport shall carry and keep in force public liability insurance with an insurance company of recognized responsibility covering bodily injury and property damage to protect the County, its Council Members, directors, agents, officers, and employees, from liability covered by the indemnification provisions of this Article. Without limiting its liability as aforesaid, Air Carrier agrees to require that all of its aircraft operators carry and keep in force such insurance with limits of liability for death, personal injury, property damage and indemnity in a sum equal to $125,000,000.00 with the County, its Council

19

253

Members, directors, agents, officers and employees as additional insureds to the extent of Air Carrier's indemnity obligations hereunder.

**10.5   County Public Liability Insurance** - County shall maintain in force during the term of this Agreement comprehensive general public liability insurance protecting the County from claims of bodily injury and property damage liability arising out of the maintenance, use and occupancy of the Premises.

**10.6   County Fire and Extended Coverage Insurance-Terminal Complex**-County agrees to maintain in force during the term of this Agreement fire and extended coverage insurance on the Terminal Complex and any additions, alterations, or modifications thereto and on all contents owned by the County usual and incidental to the Terminal Complex in an amount determined by the County. Air Carrier agrees to pay its pro rata share of the cost of County Insurance as an increment of the M&O Rate component of the Signatory Airline calculations referred to in hereof.

**10.7   Air Carrier Insurance for Property Loss**-Air Carrier shall purchase similar insurance on or self-insure its contents, improvements, betterments and other incidental personal property (hereinafter referred to as "Air Carrier Insurance").

**10.8   Air Carrier Insurance On Automobiles And Other Ground Vehicles**-Air Carrier, without expense to County shall obtain and cause to be kept in force at all times during the term of this Agreement, liability insurance in the form of primary and excess, or layered amounts of insurance covering the operation of Air Carrier's automobiles and other ground vehicles and mobile equipment at the Airport, issued by a company or companies of sound and adequate financial responsibility approved by County in a combined single limit of not less than $1,000,000.00 for bodily injury and property damage liability per any one occurrence. All policies of liability insurance referred to above shall include the County, its Council Members, directors, agents, officers and employees as additional insureds to the extent of Air Carrier's indemnity obligations hereunder.

**10.9   Certificate(s) of Insurance**-On or before the Effective Date Air Carrier shall cause its insurer or agent and / or the insurer / agent of its aircraft operators to furnish County with a certificate(s) of insurance, in duplicate, of all insurance coverage required under the terms of this Article 10. Such certificate(s) shall provide that the policies of insurance referred to therein shall not be subject to cancellation or other material change except after delivery of ninety (90) days advance written notice by certified or registered mail to the Director of Airports of such cancellation or material change. Air Carrier, prior to the effective date of such cancellation or material change shall provide (or cause to be provided) County with substitute certificate(s) of insurance complying with this Agreement.

## ARTICLE 11

## QUIET ENJOYMENT

11.1   County agrees that on payment of the rents, fees and other charges provided for herein and the performance of the covenants and agreements on the part of Air Carrier to be performed

20



hereunder, Air Carrier shall peaceably have and enjoy the Premises, appurtenances, facilities, rights, licenses and privileges granted herein.

## ARTICLE 12

## INSPECTION BY COUNTY

12.1    County may enter upon the Premises including the Premises that are leased exclusively, preferentially, or jointly to Air Carrier and others, during normal business hours and at such times as may be reasonable under the circumstances for any purpose necessary, incidental to or connected with the performance of its obligations hereunder or in the exercise of its governmental functions relating to the public health, safety, good conduct and the proper management of the Airport.

## ARTICLE 13

## COMPLIANCE WITH LAWS, RULES AND REGULATIONS

13.1    **Compliance with County Laws, Rules and Regulations** - Air Carrier agrees to observe and obey County's laws, rules and regulations with respect to the use of the Airport and its appurtenances, facilities, improvements, equipment and services, as they are currently in effect and as they, from time to time, may be amended; provided that such amendments shall be consistent with safety and with rules, regulations and orders of the FAA with respect to all Airport operations and, provided further, that such amendments shall not be inconsistent with the provisions of this Agreement or other agreements between County and Air Carrier relating to the use of the Airport or inconsistent with the procedures prescribed or approved from time to time by the FAA with respect to the operation of aircraft operated by Air Carrier at the Airport.

13.2    **Payment of County Penalties and Fines** - To the extent permitted by law and by ordinance of Council, County may collect such penalties and fines as may be reasonable and authorized in enforcing its rules and regulations.

13.3    **Compliance with Federal, State and Local Laws, Rules and Regulations** –Air Carrier, at Air Carrier's sole costs and expense, shall also observed and obey and shall require its employees, suppliers, and business invitees to observe and obey, all present and future federal, state, county, local, or Department of Airports laws, statutes, ordinances, codes, rules, or regulations relating to the use or occupancy of the Premises, relating to the use or occupancy of vehicle parking areas, the aircraft apron, and any other areas to which Air Carrier has access pursuant to this Agreement, and relating to any of the activities of Air Carrier, its employees, suppliers, and business invitees undertaken on or near any of the areas.  As used herein, laws statutes, ordinances, codes, rules, or regulations includes, without limitation, all of the same dealing with any substance that is listed, defined, or regulated as a "hazardous substance", or otherwise classified as hazardous or toxic by any of the foregoing governmental entities or any agency or department thereof, and includes all of the same dealing with asbestos, radon, any polychlorinated biphenyl, urea formaldehyde foam insulation, explosive or radioactive material, or motor fuel or other petroleum hydrocarbons, or which causes or poses a threat to cause a



contamination or nuisance on the Premises or any adjacent property or hazard to the environment or to the health or safety of persons or near the Premises. As to disposal of such substances, Air Carrier will maintain a contract with a licensed and recognized waste disposal company that meets the criteria for such companies as they may be changed from time to time by the Department of Airports. When requested, Air Carrier will provide County with a written copy of the contract and a current letter from the contractor acknowledging that the contract is in effect. Air Carrier agrees to indemnify and hold County harmless from any and all penalties, losses, liabilities, and costs, including attorney's fees, remediation costs, and laboratory and investigative costs arising from Air Carrier's failure to comply with this Article.

## ARTICLE 14
## ASSIGNMENT AND SUB-USE

14.1    Air Carrier shall not assign or transfer this Agreement, or any part thereof, without the prior written consent of County; provided, however, that Air Carrier may assign and transfer this Agreement in its entirety without such consent to any sister or parent corporation or to any successor-interest of Air Carrier with or into which Air Carrier may merge or consolidate or which may acquire substantially all the assets of Air Carrier; provided, however, that no such assignment or transfer shall relieve Air Carrier of its obligations hereunder without the prior written consent of County.

14.2    Air Carrier shall not grant any rights of sub-use to all or any part of the Premises, including agreements to provide ground handling services for other Aircraft Operators, without the prior written approval of County, which approval or disapproval shall be within the sole and exclusive discretion of County.

14.3    In the event Air Carrier, in accordance with the foregoing, assigns this Agreement or grants rights of sub-use to the Premises, the assignee or sub-user shall be bound by all of the terms of this Agreement as if it were the Air Carrier hereunder; unless County agrees in writing to release the Air Carrier here from, no such assignment, or grant of sub-use rights shall serve to release Air Carrier from any of its obligations, duties, or responsibilities under this Agreement; provided, however, in no event shall Air Carrier be released from the environmental or any other indemnity provision contained herein.

## ARTICLE 15
## SURRENDER OF POSSESSION

15.1    At the termination of this Agreement by expiration or otherwise, Air Carrier shall yield and deliver to County the possession of the Premises including the Premises leased exclusively or preferentially to Air Carrier or jointly to Air Carrier and others.  Such Premises shall be delivered in clean and good condition in accordance with Air Carrier's express obligations hereunder, except for reasonable wear and tear and damage by fire or other casualty. Air Carrier shall have the right at any time during the term of this Agreement, or any renewal or extension hereof, and within thirty (30) days after termination of this Agreement, to remove its trade

256

fixtures and equipment situated on the Premises that were installed, or placed by it, at its expense in, on or about the Premises subject however to any valid lien that the County may have thereon for unpaid fees or other charges and provided that Air Carrier shall pay County for any damage caused by such removal.

## ARTICLE 16

## TAXES

16.1    All taxes imposed on this Agreement as extended or modified (including any renewals thereof and property interests created thereby) and on any other agreements now in effect between County and Air Carrier or which may hereinafter be entered into between the Air Carrier and County (including any renewals thereof and property interests created thereby) shall be charged to and paid by Air Carrier.

16.2    Without limiting the generality of the foregoing, Air Carrier shall pay all sales taxes, if any, assessed or levied on account of amounts payable by Air Carrier to County hereunder.

16.3    Air Carrier shall also pay all taxes, assessments, and charges, which during the Term of this Agreement may become a lien or which may be levied by the State, County, City or any other tax levying body, upon any taxable interest by Air Carrier acquired in this Agreement, or any taxable interest by Air Carrier acquired in this Agreement, or any taxable possessory right which Air Carrier may have in or to the premises or facilities leased hereunder, or the improvements thereon, by reason of its occupancy thereof, or otherwise, as well as taxes, assessments, and/or charges on taxable property, real or personal, owned by Air Carrier in or about said premises. Upon any termination of tenancy, all taxes then levied or a lien on any of said property, or taxable interest therein, shall be paid in full and without proration by Air Carrier forthwith, or as soon as a statement thereof has been issued by the tax collector, if termination occurs during the interval between attachment of the lien and issuance of statement. However, Air Carrier shall not be deemed to be in default under this Agreement for failure to pay taxes pending the outcome of any proceedings instituted by Air Carrier to contest the validity or the amount of such taxes, provided that such failure to pay does not result in any forfeiture.

16.4    If the Air Carrier shall fail to pay said taxes, charges or assessments within thirty (30) days before they become delinquent, County may, at its option, pay such taxes, charges or assessments. Such amount paid by County, plus interest at the rate of one and one half percent (1.5%) per month, shall be considered as additional fees and charges payable hereunder and shall be due and payable at the next due date for fees and charges for Terminal Complex facilities not requiring the application of Joint Use Formula.

## ARTICLE 17

## DEFAULT AND CANCELLATION

17.1    **Events of Default**-If any of the following events ("Event(s) of Default") occurs, Air Carrier shall be deemed to be in default in its obligations under this Agreement:

23

257

17.1.1 Default in the payment of any rents, fees or other charges, including PFCs, due to County, or any money advanced by County and collectible as a fee or charge or otherwise, and continuance of such default for a period of ten (10) days after there has been given a written notice in accordance with Section 23.9 hereof by County to Air Carrier specifying such default and requiring it to be remedied and stating that such notice is a "notice of default" hereunder;

17.1.2 Default in the performance, or breach, of any other covenant or warranty of Air Carrier in this Agreement (other than the payment of any rents, fees or other charges due to County) and the continuance of such default or breach for a period of thirty (30) days after written notice has been given in accordance with Section 23.9 hereof by County to Air Carrier specifying such default or breach and requiring it to be remedied and stating that such notice is a "notice of default" hereunder; provided, however, that if Air Carrier commences to cure such default within thirty (30) days after receipt of such "notice of default" and exercises good faith and due diligence to cure said default, Air Carrier may be given additional time to cure such default.

17.1.3 If Air Carrier files a voluntary petition in bankruptcy, or makes an assignment of all or substantially all of Air Carrier's assets for the benefit of Air Carrier's creditors, or if Air Carrier is adjudicated a bankrupt in any involuntary proceeding in bankruptcy against Air Carrier, or if a receiver or a trustee of Air Carrier's assets is appointed; provided, however, that in the latter event, if any such appointment is involuntary, then it shall not be considered as an Event of Default by Air Carrier unless Air Carrier fails to procure a dismissal thereof within ninety (90) days after the appointment of such receiver or trustee.

17.2   **Remedies Upon Default** - If any Event of Default occurs and is continuing, County may cancel this Agreement by giving Air Carrier at least fifteen (15) days' prior written notice. Such cancellation shall be without forfeiture, waiver, or release of County's right to take whatever legal proceedings may appear necessary or desirable to collect any fees or other charges then due or to enforce any obligation, covenant or agreement of Air Carrier under this Agreement or applicable law.

17.3   **Cancellation by Air Carrier** - Air Carrier may cancel this Agreement and terminate all its obligations hereunder at any time that Air Carrier is not in default in the payment of any fees or charges to the County hereunder or in the discharge of any of its other obligations hereunder by giving County at least twenty (20) days' prior written notice, if Air Carrier shall be prevented from operating its Air Transportation business to and from the Airport by reason of its inability to use a substantial part or all of the Airfield or of the Premises as hereinafter set forth:

17.3.1 For a period of longer than one hundred twenty (120) consecutive days as a result of any governmental action or any condition of the Airport not due to the fault of Air Carrier; or

17.3.2 For a period of longer than ninety (90) consecutive days as a result of a permanent injunction issued by any court of competent jurisdiction not due to fault of Air Carrier.

17.3.3 If County breaches any of the covenants or agreements set forth in this Agreement, and County fails to cure such default within thirty (30) days after there has been

24



given a written notice in accordance with Section 23.9 hereof by Air Carrier to County specifying such breach, Air Carrier may cancel this Agreement; provided, however, that if County commences to cure such default within thirty (30) days after receipt of such "notice of default" and exercises good faith and due diligence to cure said default, County shall be given additional time, not to exceed sixty (60) days, to cure such default. In such event, Air Carrier may cancel this Agreement pursuant to this Article without forfeiture, waiver, or release of Air Carrier's right to any damages otherwise available to it, or to any sums of money that may be due Air Carrier from County after deduction by County of amounts due to it.

17.4   **Late Charges** - County will assess late charges of 18% per annum prorated accordingly upon any delinquent invoice or unpaid charge. Such late charge will be assessed from the eleventh (11th) day of the month for fixed rentals, fees and charges and from the twenty-first (21st) day after the date of County's invoice for other non-fixed rentals, fees and charges, until date payment is received by County.

## ARTICLE 18
### DAMAGE OR DESTRUCTION

18.1   If any property, part or all of which is included within the Premises, shall be partially damaged by fire or other casualty, but not rendered untenantable, the same shall be repaired with due diligence by County at County's expense. If the damage shall be so extensive as to render part or all of such Premises unusable but capable of being repaired in sixty (60) days, the same shall be repaired with due diligence by County, at County's expense, and the fees and charges payable hereunder shall be proportionately paid to the time of such damage and shall thereafter cease as to the unusable Premises, until such shall be repaired. In case such property, or any part thereof, is completely destroyed by fire or other casualty, or so damaged as to be incapable of repair within sixty (60) days, then, at the option of County:

18.1.1   Said Premises shall be repaired or reconstructed with due diligence by County at County's expense and the fees and charges payable hereunder for the destroyed Premises shall be proportionately paid to the time of such damage or destruction and shall thereafter cease until such time as the Premises shall be repaired; or

18.1.2   Within ninety (90) days after the time of such damage or destruction and before said Premises shall be repaired and before a contract for repair or reconstruction thereof has been signed, County shall give Air Carrier notice of its intention to cancel this Agreement or the portion thereof relating to such property, in which case this Agreement in its entirety, or the portion thereof relating to such property, shall forthwith cease and terminate.

## ARTICLE 19
### PROHIBITED USES

19.1   **Prohibited Uses** - Air Carrier shall not do or permit anything to be done in, on, or at the Airport which will in any way conflict with any law, or ordinance of any governmental agency,

259

or with County's rules and regulations provided for in Article 13 herein, or create a nuisance or in any way obstruct or interfere with the rights of other users of the Airport, or damage any property or persons thereon, or endanger the health and safety of persons using the Airport.

19.2   **Oil, Fuel and Other Materials** - Air Carrier agrees to prevent the entry of oil, fuel or other prohibited materials that are under its control into the drainage system of Airport or into the drainage system of any of its surrounding communities, unless such materials are first properly treated by equipment installed with the approval of County for that purpose. Air Carrier shall bear all costs related to prohibited entry of such oil, fuel or other materials into said drainage systems.

## ARTICLE 20

## ALTERATIONS AND ADDITIONS

20.1   Air Carrier shall make no alterations or additions to the Premises leased hereunder without the prior written approval of the County.

## ARTICLE 21

## FEDERAL GRANTS AND NON-DISCRIMINATION

21.1   **Non-Discrimination** - Air Carrier, for itself, its personal representatives, successors in interest and assigns, as a part of the consideration hereof, does hereby covenant and agree that:

21.1.1 No person on the grounds of race, color, national origin, religion, disability, sex or age shall be excluded from participation in, denied the benefits of or otherwise subjected to discrimination in the use of said facilities;

21.1.2 In the construction of any improvements on, over or under the Air Carrier's Premises and the furnishing of services thereon, no person on the grounds of race, color, national origin, religion disability, sex or age shall be excluded from participation in, denied the benefits of, or otherwise subjected to discrimination; and

21.1.3 Air Carrier shall use the Airport in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally Assisted Programs of the Department of Transportation-Effectuation of Title VI of the Civil Rights Act of 1964, and as said regulations may be amended.

21.1.4 In the event of breach of any of the above non-discrimination covenants, County shall have the right to terminate this Agreement and to re-enter and repossess Air Carrier's Premises and the facilities thereon. This provision shall not be effective until the procedures of Title 49, Code of Federal Regulations, Part 21 are followed and completed, including exercise or expiration of appeal rights.


260

21.2   **Federal Grants** - This Agreement shall be subordinate to the provisions of any existing and future agreements between County and the United States of America, its boards, agencies, or commissions, relative to the operation or maintenance of the Airport, the execution of which has been, or will be, required as a condition to the expenditure of Federal funds or receipt of federal property for the development of the Airport.

## ARTICLE 22

## TITLE TO FIXTURES AND EQUIPMENT INSTALLED BY AIR CARRIER

22.1   Air Carrier will retain title to all of its trade fixtures and equipment.  Air Carrier may remove at any time its trade fixtures and equipment, signs bearing its name, ticket counter inserts, computers, radio and other communications equipment, office machines and other portable operation equipment; provided, however, that if removal of Air Carrier's trade fixtures or equipment will mar the appearance of the Premises, or impair the usefulness thereof, and if any such removal is made, then Air Carrier will forthwith restore the Premises to a good and sightly condition at its expense and at County's election, at the time of such removal, Air Carrier may be required to procure a performance bond in a form approved by County and in an amount agreed between County and Air Carrier or, if County and Air Carrier cannot agree, in an amount of a bid by County's contractor necessary to ensure that such restoration of the Premises will be accomplished.

## ARTICLE 23

## MISCELLANEOUS

23.1   **Non-Waiver of Rights** - Continued performance by either party hereto pursuant to the terms of this Agreement after a default in any of the terms, covenants and conditions herein contained to be performed, kept or observed by the other party hereto, shall not be deemed a waiver of any right to cancel this Agreement for any subsequent default and no waiver of any such default shall be construed, or act as a waiver of any subsequent default.

23.2   **Invalidity of Clauses** - The invalidity of any Article, Section, portion, paragraph, provision, or clause of this Agreement shall have no effect upon the validity of any other part or portion hereof.

23.3   **Approval by the Parties** - Whenever the consent or approval of County or Air Carrier is called for herein, it is understood and agreed that such approval shall be in writing and obtained in advance and shall not be unreasonably withheld or delayed.

23.4   **Headings** - The Article and Section titles shown in this Agreement are included only as a matter of convenience and for reference and in no way define, limit, broaden or describe the scope or intent of any provisions of this Agreement.

23.5   **Performance and Labor and Material Payment Bonds** - Air Carrier shall cause appropriate performance and labor and material payment bonds with standard public liability

261

insurance coverage to be placed in effect in a form approved by County prior to any construction performed by Air Carrier or any of its contractors or subcontractors upon the Premises or arising out of or because of the performance of any work or labor by or for it or them at said Premises. In the event any person or corporation shall attempt to·assert a claim against County for work done or materials supplied in connection with improvements made by Air Carrier, Air Carrier shall hold County harmless from such claim, including the cost of defense.

23.6   __Remedies__ - The rights and remedies given to County and Air Carrier in this Agreement are distinct, separate and cumulative, and no one of them, whether or not exercised by either party, shall be deemed to be in exclusion of any of the others herein or by law or in equity provided.

23.7   __Governing Law__ - The parties hereto agree that this Agreement shall be governed and construed in accordance with the laws of the State of South Carolina.

23.8   __Non-Liability__ - No board member, Council Member, director, officer, agent, or employee of County or Air Carrier shall be charged personally or be held liable by or to the other party under any term or provision of this Agreement, or any amendment thereto, or because of any breach hereof, or because of its execution.

23.9   __Notices__ - The foregoing addresses may be changed by either party giving to the other party the same type of notice described below providing a substitute address.  Receipt of said Notice shall be deemed to have been received the date receipt thereof is acknowledged by the representative signing for said delivery.  Any request, demand, authorization, direction, notice, consent or waiver provided or permitted to be made upon, given by, or furnished to, the County or Air Carrier shall be sufficient for every purpose hereunder if in writing and mailed by certified or registered mail, postage prepaid and addressed as follows:

For Horry County:      Horry County Department of Airports
                       Attn:  Director of Airports
                       1100 Jetport Road
                       Myrtle Beach, SC 29577

For Air Carrier:       Myrtle Beach Direct Air & Tours
                       1600 Oak Street, Suite B
                       Myrtle Beach, SC  29577

23.10  __Agreement Not to Grant More Favorable Terms__ – Subject to Section 1.50 herein, County agrees not to enter into any lease, license, contract or other agreement with any other Indirect Air Carrier or Aircraft Operator containing more favorable fees, rentals and charges than this Agreement or to grant to such Indirect Air Carrier or Aircraft Operator rights or privileges with respect to the use of Airport facilities that are not accorded to Air Carrier hereunder, unless the same fees, rentals, charges, rights and privileges are concurrently made available to Air Carrier. County further covenants and agrees that it will adopt and put into effect a schedule of fees and charges for Indirect Air Carriers and Aircraft Operators that use the Airport without executing an agreement substantially similar to this Agreement which at all times during the term

28



hereof shall be at least one hundred twenty five percent (125%) of the rates established pursuant to this agreement.

23.11  **Entire Agreement** - This Agreement, together with all Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties hereto relating to the subject matter hereof and may be amended only in writing, executed by duly authorized representatives of the party to be bound. This agreement supersedes any previous agreement entered into between the parties, excepting those matters surviving the expiration or early termination of the prior agreement(s).

**IN WITNESS WHEREOF,** the parties hereto execute this Signatory Indirect Air Carrier Contract and Airport Use Agreement the date first above written, which shall be considered effective as of July 1, 2007.

**FOR HORRY COUNTY:**

BY: _____          _____
Danny Knight                                    WITNESS
Horry County Administrator


**FOR AIR CARRIER:**

BY: _____          _____
Judy Tull                                          WITNESS

TITLE:  CEO

29

EXHIBIT B

4843-6129-6143.1

# VERIFICATION CERTIFICATE

**Platte River Insurance Company** (hereinafter called the Surety), hereby confirms that its

Surety Bond numbered **41087482**, in the amount of $ **151,000.00**, on behalf of
**Southern Sky Air & Tours dba**                     **Myrtle Beach, Horry County International Airport**
**Myrtle Beach Direct Air & Tours** (Principal) in favor of **Department of Airports**, (Obligee) with an

original effective date of **January 25, 2007** is still in full force and effect subject to the terms,

conditions and limitations of said bond.

    This verification certificate is executed upon the express condition that the Surety's liability under
said bond, together with this and all previous verification certificates shall not be cumulative and shall in
no event exceed the amount specifically set forth in said bond or any existing certificate changing the
amount of said bond.

Signed, sealed and dated: **December 7, 2011 .**

Surety:   **Platte River Insurance Company**

By:_____
    Alejandro Navarro ,  Attorney-in-Fact

# Machaen Enterprises, Inc.

*Rw*

*File - Direct
Air*

*Surety & Fidelity Bonding*

December 7, 2011

Myrtle Beach
Horry County International Airport
Department of Airports
1100 Jetport Rd.
Myrtle Beach, SC 29577

To Whom It May Concern,

The enclosed certificate is being sent to you for the continuation of bond # 41087482 in the amount of $ 151,000.00 for Southern Sky Air & Tours dba Myrtle Beach Direct Air & Tours.

Should you have any questions or comments please do not hesitate to call our office at area code (201) 327-8400.

Sincerely,

Luis Ospino
MSB Bond Department
General Manager

MYR '11 DEC12pm 3:04

# PLATTE RIVER INSURANCE COMPANY

## Change Rider

| Bond No. 41087482 | Principal | Southern Sky Air & Tours dba Myrtle Beach Direct Air & Tours |
|---|---|---|
| Date of Bond **January 25, 2007** | Obligee | Myrtle Beach, Horry County International Airport Department of Airports |
| Additional Premium $ | Return Premium $ | Date of Change **March 14, 2008** |

This rider is to be attached to and form a part of the above described bond.

In consideration of the additional or return premium shown above the Surety hereby gives its consent to

**Increase Bond Amount:**

**From** $ 116,000.00

**To** $ 151,000.00

Provided, however, that the aggregate liability of the Surety for any one or more losses occurring prior to the effective date of change shall not exceed _____ **$ 116,000.00** _____, or for any one or more losses occurring after said date not exceed _____ **$ 151,000.00** _____

It is further understood that in no event shall the Surety's liability be cumulative.

**Change Rider Power # 41125023**

Signed and dated on _____ **March 14, 2008** _____
                              (Month, day, year)

PLATTE RIVER INSURANCE COMPANY

By:_____

Alejandro Navarro - Attorney-In-Fact

Accepted

_____

By:_____

## PLATTE RIVER INSURANCE COMPANY
### POWER OF ATTORNEY

41125023

**KNOW ALL MEN BY THESE PRESENTS**, That the **PLATTE RIVER INSURANCE COMPANY**, a corporation of the State of Nebraska, having its principal offices in the City of Middleton, Wisconsin, does make, constitute and appoint

————————————————————ALEJANDRO NAVARRO————————————————————

its true and lawful Attorney(s)-in-fact, to make, execute, seal and deliver for and on its behalf, as surety, and as its act and deed, any and all bonds, undertakings and contracts of suretyship, provided that no bond or undertaking or contract of suretyship executed under this authority shall exceed in amount the sum of

——————————— ALL WRITTEN INSTRUMENTS IN AN AMOUNT: $2,500,000.00 ———————————

This Power of Attorney is granted and is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of **PLATTE RIVER INSURANCE COMPANY** at a meeting duly called and held on the 8th day of January, 2002.

"**RESOLVED**, that the President, and Vice-President, the Secretary or Treasurer, acting individually or otherwise, be and they hereby are granted the power and authorization to appoint by a Power of Attorney for the purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, one or more vice-presidents, assistant secretaries and attorney(s)-in-fact, each appointee to have the powers and duties usual to such offices to the business of the Corporation; the signature of such officers and the seal of the Corporation may be affixed to such power of attorney or to any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Corporation in the future with respect to any bond or undertaking or other writing obligatory in the nature thereof to which it is attached. Any such appointment may be revoked, for cause, or without cause, by any of said officers, at any time."

**IN WITNESS WHEREOF**, the **PLATTE RIVER INSURANCE COMPANY** has caused these presents to be signed by its officer undersigned and its corporate seal to be hereto affixed duly attested, this 1st day of June, 2006.

Attest:

*Alan S. Ogilvie*
Alan S. Ogilvie
Secretary

**SEAL**
PLATTE RIVER INSURANCE COMPANY
CORPORATE
NEBRASKA

PLATTE RIVER INSURANCE COMPANY

*James J. McIntyre*
James J. McIntyre
President

STATE OF WISCONSIN } S.S.:
COUNTY OF DANE

On the 1st day of June, 2006 before me personally came James J. McIntyre, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Dane, State of Wisconsin; that he is President of **PLATTE RIVER INSURANCE COMPANY**, the corporation described in and which executed the above instrument; that he knows the seal of the said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

KATHLEEN
A.
PAULSON
CERTIFICATE

*Kathleen A. Paulson*
Kathleen A. Paulson
Notary Public, Dane Co., WI
My Commission Expires 10-15-2006

STATE OF WISCONSIN } S.S.:
COUNTY OF DANE

I, the undersigned, duly elected to the office stated below, now the incumbent in **PLATTE RIVER INSURANCE COMPANY**, a Nebraska Corporation, authorized to make this certificate, **DO HEREBY CERTIFY** that the foregoing attached Power of Attorney remains in full force and has not been revoked; and furthermore, that the Resolution of the Board of Directors, set forth in the Power of Attorney, is now in force.

Signed and sealed at the City of Middleton, State of Wisconsin this ___14th___ day of __March__, 2 _008_.

**SEAL**

*Alan S. Ogilvie*
Alan S. Ogilvie
Secretary

THIS DOCUMENT IS NOT VALID UNLESS PRINTED ON GREEN SHADED BACKGROUND WITH A RED SERIAL NUMBER IN THE UPPER RIGHT HAND CORNER. IF YOU HAVE ANY QUESTIONS CONCERNING THE AUTHENTICITY OF THIS DOCUMENT CALL 800-475-4450.

PRS-POA (6-06)

# BOND

Bond # 41087482

KNOW ALL MEN BY THESE PRESENTS that Southern Sky Air & Tours dba Myrtle Beach Direct Air & Tours, 1600 Oak Street North, Suite B, Myrtle Beach, South Carolina 29577 as Principal and Platte River Insurance Company, 115 Glastonbury Blvd, Glastonbury, Connecticut 06033 as Surety, are firmly bound unto Myrtle Beach, Horry County International Airport, Department of Airports, a company incorporated under the laws of the State of South Carolina whose registered office is at 1100 Jetport Road, Myrtle Beach, S.C. 29577 as Obligee, in the aggregate penal sum of One Hundred Sixteen Thousand  Dollars ( $ 116,000.00 U.S.) for the payment of which, well and truly be made, we bind ourselves, our, heirs, executors, administrators, successors and assigns, jointly and severally by these presents.

WHEREAS, the Principal and Obligee have entered into a Ground Handling Services, Aircraft Landings and Terminal and Office Space Usage Agreement and pursuant to this Agreement the Obligee requires security guaranteeing Agreement.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION is such that the Principal shall faithfully perform in full all of its obligations under the aforementioned Agreement, including saving harmless the Obligee from all cost and damage by reason of Principal's failure to do so, then this obligation shall be void: otherwise it shall remain in full force and effect.

PROVIDED, that regardless of the number of years this bond remains in effect, in no event shall the aggregate liability of the Surety under this bond exceed the penal sum of this bond.

This bond shall continue in full force and effect indefinitely, subject, however, to cancellation if the Surety shall so elect, this bond may be canceled at anytime by the Surety filing with Myrtle Beach, Horry County International Airport. a written notice of such cancellation by registered or certified mail with return receipt requested, the cancellation to be effective not less than 30 days after receipt of such notice. The filing of such notice shall not discharge the Surety from any liability already accrued under this bond or which shall accrue herein before the expiration of such 30 days or other period.

IT IS FURTHER AGREED THAT, any notice of default under this bond must be made in writing by registered or certified mail within 30 days of said default to Platte Insurance Company, 115 Glastonbury Blvd, Glastonbury, Ct. 06033; Attn: Bond Claims. Any suit brought under this bond must be made in a court of the United States of America.

This agreement is not assignable to any to any other party and may not be changed without the written consent of the Surety and the obligee. We have duly executed the forgoing obligation this 25th day of January, 2007 to be effective on the 25th day of January, 2007.

SOUTHERN SKY AIR & TOURS, DBA
MYRTLE BEACH DIRECT AIR & TOURS                    PLATTE RIVER INSURANCE COMPANY
                Principal                                                               Surety


BY: _____               BY: _____
Title: C.E.O. – Judy K. Tull                                      Attorney-in-Fact: Alejandro Navarro


                                                                                    Surety Seal

# PLATTE RIVER INSURANCE COMPANY
## POWER OF ATTORNEY

41087482

**KNOW ALL MEN BY THESE PRESENTS**, That the **PLATTE RIVER INSURANCE COMPANY**, a corporation of the State of Nebraska, having its principal offices in the City of Middleton, Wisconsin, does make, constitute and appoint

---------------------------------------------------- ALEJANDRO NAVARRO ----------------------------------------------------

its true and lawful Attorney(s)-in-fact, to make, execute, seal and deliver for and on its behalf, as surety, and as its act and deed, any and all bonds, undertakings and contracts of suretyship, provided that no bond or undertaking or contract of suretyship executed under this authority shall exceed in amount the sum of

-------------------------------------- ALL WRITTEN INSTRUMENTS IN AN AMOUNT: $2,500,000.00 --------------------------------------

This Power of Attorney is granted and is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of **PLATTE RIVER INSURANCE COMPANY** at a meeting duly called and held on the 8th day of January, 2002.

"**RESOLVED**, that the President, and Vice-President, the Secretary or Treasurer, acting individually or otherwise, be and they hereby are granted the power and authorization to appoint by a Power of Attorney for the purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, one or more vice-presidents, assistant secretaries and attorney(s)-in-fact, each appointee to have the powers and duties usual to such offices to the business of the Corporation; the signature of such officers and the seal of the Corporation may be affixed to such power of attorney or to any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Corporation in the future with respect to any bond or undertaking or other writing obligatory in the nature thereof to which it is attached. Any such appointment may be revoked, for cause, or without cause, by any of said officers, at any time."

**IN WITNESS WHEREOF**, the **PLATTE RIVER INSURANCE COMPANY** has caused these presents to be signed by its officer undersigned and its corporate seal to be hereto affixed duly attested, this 1st day of June, 2006.

Attest:

PLATTE RIVER INSURANCE COMPANY

*Alan S. Ogilvie*
Alan S. Ogilvie
Secretary

SEAL
PLATTE RIVER INSURANCE COMPANY
CORPORATE
NEBRASKA

*James J. McIntyre*
James J. McIntyre
President

STATE OF WISCONSIN
COUNTY OF DANE } S.S.:

On the 1st day of June, 2006 before me personally came James J. McIntyre, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Dane, State of Wisconsin; that he is President of **PLATTE RIVER INSURANCE COMPANY**, the corporation described in and which executed the above instrument; that he knows the seal of the said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name thereto by like order.

KATHLEEN A. PAULSON

*Kathleen A. Paulson*
Kathleen A. Paulson
Notary Public, Dane Co., WI
My Commission Expires 10-15-2006

STATE OF WISCONSIN
COUNTY OF DANE } S.S.:

CERTIFICATE

I, the undersigned, duly elected to the office stated below, now the incumbent in **PLATTE RIVER INSURANCE COMPANY**, a Nebraska Corporation, authorized to make this certificate, **DO HEREBY CERTIFY** that the foregoing attached Power of Attorney remains in full force and has not been revoked; and furthermore, that the Resolution of the Board of Directors, set forth in the Power of Attorney is now in force.

Signed and sealed at the City of Middleton, State of Wisconsin this ____**25th**____ day of ____**January**____, 2 **007**

SEAL

*Alan S. Ogilvie*
Alan S. Ogilvie
Secretary

THIS DOCUMENT IS NOT VALID UNLESS PRINTED ON GREEN SHADED BACKGROUND WITH A RED SERIAL NUMBER IN THE UPPER RIGHT HAND CORNER. IF YOU HAVE ANY QUESTIONS CONCERNING THE AUTHENTICITY OF THIS DOCUMENT CALL 800-475-4450.

PRS-POA (6-06)

**NOTICE LIST**

*Via email to:*   Gina L. Martin, Esq.
Goodwin Procter LLP
Exchange Place, 53 State Street
Boston, MA 02109
(Counsel to Merrimack Bank)
*gmartin@goodwinprocter.com*

*Via Overnight Mail to:*

| | |
|---|---|
| Valley National Bank<br>1040 Avenue of the Americas<br>New York, NY 10018 | United States Attorney<br>One Courthouse Way<br>Suite 9200<br>Boston, MA 02210 |
| World Atlantic Airlines<br>Attn: Thomas Romero, CEO<br>5200 NW 36th St.<br>Miami, FL 33166 | Chemoil Corp.<br>200 East Las Olas Blvd., Ste. 2050<br>Attn: Richard White<br>Fort Lauderdale, FL 33301 |
| Kalamazoo/Battle Creek International Air<br>5235 Portage Road<br>Kalamazoo, MI 49002 | Lehigh Northampton Airport<br>3311 Airport Blvd.<br>Allentown, PA 18109 |
| Mass. Port Authority<br>Attn: Director, Worcester Regional Airport<br>One Harborside Dr., Ste. 200S<br>Boston, MA 02128 | Myrtle Beach International Airport<br>1100 Jetport Rd.<br>Myrtle Beach, SC 29577 |
| WUTV – Fox 29<br>699 Herbal Ave., Ste. 100<br>Buffalo, NY 14207 | Palm Beach International Airport<br>846 Palm Beach International Airport<br>West Palm Beach, FL 33406 |
| Quickflight, Inc.<br>145 Burt Rd., Ste. 16<br>Lexington, KY 40503 | Sky King Airlines<br>3200 Flightline Dr., Ste. 302<br>Lakeland, FL 33811 |
| Springfield Port Authority<br>1200 Capital Airport Drive<br>Springfield, IL 62707-8471 | Xtra Airways<br>Attn: Lisa Dunn, President<br>800 West Idaho St., Ste. 304<br>Boise, ID 83702 |
| Vision Airlines<br>Attn: David Meers, SVP/COO<br>3975 Johns Creek Ct, Ste 100A<br>Suwanee, GA 30024 | WFFF/WVNY-TV<br>Smith Broadcasting of VT, LLC<br>298 Mountain View Drive<br>Colchester, VT 05406 |

9

*Via 1st Class  Mail to:*

| Allegheny County Airport Authority<br>PO Box 642623<br>Pittsburgh, PA 15264 | Niagra Frontier Transportation Authority<br>P.O. Box 5008<br>Buffalo, NY 14205 |
| --- | --- |
| The Port Authority of NY and NJ<br>PO Box 95000<br>Philadelphia, PA 19195-1517 | |

10

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of this Motion, together with exhibits, the

Declaration of Pat Apone, the proposed Order, and the proposed Alternative Order were filed

this 20th day of June, 2012 through the ECF filing system and will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing, and by overnight mail or

as otherwise indicated on the attached Notice List.

/s/ Lawrence M. Kraus
Lawrence M. Kraus BBO No. 564561

11