UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| In re:<br><br>SOUTHERN SKY AIR & TOURS, LLC<br>d/b/a DIRECT AIR,<br><br>Debtor. | Chapter 7<br>Case No. 12-40944-MSH |

**MOTION OF CHAPTER 7 TRUSTEE FOR ORDER (1) APPROVING
AGREEMENT REGARDING DEBTOR'S ACCOUNTS AT VALLEY NATIONAL
BANK AND (2) EXTENDING CLAIM BAR DATE FOR CHARTER
PARTICIPANTS TO JANUARY 15, 2013**

To the Honorable Melvin S. Hoffman, United States Bankruptcy Judge:

NOW COMES Joseph H. Baldiga, the Chapter 7 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Southern Sky Air & Tours, LLC d/b/a Direct Air (the "Debtor"), and hereby moves this Court to enter an order (1) approving the agreement (the "Agreement") between the Trustee, JetPay Merchant Services, LLC ("JetPay"), Merrick Bank Corporation ("Merrick"), and American Express Travel Related Services Company, Inc. ("AMEX")[1] regarding accounts maintained at Valley National Bank ("VNB") for and on behalf of the Debtor (collectively, the "Escrow Account")[2] and (2) extending the claims bar date for Charter Participants (defined in paragraph 2 below) to January 15, 2013. A copy of the Agreement is attached hereto as **Exhibit A**.[3]

---

[1] JetPay, AMEX, and Merrick shall hereafter be known as the "Credit Card Parties." The Credit Card Parties and the Trustee shall hereafter be known as the "Parties."
[2] Use of the word "escrow" is not an admission by the Parties that the accounts comprising the Escrow Account are in fact escrow accounts and is without prejudice to any Party's right to argue that the funds in such accounts either are or are not subject to an escrow arrangement and either are or are not property of the Estate.
[3] The Agreement is comprised of a Term Sheet and an Addendum to Term Sheet, both of which are included in the attached **Exhibit A**.

{Practice Areas\CORP\15008\14190\A2087157.DOC}

In support of this Motion, the Trustee states as follows:

## I. BACKGROUND.

### A. Bankruptcy Case Background.

1. On March 15, 2012 (the "Petition Date"), the Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2. Prior to the Petition Date, the Debtor was a public charter operator (tour operator) with charter programs servicing various points in the United States. On March 13, 2012 (two days prior to the Petition Date), the Debtor ceased operation of its tour programs, stopped accepting flight reservations and terminated reservation capabilities on its web-site. The Debtor never resumed operations. By the time of these actions, the Debtor had previously accepted flight reservations from thousands of charter participants (the "Charter Participants"), who were then unable to fly with the Debtor, and who were left with claims for the monies lost in connection with the Debtor's cancelled flights and ceased operations.

3. On April 11, 2012 (the "Conversion Date"), this Court converted the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

4. On the Conversion Date, the United States Trustee appointed the Trustee as Chapter 7 trustee of this proceeding and he continues to serve as such. Since his appointment, the Trustee has worked to secure assets and records of the Debtor and to begin investigating the many allegations of fraud raised by interested parties during the Debtor's Chapter 11 case and to the Trustee post-conversion.

**B.     The Valley National Bank Accounts.**

5.     As a public charter operator, the Debtor's operations were governed by, among other things, regulations promulgated by the United States Department of Transportation ("DOT"), 14 C.F.R. Part 380. One of the Debtor's obligations was compliance with regulations regarding security and depository agreements. See 14 C.F.R. § 380.34.

6.     Pursuant to 14 C.F.R. § 380.34, public charter operators may, in lieu of furnishing a certain type of security agreement, elect to: (a) furnish a surety bond, a surety trust agreement, or a letter of credit in the amount of at least $10,000 times the number of flights, except that the amount need not exceed $200,000;[4] and (b) enter into an agreement with the company directly engaging in the operation of aircraft (known as the "direct air carrier") and a designated bank, the terms of which shall provide that "all payments by charter participants paid to charter operators... shall be deposited with and maintained by the bank subject to [...certain...] conditions[.]" 14 C.F.R. § 380.34(b).

7.     Prior to the Petition Date, the Debtor entered into Public Charter Depository Agreements (the "Depository Agreements") with various direct air carriers and VNB. The Depository Agreements are substantially similar; a copy of one of the Depository Agreements is attached hereto for reference as **Exhibit B**.

8.     Pursuant to the Depository Agreements, VNB agreed to act as depository bank within the meaning of 14 C.F.R. § 380. See Depository Agreements at page 1. The Debtor was required to deliver to VNB all amounts received from each Charter Participant in accordance with 14 C.F.R. § 380.34. Id. at § 1.2. Subject to certain additional terms, VNB agreed to accept such payments from the Debtor for deposit. Id. at § 1.1. VNB agreed to maintain a separate

---

[4] The Debtor carried a surety bond through Platte River Insurance Company in the amount of $200,000. The proceeds of that surety bond are the subject of a separate motion which was filed by the Trustee on September 4, 2012.

account for each charter, flight, or rotation, but was permitted to use deposited funds in its general banking business. Id. at § 1.3.

9. Federal regulations govern further disbursement of funds after payments from charter participants have been deposited into depository banks, such as VNB. Depository banks are permitted to pay the direct air carrier, by deposit into such carrier's escrow account, for the charter price for transportation no earlier than 60 days prior to the scheduled day of departure, upon certification of the departure date by such carrier. 14 C.F.R. § 380.34(b)(2)(ii) and 14 C.F.R. § 212.8(a). With some exceptions (including payment to direct air carriers as noted above), the depository bank "shall not pay out any funds from the account prior to 2 banking days after completion of each charter, when the balance in the account shall be paid [to] the charter operator..., upon certification of the completion date by the air carrier." 14 C.F.R. § 380.34(b)(2)(ix). If a charter operator notifies its depository bank that a charter has been canceled, the bank is required to make applicable refunds directly to the charter participants. 14 C.F.R. § 380.34(b)(2)(iv).

10. The Depository Agreements contain provisions regarding disbursement of funds that are in line with the above-described requirements of 14 C.F.R. § 380.34. See Depository Agreements at § 2.1.

11. As of the Petition Date, VNB maintained two accounts for and on behalf of Direct Air, a money market account and a DDA account.[5] According to VNB, funds were "swept" from the DDA account into the money market account periodically to earn interest. The VNB money market account currently holds a balance of approximately $1,016,925.90. The VNB DDA account currently holds a balance of approximately $.01.

---

[5] The money market account and the DDA account, along with any other accounts that VNB maintained for or on behalf of the Debtor, comprise the Escrow Account.

C. **The JetPay Motion for Relief.**

12. On March 21, 2012, prior to the Conversion Date, JetPay filed its Emergency Motion for Relief from Stay to Continue Processing Customer Chargebacks from Non-Estate Property Escrow Account in the Ordinary Course (the "JetPay Motion for Relief"). In the JetPay Motion for Relief, JetPay sought an order granting relief from stay to permit affected parties to continue processing customer chargebacks and refunds in the ordinary course of business. A hearing on the JetPay Motion for Relief is currently scheduled for September 13, 2012.[6]

13. JetPay describes itself as a "credit card processor" that, by virtue of a Merchant Agreement among itself, Merrick and the Debtor, had responsibility for processing customers' Visa and MasterCard purchases of the Debtor's charter flights. See JetPay Motion for Relief at ¶ 6.[7] According to JetPay, "[e]ach time a flight is purchased with a valid Visa or MasterCard, JetPay is responsible for funding the [Escrow Account] for that purchase and assumes responsibility for collecting the purchase price (and applicable fees) from the credit card companies and/or their member banks. Thus, JetPay (through its own bank, Merrick Bank) is the entity funding the [Escrow Account]." Id. JetPay has advised the Trustee that "debit card" purchases were processed in the same manner as "credit card" purchases. For simplicity, this Motion treats debit card purchases as a type of credit card purchase.

14. American Express cards were the only credit cards other than Visa, MasterCard or Discover Card that could be used by Charter Participants to purchase tickets from the Debtor. Accordingly, AMEX also funded the Escrow Account for customers' purchases. Far fewer Charter Participants purchased tickets with American Express cards; AMEX estimates that approximately 10% of the Debtor's customers used American Express cards to purchase flights.

---

[6] The Parties intend to file a separate motion requesting that this Court continue generally the hearing on the JetPay Motion for Relief, based on the pendency of this Motion.
[7] JetPay has since clarified that it also processed DiscoverCard purchases.

Upon information and belief, only a very small fraction, if any, of Charter Participants purchased tickets using a method other than a credit card (i.e., Visa, MasterCard, DiscoverCard, or American Express), such cash or checks. Charter Participants used non-credit card payment methods (i.e., cash or checks) with a bit more frequency for airport-sited travel-related expenses such as baggage fees and snacks, although these non-credit card transactions still were in the minority of the transactions effected.

15. In the JetPay Motion for Relief, JetPay describes the typical disbursement scenario in the event that the Debtor, prior to its bankruptcy filing, canceled a charter flight: "[W]here a customer has paid by Visa or MasterCard, the customer obtains a credit from his credit card account and therefore [VNB] does not issue a check. Instead, through a series of debits among institutions that occur within a 24-hour period, JetPay reimburses the credit card issuing bank, then sends a draft to [VNB] and is immediately thereafter reimbursed by [VNB]." JetPay Motion for Relief at ¶ 7.[8]

**D.    The Shortfall.**

16. Since the Petition Date and the cancellation of the Debtor's flights, thousands of customers have sought "chargebacks" for flights purchased on their credit cards and debit cards. Merrick and AMEX have reimbursed those customers (via their credit card and debit card-issuing banks in the case of Visa and MasterCard cardholders and via Discover and AMEX in the case of Discover and American Express cardholders) in amounts far exceeding the Escrow Account balance (as specified below) but, due to VNB's refusal to release the limited funds in the Escrow Account, neither Merrick nor AMEX has received even partial reimbursement. In the JetPay Motion for Relief, JetPay estimated that its exposure for these chargebacks and refunds might reach $20 million. JetPay Motion for Relief at ¶ 10. JetPay has since informed

---

[8] In fact, the funds used to reimburse the credit card issuing bank were Merrick funds.

the Trustee that as of August 28, 2012, it has processed over 63,000 chargebacks and refunds from Merrick totaling approximately $25.8 million. AMEX, meanwhile, has informed the Trustee that as of August 28, 2012, AMEX has processed over 6,000 chargeback transactions crediting American Express cardholders approximately $3.68 million for disputed charges related to purchases from the Debtor. The Trustee believes that the chargebacks funded by Merrick and AMEX will continue to increase, albeit in slower and lower amounts.

17. As previously noted, however, the Escrow Account contains just over $1 million. Based on the number of scheduled flights that were canceled on account of the Debtor's bankruptcy filing, as well as the claims of Merrick, JetPay and AMEX, the Trustee estimates that the shortfall in the Escrow Account could be as high as $30 million.

18. The proceeds of the Escrow Account clearly are insufficient to satisfy the claims of all Charter Participants and/or their agents (i.e., the Credit Card Parties). The facts and circumstances leading to the Escrow Account shortfall need to be investigated. The Credit Card Parties have asserted that the funds comprising the Escrow Account (and any recoveries of the shortfall) do not and would not constitute property of the Estate, but have recognized the benefit of having the Trustee and his professionals investigate the Escrow Account shortfall. The Trustee, without conceding that any Escrow Account funds and recoveries may not be property of the Estate, is unwilling to conduct such an investigation absent some material benefit to the Estate. After negotiations, the Parties have agreed to terms and conditions by which the current contents of the Escrow Account (the "Escrow Proceeds") shall be disbursed in such a manner so as to facilitate the investigation of the Escrow Account shortfall while simultaneously providing a benefit to the Estate.

## II. SUMMARY OF THE AGREEMENT.[9]

A. As set forth on the attached Term Sheet, the Escrow Proceeds shall be allocated among the Parties and distributed upon receipt from VNB as follows:

(i) the first $100,000 of Escrow Proceeds (the "Investigation Funds") shall be distributed to the Estate to compensate the Trustee and his professionals (subject to fee applications) for allowed administrative expenses incurred in connection with the Investigation (defined in subparagraph B below);

(ii) the next $75,000 of Escrow Proceeds (the "Estate Funds") shall be distributed to the Trustee on behalf of the Estate to pay claims (including administrative claims) in accordance with the normal bankruptcy priorities;

(iii) the next $75,000 of Escrow Proceeds (the "Charter Participant Funds") shall be distributed to the Estate exclusively to partially or fully pay the Charter Participants who did not receive a full refund or chargeback, or who otherwise were not fully reimbursed in connection with money paid by them into the Escrow Account, but only to the extent that such Charter Participants have a valid claim against the Escrow Account;

(iv) any unused balance of the Charter Participant Funds shall be distributed 90% to Merrick and 10% to AMEX; and

(v) all remaining Escrow Proceeds shall be distributed 90% to Merrick and 10% to AMEX. Merrick and AMEX may participate in distributions from the Estate, pro rata with other general unsecured claimants, but only after exhausting funds received under the Agreement toward application of their respective claims.

---

[9] The following is a summary only. Interested parties are directed to the attached Term Sheet and Addendum to Term Sheet for the full and complete terms of the Agreement.

{Practice Areas\CORP\15008\14190\A2087157.DOC}   8

B. The Trustee shall have primary responsibility for conducting an investigation (the "Investigation") into the dissipation of funds from the Escrow Account, including, without limitation, hiring professionals, conducting examinations and pursuing other discovery, and gathering and analyzing data. Before the Investigation Funds are exhausted, the Trustee shall make a complete report to the Parties of his findings and recommendations in connection with his Investigation. Under the Agreement, the Trustee's Investigation shall be inclusive of the activities of the Trustee and his professionals both before and after the date of the Agreement in, for example, obtaining documents, communicating with current and former management and employees of the Debtor, and negotiating and obtaining the Court's approval of the Agreement.

C. The Trustee shall retain Posternak Blankstein & Lund, LLP ("Posternak") as special counsel to the Trustee for the sole purpose of obtaining the release of the Escrow Proceeds from VNB, to the extent that the Estate is a necessary or interested party to any negotiation or proceeding in connection with such purpose.[10] Posternak may rely on Satterlee Stephens Burke & Burke, LLP ("Satterlee"), as counsel to Merrick, to perform legal work undertaken to that end. Posternak's and Satterlee's fees and disbursements incurred in connection with such representation and work shall not be an administrative claim against the Estate (and shall not therefore be subject to Bankruptcy Court approval) but will be paid by JetPay and Merrick, as the case may be, in accordance with counsels' fee agreements with such parties.

D. Subject to the foregoing, the Estate shall be responsible for all compensation to all professionals retained by the Estate and other allowed administrative expenses (collectively, "Administrative Costs"). The Trustee shall not look to the Credit Card Parties for any

---

[10] Posternak shall not represent the Trustee in connection with any dispute with JetPay/Merrick, including any dispute relating to the implementation of the Agreement. In the event of any a dispute, JetPay and/or Merrick reserve the right to continue retaining Posternak.

contribution to such Administrative Costs. None of the Escrow Proceeds shall be used to satisfy any Administrative Costs (beyond the Investigation Funds) except upon the prior written approval by Merrick, which approval may be withheld or conditioned at Merrick's discretion. Nothing in the Agreement shall affect any requirements under law to have the payment of Administrative Costs approved by the Bankruptcy Court.

E.  The Credit Card Parties shall have the right to participate in all aspects of the Trustee's Investigation and litigation in connection with the Agreement, including, without limitation, access to all data and other facts gathered in connection with the Investigation and participation in any discovery.

F.  Without the express written consent of Merrick, which consent shall not be unreasonably withheld when considering the best interests of Merrick, the Trustee shall not settle any claim in connection with obtaining turnover of the Escrow Proceeds from VNB. Any disputes over withheld consent shall be submitted to the Bankruptcy Court.

G.  Without the express written consent of Merrick, which consent shall not be unreasonably withheld, the Trustee shall not hire any non-attorney professional to assist him in the Investigation other than Verdolino & Lowey P.C.

H.  All information obtained in the course of the Investigation shall be treated as confidential information by the Parties and shall be used for no purpose other than in connection with claims any party may have as a result of the Debtor's bankruptcy. All Parties shall have the right to use results of the Investigation.

I.  The Trustee agrees that he will not file any objection as to the validity of any claim filed by any of the Credit Card Parties based on chargebacks paid less funds received pursuant to the Agreement.

J.  Nothing in the Agreement shall prejudice the right of any of the Parties to (i) pursue any claim any party may otherwise have or (ii) to argue that the Escrow Proceeds are, or are not, property of the Estate.

K.  The Parties shared the Term Sheet portion of the Agreement with the DOT prior to the Trustee's filing of this Motion, and have had extensive discussions with the DOT concerning the terms of the Agreement. At the DOT's request, the Credit Card Parties have agreed to honor credit card and debit card chargeback requests which are received from Charter Participants by or before January 15, 2013, provided that such requests are otherwise valid. Similarly, the Trustee has agreed not to object to claims filed by Charter Participants after the September 11, 2012 bar date on the basis of being untimely filed, provided that such claims are filed on or before January 15, 2013. The Trustee shall be free to object to any such claims on all other grounds including, without limitation, that such claims are duplicative, excessive or have already been paid from another source. These agreements by the Parties to address the DOT's concerns are subject to Court approval of this Motion and the Agreement, and are without prejudice to the Parties' rights to object to any and all claims other than on the basis of being untimely asserted and/or filed. The Addendum to Term Sheet, which is included in **Exhibit A** to this Motion, reflects the Parties' agreement to the terms set forth in this paragraph. With this Motion, the Trustee is seeking, inter alia, an order from this Court extending the bar date for Charter Participants (only) to file prepetition claims to January 15, 2013.

### III. REASONABLENESS OF THE SETTLEMENT.

19. In determining whether a settlement agreement should be approved, a bankruptcy court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Jeffrey v. Desmond, 70 F.3d

183, 185 (1st Cir. 1995), quoting In re GHR Cos., 50 B.R. 925, 931 (Bankr. D. Mass. 1985) (additional citation omitted). The Trustee's judgment as to the propriety of the proposed settlement is to be accorded some deference. Hill v. Burdick (In re Moorhead Corp.), 208 B.R. 87 (1st Cir. BAP 1997).

20.    The Trustee believes that the Agreement clearly is in the best interest of the Estate. As a preliminary matter, certain of the Parties, and VNB, have previously expressed beliefs that the Escrow Proceeds may not be property of the Estate, although all of the Parties have retained the right to argue either for or against such premise. There is a strong argument that the Escrow Proceeds are, in fact, Charter Participants' funds (or Merrick's and AMEX's funds, standing in the shoes of reimbursed Charter Participants) rather than Estate property, based on the regulations regarding deposit and disbursement of such funds, the Depository Agreements, and the Credit Card Parties' prior relationships with the Debtor and VNB. The Agreement allocates a substantial portion of the Escrow Proceeds to the Estate (i.e., the Investigation Funds and the Estate Funds) and a separate portion for Charter Participants who were not fully reimbursed (i.e., the Charter Participant Funds). Absent the Agreement, it is uncertain at best whether the Estate would be entitled to any portion of the Escrow Proceeds.

21.    Further, VNB has indicated that it is likely to refuse to turn over the Escrow Proceeds absent a Bankruptcy Court order. Pursuant to the Agreement, JetPay and/or Merrick will bear the responsibility for paying legal fees incurred in connection with obtaining the release of the Escrow Proceeds from VNB. Although the Trustee is confident that the Parties will prevail in obtaining the release of the Escrow Proceeds from VNB, it may be a costly and/or lengthy process to do so. Absent the Agreement, the Estate would likely incur substantial administrative costs simply to obtain turnover of the Escrow Proceeds.

22. The Agreement does not obligate the Trustee to take further action in connection with the Investigation prior to VNB's release of the Escrow Proceeds, and the Trustee has advised the other Parties that he will not be taking further action in connection with the Investigation unless and until the Estate receives from VNB the Investigation Funds, the Estate Funds and the Charter Participant Funds.

23. The Trustee has already commenced an investigation into the dissipation of funds from the Escrow Account and the resulting shortfall, and will need to continue with some or all of that investigation simply to perform his required duties as trustee. Moreover, the Trustee will need to conduct a claims analysis, which by necessity will include an analysis of Charter Participants' claims, regardless of whether the Trustee has access to any of the Escrow Proceeds. The Agreement represents an efficient use of the Parties' resources, including Estate resources, and Escrow Proceeds for the collective goals of investigating the Escrow Account shortfall and analyzing claims against the Escrow Proceeds and the Estate, while helping to provide a funding source to the Estate for the Trustee's efforts in that regard.

24. Based on the foregoing, the Trustee believes that the Agreement is fair and equitable and will result in a material benefit to the Estate. Absent the Agreement, general unsecured creditors would likely receive the benefit of <u>no</u> Escrow Proceeds, while funds in the Estate would nonetheless be diverted for Estate-related work that would likely be duplicated elsewhere for different purposes. Accordingly, the Trustee submits that the Agreement represents the most efficient and cost-effective structure for addressing the Escrow Proceeds and related claims.

25. Additionally, the Agreement benefits creditors of the Estate, in particular consumers who comprise the Charter Participants. The Agreement materially extends the

deadlines for Charter Participants to (a) assert credit card and debit card claims against the Credit Card Parties and (b) file prepetition claims against the Estate, in both instances to January 15, 2013.

WHEREFORE, the Trustee respectfully requests that this Court enter an order:

a. Approving the Agreement;

b. Extending to January 15, 2013 the deadline by which Charter Participants (only) may file prepetition claims against the Estate; and

c. Granting the Trustee such other and further relief as is just.

Respectfully submitted,

JOSEPH H. BALDIGA,
CHAPTER 7 TRUSTEE

By his counsel,

/s/ Gina Barbieri
Joseph H. Baldiga, BBO #549963
Gina M. Barbieri, BBO #670596
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA  01581
Phone: (508) 898.1501
Fax:    (508) 898.1502
Email: jbaldiga@mirickoconnell.com
          gbarbieri@mirickoconnell.com

Dated: September 10, 2012

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| In re:<br><br>**SOUTHERN SKY AIR & TOURS, LLC<br>d/b/a DIRECT AIR,**<br><br>Debtor. | Chapter 7<br>Case No. 12-40944-MSH |

**ORDER (1) APPROVING AGREEMENT REGARDING DEBTOR'S ACCOUNTS AT VALLEY NATIONAL BANK AND (2) EXTENDING TO JANUARY 15, 2013 THE CLAIM FILING DEADLINE FOR CHARTER PARTICIPANTS**

Upon the motion filed on September 10, 2012 by Joseph H. Baldiga, Chapter 7 trustee of the bankruptcy estate (the "Estate") of Southern Sky Air & Tours, LLC d/b/a Direct Air (the "Debtor"), to approve the Agreement (the "Agreement") by and among the Trustee, JetPay Merchant Services, LLC, Merrick Bank Corporation, and American Express Travel Related Service Company, Inc. regarding accounts maintained at Valley National Bank for and on behalf of the Debtor; the Court finding that the Motion is in the best interest of the Estate; and no objection to the Motion having been filed or any such objection having been withdrawn or overruled;

NOW THEREFORE IT IS HEREBY ORDERED THAT:

1. The Motion is allowed;

2. The Agreement is approved; and

3. The deadline for Charter Participants (as defined in the Motion) to file prepetition claims against the Estate is extended to January 15, 2013.

Dated: _____, 2012

_____
The Honorable Melvin S. Hoffman
United States Bankruptcy Judge

{Practice Areas\CORP\15008\14190\A2087157.DOC}