## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (CENTRAL DIVISION)

In re:

**SOUTHERN SKY AIR & TOURS, LLC
d/b/a DIRECT AIR,**

**Chapter 7
Case No. 12-40944-MSH**

            **Debtor.**

### TRUSTEE'S REPORT ON
### DIRECT AIR'S OPERATIONS AND SHORTFALL

To the Honorable Melvin S. Hoffman, United States Bankruptcy Judge:

NOW COMES Joseph H. Baldiga, the Chapter 7 trustee (the "Trustee") of the

bankruptcy estate ("Estate") of Southern Sky Air & Tours, LLC d/b/a Direct Air ("Direct Air"),

after concluding his investigation, and submits this report on the operations of Direct Air and the

dissipation of funds from Direct Air's depository accounts maintained at Valley National Bank

("VNB").

## I.  INTRODUCTION

Direct Air was a public charter operator servicing several destinations in the United

States.  On March 15, 2012 (the "Petition Date"), Direct Air filed a voluntary petition for relief

under Chapter 11 of the Bankruptcy Code.  Two days prior the Petition Date, Direct Air abruptly

ceased operations.  At the time that it shut down, Direct Air had already accepted advance travel

reservations and payment from thousands of customers.

On April 11, 2012 (the "Conversion Date"), this Court converted Direct Air's Chapter 11

bankruptcy case to a Chapter 7 case.  Also on the Conversion Date, the U.S. Trustee appointed

Joseph H. Baldiga as Chapter 7 trustee of Direct Air's bankruptcy case.

In the Trustee's review of Direct Air's assets and liabilities, he determined that as of the Petition Date, the balance of customer payments in Direct Air's depository accounts at VNB was $1,016,935.91.  In contrast, claims by and on behalf of customers for incomplete travel exceed $31 million, indicating a significant shortfall in Direct Air's depository accounts at VNB.

Pursuant to an agreement between JetPay Merchant Services, LLC ("JetPay"), Merrick Bank Corporation ("Merrick"), and American Express Travel Related Services Company, Inc. ("AMEX"), which this Court approved on October 11, 2012 [Dkt. No. 240], the Trustee undertook primary responsibility for investigating Direct Air's operations and dissipation of funds from its depository accounts at VNB that created the shortfall.

The Trustee's counsel, Mirick O'Connell DeMallie & Lougee, LLP, assisted the Trustee with his investigation.  The Trustee also employed Verdolino & Lowey, P.C., an accounting firm which has significant experience in forensic accounting/computing, to assist the Trustee with technical analysis of Direct Air's records.  In addition, the Trustee coordinated his efforts and cooperated with counsel for Merrick, JetPay and AMEX.  The Trustee's investigation included a review of:  (a) approximately sixty (60) boxes of physical files and company books and records retrieved from the Direct Air office in Myrtle Beach, South Carolina after the Conversion Date; (b) information from hard drives recovered from the Direct Air office; (c) millions of records from Direct Air's reservation software system; (d) documents produced in response to subpoenas to Judy Tull, Ed Warneck, Kay Ellison, Stanley Marshall Ellison, Robert Keilman, Jet Pay and VNB; and (e) documents voluntarily provided by other parties.  In addition, the Trustee conducted seven (7) examinations pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure and over a dozen interviews of relevant persons, entities and government agencies.

## II.  <u>SUMMARY OF FINDINGS</u>

In summary, the Trustee's investigation concluded that on the Petition Date Direct Air's customers had paid $33,005,883.69 for reservations to travel after the Petition Date.  Taking into account permissible withdrawals of these funds for advance air carrier payments and credit card processing fees, and adjusting for unfunded credit card payments, the balance in Direct Air's depository accounts at VNB on the Petition Date should have been $31,406,299.70.  Instead, the depository accounts had a balance of only $1,016,935.91, resulting in a shortfall from Direct Air's depository accounts at VNB in the amount of $30,389,363.79.

The shortfall is attributable in part to $12,175,928.50 released for duplicative Family Ties membership fees.  Further, $8,323,734.82 of the shortfall was requested and released for "ghost" transactions that did not represent actual customers or revenue to Direct Air.  Finally, a portion of the shortfall is due to funds totaling $5,543,750.80 that were never deposited to the depository accounts at VNB but were nevertheless requested and released by VNB.  These funds improperly dissipated from Direct Air's depository accounts at VNB total $26,043,414.02, or 85.5%, of the shortfall.   Further review of each transaction would be necessary to identify additional sources of the shortfall with certainty, although a summary review of the data suggests that Direct Air's request for release of funds from its depository accounts at VNB for vouchers (other than Family Ties vouchers) may be another source of the shortfall.

The findings and conclusions of the Trustee's investigation are set forth in detail herein.

## III.  <u>BACKGROUND OF DIRECT AIR</u>

Direct Air incorporated in South Carolina on June 26, 2006 and established its only office

at 1600 Oak Street North, Suite B, Myrtle Beach, South Carolina.[1]  Direct Air was a public

charter operator authorized under and subject to 14 C.F.R. §380, et seq. of the Special

Regulations ("DOT Regulations") of the United States Department of Transportation, Office of

Aviation ("DOT").[2]  Pursuant to the DOT Regulations, a public charter operator, such as Direct

Air, arranges one-way or round-trip flights flown by direct air carriers.[3]  A public charter

operator may also arrange flights through an indirect air carrier acting as a broker that further

contracts with a direct air carrier.  A direct air carrier is the party that engages in the actual

operation of the aircraft.[4]  Direct Air itself did not own or operate aircraft.  Direct Air's first

flight departed Newark Liberty International Airport and landed at Myrtle Beach International

Airport on March 7, 2007.[5]

        The founding members of Direct Air were:  Judy Tull, Ed Warneck, Robert Keilman,

Kay Ellison and Stanley Marshall Ellison (the "Founding Members").[6]  The Founding Members

all played significant roles (described below) in the operations of Direct Air.  In addition to the

Founding Members, several individuals invested at the startup of Direct Air and received

nominal shares (i.e., 3% each) of Direct Air.[7]  These investors played no role in the operations of

the company.[8]  The Founding Members split the remaining shares of Direct Air equally among

---

[1] South Carolina Secretary of State Business Filings online database for Southern Sky Air & Tours, LLC; Articles of
    Incorporation for Southern Sky Air & Tours, Inc.; Direct Air marketing materials (prepared early 2011) at pg.
    18.  All citation sources (other than publicly available regulations and cases) are compiled and filed with this
    Court as Exhibits to Trustee's Report on Direct Air's Operations and Shortfall.  A complete copy of the
    Exhibits will be provided upon request to the Trustee or his undersigned counsel and upon providing the
    Trustee with an e-mail address, if available.
[2] Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006.
[3] 14 C.F.R. § 380.02 (2005).
[4] 14 C.F.R. § 212.2 (2006).
[5] Direct Air marketing materials at pg. 2.
[6] Robert Keilman Rule 2004 Examination Transcript ("Keilman Tr.") 27:20-28:3.
[7] Keilman Tr. 24:17-26:6.
[8] Kay Ellison Rule 2004 Examination Transcript ("K. Ellison Tr.") 35:3-12.

themselves, such that each owned 15.8% of Direct Air.[9]

On February 19, 2008, Direct Air filed an amendment with the South Carolina Secretary of State to convert from a corporation into a limited liability company.[10]  This resulted in no meaningful changes to Direct Air's operations or business.  The Founding Members jointly managed Direct Air, which was then a manager-managed limited liability company.[11]

The roles of the Founding Members were as follows:

- Judy Tull.  Ms. Tull was the Chief Executive Officer (CEO) of Direct Air.[12]  Ms. Tull started Direct Air with approximately forty (40) years' experience in charter aviation operations that included running two of her own companies as an aviation/charter services broker: Universal Aviation Services and World Technology Systems.[13]  Ms. Tull also worked in flight operations for Hooters Air, Transamerica Airlines and Braniff International.[14]  At Direct Air, Ms. Tull handled all aspects of flight operations, including among other tasks locating and contracting with air carriers.[15]

- Ed Warneck.  Mr. Warneck was the President of Direct Air.[16]  He previously owned two tour companies and had many connections in the Myrtle Beach area.[17]  At

---

[9] Direct Air Certificates of Membership Interest issued December 27, 2007.  The Certificates were subsequently cancelled as part of the acquisition of Direct Air in September 29, 2011.  See id.

[10] South Carolina Secretary of State Business Filings online database for Southern Sky Air & Tours, LLC.

[11] K. Ellison Tr. 35:7-12;  Judy Tull Rule 2004 Examination Transcript ("Tull Tr.") 15:4-7, 43:19-25, 44:3-8; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006.

[12] Tull Tr. 14:23; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006; Direct Air marketing materials at pg. 8; Resolution of Directors Regarding Bank Account and Authorized Parties dated September 15, 2006; Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006 at pg. 9.

[13] Tull Tr. 18:21-19:9, 22:19-24, 28:24-25.

[14] Id. at 19:10-22:18.  Hooters Air was a public charter operator similar to Direct Air.  Id. at 19:14-19.  Braniff International and Transamerica Airlines were both scheduled air carrier, however Ms. Tull worked in their charter departments.  Id. at 22:5-18.

[15] Id. at 38:19-22.

[16] Ed Warneck Rule 2004 Examination Transcript ("Warneck Tr.") 42:2-5; Tull Tr. 15:19; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006; Direct Air marketing materials at pg. 8; Resolution of Directors Regarding Bank Account and Authorized Parties dated September 15, 2006; Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006 at pg. 9.

[17] Warneck Tr. 15:11-23.

Direct Air, Mr. Warneck was responsible for marketing and sales.[18]  In addition, he built

strategic alliances with destination communities and obtained community support for

Direct Air.[19]

- Robert Keilman.  Mr. Keilman was the Chief Financial Officer (CFO) of Direct

Air.[20]  Mr. Keilman's professional experience was in finance and he had been the

Comptroller/Senior Vice President for the Bank of New York for approximately fifteen

(15) years when Direct Air started.[21]  He has held a CPA license since 1973.[22]  Mr.

Keilman previously worked with Mr. Warneck at his tour companies.[23]  The other

Founding Members brought Mr. Keilman on board at Direct Air for his financial

experience and ability to fund the startup and operations of Direct Air, both directly and

through his connections with other potential investors.[24]  While Direct Air was in

business, Mr. Keilman resided in New Jersey and generally visited the Direct Air Myrtle

Beach office one week each month.[25]  Despite his geographical distance, Mr. Keilman

was involved in the everyday operations of the business.[26]

- Stanley Marshall Ellison and Kay Ellison.  The Ellisons are husband and wife.[27]

Mr. Ellison started as the Vice President of Reservations & Technology for Direct Air

---

[18] Id. at 41:10-19; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006.
[19] Warneck Tr. 41:18-19, 42:25-43:02; 49:25-50:4; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006.
[20] Keilman Tr. 29:15-17; Tull Tr. 15:19-20; K. Ellison Tr. 23:12-13; Stanley Marshall Ellison Rule 2004 Examination Transcript ("S. Ellison Tr.") 14:15-16, 14:21-22; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006; Direct Air marketing materials at pg. 9; Resolution of Directors Regarding Bank Account and Authorized Parties dated September 15, 2006; Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006 at pg. 9.
[21] Keilman Tr. 13:24-14:12.
[22] Id. at 17:15-20.
[23] Warneck Tr. 15:15-17.
[24] Tull Tr. 42:11-43:1; K. Ellison Tr. 23:2-7; S. Ellison Tr. 14:19-16:6.
[25] Keilman Tr. 32:16-33:5; K. Ellison Tr. 23:25-24:2; Mary Baldwin Rule 2004 Examination Transcript ("Baldwin Tr.") 44:3-10.
[26] K. Ellison Tr. 23:23-24:8; S. Ellison Tr. 15:1-8; Tull Tr. 45:24-46:12; Baldwin Tr. 44:5-21.
[27] K. Ellison Tr. 14:15-18.

and Ms. Ellison started as the Vice President of System Operations.[28]  Together, they

oversaw all of the customer reservations for Direct Air.  In the 1990s, the Ellison owned

and operated Great American Holdings, Inc. d/b/a Sovereign World Travel, a travel

agency/reservation company in West Virginia.[29] Ms. Tull's company, World Technology

Systems, bought the Ellisons' business in approximately 1995 and the Ellisons managed

reservations at World Technology Systems until it closed.[30]  Thereafter, the Ellisons

handled reservations for Hooters Air, a public charter operator.[31]  When Direct Air

started, the Ellisons were living in West Virginia and running Direct Air's reservation

center there.  Although Direct Air's reservation center remained in West Virginia, the

Ellisons moved to South Carolina and worked full-time out of the Direct Air office by

2007.[32]  Subsequent to moving to Myrtle Beach, Ms. Ellison took the title of Managing

Partner.[33]  By 2011, Mr. Ellison held the title of Chairman of Direct Air.[34]

## IV.  DIRECT AIR'S OPERATIONS

### A.  Flight (or "Lift")

Since Direct Air neither owned nor operated aircraft, it contracted with direct and indirect

air carriers to fly Direct Air's customers.  Judy Tull was responsible for finding suitable air

---

[28] Id. at 23:13-15; correspondence from Judy Tull to Bob Halagarda dated September 14, 2006.

[29] K. Ellison Tr. 19:3-12.  In 1994, Great American Holdings, Inc. d/b/a Sovereign World Travel filed a petition under Chapter 7 of the Bankruptcy Code.  In re: Great American Holdings, Inc., No. 2:94-bk-20032 (W. Va. filed Jan. 28, 1994).  Shortly thereafter, the Ellisons personally filed for bankruptcy.  In re: Stanley Marshall Ellison and Kay Dearing Ellison, No. 5:94-bk-50123 (W. Va. filed Apr. 15, 1994).   In an adversary proceeding brought in the Ellisons' bankruptcy case, the Fourth Circuit affirmed the bankruptcy court's finding that the Ellisons failed to place customer payments for travel in a trust account for Airlines Reporting Corp. at a time when Sovereign World Travel was experiencing financial difficulties.  Airlines Reporting Corp. v. Ellison (In re: Ellison), 296 F.3d 266, 269 (4th Cir. 2002).  As a result of the Ellisons' defalcation while acting in a fiduciary capacity, the Ellisons' indebtedness to Airlines Reporting Corp. was not dischargeable in their bankruptcy.  Id. at 271.

[30] K. Ellison Tr. 19:8-15.

[31] See generally K. Ellison Tr. 15:19-16:12.

[32] Id. at 13:23-14:8; Tull Tr. 14:23-15:3.

[33] Direct Air marketing materials at pg. 9.

[34] Id.

carriers and negotiating contracts with them.[35]  Some of the air carriers that flew Direct Air's

customers included:  Aviation Advantage as an indirect air carrier for USA Jet, Aviation

Technology as an indirect air carrier for Sky King, direct air carrier Pace Airlines and direct air

carrier Virgin America.[36]  Under the DOT Regulations, a public charter operator is authorized to

pay its air carrier(s) up to sixty (60) days in advance of a flight's departure date.[37]  With certain

air carriers, Direct Air negotiated to pay after flights were completed, reducing Direct Air's

expenses in advance of the flights.[38]

## B.  Customer Reservations

Direct Air's customers could make reservations for flights by phone at Direct Air's West

Virginia reservation center (877-432-3473) or on Direct Air's website

(http://www.visitdirectair.com).[39]  Customers made a negligible number of reservations in

person at airports (primarily associated with Direct Air's Family Ties vouchers) or by mailing in

checks for traditional group charter flights.[40]  Customers making a reservation would select the

flight they wished to fly by selecting the departure and arrival airports and the date.[41]  Customers

had the opportunity during the reservation process to make and purchase special service requests

in advance.  Special service requests were requests for extras such as checked baggage, golf

clubs, first class seating, pets or lap infants.[42]  Direct Air charged its customers additional fees

for special service requests ("Ancillary Fees").[43]  If a customer did not elect to purchase a special

---

[35] K. Ellison Tr. 25:11-14.
[36] See generally (excerpt from) Direct Air's VNB Weekly Releases binder (December 21, 2007 to May 28, 2008).
[37] 14 C.F.R. § 380.34(b)(2)(ii).
[38] Tull Tr. 66:24-67:12; interview with Judy Tull on September 25, 2013.
[39] Direct Air marketing materials at pgs. 3, 18.
[40] Keilman Tr. 55:14-56:10.  The DOT Regulations do not permit customers to pay for bookings by means other
than "check, money order, or credit card draft payable to the [depository] bank".  14 C.F.R. § 380.34(b)(2)(i).
[41] K. Ellison Tr. 50:18-51:1.
[42] Id. at 54:23-55:6.
[43] See Cross-Tab Report for departure dates December 29, 2011 to December 31, 2011 from Radixx Air Enterprise
software.

service request in advance, that customer could pay Ancillary Fees for a special service request at the airport upon check-in.[44]

### C.  Direct Air's Family Ties Program

Direct Air's most popular marketing campaign was its "Family Ties" program whereby Direct Air sold a one-price round trip travel certificate, or "voucher", valid for a flight to one of several destinations.[45]  A customer who purchased a Family Ties voucher could freely transfer the voucher to another person, or use the voucher for any available date and destination until its expiration date.[46]  The price for each Family Ties voucher included a membership fee that ranged over time from $40-$60.[47]  Family Ties vouchers were only sold during special Family Ties sales.[48]

Direct Air tracked the purchase of Family Ties vouchers by entering each voucher into Direct Air's reservation software as a reservation for travel from airport code "FAM" to "ILY" on the date that the voucher expired.[49]  "FAM" and "ILY" were not actual airport codes.  When a customer wanted to use the voucher, the customer would contact Direct Air to redeem the voucher and reserve a seat on a particular flight.  At that time, Direct Air would make a "reaccommodation" to the initial reservation and enter the actual airport codes and actual dates for the flight.[50]  The Family Ties program was popular with Direct Air's customers because of the low cost and flexibility in using the vouchers.[51]  The Family Ties program was also popular with

---

[44] Payments made at the airport upon check-in were handled differently than advance reservations because Direct Air asserted that those payments were for same day services that were not subject to DOT Regulations.  Direct Air sent these payments to an operating account, where they were immediately available for Direct Air's use. Interview with Shawn Ullerup on December 18, 2013.
[45] Direct Air marketing materials at pg. 3.
[46] Direct Air marketing materials at pg. 3; Warneck Tr. 101:23-102:9.
[47] Tull Tr. 138:16-20; Warneck Tr. 109:17-23.
[48] Direct Air marketing materials at pg. 3.
[49] Tull Tr. 128:5-18; K. Ellison Tr. 95:23-96:22.
[50] Tull Tr. 137:4-15; K. Ellison Tr. 109:7-19; interview with Shawn Ullerup on December 18, 2013.
[51] Warneck Tr. 102:10-17; S. Ellison Tr. 62:23-63:15.

Direct Air because the membership fees provided a large infusion of cash for the company.[52]

### D. Radixx Reservation Software

Direct Air utilized Radixx Air Enterprise software ("Radixx") developed by Radixx

Solutions International ("Radixx International") to track customer reservations.[53]  Ms. Tull, Ms.

Ellison and Mr. Ellison were familiar with reservation software from Radixx International.  Each

had used software from Radixx International at jobs prior to Direct Air.  Mr. Warneck and Mr.

Keilman reportedly never used any Radixx software either prior to or during their work at Direct

Air.

Radixx created a record for all Direct Air reservations, regardless of the method in which

the reservation was made.  The software recorded the reservation details, generated a

confirmation number for a customer in lieu of a ticket and maintained a full history for each

reservation, including all changes to it.[54]  Direct Air used Radixx modules at the airports to

accept payment for special service requests and check-in customers for flights.[55]  Once a flight

departed, an agent at the airport was supposed to "close" the flight in Radixx, although agents at

Direct Air's reservation center could close a flight if an airport agent neglected to do so.[56]

Each Radixx user had his or her own user name and password.[57]  Users had different

privileges depending on their positions.  For example, reservation agents at the West Virginia

reservation center generally had the authority to make new reservations and edit the departure

date or itinerary for existing reservations.[58]  Reservation Supervisors at the reservation center,

---

[52] Warneck Tr. 110:1-111:5; S. Ellison Tr. 48:7-11.  Family Ties sales were "essentially a way that Direct Air could
generate revenue that it could use immediately from the membership fees…"  Warneck Tr. 110:1-4.
[53] Interview with Ron Peri on December 20, 2013.
[54] K. Ellison Tr. 50:18-51:25; interview with Greg Gent on October 10, 2013; interview with Ron Peri on December
20, 2013.
[55] Interview with Ron Peri on December 20, 2013.
[56] Interview with Shawn Ullerup on December 18, 2013.
[57] Id.
[58] Id.

Shawn Ullerup and Mary Anne Jarrell, had additional privileges to cancel reservations or charges

and make other modifications to existing reservations.[59]  The following user names, among

others, had the authority to cancel reservations:  JTull; kellison; mjarrell; sullerup; striggs and

aavis.[60]  Radixx maintained a log of all activity, including reaccommodations and

cancellations.[61]  Cancelling a reservation did not delete the record in its entirety.[62]  Despite

having a user name to access Radixx (i.e., JTull), Ms. Tull asserts that she never made or edited a

reservation while at Direct Air.[63]  It was against Direct Air's policy and reportedly uncommon

for a reservation agent or supervisor to access Radixx with a user name other than his or her

own.[64]

Direct Air had the capacity to generate reports from Radixx that could be printed or

downloaded.  Direct Air used Radixx's "web reports", which were reports generated from live

Radixx records.[65]  At one point, Radixx International was concerned that web reports could

contain inaccuracies and recommended that its clients use another form of reporting.[66]  Direct

Air declined to do so and continued using web reports despite being informed that Radixx

International had concerns with the accuracy of web reports.[67]

Direct Air frequently used the "Charter Escrow Detail Report" from Radixx.[68]  This

report totaled Direct Air's revenue for flights during a requested time period, and included

---

[59] Id.; see also Affidavit of Penelope A. Bley ("Bley Affidavit") ¶27 and Exhibit H.  The Bley Affidavit is separately
filed as an attachment to this Report with its own Exhibits A-I.
[60] Interview with Shawn Ullerup on December 18, 2013; Bley Affidavit ¶27 and Exhibit H.
[61] Interview with Greg Gent on October 10, 2013; Bley Affidavit ¶27.
[62] Id. at ¶27.
[63] Tull Tr. 122:4-11.
[64] Interview with Shawn Ullerup on December 18, 2013.
[65] Interview with Ron Peri on December 20, 2013.
[66] Id.
[67] Id.
[68] See generally (excerpt from) Direct Air's VNB Weekly Releases Binder.

subtotals by flight segment (i.e., the leg between each airport) and payment method.[69] Radixx

eventually discontinued the Charter Escrow Detail Report and Direct Air thereafter relied on a

"Cross Tab" report to obtain similar revenue information (the Charter Escrow Detail Report and

Cross Tab report, each a "Radixx Report").[70] The Radixx Reports contained only summary

flight data, not specific customer data.[71]

### E. Direct Air's Depository Accounts at VNB

The DOT Regulations require a public charter operator such as Direct Air to safeguard

payments made by customers for advance reservations.[72] Pursuant to the DOT Regulations, a

public charter operator may protect its customers in one of two ways: (a) posting a bond in an

amount equal to (or in some cases, multiples of) the charter price; or (b) placing customer funds

in a depository account with a designated bank, accompanied by a smaller bond.[73] Direct Air

elected the latter option and opened depository accounts with VNB.[74]

The Founding Members of Direct Air each understood that under this election, the DOT

Regulations required Direct Air to deposit and maintain customer payments in its depository

accounts at VNB until a customer's flight had flown.[75] They believed, however, that this applied

only to the portion of the charter price attributable solely to the flight—not to Ancillary Fees or

Family Ties membership fees.[76] Nevertheless, the express language of DOT Regulations

provides that "all payments by [customers] paid to charter operators or foreign charter operators

---

[69] See generally (excerpt from) Direct Air's VNB Weekly Releases Binder.

[70] Cross-Tab Report for departure dates December 29, 2011 to December 31, 2011 from Radixx.

[71] See generally (excerpt from) Direct Air's VNB Weekly Releases Binder; Cross-Tab Report for departure dates December 29, 2011 to December 31, 2011 from Radixx.

[72] 14 C.F.R. § 380.34.

[73] Id.

[74] Tull Tr. 46:23-24; Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006. Ms. Tull selected VNB as Direct Air's depository bank after working with VNB in her prior job at Hooters Air. Tull Tr. 47:8-48:3.

[75] Tull Tr. 46:25-47:7; K. Ellison Tr. 162:1-4; Warneck Tr. 74:15-21; Keilman Tr. 56:11-18, 76:21-77:4; S. Ellison Tr. 26:25-27:4.

[76] Tull Tr. 36:16-37:12, 239:7-9, 244:24-245:12; K. Ellison Tr. 162:1-19; Warneck Tr. 74:22-75:11, 108:22-109:10; Keilman Tr. 59:7-60:10.

and their retail travel agents <u>shall be deposited with and maintained by the [depository]</u> <u>bank</u>....”[77]

VNB has operated as a depository bank under the DOT Regulations since approximately 2000.[78]  VNB's responsibilities when acting as a depository bank and procedures for handling depository accounts are set forth in (a) the DOT Regulations, (b) the Public Charter Depository Agreement entered into by and among VNB, a public charter operator and an air carrier, and (c) VNB's Global Escrow Procedure Manual.[79]

Direct Air maintained two linked depository accounts at VNB.[80]  Account ending #4734 received customer payments for advance reservations and account ending #4554 was a money market account into which funds were transferred to earn a higher rate of interest.[81]  Funds moved freely between the two accounts but Direct Air could not release funds from either depository account (to pay itself or its vendors) without satisfying the requirements of the DOT Regulations and VNB's Global Escrow Procedure Manual (described in Section III.F <u>infra</u>).[82] The only deposits into Direct Air's depository accounts were customer payments for advance reservations (including Ancillary Fees for special service requests and Family Ties membership fees) and interest income.[83]  Credit and/or debit card (collectively, "credit card") processors

---

[77] 14 C.F.R. § 380.34(b)(2) (emphasis added).

[78] Lori Rooney individually and as designee of Valley National Bank Rule 2004 Examination Transcript ("VNB Tr.") 18:18-19:2.

[79] VNB Tr. 51:16-20, 82:11-16; <u>see generally</u> 14 C.F.R. § 380.34(b)(2); Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006; VNB Global Escrow Procedure Manual.

[80] VNB Tr. 81:8-15; <u>see also</u> <u>id.</u> at 70:20-72:23, 77:20-78:3.

[81] <u>Id.</u>; Bley Affidavit ¶10.

[82] VNB Tr. 70:20-72:23.

[83] Bley Affidavit ¶15.  At times, Direct Air's air carriers refunded money to Direct Air's depository accounts at VNB for flights that were not completed as scheduled.  Because these are refunds and not original deposits, these are not included in the analysis or discussion of deposits into Direct Air's depository accounts at VNB. <u>Id.</u>

deposited virtually all of the funds into Direct Air's depository accounts at VBN.[84]   On average,

credit card processors deposited funds into Direct Air's depository accounts within 1-3 days of

the charge being incurred by the passenger.[85]

JetPay was the credit card processer for both credit card and debit card transactions made

with MasterCard or Visa cards.[86]   Merrick funded the credit card or debit card payments and

deposited the funds into Direct Air's depository accounts at VNB.[87]   During the first few months

that Direct Air took reservations, JetPay deducted its credit card processing fees from the funds

deposited into Direct Air's depository accounts.[88]   In February 2007, JetPay reversed all of the

fees deducted from the depository accounts to date, re-deposited that amount in Direct Air's

depository accounts and withdrew its fees from a Direct Air operating account going forward.[89]

AMEX processed and funded its own credit card payments.  At all times, AMEX withdrew its

monthly processing fees from Direct Air's depository accounts at the beginning of the following

month.[90]   On average, JetPay and AMEX charged credit card processing fees equal to 3.3% of

the value of the credit card payments processed.[91]

The DOT Regulations required VNB to "maintain a separate accounting for each charter

group" within Direct Air's depository accounts at VNB.[92]   "Charter group" refers to each flight

operated by a public charter operator.[93]   Accordingly, VNB must account for all funds in Direct

---

[84] Id. Payments recorded in Radixx are differentiated by the type of card used (i.e., MasterCard, Visa, American Express or Discover Card), but Radixx did not differentiate between credit and debit transactions.  Id.  Both credit and debit card payments are referred to herein as "credit card" payments.
[85] Interview with JetPay on September 11, 2013; Tull Tr. 81:9-13.
[86] Interview with JetPay on September 11, 2013.
[87] Id.
[88] Bley Affidavit ¶18.
[89] Id.
[90] Id.
[91] Id. at ¶19.
[92] 14 C.F.R. § 380.34(b)(2)(vii).
[93] Interview with Andrea Handel, Lisa Swafford-Brooks, Charles Smith and Paula Lee (DOT) on September 20, 2013.

Air's depository accounts on a flight-by-flight basis.[94]  An important purpose of this requirement

is to ensure that there are sufficient funds in a public charter operator's depository account for

each flight, and that funds paid for future flights are not used for current flights for which there

are insufficient funds.[95]  VNB understood that the DOT Regulations, Public Charter Depository

Agreements and VNB's own Global Escrow Procedure Manual required VNB to maintain a

flight-by-flight accounting for funds deposited in a public charter operator's depository

account.[96]

In order to comply with the DOT Regulations requiring a flight-by-flight accounting,

VNB established a separate sub-accounting system.[97]  Funds did not actually transfer to different

accounts within VNB; rather, the sub-accounting system was an internal control at VNB to track

and account for all of the funds within each depository account.[98]  When VNB received a deposit

into Direct Air's depository accounts, the funds were initially "unallocated", meaning that there

was no accompanying information to identify with which flight the funds were associated.[99]

Unallocated funds are designated within VNB's system with a sub-account number starting with

"U".[100]  In order to allocate funds from a U account, VNB needed information regarding with

which flight the deposited funds were associated.[101]  VNB designated allocated funds with sub-

accounts beginning with "K".[102]  Funds had to be accounted for before funds could be released

---

[94] VNB Tr. 178:25-179:7.

[95] Interview with Lisa Swafford-Brooks (DOT) on January 31, 2014.

[96] VNB Tr. 98:9-22, 178:25-179:7; Supplemental Certification of Lori Rooney In Further Support Of Valley National Bank's Motion for Summary Judgment ¶7 in Discovery Financial Services, LLC v. Valley National Bank, No. 06-cv-12932-AKH [Doc. No. 48-2] filed February 1, 2008; see also 14 C.F.R. § 380.34(b)(2)(vii); Public Charter Depository Agreement between Direct Air, Sky King, Inc. and VNB dated October 20, 2006 at Section 1.3; VNB Global Escrow Procedure Manual at Section III(1).

[97] Supplemental Certification of Lori Rooney In Further Support of Valley National Bank's Motion for Summary Judgment ¶7; VNB Global Escrow Procedure Manual at Section III(1).

[98] VNB Tr. 102:16-19; VNB Global Escrow Procedure Manual at Section III(1).

[99] VNB Tr. 223:3-7; see id. at 90:12-91:2.

[100] Id. at 90:12-24; VNB Global Escrow Procedure Manual at Section III(1)(A).

[101] VNB Tr. 178:22-24.

[102] VNB Global Escrow Procedure Manual at Section III(1)(A).

from a depository account.[103]  VNB's system would not allow VNB to release funds from a U

account.[104]  VNB could only release funds from a K account.[105]  On a daily basis, VNB

provided a Daily Financial Report to Direct Air reflecting the current balance of Direct Air's

depository accounts and daily activity in every sub-account, including U accounts and K

accounts.[106]

At the very outset of Direct Air's operations, Ms. Tull periodically emailed a detailed

customer-by-customer report of advance reservations to Lori Rooney at VNB.[107]  For example,

the report Ms. Tull sent VNB on March 13, 2007 contained over 30,000 separate lines of

customer reservation data.[108]  Ms. Tull believed this information would allow VNB to account

for customer payments in Direct Air's depository accounts.[109]  However, VNB was unable to

establish sub-accounts by flight based on these initial reports because the reports failed to

provide flight revenue totals.[110]  VNB lacked the capacity to aggregate this large volume of

customer data into flight-by-flight revenue totals.[111]

Due to the size of the detailed customer-by-customer report, Direct Air soon experienced

technical problems generating and sending this report to VNB.[112]  On or about June 13, 2007,

Ms. Tull notified VNB by fax that Direct Air would thereafter send only summary flight revenue

reports, with supporting detail available for VNB to access directly in Radixx.[113]  Ms. Tull

---

[103] Id.

[104] VNB Tr. 91:10-92:2, 93:6-10; VNB Global Escrow Procedure Manual at Section III(1)(A).

[105] VNB Global Escrow Procedure Manual at Section III(1)(A).

[106] See generally (excerpt from) Direct Air's Escrow Banking Report '07 binder (November 28, 2007 to November 30, 2007).

[107] Email from Judy Tull to Lori Rooney dated March 5, 2007 with 1-page excerpt from attachment (redacted to protect customer information); email from Judy Tull to Lori Rooney dated March 13, 2007 with 1-page excerpt from attachment (redacted to protect customer information); Tull Tr. 78:1-24; VNB Tr. 183:3-12.

[108] See email from Judy Tull to Lori Rooney dated March 13, 2007 with 1-page excerpt from attachment.

[109] Tull Tr. 84:10-15.

[110] VNB Tr. 182:22-183:19, 185:13-186:6.

[111] Id. at 188:7-17.

[112] Fax from Judy Tull to Lori Rooney dated June 13, 2007; Tull Tr. 79:21-23, 81:14- 82:10, 86:12-19.

[113] Fax from Judy Tull to Lori Rooney dated June 13, 2007.

believed that VNB then had the necessary information to allocate Direct Air's depository

accounts at VNB based on the summary reports (i.e., the Radixx Reports) she submitted and

VNB's access to detailed information directly in Radixx.[114]  Although Direct Air offered VNB

means to access and verify flight information in Radixx, VNB never attempted to access Radixx

at any time to verify flight revenue or other information provided by Direct Air.[115]

      After June 13, 2007, the only flight information Direct Air submitted to VNB was in

conjunction with seeking the release of funds from the depository accounts to pay Direct Air's

air carriers for flight operations and release flight revenue to Direct Air after flights were

completed.[116]  It is the latter request to release flight revenue to Direct Air that is relevant to this

report.  As described _infra_, on a weekly basis, Direct Air sent a release request ("release

request") to VNB with a Radixx Report to trigger the release of funds from Direct Air's

depository accounts to its own operating accounts or to one or more of Direct Air's vendors.[117]

Direct Air did not send a Radixx Report or any other flight information contemporaneously with

the payment of customer funds into the depository accounts.[118]  Because of the delay inherent in

a customer's booking/paying for advance reservations and actually travelling, this practice

resulted in large amounts of Direct Air's customers' payments sitting unaccounted in U accounts

at VNB.[119]  VNB believed—and still maintains—that the DOT Regulations did not require

flight-by-flight allocation of funds to occur at any particular time.[120]  VNB further believed that

it was permissible under the DOT Regulations for funds in a depository account to remain

unallocated for as long as it takes—even several months—for flight information to be provided

---

[114] Tull Tr. 87:2-88:16.
[115] VNB Tr. 192:10-15.
[116] Bley Affidavit ¶11.
[117] See generally (excerpt from) Direct Air's VNB Weekly Releases binder.
[118] VNB Tr. 223:3-7.
[119] Id. at 204:7-15, 237:18-22.
[120] Id. at 203:4-17, 205:4-19.

in a form convenient for VNB.[121]  However, it is inconsistent with the spirit and purpose of the

DOT Regulations for customer funds to remain unaccounted for in depository accounts for

significant periods of time.[122]

### F.  Release of Funds from Direct Air's Depository Accounts
for Completed Flights

The DOT Regulations dictate the timing and conditions for release of funds from a

depository account.[123]  With limited exceptions for advance payments to air carriers and credit

card processing fees, funds for a particular flight in a depository account may only be released to

a public charter operator after the public charter operator and the air carrier certify that the flight

was completed.[124]

After flight operations began in March 2007, Direct Air began sending weekly release

requests to VNB for completed flights, requesting the release of funds from its depository

accounts at VNB to Direct Air's general operating accounts.[125]  Typically, Ms. Tull would obtain

a Radixx Report herself or from Ms. Ellison and Ms. Tull would then use the information in the

Radixx Report to prepare a release request.[126]  The release request identified and certified that

each flight from the prior week was completed, listed the air carrier, and totaled the revenue per

flight.[127]  Family Ties vouchers that had been redeemed for a seat on a completed flight would be

included in this request, similar to any other reservation.[128]  The release request also identified

the amount paid in advance to air carriers for the prior week's flights.[129]  At the bottom of each

release request, Direct Air requested the remaining balance (gross flight revenue less expenses

---

[121] Id. at 202:15-205:19.
[122] Interview with Lisa Swafford-Brooks (DOT) on January 31, 2014.
[123] 14 C.F.R. § 380.34(b)(2)(ix).
[124] Id.
[125] See generally (excerpt from) Direct Air's VNB Weekly Releases binder.
[126] K. Ellison Tr. 132:3-25; Tull Tr. 90:4-91:7; interview with Judy Tull and Kay Ellison on September 25, 2013.
[127] See generally (excerpt from) Direct Air's VNB Weekly Releases binder.
[128] Bley Affidavit ¶24.
[129] See generally (excerpt from) Direct Air's VNB Weekly Releases binder.

already paid) be paid to Direct Air or on occasion, to one or more of Direct Air's vendors.[130]

Ms. Tull faxed and emailed release requests to Ms. Rooney's attention at VNB on a weekly

basis, accompanied by a Radixx Report.[131] The air carrier for each listed flight separately

provided a certification to VNB that it had completed those flights.[132]

Upon VNB's receipt of the above documentation for a week's flights, VNB's procedure

was to check that the figures from the release request matched the accompanying report totals

and VNB's records for prepayments on those flights.[133] This was nothing more than verification

that Direct Air's figures and calculations were accurate.[134] If so—and on occasion despite

inaccuracies in Direct Air's figures—VNB authorized payment of the amount Direct Air

requested from its depository accounts without further inquiry or investigation.[135]

Because large amounts of Direct Air's depository funds sat in U accounts, VNB first

needed to create K accounts for the funds to be released.[136] VNB would use the information

from Direct Air's release request to set up a single K account for the net amount due to Direct

Air for a prior week's flights.[137] VNB never attempted to verify that the total flight revenue

Direct Air reportedly generated with respect to a particular flight was actually paid by Direct

Air's customers for that flight into Direct Air's depository accounts at VNB. VNB also never

attempted to verify that there was sufficient money remaining in Direct Air's depository

---

[130] See generally id.

[131] Tull Tr. 68:13-24; see generally (excerpt from) Direct Air's VNB Weekly Releases Binder (December 21, 2007 to May 28, 2008).

[132] 14 C.F.R. § 380.34(b)(2)(ix); VNB Tr. 227:14-19; Tull Tr. 96:12-24.

[133] VNB Tr. 64:11-24, 230:11-18, 231:15-21, 231:22-232:11.

[134] Id. at 230:11-18, 231:15-21, 231:22-232:11.

[135] VNB Tr. 231:15-21. On the Direct Air release request dated June 4, 2009, the reported revenue collected for flights flown the prior week totaled $419,515.07. Release Request and Charter Escrow Detail Report dated June 4, 2009. The accompanying Radixx Report showed $419,551.07. Id. Ms. Rooney admitted that VNB's role was to check that the totals reported are accurate and in this circumstance, someone from VNB should have—but did not—picked up on the inaccurate revenue total reported on the release request. VNB Tr. 230:11-23, 232:12-16.

[136] VNB Global Escrow Procedure Manual at Section III(1)(A).

[137] VNB Tr. 233:10-234:4; VNB Global Escrow Procedure Manual at Section III(1)(A).

accounts to cover advance reservations for flights that had not yet flown.  Because funds sat in U

accounts for extended amounts of time, VNB had no way to verify this information, even if it

wanted to.

Over the course of Direct Air's operations, Direct Air's depository accounts at VNB had

a minimum month-end aggregate balance of $151,206.39 and a maximum month-end aggregate

balance of $4,221,674.51.[138]  On average, the month-end aggregate balance in the depository

accounts at VNB was $1,591,712.78.[139]

Ultimately, after authorizing the release request, VNB wired funds to a Direct Air

operating account at another bank or to one or more of Direct Air's vendors, as instructed in the

release request.[140]  Those funds would then be free from any DOT restrictions and Direct Air

could use the funds in its operating account in any manner it wished.

### G.  Release of Funds from Direct Air's Escrow Account for Family Ties Membership Fees

The Founding Members of Direct Air believed that Family Ties membership fees were

not subject to the depository account requirements of the DOT Regulations.[141]  Instead of

following the above procedure for the release of funds, Ms. Ellison, Ms. Tull and on one

occasion Mr. Keilman simply directed VNB to release membership fees after Family Ties sales

were completed.[142]  Direct Air never certified to VNB that the vouchers associated with the

requested membership fees had been used for flights.[143]  Given the timing of the release requests,

it is unlikely that the vouchers had been redeemed for flights before the membership fees were

requested and paid out of Direct Air's depository account.

---

[138] Bley Affidavit ¶14 and Exhibit C.
[139] Id.
[140] Id. at ¶28.
[141] Tull Tr. 138:21-139:10; Warneck Tr. 75:3-11, 109:3-10; K. Ellison Tr. 162:1-7.
[142] Bley Affidavit Exhibit E.
[143] (Excerpt from) Direct Air's VNB Weekly Releases binder at pgs. 129-131.

For example, Direct Air held a Family Ties sale from December 8-10, 2007.[144] Direct Air sold over 7,000 Family Ties vouchers during that sale, each with a $50 membership fee.[145] The vouchers associated with these membership fees could be redeemed for available flights through October 2008.[146] Two weeks after the Family Ties sale, on December 21, 2007, Ms. Tull faxed a request to VNB to release $260,650.00 representing the membership fee for 5,213 of the Family Ties vouchers sold.[147] On December 24, 2007, VNB wired the funds to Direct Air's operating account as requested.[148] Direct Air then requested the balance of the membership fees from that Family Ties sale, which VNB paid to Direct Air on January 23, 2008.[149] Similarly, Direct Air held another Family Ties sale in April 2011, selling 25,472 Family Ties vouchers valid for travel through April 2012.[150] Each voucher included a $60 membership fee.[151] By May 17, 2011, Direct Air requested and VNB paid Direct Air $1,506,900.00 from Direct Air's depository accounts at VNB, nearly all of the membership fees paid as part of the April 2011 Family Ties sale.[152] These examples are typical of the procedures Direct Air used to obtain the release of Family Ties membership fees throughout Direct Air's operations.

From the beginning of operations, Direct Air had a policy that its agents would delete Family Ties membership fees from a reservation record when the voucher was redeemed for a seat on an actual flight.[153] Pursuant to such policy, when the voucher was redeemed the revenue shown as paid for the flight would be the amount paid by the customer less the membership

---

[144] Id.
[145] Id.
[146] Id.
[147] Id.
[148] Id. at pg. 117.
[149] Id.
[150] Email from Judy Tull to Lori Rooney dated May 17, 2011.
[151] Id.
[152] Id.
[153] Correspondence from Reese Boyd, Esq. to Jessica Murphy, Esq. dated December 18, 2013 at pgs. 4-5.

fee.[154]  Mr. Ullerup confirmed that during the first six (6) months of operations, Direct Air deleted Family Ties membership fees from customers' reservation records when vouchers were redeemed for seats.[155]  This practice was discontinued by December 2007 when reservation activity increased.  The Founding Members did not enforce the policy.[156]

When Direct Air's policy was not followed, the revenue in Radixx associated with a redeemed Family Ties voucher was the full amount paid by the customer <u>including</u> the membership fee.[157]  That resulted in Direct Air being paid twice from the depository accounts at VNB for Family Ties membership fees:  (a) once when Direct Air separately requested the membership fees and (b) again as part of a release request for the completed flight.  Both Ms. Tull and Ms. Ellison have acknowledged that at times release requests would contain a request for Family Ties membership fees already separately requested and paid to Direct Air.[158]

VNB acquiesced to Direct Air's request for the immediate release of Family Ties membership fees without question.  During the Trustee's investigation, VNB was unable to explain why customer payments for Family Ties membership fees were not subject to the DOT Regulations depository account requirements and could be paid in the manner that VNB paid them.[159]

## V.  <u>DISCOVERING THE SHORTFALL AND THE SALE OF DIRECT AIR</u>

The Founding Members of Direct Air testified as part of this investigation that they first discovered a shortfall in Direct Air's depository accounts at VNB in connection with efforts to

---

[154] <u>Id.</u>
[155] Interview with Shawn Ullerup on December 18, 2013.
[156] <u>Id.</u>
[157] Correspondence from Attorney Boyd to Attorney Murphy dated December 18, 2013 at pgs. 4-5
[158] <u>Id.</u> at pg. 5.
[159] VNB Tr. 172:2-18.

sell Direct Air to Vision Airlines in late 2009.[160]  The Founding Members explored selling Direct

Air at this time because of the rising expenses in aviation (i.e., air carriers and fuel) and the

generally poor financial condition of Direct Air as a public charter operator.[161]  The Founding

Members were aware that Direct Air was never profitable and that Direct Air operated at a loss

every year.[162]

   All of the Founding Members failed to testify with any certainty regarding the amount of

the shortfall or how they first learned of it.[163]  Notwithstanding the Founding Members'

testimony that they did not learn of the shortfall until late 2009, as a result of Ms. Ellison and

Ms. Tull's intimate involvement with Direct Air's depository accounts at VNB and Radixx, both

Ms. Ellison and Ms. Tull could have discovered the existence and amount of the shortfall from

the beginning.  In addition, Mr. Keilman obtained information from Ms. Ellison at the end of

2009/beginning of 2010 that allowed him to create his own escrow analysis, showing an

estimated shortfall in Direct Air's depository accounts at VNB.[164]  Since Mr. Keilman was able

to obtain information to identify and calculate a shortfall in Direct Air's depository accounts at

VNB in 2009/2010, it is reasonable to expect he could have obtained information showing a

shortfall earlier if he had simply requested it.

   None of the Founding Members could precisely account for how the shortfall

occurred.[165]  Mr. Keilman, however, admits that the shortfall was caused by Direct Air

requesting and VNB releasing funds from Direct Air's depository accounts at VNB that should

---

[160] Tull Tr. 182:4-183:1; K. Ellison Tr. 222:10-224:1; Warneck Tr. 126:2-16; Keilman Tr. 164:5-165:10; S. Ellison
    Tr. 28:23-29:25.
[161] S. Ellison Tr. 28:25-29:12.
[162] Tull Tr. 62:9-15; Warneck Tr. 47:21-48:7; Keilman Tr. 157:18-21; S. Ellison Tr. 25:12-22.
[163] Tull Tr. 183:2-19, 189:14-22; K. Ellison Tr. 222:10-224:1; Warneck Tr. 126:2-16; Keilman Tr. 164:5-165:10; S.
    Ellison Tr. 28:23-29:25.
[164] Escrow Analysis spreadsheet.
[165] Tull Tr. 235:11-14, 236:17-23; S. Ellison Tr. 34:7-10.

not have been released.[166]  Rather than identify and address the root of the shortfall, the

Founding Members focused on finding a solution to the situation through one of the following

options:  (a) merge with a direct air carrier to reduce costs and "fly off" the shortfall; (b) sell

Direct Air; or (c) obtain additional investments and infusions of cash.[167]  The Founding

Members decided to pursue the sale of Direct Air.[168]  Although the Founding Members disclosed

the existence of a shortfall to potential buyers, the Founding Members failed to disclose the

existence of the shortfall to any members of the Direct Air staff, its counsel, its creditors, or any

of its banks, including VNB, where the shortfall occurred.[169]

    Thereafter, the Founding Members engaged in serious and extended discussions

regarding a sale of Direct Air to TMC Avion, Inc. ("TMC Avion").  Although the parties

executed a Purchase Agreement on April 22, 2011, Direct Air ultimately withdrew from the

transaction.[170]  The Founding Members' decision not to sell Direct Air to TMC Avion was based

on representations made by Jeff Conry (at the time a TMC Avion employee/contractor) about

TMC Avion's purported inability to finance the transaction and its intention to move Direct Air

to California.[171]  But for Mr. Conry's representations, which the Founding Members later

discovered were false, the Founding Members would have completed a sale of Direct Air to

TMC Avion.[172]  Instead, Jeff Conry referred the Founding Members to Hank Torbert, an investor

who was looking to purchase a company involved in the aviation industry.[173]

    Although Mr. Torbert was experienced in investing in a variety of private companies,

---

[166] Keilman Tr. 271:12-24 ("We were taking money out that we shouldn't have taken out, that's true…").
[167] K. Ellison Tr. 267:20-268:5.
[168] Keilman Tr. 270:12-24.
[169] Tull Tr. 234:13-235:4; K. Ellison Tr. 270:1-3; Warneck Tr. 149:7-10; Baldwin Tr. 31:23-32:6.
[170] Correspondence from Robert Keilman and Judy Tull to Bob Yari (TMC Avion) dated June 7, 2011.
[171] Tull Tr. 235:18-236:3; K. Ellison Tr. 310:4-316:21;Warneck Tr. 197:7-19, 204:4-10, 210:1-6; Keilman Tr. 192:9-193:12; S. Ellison Tr. 37:17-38:13.
[172] See note 169.
[173] See note 169.

Direct Air would be his first investment in an aviation company.[174]  Donald Stukes, of Stukes

Atwood, LLC, first introduced Mr. Torbert to the idea of investing in the aviation industry.[175]

Mr. Stukes' background was in commercial airline operations where he bought and sold aircraft,

and consulted on mergers and acquisitions for air carriers.[176]  Mr. Stukes had no experience with

public charter operators, which are governed by separate DOT Regulations.[177]

The Founding Members and Mr. Torbert ultimately negotiated the sale of Direct Air to

Mr. Torbert's entity, Avondale Aviation I, LLC ("Avondale").[178]  Mr. Torbert was minimally

aware at the time that Avondale first submitted a proposal for the acquisition to Direct Air on

July 13, 2011 that Direct Air had a shortfall in its depository accounts at VNB.[179]  In connection

with the acquisition, Ms. Ellison prepared a spreadsheet showing the shortfall in Direct Air's

depository accounts at VNB based on information she obtained from Radixx and from VNB

statements.[180]  On September 12, 2011, she circulated a spreadsheet to the other Founding

Members with the then-current shortfall calculations.[181]  This spreadsheet became Exhibit F to

the Membership Interest Purchase Agreement that, in part, documented the acquisition.[182]

According to Ms. Ellison's calculations, as of September 12, 2011, the gross shortfall for

customer airfare payments in Direct Air's depository accounts at VNB was $11,916,295.[183]

After accounting for permissible exceptions from the depository accounts, such as prepaid fuel

and air carriers, and credit card processing fees, Ms. Ellison calculated the net shortfall

---

[174] Interview with Hank Torbert on December 11, 2013.
[175] Id.
[176] Interview with Donald Stukes on December 17, 2013.
[177] Id.
[178] Membership Interest Purchase Agreement.
[179] Correspondence from Hank Torbert to Judy Tull dated July 13, 2011 at pg. 2.  Avondale's proposal tied profit
      sharing for equity partners to a 100% liquidation of the "DOT escrow liability."  Id.
[180] K. Ellison Tr. 296:25-297:15; interview with Kay Ellison on September 25, 2013.
[181] Email from Kay Ellison to Judy Tull, Ed Warneck and Bob Keilman dated September 2011 with 2011-2012
      Escrow Revenue as of 9/12/2011 spreadsheet attachment.
[182] 2011-2012 Escrow Revenue as of 9/12/2011 spreadsheet (Exhibit F to the Membership Interest Purchase
      Agreement).
[183] Id.

associated with Direct Air's flight operations was $5,475,729.[184]  As part of the Trustee's

investigation, Ms. Ellison explained to the Trustee's counsel that there was an <u>additional</u>

shortfall at the time of $7,077,036 associated with the Family Ties program.[185]  Although none

of the Founding Members were able to precisely describe the Family Ties shortfall calculation

during the Trustee's investigation, some of the Founding Members suggested that it arose from

the release of Family Ties membership fees from the depository accounts at VNB before those

customers completed their travel.[186]  Ms. Ellison stated that her spreadsheet shows that the

shortfall in Direct Air's depository accounts at VNB was $12,552,765 as of September 12,

2011.[187]

During the Trustee's investigation, Ms. Ellison asserted that she explained the total

shortfall figures to Mr. Torbert before completing the sale of Direct Air to Avondale.[188]  Mr.

Torbert states that during due diligence for the acquisition of Direct Air, he was aware only that

the shortfall was approximately $5 million.[189]  However, as of August 31, 2011, the Trustee's

forensic accounting indicates that the approximate shortfall in Direct Air's depository accounts at

VNB was actually $27,903,238.27.[190]

On September 29, 2011 (the "Closing Date"), Direct Air and the Founding Members

entered into a Membership Interest Purchase Agreement with Avondale and Stukes Atwood,

LLC (with Avondale, the "Buyers").[191]  For Mr. Stukes' assistance in closing the deal with

---

[184] <u>Id.</u>
[185] K. Ellison Tr. 303:22-304:15.
[186] Keilman Tr. 180:10-17; Warneck Tr. 157:19-159:12; Tull Tr. 232:17-233:25; K. Ellison Tr. 303:22-304:15.
[187] K. Ellison Tr. 303:22-304:15; <u>see</u> 2011-2012 Escrow Revenue as of 9/12/2011 spreadsheet (Exhibit F to the Membership Interest Purchase Agreement).
[188] K. Ellison Tr. 304:16-305:2.
[189] Direct Air §341 Meeting Transcript (June 13, 2012) at pgs. 12, 36; interview of Hank Torbert on December 11, 2013; interview of Donald Stukes on December 17, 2013.
[190] Bley Affidavit ¶22 and Exhibit C.
[191] Membership Interest Purchase Agreement.

Direct Air, Stukes Atwood, LLC received nominal shares of the company at closing.[192]  The

Buyers initially purchased 55% of the Founding Members' shares in Direct Air in exchange for

an infusion of cash, a Promissory Note by Avondale in favor of the Founding Members in the

amount of $750,000.00, plus security for Direct Air's $3,000,000 line of credit with its main fuel

supplier, Chemoil Corporation d/b/a Chemoil Aviation.[193]  The Buyers had an obligation to

purchase 45% of the Founding Members' remaining shares of Direct Air upon the acquisition of

an operating airline with a valid Airline Operating Certificate ("AOC") using funding from the

Buyers or another acquisition company.[194]  On December 22, 2011, Avondale Aviation II, LLC,

an acquisition company related to Avondale, acquired Swift Air, LLC.[195]  At the time, Swift Air,

LLC was an operating airline with a valid AOC.[196]  Without legal justification or excuse, the

Buyers took no steps to purchase 45% of the Founding Members' remaining shares of Direct Air

as required by the express terms of the additional purchase trigger in the Membership Interest

Purchase Agreement.[197]

The Trustee's forensic accounting shows that the shortfall in Direct Air's depository

accounts at VNB on September 30, 2011, the day after the Closing Date, was approximately

$29,760,298.74, over $17 million more than Ms. Ellison's calculation of the shortfall.[198]

## VI.  POST-ACQUISITION

After the acquisition, each of the Founding Members except for Mr. Keilman continued

---

[192] Interview of Hank Torbert on December 11, 2013.
[193] Membership Interest Purchase Agreement; Promissory Note dated September 29, 2011; Direct Air §341 Meeting Transcript (June 13, 2012) at pg. 10; interview of Hank Torbert on December 11, 2013.
[194] Membership Interest Purchase Agreement; interview of Hank Torbert on December 11, 2013.
[195] Interview of Hank Torbert on December 11, 2013.
[196] Id.; In re: Swift Air, LLC, No. 12-14362 (Ariz.).  Swift Air, LLC filed for bankruptcy protection on June 27, 2012.
[197] Interview of Hank Torbert on December 11, 2013.
[198] Bley Affidavit ¶22 and Exhibit C.

to work at Direct Air in largely the same roles that each had prior to the acquisition.[199]  Mr.

Keilman was the only Founding Member that did not continue employment with Direct Air after

the Closing Date.[200]  Avondale did not make any significant changes to the operations of Direct

Air or the level of responsibility given to Ms. Tull, Ms. Ellison, Mr. Ellison or Mr. Warneck.[201]

Despite knowledge of the shortfall, Mr. Torbert failed to change the procedure for requesting the

release of funds from Direct Air's depository accounts at VNB.[202]  Mr. Torbert left the Founding

Members with full access to Direct Air's depository accounts at VNB.[203]  Mr. Torbert himself

did not have access to Direct Air's bank accounts at VNB until two days prior to the Petition

Date.[204]

Mr. Torbert and Mr. Stukes were not active in the daily operations of Direct Air.[205]

Instead, they engaged Mr. Conry, Wayne Greene and Bryan Kornreich, at different times and in

different capacities, to discern a full financial picture of Direct Air, without success.[206]  Efforts to

obtain detailed information were purportedly hampered by Ms. Ellison, who would not provide

financial information when requested.[207]

From the financial information Mr. Torbert accessed, as of early February 2012, Mr.

Torbert believed the shortfall in Direct Air's depository accounts was $11 million.[208]  In fact, as

of January 31, 2012, the Trustee's forensic accounting shows that the approximate shortfall in

---

[199] Warneck Tr. 210:19-211:14; S. Ellison Tr. 40:10-41:3; interview with Hank Torbert on December 11, 2013.
[200] Keilman Tr. 265:12-21.  Mr. Keilman asserts he had no responsibilities or duties to Direct Air after the Closing Date.  Id.
[201] See note 197 supra.
[202] Interview with Hank Torbert on December 11, 2013.
[203] See Direct Air's Resolution of Directors Regarding Bank Account and Authorized Parties dated March 13, 2011 (submitted for the first time to VNB two days prior to the Petition Date).
[204] Id.; interview with Hank Torbert on December 11, 2013.
[205] Interview with Hank Torbert on December 11, 2013; interview with Donald Stukes on December 17, 2013.
[206] Interview with Hank Torbert on December 11, 2013; interview with Donald Stukes on December 17, 2013; interview with Wayne Greene on December 10, 2013; interview with Bryan Kornreich on December 13, 2013.
[207] Interview with Hank Torbert on December 11, 2013; interview with Donald Stukes on December 17, 2013; interview with Wayne Greene on December 10, 2013; interview with Bryan Kornreich on December 13, 2013.
[208] Interview with Hank Torbert on December 11, 2013.

Direct Air's depository accounts at VNB was $33,091,861.09.[209]  Under Avondale's ownership

of Direct Air, the shortfall had worsened during the four (4) months from the Closing Date

through January 31, 2012 by over $3 million.[210]  During this time, Ms. Ellison and Ms. Tull

continued to exclusively manage Direct Air's relationship with VNB and prepare and transmit

release requests to access funds in Direct Air's depository accounts at VNB.[211]

Direct Air ultimately ceased flight operations on March 13, 2012, without making

arrangements for customers who had departed on round-trip travel.  Direct Air never resumed

operations before the Petition Date.

## VII. DISSIPATION OF THE DEPOSITORY ACCOUNT FUNDS

At the time Direct Air ceased operations, records in Radixx show that customers had

already paid Direct Air a total of $33,005,883.69 for travel after March 13, 2012.[212]  Pursuant to

the DOT Regulations, this was the maximum amount that should have been in Direct Air's

depository accounts at VNB as of the Petition Date.   Permissible withdrawals from Direct Air's

depository account at VNB as of the Petition Date were:  (a) credit card companies' processing

fees[213] charged on advance reservations in the amount of $813,481.19 and (b) advance payments

to air carriers[214] in the amount of $572,269.00.[215]  In addition, the amount in Direct Air's

depository accounts at VNB would not include customer credit card payments that had been

processed in the days before Direct Air ceased operations but not yet funded into Direct Air's

---

[209] Bley Affidavit ¶22 and Exhibit C.
[210] Id. at Exhibit C.
[211] Ms. Tull resigned her employment at Direct Air in February 2012. Tull Tr. 17:22-18:6; Direct Air §341 Meeting
    Transcript (June 13, 2012) at pgs. 74-75.  During Ms. Tull's absence, Ms. Ellison had sole responsibility for
    preparation of the release requests. K. Ellison Tr. 132:20-25.  Ms. Tull returned to the company as a consultant
    in early March 2012 and was involved in Direct Air's depository accounts at VNB, including preparing and
    transmitting release requests to access funds from Direct Air's depository accounts, until Direct Air ceased
    operations approximately a week later.  Tull Tr. 17:22-18:6.
[212] Bley Affidavit ¶20 and Exhibit C.
[213] 14 C.F.R. § 380.34(b)(2)(i).
[214] 14 C.F.R. § 380.34(b)(2)(ii).
[215] Bley Affidavit ¶21-22.

depository account at VNB.[216]  These credit card charges were never funded.[217]  Unfunded credit

card charges at the time Direct Air ceased operations totaled $213,833.80.[218]  Taking into

account the permissible withdrawals and unfunded credit card charges, the minimum balance in

Direct Air's depository accounts on the Petition Date required by DOT Regulations was

$31,406,299.70.[219]  The actual balance of the depository accounts at VNB at that time was

$1,016,935.91, creating an impermissible shortfall of $30,389,363.79.[220]

The Trustee, through his investigation, has identified three main sources of the

dissipation of funds from Direct Air's depository accounts at VNB accounting for 85.5% of the

shortfall:  (a) $12,175,928.50 from the withdrawal of Family Ties membership fees twice; (b)

$8,323,734.82 in inflated flight revenue; and (c) $5,543,750.80 in funds requested from the

depository accounts at VNB that had not been deposited in those accounts. [221]

## A.  Family Ties Membership Fees

Despite Direct Air's stated policy of deleting membership fees from reservation records

when Family Ties vouchers were redeemed, that policy was not enforced by the end of 2007.[222]

As a result, beginning in December 2007, when Family Ties vouchers were redeemed for seats

on a flight, revenue for those seats included the $40-$60 Family Ties membership fees.[223]

Radixx records confirm that thousands of seats on flights flown after December 2007 included

revenue from Family Ties membership fees.[224]  When customers flew using Family Ties

vouchers, a Radixx Report generated for those flights included Family Ties membership fees in

---

[216] Bley Affidavit ¶23.
[217] Id. at ¶16.
[218] Id. at ¶16 & 23.
[219] Id. at ¶23.
[220] Id.
[221] Id. at ¶26-29.
[222] Interview with Shawn Ullerup on December 18, 2013.
[223] Bley Affidavit ¶26.
[224] Id.

the flights' revenue figures.[225]  The flight revenue figure from a Radixx Report was reported on

Direct Air's release request and VNB released the amount requested from Direct Air's

depository accounts.[226]

    After every Family Ties sale, Direct Air separately requested that VNB immediately

release the membership fees for the Family Ties vouchers sold.[227]  VNB complied and promptly

paid the requested amount from Direct Air's depository accounts for the Family Ties

membership fees.[228]  With Family Ties membership fees included in the flight beginning in

December 2007, every separate request for Family Ties membership fees after that time resulted

in Direct Air withdrawing each Family Ties membership fee twice.[229]  From December 2007 to

March 2012, Family Ties membership fees totaling $12,175,928.50 were separately requested by

Ms. Tull (22 requests), Ms. Ellison (12 requests) and Mr. Keilman (1 request).[230]

    During the Trustee's investigation, Ms. Ellison described the Family Ties membership

fees as an "issue" when discussing the shortfall.[231]  In fact, Ms. Tull and Ms. Ellison were aware

that Direct Air's policy of deleting Family Ties membership fees from reservation records was

not being enforced.[232]  Both further acknowledged that without deleting the membership fees,

the funds requested in Direct Air's release requests to VNB exceeded the amount to which Direct

Air was entitled.[233]  This resulted in dissipation of funds from Direct Air's depository accounts

in the amount of $12,175,928.50.[234]

B.  Inflating Flight Revenue

---

[225] Id.
[226] See Report Section IX(G) supra.
[227] See Report Section IX(G) supra.
[228] Bley Affidavit ¶26 and Exhibit F.
[229] Id.
[230] Id.
[231] K. Ellison Tr. 223:24-224:1.
[232] Correspondence from Reese Boyd, Esq. to Jessica Murphy, Esq. dated December 18, 2013 at pgs. 4-5.
[233] Id.
[234] Bley Affidavit ¶26.

Another way that funds were dissipated from Direct Air's depository accounts was by inflating the revenue reported for each flight in Direct Air's release requests. Because each release request for a completed flight was supported by a Radixx Report stating the total flight revenue collected, the flight revenue on the release request could not simply be increased. Instead, new customers were routinely added to flights in Radixx that artificially inflated the revenue totals on the Radixx Reports.[235]

Between February 12, 2008 and November 10, 2010, several thousand customers were added en masse to Direct Air flights after the flights were completed.[236] Indicia of fraud with respect to the addition of these customers were: (a) the customers were added in large numbers to flights more than twenty-four (24) hours _after_ the flight's departure date; (b) revenue reported for each customer was the same amount and identified as having been paid in cash; (c) there are no records of corresponding cash deposits for these customers; (d) the additions were typically made the day before or on the day that Direct Air printed a Radixx Report showing flight revenue totals to support a release request; and (e) after Radixx Reports had been printed and release requests submitted, most of these added customers were then cancelled from the flight.[237] Cancellation of these customers would avoid imposition of Federal Excise Taxes.

The following is a summary of Radixx records for all occasions when customers were added to flights with the above indicia of fraud:

---

[235] Id. at ¶27.
[236] Id. and Exhibits G & H.
[237] Id. at ¶27.

| Booking Agent | Revenue | Cancelling Agent | Credits |
|---|---|---|---|
| **kellison** | $    148,069.50 | JTull | $     (148,069.50) |
|  | $ 2,168,443.23 | kellison | $ (2,149,473.23) |
|  | $    362,028.44 | mjarrell | $     (351,328.44) |
|  | $     72,968.05 | (blank) | $                - |
| **kellison Total** | $ 2,751,509.22 |  | $ (2,648,871.17) |
| **mjarrell** | $    167,747.50 | aavis | $     (167,747.50) |
|  | $ 1,214,981.30 | kellison | $ (1,214,981.30) |
|  | $ 3,268,108.50 | mjarrell | $ (3,260,858.50) |
|  | $    144,470.00 | striggs | $     (144,470.00) |
|  | $    119,342.50 | sullerup | $     (119,342.50) |
|  | $    179,856.00 | (blank) | $     (168,615.00) |
| **mjarrell Total** | $ 5,094,505.80 |  | $ (5,076,014.80) |
| **rholbrook** | $    119,154.60 | kellison | $     (119,154.60) |
| **rholbrook Total** | $    119,204.60 |  | $     (119,154.60) |
| **sullerup** | $    358,565.20 | sullerup | $     (358,565.20) |
| **sullerup Total** | $    358,565.20 |  | $     (358,565.20) |
| **Grand Total** | **$ 8,323,784.82** |  | **$ (8,202,605.77)** |

[238]

In an interview with Mr. Ullerup, he stated that he was instructed by Ms. Ellison on occasion to add customers en masse or cancel them after flights had departed.[239]  Mary Anne Jarrell could not be reached for comment but it is expected that she would similarly state that Ms. Ellison instructed her to make certain additions and/or deletions after flights had departed.  When asked during this investigation why large numbers of customers were added to flights more than twenty-four hours after a flight departed and subsequently cancelled, neither Ms. Ellison, Ms. Tull or Mr. Ullerup could offer a valid business reason for doing so.[240]  The additional revenue associated with customers added after flights had departed was $8,323,734.82.[241]  By submitting release requests to VNB with inflated revenue totals, Direct Air withdrew $8,323,734.82 more from its depository accounts at VNB than it was entitled to for those flights.

---

[238] <u>Id.</u> and Exhibit G.
[239] Interview with Shawn Ullerup on December 18, 2013.
[240] Interview with Shawn Ullerup on December 18, 2013; correspondence from Reese Boyd, Esq. to Jessica Murphy, Esq. dated December 18, 2013 at pgs. 2-4.
[241] Bley Affidavit ¶27.

### C.  Requesting Funds Not Deposited To Direct Air's Depository Accounts

On 188 different release requests, the Radixx Reports accompanying the release requests show payment methods such as "CASH", "INVC", "VCHR", "PDUE", "TCHK".[242]  Some of these payment methods represent complimentary vouchers, barter with other trades or indicate a balance is still due from the customer.[243]  What these payment methods have in common are that none of them resulted in funds being deposited to Direct Air's depository accounts at VNB.[244] The only customer payments deposited into the depository accounts at VNB were credit card payments[245] for advance reservations and four (4) checks for special charters.[246]  Cash was never deposited into Direct Air's depository accounts.[247]  VNB was aware Direct Air's depository accounts never received cash deposits.[248]

Over the course of Direct Air's operations, Direct Air requested and VNB paid $5,543,750.80 from Direct Air's depository accounts for revenue reportedly collected from payment methods other than credit cards and the special charter checks.[249]  These funds were never deposited into the depository accounts at VNB and should not have been calculated as part of the amounts to be released from these accounts.[250]  The release of funds that were never deposited into the depository accounts in the first instance further dissipated Direct Air's depository accounts at VNB by $5,543,750.80.[251]

### D.  Release Funds Used In Direct Air's Business Operations

All funds VNB released from Direct Air's depository accounts to Direct Air—whether

---

[242] Id. at ¶28.
[243] Tull Tr. 117:13-119:7; interview with Judy Tull and Kay Ellison on September 25, 2013.
[244] Bley Affidavit ¶28.
[245] Credit card payments includes both credit and debit card payments.  See note 84 supra.
[246] Bley Affidavit ¶28.
[247] Id.; VNB Tr. 86:15-20.
[248] VNB Tr. 86:15-20.
[249] Bley Affidavit ¶28.
[250] Id.
[251] Id.

properly released or not—were paid by wire to Direct Air's operating accounts at other banks or

to Direct Air vendors.[252]  Each transaction is reflected on VNB bank statements as well as

statements from the receiving banks.  There is no evidence of money transfers to off-shore

accounts or large amounts of unidentified cash withdrawals from Direct Air bank accounts.[253]  A

review of Direct Air's bank statement, business records, invoices and payroll suggests that

payments made by Direct Air to businesses and individuals were consistent with Direct Air's

business operations.[254]

## VII.  CONCLUSION

Based on bank statements, Direct Air's release requests and records from Radixx, Direct

Air's depository accounts at VNB received customer payments totaling $209,410,162.22 during

the course of Direct Air's operations.[255]  VNB released $208,393,226.31 from Direct Air's

depository accounts as requested, leaving Direct Air's depository accounts with a balance of only

$1,016,935.91 on the Petition Date.[256]  On average, VNB left a balance in Direct Air's

depository accounts of only a balance of only $1.6 million a month after VNB processed of

Direct Air's release requests.[257]  VNB never failed to process any release request submitted by

Direct Air.

With advance reservations on the Petition Date of $33,005,883.69—taking into account

permissible withdrawals of these funds for advance air carrier payments of $572,269.00 and

credit card processing fees of $813,481.19, and unfunded credit card payments of $213,833.80—

the balance in Direct Air's depository accounts as of the Petition Date should have been

---

[252] Id. at ¶30.
[253] Id.
[254] Id.
[255] Id. at ¶13.
[256] Id.
[257] Id. at ¶14.

$31,406,299.70.[258]  Direct Air's depository accounts at VNB had a balance of only

$1,016,935.91, resulting in a shortfall of $30,389,363.79.[259]  The shortfall is attributable in part

to $12,175,928.50 released for duplicative Family Ties membership fees.[260]  Further,

$8,323,734.82 of the shortfall was requested and released for "ghost" transactions which did not

represent actual customers or revenue to Direct Air.[261]  Finally, a portion of the shortfall is due to

funds totaling $5,543,750.80 that were never deposited to the depository accounts at VNB but

were nevertheless requested and released by VNB.[262]  In total, these funds account for

$26,043,414.12, or 85.5%, of the shortfall.

Determining the source of the remaining $4,345,949.67 shortfall with certainty would

require in depth review and analysis of each release request and customer record.  From a

summary review of the data, it appears likely that Direct Air's treatment of vouchers (other than

Family Ties vouchers) is another source of the shortfall, especially to the extent Direct Air

repeatedly sought payment for the same vouchers.

---

[258] Id. at ¶29.
[259] Id.
[260] Id. and Exhibit F.
[261] Id. at ¶27 and Exhibits G & H.
[262] Id. at ¶28 and Exhibit I.

JOSEPH H. BALDIGA,
CHAPTER 7 TRUSTEE

By his counsel,


        /s/ Jessica E. Murphy
Joseph H. Baldiga, BBO #549963
Jessica E. Murphy, BBO #664361
Gina Barbieri O'Neil, BBO #670596
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA  01581
Phone: 508.898.1501
Fax:    508.898.1502
Email: bankrupt@mirickoconnell.com
Email: jmurphy@mirickoconnell.com
Email: goneil@mirickoconnell.com

Dated:  March 3, 2014