# EXHIBIT 1

Ex 1—



## SOUTHERN SKY AIR & TOURS, LLC

*Note: This online database was last updated on 2/17/2014 6:01:25 PM.*
*See our Disclaimer.*

| | |
|---|---|
| **DOMESTIC / FOREIGN:** | Domestic |
| **STATUS:** | Good Standing |
| **STATE OF INCORPORATION / ORGANIZATION:** | SOUTH CAROLINA Profit |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| **REGISTERED AGENT NAME:** | REESE R BOYD, III |
| **ADDRESS:** | 1500 HWY 17 N |
| **CITY:** | MYRTLE BEACH |
| **STATE:** | SC |
| **ZIP:** | 29675 |
| **SECOND ADDRESS:** | STE 212 |
| **FILE DATE:** | 06/26/2006 |
| **EFFECTIVE DATE:** | 06/26/2006 |
| **DISSOLVED DATE:** | / / |

### Corporation History Records

| CODE | FILE DATE | COMMENT | Document |
|---|---|---|---|
| Amendment | 02/19/2008 | CONVERTED FROM-SOUTHERN SKY AIR AND TOURS, INC.(AT WILL) | |
| Agent | 08/24/2007 | CHANGED AGT/ADD FROM-CLAY D BRITTAIN, III | |
| Incorporation | 06/26/2006 | STATUTORY CLOSE CORPORATION | |

Disclaimer: The South Carolina Secretary of State's Business Filings database is provided as a convenience to our customers to research information on business entities filed with our office. Updates are uploaded every 48 hours. Users are advised that the Secretary of State, the State of South Carolina or any agency, officer or employee of the State of South Carolina does not guarantee the accuracy, reliability or timeliness of such information, as it is the responsibility of the business entity to inform the Secretary of State of any updated information. While every effort is made to insure the reliability of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from this database does so at his own risk.

# EXHIBIT 2

OCT. 2. 2006  4:20PM   Thompson and Henry 843-692-0918                    No.3655   P. 2

CERTIFIED TO BE A TRUE AND CORRECT COPY
AS TAKEN FROM AND COMPARED WITH THE
ORIGINAL ON FILE IN THIS OFFICE

SOUTHERN SKY AIR & TOURS, INC.
Filing Fees: $195.00 ORIG

STATE OF SOUTH CAROLINA
SECRETARY OF STATE

Mark Hammond     South Carolina Secretary of State

JUN 2 6 2006

ARTICLES OF INCORPORATION
FOR A
STATUTORY CLOSE CORPORATION

SECRETARY OF STATE OF SOUTH CAROLINA
TYPE OR PRINT CLEARLY IN BLACK INK

1.   The name of the proposed corporation is _____ Southern Sky Air & Tours, Inc.

2.   This corporation is a statutory close corporation, pursuant to Chapter 18, Title 33 of the
     1976 South Carolina Code of Laws, as amended.

3.   The initial registered office of the corporation is ____ c/o Thompson and Henry, PO Box 1290
                                                              Street Address

     _____ Myrtle Beach, Horry County, South Carolina 29578 _____
     City              County              State              Zip Code

     and the initial registered agent at such address is _____ Clay D. Brittain, III _____
                                                                  Print Name

     I hereby consent to the appointment as registered agent of the corporation _____
                                                                                  Agent's Signature

4.   The corporation is authorized to issue shares of stock as follows.  Complete "a" or "b", whichever
     is applicable:

     a.  [✓]  The corporation is authorized to issue a single class of shares, the total number of shares
              authorized is _____ 20,000 _____

     b.  [ ]  The corporation is authorized to issue more that one class of shares:

              Class of Shares                    Authorized No. of Each Class

              _____                    _____

              _____                    _____

              _____                    _____

     If shares are divided into two or more classes or if any class of shares is divided into series within
     a class, the relative rights, preferences, and limitations of the shares of each class, and of each
     series within a class, are as follows:

5.   The existence of the corporation shall begin as of the filing date with the Secretary of State unless
     a delayed date is indicated (See Section 33-1-230(b) of the 1976 South Carolina Code of Laws,
     as amended) _____ June 26, 2006 .

6.   Unless specified otherwise below, the transfer of shares of stock of the corporation shall be
     subject to the restrictions set out in Sections 33-18-110 through 33-18-130 of the 1976 South
     Carolina Code of Laws, as amended.  Specify any variations in the statutory format in Sections
     33-18-110 through 33-18-130.
     This company elects to be exempt from all share restrictions of Section 33-18
     through Section 33-18-130.

VNB 00054

Southern Sky Air & Tours, Inc.
Name of Corporation

7.   Unless otherwise specified below the corporation shall have a board of directors (See Sections 33-18-210 of the 1976 South Carolina Code of Laws, as amended).

☐   This corporation elects not to have a board of directors.

8.   Check, if applicable.

☐   This corporation elects to have the provisions of Sections 33-18-140 through 33-18-170 of the 1976 South Carolina Code of Laws, as amended, which give the estate of a deceased shareholder the right to compel the corporation to purchase the deceased shareholder's shares, apply.
Specify any variations in the statutory format in Sections 33-18-140 through 33-18-170.

9.   The optional provisions, which the corporation elects to include in the articles of incorporation, are as follows (See the applicable provisions of Sections 33-2-102, 33-18-330, 35-2-105, and 35-2-221 of the 1976 South Carolina Code of Laws, as amended).

10.   The name, address and signature of each incorporator is as follows (only one is required):

a.   Judy K. Tull
Name

1414 Highland Circle, Myrtle Beach, SC 29575
Address

_Judy K Tull_
Signature

b.   Edward S. Warneck
Name

8349 Juxa Drive, Myrtle Beach, SC 29579
Address

_Edward S Warneck_
Signature

c.   S. Marshall Ellison
Name

PO Box 374, Ghent, West Virginia 25843
Address

_S Marshall Ellison_
Signature

11.   I, _____ Clay D. Brittain, III _____, an attorney licensed to practice in the State of South Carolina, certify that the corporation, to whose articles of incorporation this certificate is attached, has complied with the requirements of Chapter 2, Title 33 of the 1976 South Carolina Code of Laws, as amended, relating to the articles of incorporation.

VNB 00056

Oct. 2. 2006  4:21PM   Thompson and Henry 843-692-0918                    No.0000   P. 4

Southern Sky Air & Tours, Inc.
Name of Corporation

Date ___June 23, 2006___

_Clay D. Brittain_
Signature

Clay D. Brittain, III
Type or Print Name

1314 Professional Drive
Address

Myrtle Beach, SC 29578

(843) 692-2628
Telephone Number

## FILING INSTRUCTIONS

1.  Two copies of this form, (the original and either a duplicate original or a conformed copy, must be filed.

2.  If the space in this form is insufficient, please attach additional sheets containing a reference to the appropriate paragraph in this form.

3.  Enclose the fee of $135.00 payable to the Secretary of State,

4.  THIS FORM MUST BE ACCOMPANIED BY THE ANNUAL REPORT (SEE SECTION 12-19-20 OF THE 1976 SOUTH CAROLINA CODE OF LAWS, AS AMENDED)

Return to:  Secretary of State
P.O. Box 11350
Columbia, SC 28211

## SPECIAL NOTE

ALL SHARE CERTIFICATES ISSUED BY A STATUTORY CLOSE CORPORATION MUST CONTAIN THE FOLLOWING CONSPICUOUS NOTICE:

THE RIGHTS OF SHAREHOLDERS IN A STATUTORY CLOSE CORPORATION MAY DIFFER MATERIALLY FROM THE RIGHTS OF SHAREHOLDERS IN OTHER CORPORATIONS. COPIES OF THE ARTICLES OF INCORPORATION AND BY-LAWS, SHAREHOLDERS' AGREEMENTS AND OTHER DOCUMENTS, ANY OF WHICH MAY RESTRICT TRANSFERS AND AFFECT VOTING AND OTHER RIGHTS, MAY BE OBTAINED BY A SHAREHOLDER ON WRITTEN REQUEST TO THE CORPORATION.

THE FILING OF THIS DOCUMENT DOES NOT, IN AND OF ITSELF, PROVIDE AN EXCLUSIVE RIGHT TO USE THIS CORPORATE NAME ON OR IN CONNECTION WITH ANY PRODUCT OR SERVICE. USE OF A NAME AS A TRADEMARK OR SERVICE MARK WILL REQUIRE FURTHER CLEARANCE AND REGISTRATION AND BE AFFECTED BY PRIOR USE OF THE MARK. FOR MORE INFORMATION, CONTACT THE TRADEMARKS DIVISION OF THE SECRETARY OF STATE'S OFFICE AT (803) 734-1728.

DOM-ART OF INCORP FOR A STATUTORY CLSE CORP.doc

Form Revised by South Carolina
Secretary of State, January 2000

VNB 00055

# EXHIBIT 3





EXHIBIT
Keilman
59
11-14-13 JF

# SOUTHERN SKY AIR & TOURS D/B/A DIRECT AIR

Southern Sky Air and Tours LLC d/b/a Direct Air is an indirect air carrier, based in Myrtle Beach, South Carolina, providing public charter flights. All flights are filed and approved by the Department of Transportation and operate under Part 380 CFR (Code of Federal Regulation). The company began providing scheduled public charter flights March 7, 2007. The company was formed due to market conditions that reduced air service to Myrtle Beach SC. The focus of the company was to grow the Myrtle Beach market by providing scheduled chartered non-stop service from cities where there was not direct air service at reasonable rates including golf and vacation packages.

Myrtle Beach had experienced rapid growth of new business and real estate development while the numbers of visitors had declined. High airfares, limited or inconvenient schedules and lengthy travel times had discouraged potential travelers. With discontinued air service, previously committed visitors were forced to find alternate travel, usually with higher fares and less desirable schedules.   It was the company's belief that by providing safe and reliable non-stop air transportation that met the preferred schedules of the consumer, more visitors would result.

[First and f]oremost, The Company scheduled service between cities that had a history of travelers to Myrtle Beach where service was [reduc]ed or did not exist.  The cities chosen to travel from were Newark, NJ, Pittsburgh, PA and Niagara Falls, NY.  Additional [cities] added to Myrtle Beach were Plattsburgh, NY, Worcester, MA, and Columbus, OH and Springfield, IL.

[In 200]8, The Company added service to Ft. Myers/Punta Gorda, Florida and Orlando/Sanford, FL due to market conditions [that] reduced air service to Punta Gorda.  The Airport Authorities in several cities approached Direct Air to provide [a]ir airports as we had for Myrtle Beach.  The cities that were chosen were:   Worcester, MA, Plattsburgh, NY, [. . .]NY, Kalamazoo, MI, Toledo, OH and Rockford, IL and Myrtle Beach, SC.   Springfield, IL was added November of [. . .]de, FL was added in March 2010.

[Flights] to West Palm Beach have been added to the winter schedule from Worcester, MA, Niagara Falls, NY, Ke[. . .]ckford/Chicago.

[. . .]all credit card charges   with payments into an escrow account in accordance with the [. . .]w requirements.    Direct Air has a $200,000 consumer protection bond with the [. . .]under the name Southern Sky Air & Tours d/b/a Direct Air.

Booking – D[. . .]
Department of [. . .]
Department of Transp[. . .]

**Reservations** - Reservations may be booked via the internet at VISITDIRECTAIR.COM on a 24 hours basis or through the reservations call center through the toll free number 1-877-432-DIRECT (3473). The call center is open from 7:00 am until midnight seven days a week. Direct Air operates a Reservations/Call Center located in Beckley, West Virginia. The center is capable of handling as many 20,000 incoming calls per day, with the equipment and staff, supporting as many as 100 reservations/sales agents on the line simultaneously.

**Ticketing** - All reservations are processed via the internet through Radixx Solution International Systems which is designed to optimize ticket-less internet and direct distribution while also providing full E-ticket distribution through the travel agency community. Over 85% of all bookings are booked via the Internet through the web-site VISITDIRECTAIR.COM.

**Marketing and Sales** - Under the name of "Direct Air" sales promotion programs are developed promoting travel between destinations. Campaigns are developed utilizing television, radio, newspapers, billboards, e-mail blasts, trade shows, electronic interactive, direct mail, in-flight magazines and website links. Marketing assistance programs are established with local airport authorities to reduce costs and increase marketing dollars. Trade programs for media are developed which converts empty seats into media exposure and promotional opportunities. Direct Air has over 221,000 qualified segmented email addresses directly related to travelers who have previously flown on Direct Air

_____ marketing is created to maximum e-commerce opportunities to leverage direct relationships with the customers by _____quent emails which is a very low cost way to communicate with customers. 80% of marketing is direct distribution.

_____ - The pricing strategy of the company has been to provide service for niche markets that yield higher airfares due ____ of service. Base airfares are promoted beginning at $69 per passenger each way with airfares increasing in ___ up to $229. Promotional fares are offered primarily to our Direct Air customer base. Direct Air has a unique a ___ called "Family Ties". Three times a year customers can purchase tickets for a designated time period for a ___ open travel dates and passenger names at time of purchase. These tickets are transferable and may be ___ d friends and are good for travel up to one year.

**A___** ___ ___ company has been able to reach 30% higher yield then competitors due to market choice, yield ___ mana___ ___ ___ing. By unbundling the product, after purchasing the base fare, passengers have the choice to ___ pick adv___ ___ of bags, change fees, first class options, un-accompanied minor fees and pet fees. ___ additional bo___ convenience booking fees, reservations call center fees and baggage fees have increased ___ ___e per pass___ ___ ___ment above the base air fare.

**Third Party Revenue** - Additional revenue opportunities to be implemented in 2011 - hotel room commission, car rentals, show tickets, theme park tickets, golf, web site advertising and in market texting.

**Ground Operations** - Direct Air has its' own ticket counter space in all airports with signage and provides the above and below wing services in Myrtle Beach and Kalamazoo, MI. Services in all other cities are provided by contracted ground handlers and fuel providers, caterers and all services necessary to support charter flights. Computer equipment is installed at every airport ticket counter allowing for automated check-in. Direct Air has it's own ticket counter space in all airports.

**Airports** - Local airport authorities in order to attract air service waive landing fees, terminal charges, usage fees, above and below wing charges, ground handling fees and operating equipment charges. The community and airport authorities participate in funding of the program by providing advertising and promotion (cash and program administration in-kind services).

**Aircraft** - Direct Air contracts charter aircraft on and ACMI basis guaranteeing a monthly minimum number of block hours monthly. Contracted Carriers are Dynamic Air with MD88 aircraft with 12 First Class and 127 Coach configuration, Xtra ways Boeing 737-400 12 First Class and 138 Coach class configuration, Vision Airlines Boeing 737-800 with 168 coach figuration and Sky King with Boeing 737-400 with 12 First Class and 138 Coach. Most aircraft has all leather seating.

t **Services** - In 2008 Direct Air increased revenue opportunity by implementing on board fees for snacks and all

been noted as a company to watch by news travel publications, USA Today, transportation expert Mike Boyd elopment Group. The company has moved over 950,000 passengers and over 115 million in revenue in its' operation thus proving the product and the company infrastructure capability. By running a successful rect Air has been able to develop the markets that we are currently servicing. Based on that success, come the 121 certificated carrier allowing control of costs, product identity and growth.

# Direct Air Revenue Statistics



### Direct Air Revenue Statistics

| | 2007 | 2008 | 2009 | 2010 | 2011* |
|---|---|---|---|---|---|
| # Passengers | 66,472 | 142,429 | 229,028 | 329,100 | 592,754 |
| Total Air Revenue pp | $8,311,068 | $17,853,505 | $21,016,642 | $28,819,615 | $61,646,416 |
| Total Ancillary pp | $236,667 | $1,732,578 | $7,433,251 | $11,319,529 | $20,746,390 |
| Total Revenue | $8,547,735 | $19,586,083 | $28,449,893 | $40,139,144 | $82,392,611 |
| Average Fare pp | $125.00 | $125.35 | $91.67 | $87.57 | $104.00 |
| Ancillary pp | $3.56 | $12.16 | $32.42 | $34.39 | $35.00 |
| Total Fare Inc Ancillary | $129 | $137 | $124 | $122 | $139 |

Projections for 2011



Direct Air Revenue Statistics, continued

# Direct Air Route Overview 2007-2011

## Direct Air Route Overview from 2007 thru 2011

| Destination | Date Service Began | Season | Months of Service | Flights Per Week | Total Pax | Total Revenue | Avg Fare Per Pax |
|---|---|---|---|---|---|---|---|
| EWR | Mar-07 | Mar - Dec | 8 mos | 4 | 83,017 | $9,140,208 | $110 |
| IAG | Mar-07 | Feb - Dec | 11 mos | 6 - 8 | 123,902 | $15,942,687 | $129 |
| LCK | Mar-07 | Jun - Aug | 3 mos | 2 | 25,333 | $2,988,370 | $118 |
| ORH | Mar-08 | Mar - Nov | 10 mos | 2 | 25,283 | $2,920,156 | $116 |
| PBG | Mar-08 | Feb - Nov | 9 mos | 6 - 8 | 68,774 | $9,411,567 | $137 |
| PIT | Mar-07 | Mar - Dec | 10 mos | 3 - 10 | 117,811 | $14,254,388 | $121 |
| SPI | Mar-09 | Jun - Aug | 3 mos | 2 | 10,503 | $1,125,288 | $107 |
| IAG | Nov-09 | Nov - Apr | 5 1/2 mos | 2 | -4,189 | $476,699 | $114 |
| ABE | Nov-08 | Nov - Apr | 5 1/2 mos | 2 - 8 | 22,242 | $2,872,475 | $129 |
| AZO | Nov-08 | Year round | 12 mos | 3 - 8 | 48,166 | $5,223,830 | $127 |
| IAG | Nov-08 | Nov - Apr | 5 1/2 mos | 3 - 6 | 39,005 | $4,940,178 | $127 |
| ORH | Nov-08 | Nov - Apr | 12 mos | 3 - 8 | 61,945 | $7,702,866 | $124 |
| PBG | Nov-08 | Nov - Apr | 5 1/2 mos | 1 | 14,799 | $1,877,873 | $127 |
| RFD | Nov-08 | Nov - Apr | 5 1/2 mos | 3 - 8 | 25,940 | $3,381,762 | $130 |
| SPI | Nov-08 | Nov - Apr | 5 1/2 mos | 2 | 16,527 | $2,059,920 | $126 |
| TOL | Nov-08 | Nov - Apr | 5 1/2 mos | 2 | 23,143 | $2,964,976 | $128 |
| ORH | Nov-08 | Year round | 12 mos | 3 - 4 | 62,426 | $6,694,882 | $128 |
| AZO | Nov-08 | Year round | 12 mos | 2 - 3 | 31,981 | $4,037,413 | $126 |
| ORH | Nov-10 | Nov - Apr | 5 1/2 mos | 2 | 1,949 | $236,962 | $122 |
| IAG | Nov-10 | Nov - Apr | 5 1/2 mos | 3 | 6,680 | $752,667 | $113 |
| ORH | Nov-10 | Nov - Apr | 5 1/2 mos | 3 | 6,424 | $738,461 | $115 |
| RFD | Nov-10 | Nov - Apr | 5 1/2 mos | 2 | 2,413 | $295,636 | $122 |

# About Us

## MANAGEMENT TEAM

The Company has assembled an experienced management and development team accomplished in the fields of tour operations and packaging, aviation charters and services, finance, marketing, technology, and general management.

## Judy Tull - Chief Executive Officer

Ms. Judy Tull, Chief Executive Officer, has over 30 years of experience in the aviation industry including executive positions with both airlines and tour operators. She has extensive experience in aviation contract negotiations, marketing, media planning, flight scheduling, operations, pricing and station management. Ms. Tull was a co-founder of World Technology Systems which operated public charter programs SunJet and Myrtle Beach Jet Express between New York City and Florida and Myrtle Beach moving over 6,000 people per day. Recently she played a key role and was instrumental in developing and managing the Hooters Air scheduled charter program.

## ? Warneck - President

?rd Warneck, a seasoned veteran of entrepreneurial management, will assist in overseeing day-to-day operations. ?rneck Chief Operating Officer/President of Championship Golf Tours and Wall Street Golf and Hospitality ?n a leading all-inclusive golf packaging business since 1985. Previously he was a partner of Focus Strategies, ?zing in marketing and fulfillment in the golf and hospitality industry. Mr. Warneck will manage and coordinate ?opment, marketing, and Strategic Partner alliances.

Cit? ?rs has been the leading independent provider of thousands of passengers for Air South, Myrtle Beach? ?st recently, Hooters Air. He has a deep understanding of marketing and packaging in the golf and hospi? ?a history of creative marketing, he has made a significant mark in forming strong ?lationships w? ?and outside Myrtle Beach. Many businesses seek his out-of-the box thinking.

## Marshall Ellison - Chairman

Over the past 20+ years, Marshall Ellison has owned and operated a successful tour operations and reservations center. His extensive experience in the tour operation industry has contributed to his becoming a leader in providing aviation outsourcing and support services. Mr. Ellison has provided reservations services, customer service and airport support to World Technology for the public charter programs, Sunjet and Myrtle Beach Jet Express. He also has provided services for TransMeridian Airlines, Nations Air, Kiwi Air, Carnival Airlines, Air Jamaica Vacations and more recently, Hooters Air. He has hired, trained and directed the daily performance of over 500 employees on three round-the clock shifts in a national call center capable of handling over 20,000 calls per day. He also has extensive experience in travel marketing, sales and travel business-to-business relationship building.

## Robert Keilman - Chief Financial Officer

Mr. Keilman, a CPA, worked six years with Deloitte & Touche. Mr. Keilman also spent 23 years employed at the Corporate Headquarters of the Bank of New York, of which 17 years were served as Comptroller/Senior Vice President. Heavily involved with business planning and expense controls, many as a result of mergers and acquisitions, Mr. Keilman served as a member of numerous Boards of Director's and sat on many board committees. His corporate and business background rounds out our group's focus on understanding corporate preferences and requirements for corporate entertaining, meetings, conferences, and strategies to enhance and strengthen business relationships. After retiring from Bank of New York, Mr. Keilman founded with partner Ed Warneck, Wall Street Golf & Hospitality Association. Bob was __ed in the development of all operations of the business.

## __ - Director/Managing Partner

__gan at Cruise International as special assistant to the President. Ms Ellison has also been integral to the __everal air reservations systems as an experienced administrator and consultant. She has been __epth and breadth of knowledge in vacation packaging, airline reservations, operations and aviation se__ She is a recognized expert in database administration, having managed millions of dollars and tens of the__ segments in inventory for Hooters Air, TransMeridian Airlines and Direct Air. Ms. Ellison brings 15 years__er relations to Direct Air. Her years of customer service management included directing a staff of custom__enter professionals. Her career in that capacity has been guided by a highly ethical customer service__that Direct Air maintains the highest degree of customer satisfaction and retention.







Advertising



Bus Advertising



Bus Advertising (cont.)





Advertising (cont.)



Advertising (cont.)



Advertising (cont.)

Advertising (cont.)







1600 Oak Street, Suite B
Myrtle Beach, South Carolina 29577

Business office: (843) 916-9700

Reservations: (877) 432-DIRECT

www.VisitDirectAir.com



# Organizational Chart

DIRECT AIR
VACATIONS & TOURS

## Operations

**Kay Ellison**
- Daily Operations
- System Admin.
- Security
- Strategic Planning
- Financial Mgt.

- Res. Center

- Yield Management
- Fuel Analyst
- Special Projects

- Accounting

**Judy Tull**
- Daily Operations
- Scheduling
- DOT Filings
- Contracting
- Strategic Planning
- Financial Mgt.

- Station Manager
  - Operations
  - Stations

## Marketing

**Marshall Ellison**
- Destination Marketing
- Technology
- Customer Service
- Res. Center - HR

- Marketing Assistant

**Ed Warneck**
- Destination Marketing
- Website Sales

- Graphic Designer

## Staff

| | Part Time | Full Time |
|---|---|---|
| Corporate Headquarters | 1 | 8 |
| Stations | 11 | 27 |
| Reservation Center* | 50 | 3 |
| Contract Labor | 3 | |

*Agents supplied and paid through a staffing service

# EXHIBIT 4

## PUBLIC CHARTER
## DEPOSITORY AGREEMENT

This Depository Agreement, made as of the _____30_____ day of _____October_____, 2006 by and among _____ S.C. _____ corporation ("Charter Operator"), SKY LINE INC , a _____ corporation ("Carrier") and VALLEY NATIONAL BANK, having a place of business at 1040 Avenue of the Americas, New York, NY 10018 ("Bank").

WHEREAS, Charter Operator is a public charter operator or foreign charter operator within the meaning of 14 CFR 380 of the Special Regulations ("Regulations") of the United States Department of Transportation, Office of Aviation ("DOT") and intends to market public charters to charter or tour participants ("Charter Participants") pursuant to said Regulations.

WHEREAS, Bank is insured by the Federal Deposit Insurance Corporation and is agreeable to act as the depository bank within the meaning of said Part 380, subject to the terms and conditions herein;

NOW, THEREFORE the parties hereto, for and in consideration of the premises and covenants hereinafter made, hereby agree pursuant to the Regulations as follows:

### SECTION 1 - DEPOSITS

1.1   Subject to the terms and conditions of this Agreement, Bank agrees from time to time to receive and accept for deposit payments, including cash, credit card transactions, checks or money orders, delivered or caused to be delivered to it by Charter Operator for deposit with respect to each charter (a "Charter") identified in a certificate from Charter Operator as being the flight schedule or schedules on file with the DOT. The flight schedule or schedules from time to time may be amended or modified by Charter Operator by written notice to Bank.

1.2   Charter Operator shall deliver or cause to be delivered to Bank for deposit with Bank as depository, all amounts received from each Charter Participant with respect to each Charter in accordance with Section 380.34 of the Regulations. To the extent such information is available, each deposit made or caused to be made by Charter Operator shall be accompanied by a notice or notices to Bank setting forth the following information: (i) the amount of the item being deposited; (ii) the name of the Charter Participant with respect to which such deposit is made; and (iii) such other information as Bank may reasonably request from time to time.

1.3   Bank shall maintain a separate account (an "Account") for each charter, flight or rotation but shall be under no obligation to segregate any funds received by it between inbound and out-bound flights in the absence of express instructions to do so. Bank may use funds deposited pursuant to this Agreement in its general banking business and may commingle such funds with its general funds. Unless otherwise agreed in writing by Bank and Charter Operator, Bank shall be under no duty to pay any interest on any funds held by it hereunder.

1.4   Funds deposited in an Account maintained for one Charter may be transferred to an Account maintained for another Charter or to the Charter Operator as reimbursement for obtaining substitute travel arrangements or otherwise upon receipt of a written directive from the Charter Operator together with such other documents and authorizations as the Bank may from time to time request.

1.5   Bank agrees to permit the Charter Operator to use the Bank's name solely for the purposes of stating on all charter solicitation materials regarding the charter program that checks and money orders are made payable to Bank. Charter Operator and Carrier agree that no references to, or use of, Bank's name will be made other than to indicate that the checks or money orders of Charter Participants shall be made payable to the order of the Bank. In addition, each tour prospectus and each agreement between Charter Operator and a Charter Participant shall state that a copy of this Agreement will be made available by Charter Operator to each Charter Participant upon request and is incorporated as part of the agreement between the Charter Operator and the Charter Participant.

1.6   Bank shall return to Charter Operator all checks received by it pursuant to this Agreement which shall be dishonored for any reason. Bank shall make the appropriate adjustment to the applicable account(s) to reflect the return of said dishonored check. Bank shall not be required to accept personal checks on any tour from any participant whose prior checks have been dishonored.

## SECTION 2 - DISBURSEMENTS

2.1   Subject to the limitations expressed in the subparagraphs hereof, Bank shall remit funds from the Account maintained with respect to each Charter as follows:

(a)   Not later than five (5) Business Days after Bank's receipt of a certificate from either Carrier or Charter Operator substantially in the form of Exhibit A (the "Exhibit A Certificate") attached hereto, specifying if available, the following information: (i) the amount due to Carrier (the "Charter Price"); (ii) the date on which such payment is due; and (iii) the address to which such payment is to be sent, Bank shall remit out of the Account for such Charter directly to Carrier, or, if Carrier maintains an escrow account pursuant to DOT requirements, to Carrier's escrow account designated on Exhibit C, the Charter Price; provided, however, that Bank shall not remit funds earlier than: (i) 60 days (including date of departure) prior to the scheduled date of departure of the originating flight if the Charter Price represents round-trip air transportation to be performed by Carrier as set forth on the Exhibit A Certificate; and (ii) 60 days (including date of departure) prior to the scheduled date of departure of the originating or returning flight as set forth on the Exhibit A Certificate, as the case may be, if such Charter Price does not represent such round-trip air transportation.

(b)   Not later than five (5) Business Days after receipt by Bank of a written notification from Charter Operator of the amount of refunds made by Charter Operator to Charter Participants as a result of cancellation by Charter Participants of participation in a Charter, which notice shall be accompanied by such evidence satisfactory to Bank, in its sole discretion, of the making of payments to Charter Participants, Bank shall remit to Charter Operator out of the Account for the Charter for which the refund was made the amount of such refunds made.

2

(c)    Not later than five (5) Business Days after Bank's receipt of written notification from either Charter Operator or Carrier of the cancellation of any Charter for which an Account has been established, Bank shall refund checks for the amount deposited in the separate account established for the canceled Charter on behalf of each Charter Participant and mail said checks directly to each Charter Participant in amounts and to the address furnished to Bank in a certificate from Charter Operator or, if addresses shall have been furnished, Bank may attempt to deliver such checks by such method as may be deemed reasonable by Bank, in its sole discretion. Bank shall have no responsibility for the failure of any check to be delivered as a result of the failure of Charter Operator to furnish Bank with the names and addresses of Charter Participants or the amounts of the Charter Participants deposits or for any cause beyond its control.

(d)    After Bank's receipt of written confirmation that the Charter Price for a Charter has been paid in full to Carrier and not later than five (5) Business Days after receipt by Bank of invoices from hotels, sightseeing enterprises or other persons or companies furnishing accommodations or service in connection with such Charter ("Vendors"), certified as correct by Charter Operator, Bank shall remit from the Account maintained for such Charter, the amount set forth in such invoices directly to such Vendors.

2.2    Except as provided in Section 2.1, Bank shall not pay to or remit any funds from an Account maintained for Charter Operator prior to two (2) Business Days after completion of such Charter. The balance in such account shall, subject to the provisions of Sections 4 and 5 of this Agreement and the following sentence hereof, be remitted to Charter Operator by Bank not later than five (5) Business Days after receipt by Bank of a certification substantially in the form of Exhibit B hereto by Carrier of the completion of such Charter.    Notwithstanding the foregoing, if the Charter to which such account relates involves air transportation only and Bank has paid the Carrier the Charter Price for all air transportation and has paid all refunds due to Charter Participants as provided in Section 2.1(b) of this Agreement, the balance in such account shall be, subject to the provisions of Section 5.4 of this Agreement, be remitted to Charter Operator by Bank not later than five (5) Business Days after receipt by Bank of certification substantially in the form of Exhibit B hereto by the Carrier performing the originating flight that such flight has in fact departed.

2.3    In the event any Charter fails to operate after payment by Bank in accordance with Section 2.1(a) of this Agreement or Carrier fails to provide air transportation for any Charter after payment by Bank in accordance with Section 2.1(a) of this Agreement, Carrier agrees to refund to Bank all monies received by it, after such cancellation or failure. Charter Operator further agrees that in the event any Charter fails to operate after payment by Bank in accordance with Section 2.1(a) of this Agreement, to pay to Bank within five (5) Business Days from the date of such cancellation, for deposit in the Account established for the canceled charter an amount equal to that remitted by Bank to Vendors pursuant to Section 2.1(d) of this Agreement. In the event Carrier shall fail to make the refund required hereby, Charter Operator agrees to pay to Bank, for deposit in the Account established for the canceled Charter, the amount of such refund or the balance owing thereon. No payment by Charter Operator pursuant to this Section 2.3 shall act as a waiver of any right which Charter Operator may have against Carrier or any Vendor. Charter Operator and Carrier each agree to give Bank prompt notice of any cancellation of a Charter or any failure of Carrier to provide air transportation.

3

2.4    All amounts remitted by Bank and sent to Bank hereunder shall be in U.S. Dollars and shall be made only to the extent funds in the Account established for a charter are legally available by Bank for withdrawal. Bank is not obligated to remit funds against any uncollected funds representing deposits in the Account. None of the provisions of this Section 2 or any of the provisions of this Agreement shall require Bank to expend its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder.

2.5    Upon distribution of all of the funds on deposit with Bank pursuant to the terms of this Agreement, Bank shall be relieved of any and all further obligations and released from any and all liability under this Agreement, except as otherwise specifically set forth herein.

## SECTION 3 - ACCOUNTING AND REPORTING

3.1    Charter Operator shall furnish any additional information and reports as Bank may request.

3.2    Bank will provide Charter Operator with a cash statement for each Account at the end of each calendar month until such time as a closing cash statement is rendered by the payment over of the balance of such Account by Bank in accordance with Section 2 of this Agreement.

3.3    Except as may be required by the Regulations, Bank is not required to maintain documents received by it pursuant to this Agreement.

## SECTION 4 - RESPONSIBILITIES OF BANK

4.1    It is understood and agreed that the duties of Bank are only as specifically provided herein and are purely ministerial in nature. Bank shall not be responsible for or be required to enforce any of the terms or conditions of this Agreement or any other agreement or institute legal proceedings of any kind. Bank shall not incur any liability whatsoever to any other party or person except for willful misconduct or gross negligence.

4.2    Bank shall be under no obligation and bear no responsibility in respect of any of the Items deposited with it other than to faithfully follow the terms of this Agreement. Bank shall be under no duty or responsibility to enforce collection of any check delivered to it hereunder. Unless agreed in writing by the parties hereto, Bank shall be under no duty to pay interest on any funds held by it hereunder.

4.3    Bank shall be entitled to rely upon the accuracy, act in reliance upon the contents, and assume the genuineness, of any notice, instruction, certificate, signature, instrument or other document that is given to Bank pursuant to this Agreement without the necessity of Bank verifying the truth, completeness or accuracy thereof. Bank shall not be obligated to make any inquiry as to the authority, capacity, existence or identity of any person purporting to give any such notice or instructions or to execute any such certificate, instruction, instrument or document and Bank shall be fully protected in acting in accordance with any certificate, instruction, instrument or document given to it hereunder believed by it to have been signed by the proper parties.

4

4.4    Bank shall not be responsible for the validity, legality or voidness or voidability or enforceability of this Agreement with respect to Charter Operator or Carrier and shall not be responsible for the performance of any obligation of Charter Operator, Carrier or any retail travel agent or Vendor under this Agreement or under the Regulations or otherwise.

4.5    In the event that (a) Bank receives a notice objecting to the disbursement of the funds on deposit with Bank, (b) Bank shall be uncertain as to its duties or rights hereunder, (c) Bank shall receive instructions with respect to the funds on deposit with Bank which, in Bank's sole determination, are, in conflict either with other instructions received by it or with any provision of this Agreement or the Regulations, or (d) in Bank's sole determination, there is a disagreement between the parties hereto or any third party which may result or has resulted in adverse claims with respect to the funds on deposit with Bank, then, in such event, Bank shall be entitled to refuse to comply with any demands on it and with respect thereto and hold the funds on deposit with Bank, or a portion thereof, in the Account pending the resolution of such uncertainty to Bank's sole satisfaction, by final judgment of the DOT, or a court of competent jurisdiction, a stipulation of settlement between the parties or otherwise; or Bank, at its sole option, may deposit the funds on deposit with Bank or a portion thereof with the clerk of a court of competent jurisdiction in a proceeding to which all parties in interest are joined. Upon the deposit by Bank of such funds with the clerk of any court, Bank shall be relieved of any and all further obligations and released from any and all liability hereunder. Bank shall have the right to deduct any fees or expenses (including reasonable fees and disbursements of counsel) incurred by it in such matter from the funds in the account deposited into court.

4.6    Bank shall not be liable for any error in judgment, action taken or omitted hereunder, or for the misconduct of any of its partners, employees, agents or attorneys appointed by it, except in the case of willful misconduct or gross negligence. Bank shall be entitled to consult with counsel of its own choosing, including itself, and shall not be liable for any action taken, suffered or omitted by it in accordance with the advice of such counsel.

## SECTION 5 - COMPENSATION, EXPENSES AND INDEMNIFICATION

5.1    Bank shall be entitled to such compensation for its services hereunder as may be agreed upon from time to time by Bank and Charter Operator in writing. The Charter Operator agrees to pay to the Bank all its normal account charges incurred in connection with each account.

5.2    Charter Operator agrees to pay Bank in addition (i) all out-of-pocket expenses of Bank in connection with the preparation, execution and delivery of this Agreement, including reasonable fees and disbursements of counsel to Bank, (ii) all out-of-pocket expenses in connection with the preparation, execution and delivery of any amendment relating to this Agreement, including reasonable fees and disbursements of counsel to Bank and (iii) all costs of obtaining performance under this Agreement by Charter Operator or Carrier, including reasonable fees and disbursements of counsel to Bank.

5.3    (a)    Charter Operator shall indemnify Bank and its partners, employees, agents and attorneys (collectively, the "Indemnitees") against, and hold them harmless of and from, any and all loss, liability, cost, damage and expense, including, without limitation, reasonable

5

counsel fees and expenses, which the Indemnitees may suffer or incur by reason of any action, claim or proceeding brought against the Indemnitees arising out of or relating in any way to this Agreement or any transaction to which this Agreement relates, unless such action, claim or proceeding is the result of the willful misconduct or gross negligence of the Indemnitees.

(b) If the indemnification provided for in this Section 5.3 is applicable, but for any reason is held to be unavailable, Charter Operator shall contribute such amounts as are just and equitable to pay, or to reimburse the Indemnitees for, the aggregate of any and all losses, liabilities, costs, damages and expenses, including counsel fees, actually incurred by the Indemnitees as a result of or in connection with, and any amount paid in settlement of, any action, claim or proceeding arising out of or relating in any way to any actions or omissions of Charter Operator.

5.4 As security for the payment of amounts due pursuant to this Section 5, Charter Operator hereby assigns to Bank and grants Bank a continuing lien and right of set-off upon any and all amounts which may now or hereafter become due and payable to Charter Operator pursuant to Section 2 of this Agreement and agrees that no payment shall be made to Charter Operator pursuant to such section until all amounts then due and payable to Bank are paid in full.

5.5 The provisions of this Section 5 shall survive any termination of this Agreement, whether by distribution of any funds on deposit with Bank or otherwise.

## SECTION 6 - TERMINATION AND AMENDMENT

6.1 Any party hereto may terminate this Agreement at any time by mailing a notice of its intention to terminate by registered mail to the other party and the DOT; provided, however, that any such termination by Carrier or Charter Operator shall be subject to approval by the DOT. For the purposes of this Agreement, Bank may assume DOT's approval of Charter Operator or Carrier's termination of this Agreement so long as Bank does not receive a written objection from the DOT within thirty (30) days from the date of such notice. Termination by Bank shall become effective fifteen (15) days from date of such notice; termination by Carrier or Charter Operator shall be effective thirty (30) days from the date of such notice. Notwithstanding the foregoing, no termination of this Agreement shall affect any obligations of Charter Operator with respect to any amounts payable under this Agreement, which shall survive any termination of this Agreement. Should this Agreement terminate as herein provided, then Bank automatically shall resign as the depository bank and Bank shall not be required to accept any deposits, make any disbursement or otherwise dispose of the funds on deposit with Bank, but its only duty shall be to hold such funds for a period of not more than five (5) Business Days following the effective date of the termination of this Agreement, at which time if a successor depository bank shall have been appointed and written notice thereof (including the name and address of such successor depository bank) shall have been given to the resigning Bank, then Bank shall pay over to the successor depository bank any funds Bank holds with respect hereto, less any portion thereof previously paid out in accordance with this Agreement; whereupon, Bank shall be relieved of all further obligations and released from any and all liability under this Agreement. In addition to any other fees payable to Bank pursuant hereunder, Bank shall be entitled to be reimbursed by Charter Operator and Charter Operator shall be liable for any

6

expenses incurred in connection with the termination of this Agreement, the transfer of any funds to a successor depository bank or the distribution of any funds pursuant to this Section 6.1.

### SECTION 7 - MISCELLANEOUS

7.1    Notices relating to this Agreement shall be sent to:

Charterer:    *Southern Sky Air & Tours*
*Dba Myrtle Beach Direct Air & Tours*
*1600 Oak St, Suite B*
*Myrtle Beach, SC 29577*
Fax Number: *843-448-7920*
Confirmation Number: *843-916-9700*

Carrier:    *Sky King Inc*
*3660 Power Inn Road, Suite H*
*Sacramento, CA 95826*
Fax Number: *916-454-2400*
Confirmation Number: *916-266-0855*

Bank:    VALLEY NATIONAL BANK
1040 Avenue of the Americas
New York, NY 10018
Attention: Global Escrow

Fax Number: (212) 840-7038
Confirmation Number: (212) 973-6534

Any notice or other communication under the provisions of this Agreement shall be in writing effective the date of the notice, and shall be given by facsimile (with confirmation), or by postage prepaid, registered or certified mail, return receipt requested, by hand delivery with receipt acknowledged, or any recognized express mail service, directed to the parties at the addresses set forth above or to any new address of which any party hereto shall have informed the others by the giving of notice in the manner provided herein.

7.2    No party hereto may assign its rights or obligations hereunder without the prior written consent of the other parties and until such notice of assignment is filed with the DOT.

7.3    As used in this Agreement, the term "Business Day" shall mean any day which is not a day for which New Jersey banks are authorized to close. Initial capped terms not otherwise defined herein, which are defined in the Regulations, are used herein with the meaning therein provided.

7.4    This Agreement may be executed in one or more counterparts, and by different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which when taken together shall constitute one and the same agreement. A facsimile signature hereto shall be deemed an original for all purposes.

7

7.5    The parties hereto agree to do such further acts and things and to execute and deliver such statements, assignments, agreements, instruments and other documents as the Bank may request from time to time in connection with the administration, maintenance, enforcement or adjudication of this Agreement in order (a) to give Bank confirmation and assurance of Bank's rights, powers, privileges, remedies and interests under this Agreement and applicable law, (b) to better enable Bank to exercise any such right, power, privilege or remedy, or (c) to otherwise effectuate the purpose and the terms and provisions of this Agreement, each in such form and substance as may be acceptable to Bank.

7.6    The rights and remedies granted to the Bank in this Agreement are cumulative and not exclusive, and are in addition to any and all other rights and remedies granted and permitted under and pursuant to law.

7.7    The failure of any of the signatories hereto to enforce any provision hereof on any occasion shall not be deemed to be a waiver of any preceding or succeeding breach of such provision or any other provision.

7.8    This Agreement, together with the rules and regulations of the Bank with respect to the account, constitutes the entire agreement and understanding of the signatories hereto and no amendment, modification or waiver of any provision herein shall be effective unless in writing, executed by the party charged therewith.

7.9    This Agreement shall be construed, interpreted and enforced in accordance with and shall be governed by the laws of the State of New Jersey without regard to the principles of conflicts of laws.

7.10    This Agreement shall bind and inure to the benefit of the parties, their successors and assigns.

7.11    If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Agreement is not effected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

7.12    Except as otherwise may be provided by law, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

7.13    The parties hereto hereby irrevocably agree that they will not initiate any action or proceeding arising out of or relating to this Agreement in any court other than a court of the State of New Jersey sitting in Bergen, Passaic or Essex Counties (the "Counties") and any Federal court sitting in the Counties and any appellate court therefrom.

8

7.14    The parties hereto hereby irrevocably submit to the jurisdiction of any court of the State of New Jersey sitting in the Counties and any Federal court sitting in the Counties and any appellate court therefrom in any action or proceeding arising out of or relating to this Agreement.

7.15    The parties hereto hereby irrevocably waive the right to trial by jury in any action, proceeding, claim or counterclaim whether in contract or tort, at law or in equity, in any manner connected with this Agreement or any transactions hereunder.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in counterparts by their officers thereunto duly authorized as of the day and year first above written.

Charter Operator:

Carrier:

Company Name

Print Name of Authorized Officer

Title

By: _____
Signature

Company Name

Print Name of Authorized Officer

Title

By: _____
Signature

Bank:    VALLEY NATIONAL BANK

Print Name of Authorized Officer

Title

By: _____
Signature

9