# EXHIBIT 5

*IN RE: SOUTHERN SKY AIR & TOURS, LLC*

---

*ROBERT KEILMAN*
*November 14, 2013*

---



**Ellen Grauer**
**COURT REPORTING**
Co., LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 105575.TXT*
*Min-U-Script® with Word Index*

```
1                      KEILMAN

2        A.      No.

3        Q.      When was your last employment?

4        A.      Let's see.  Bank of New York, and I

5   left -- I was on disability with Bank of New York

6   for Parkinson's, and I retired in -- I officially

7   retired three years ago, so that would be about

8   19 -- 2010 I guess, 2011.

9        Q.      When were you last regularly working

10  at Bank of New York?

11       A.      I think it was in 1990.

12       Q.      And after 1990 you were on

13  disability from Bank of New York?

14       A.      Yes.

15       Q.      Can you describe for me the nature

16  of the disability that caused you to stop working

17  actively at Bank of New York?

18       A.      It was a couple of things.  It was

19  my voice got very low, couldn't speak well, my

20  writing was tampered, I couldn't write legibly.

21  My -- I was tired.  My medications make me tired.

22  I couldn't work a full day.  Those combination of

23  things, they put me on disability.

24       Q.      How long did you work at The Bank of

25  New York?
```

```
1                          KEILMAN

2          A.      About 25 years.

3          Q.      What was your title with the Bank of

4   New York?

5          A.      When I left?

6          MS. MURPHY:   Yes.

7          A.      Senior vice president, comptroller.

8          Q.      How long did you have that position?

9          A.      I believe about 10, 15 years.

10         Q.      What did that position entail?

11         A.      Supervision of the accounting area,

12  budgets and then acquisitions.

13         Q.      Any day-to-day financial operations?

14         A.      No.  I wouldn't say day to day.   I

15  was a supervisor, so people worked for me.

16         Q.      Did you understand daily financial

17  transactions sufficiently that you could manage

18  other people?

19         A.      Yes.

20         Q.      Did you prepare any financial

21  reports as part of your job as senior vice

22  president or comptroller for Bank of New York?

23         A.      I didn't prepare them.   Somebody

24  else prepared them, but I received copies and

25  reviewed them.
```

1                    KEILMAN

2  for loan provisions and things like that, loan

3  loss provisions and capital -- bank capital

4  requirements.

5          Q.    Have you ever had experience with an

6  airline transportation or travel company?

7          A.    Not before I got involved with

8  direct sky, Direct Air.

9          Q.    Can you briefly describe your

10 education and any degrees that you have?

11         A.    I've got a BBA degree from Saint

12 Bonaventure University, and I'm a CPA.

13         Q.    What is a BBA?

14         A.    Bachelor of business administration.

15         Q.    When did you become a CPA?

16         A.    1973.

17         Q.    Do you need to maintain that status

18 or --

19         A.    Well, I'm still a CPA, but I haven't

20 practiced in years.

21         Q.    In order to become a CPA, do you

22 need to hold a license?

23         A.    Yes.  You need to pass an exam and

24 get a license.

25         Q.    Are there annual continuing

KEILMAN

2  meeting how the money was going to be spent.

3      Q.    Was there a meeting in which

4  everybody understood that this was your purchase

5  of a share of the company and that it would make

6  you a part owner?

7      A.    I'm sure there's a formal meeting

8  where we discussed it.

9      Q.    But it's your understanding at least

10  there were discussions between all of the

11  founding members --

12      A.    Yes.  They all understood the

13  $200,000 gave me part ownership of the company.

14      Q.    Are you aware of any other money

15  that was paid to Direct Air for start-up costs at

16  the initiation of the company?

17      A.    Yes.  There are three other friends

18  of mine that contributed money, and I believe

19  four other business people have contributed

20  money, Myrtle Beach businessmen.

21      Q.    Who were your three friends that

22  contributed money?

23      A.    Tom Mastro.

24      Q.    M-A-S-T-R-O?

25      A.    M-A-S-T-R-O, Bob Giordano,

25

```
 1                    KEILMAN
 2    G-I-O-R-D-A-N-O, and Bruce Carusi, C-A-R-U-S-I.
 3         Q.     Thank you.
 4                Are you aware of who the other four
 5    local businessmen were?
 6         A.     Yes.  One was Jim Creel, Matthew
 7    Brittain, Larry Young.  The fourth, I have to
 8    think now who it was.  Can't think of the fourth
 9    one now.
10         Q.     Do you know the amounts of their
11    investments?
12         A.     Yes.  Each one contributed a hundred
13    thousand dollars.
14         Q.     Are you aware if there was any
15    documentation of these monies?
16         A.     Yes, there was.
17         Q.     What is that?
18         A.     Well, the deposit was recognized
19    when she put the money in, and there also was a
20    sales document that they received.
21         Q.     What's a sales document?
22         A.     A -- I don't know what you call it,
23    like a memorandum of understanding.  I'm not sure
24    what the actual word was, what we used for it,
25    but it was a document that -- the offering
```

```
 1                        KEILMAN
 2   document they received.
 3        Q.    Did they receive a portion of
 4   ownership in the company for their investment?
 5        A.    Yes, they did.  They each received 3
 6   percent ownership.
 7        Q.    And your understanding that there is
 8   a document that identifies their investment and
 9   their ownership share?
10        A.    Yes, I believe so.  That should be
11   in the records down in Myrtle Beach, wherever the
12   records are kept.
13        Q.    Do you believe it was executed
14   contemporaneously with receiving their money?
15        A.    I don't know when it was executed.
16        Q.    Do you recall if you signed that
17   document on behalf of Direct Air?
18        A.    I don't think I did.
19        Q.    What was the understanding with
20   respect to how these investments would be repaid?
21        A.    They were investments.  There was no
22   understanding how they would be repaid.  They
23   were just investments in the company.
24        Q.    Was there any agreement on whether
25   they would receive profits on a yearly basis?
```

27

KEILMAN

A.     There was no understanding other
than they assumed -- I can't say what they would
assume.  But there was no understanding what
payments would be made from these, that they
would benefit from it at all.

Q.     Was there any understanding of the
conditions under which they may get their initial
investment back?

A.     No, there were no conditions.

Q.     I'm sorry.  Are you saying there's
no conditions under which they would get their
money back or there was no understanding about
what the conditions would be to get the money
back?

A.     I'm not sure if I understand your
question.  There was no expectations, nor were
any promises made to them about how they would
get repaid.

Q.     The founding five members, and I
apologize, I may refer to them collectively as
the founding members from time to time, my use of
that term would include Judy Tull, Kay Ellison,
Marshall Ellison, Ed Warneck and yourself.  Is
that an accurate description of the founding

```
 1                          KEILMAN
 2    members?
 3         A.      That's correct.
 4         Q.      Each of the founding members was
 5    given a title; is that correct?
 6         A.      I believe so, yes.
 7         Q.      Judy Tull was the CEO?
 8         A.      Yes.
 9         Q.      Ed Warneck was president?
10         A.      Yes.
11         Q.      Marshal Ellison and Kay Ellison were
12    both vice presidents?
13         A.      I'm not sure what title they had
14    originally when the company was formed.
15         Q.      Are you aware at any time that they
16    held the title of vice president?
17         A.      I don't know if they ever held the
18    vice president title.  I'm sure -- titles weren't
19    used that much down there, so I'm not sure what
20    title they went by.
21         Q.      Are you aware that Stanley Ellison
22    also had the title of secretary?
23         A.      No.  I thought Kay was the
24    secretary.
25         Q.      And you had the title of CFO,
```

```
 1                        KEILMAN
 2   correct?
 3          A.     I had the title, but I really
 4   wasn't -- I couldn't really say I was the CFO.  I
 5   didn't have the responsibilities of a CFO.  I was
 6   down there as a consultant.  And I didn't get
 7   paid a salary.  I was never an employee of the
 8   company.  I never received a salary from the
 9   company.
10          Q.     Let me go back, because you answered
11   a lot of things right there.
12                 You did have the title CFO, correct?
13          A.     They gave me the title to put on
14   paper, but I didn't really function as a CFO.
15          Q.     So the answer to that is yes, you
16   did have the title CFO, correct?
17          A.     Yes.
18          Q.     In your answer you said you were
19   down as a consultant.  What does that mean?
20          A.     I was -- just to give them advice.
21   If they ever had questions I'd help them out,
22   general business knowledge.
23          Q.     What was expected of you, in terms
24   of your contribution to the company?
25          A.     Just somebody with general business
```

KEILMAN

1

2   in the day-to-day operations of the company?

3        A.    No, I wasn't.

4        Q.    Were you involved in the development

5   of the operations of the company?

6        A.    No.  That was done by Judy and Kay

7   most of the time.  I'll give you a background

8   information, if that would help.  Originally --

9        Q.    I need you to speak a little bit

10  slower, and if you can keep your voice up so we

11  can get a good record.

12       A.    Okay.

13            Originally my intent was just to

14  help them out, raise capital to get the company

15  started and to be somebody who helped them with

16  decisions they had to make down the road.  I told

17  them I could spend no more than three days a

18  month down there, which I did for about the first

19  two years.

20            Then I got more active when

21  potential buyers present themselves to the

22  company.  I was involved with helping them

23  negotiate the transaction.  And I spent more time

24  down there then doing due diligence with the

25  potential buyers as my time increased with them,

33

KEILMAN

1

2   so I was down there to give them advice and

3   counsel about selling the company and helping

4   them with the transaction, the documents that

5   needed to be prepared.

6        Q.      You mentioned giving them counsel.

7   You're not an attorney, are you?

8        A.    No, I'm not.  Financial advice I

9   should say.

10       Q.     That's okay.  I wanted to clarify

11  that.

12            Why did you spend more time with

13  Direct Air helping out with the acquisition?

14    A.      Because I knew that's what the

15  company had to do to survive.  I knew it was

16  important to get this done properly.

17       Q.    Did you have a concern that it

18  wouldn't be handled properly if you weren't

19  involved?

20       A.     No.  I just wanted to make sure that

21  I was down there to help make sure it was handled

22  properly, but I didn't have any reservation about

23  it being done right.

24       Q.     I'm showing you what's previously

25  been marked as Exhibit 43.  It's entitled

1                         KEILMAN

2         Q.      If not that type of report, how

3    would you get information about how long between

4    a booking and a flight?

5         A.      I'm trying to think if there's a

6    report that would give you that.

7         Q.      Well, do you recall how you obtained

8    that information?

9         A.      I wasn't concerned with the timing

10   of the flights.  I just was concerned with the

11   tickets sold.  There was a report called Cross

12   Tab report, which showed all tickets sold in a

13   current period, and I worked with that report.

14        Q.      Do you have any understanding of

15   what percentage of Direct Air's business was

16   same-day ticket sales?

17        A.      Very little.  You mean how many

18   people pay for a ticket that fly that same day?

19        Q.      Yes.  Do you know how much of Direct

20   Air's business was people who went to the ticket

21   counter and paid to fly on the same day?

22        A.      I wouldn't have the direct

23   knowledge, but I would say very few.

24        Q.      Would you say about one percent of

25   the business?

```
 1                    KEILMAN
 2      A.      Yeah, about one percent.  That's
 3  based on just general knowledge, no report or
 4  nothing to tell me that.
 5      Q.      Understood.
 6              So your understanding is most
 7  people, in fact nearly all of Direct Air's
 8  business, was for people who booked and flew at
 9  some date in the future, correct?
10      A.      Correct.
11      Q.      Do you have an understanding of what
12  happened to customer funds paid for advance
13  flights?
14      A.      Just my knowledge that it was
15  booked, and Radixx would record the transaction
16  of the person buying the ticket, and they would
17  send the money to Valley National Bank that they
18  collected.
19      Q.      Do you have any understanding of how
20  the Valley National Bank account operated?
21      A.      No.
22      Q.      You understand from Exhibit 43 that
23  we looked at earlier that you are a signer on
24  that account, correct?
25      A.      Correct.
```

1              KEILMAN

2           Take a look at that and tell me if

3      you've ever read those provisions before.

4           A.      I've never seen this.

5           Q.      I'm sorry.  You've never seen that?

6           A.      Never seen this, no.

7           Q.      Did anyone explain to you that there

8      were Department of Transportation regulations

9      that governed how the escrow account was set up

10     and how it can be used?

11          A.      I'm not sure if we ever had

12     discussions like that, but I was told that by

13     Judy and Kay that you can draw money out for

14     certain types of transactions.

15          Q.      What were the transactions that you

16     could draw money out for as it was explained to

17     you?

18          A.      For luggage fees, ancillary fees,

19     ancillary type of -- like reserve seat fees,

20     luggage fees, things like that.

21          Q.      So it's your understanding, from

22     your earlier testimony, is all of the passenger

23     money had to go into escrow?

24          A.      All into escrow, then she would

25     decide what to pull out of escrow.

KEILMAN

Q.     And before a flight has been
completed, what is your understanding of what
portion of the customer money could be taken out?

A.     Certain allowable fees, ancillary
fees could be taken out.

Q.     What exactly are you referring to
when you say "ancillary"?

A.     Baggage fees, like reserve seats,
first class seats, upgrades, things like that.

Q.     I am handing you what's previously
been marked Exhibit 40.  It's a Public Charter
Depository Agreement between Direct Air, Aviation
Advantage, Inc. d/b/a Southern Skyways and Valley
National Bank (handing).

Have you ever seen that document
before?

A.     I don't believe so, no.

Q.     Valley National Bank has testified
that this is the document governing the escrow
account held by Direct Air at Valley National
Bank.

Is that your understanding of what
this document is?

A.     I don't know what the document is,

1                           KEILMAN

2          A.      Yes.

3          Q.      You mentioned in Ms. Baldwin's

4    responsibilities that she was supposed to balance

5    the bank accounts or reconcile them.

6          A.      Yes.

7          Q.      Which bank accounts?

8          A.      All the bank accounts.  There were

9    about five of them I believe.

10         Q.      Are you aware that Ms. Baldwin had

11   no access to the Valley National Bank escrow

12   account?

13         A.      I guess so, yeah.  I don't know if

14   she did or didn't, but I expect -- she wouldn't

15   sign for anything for Valley National Bank.

16         Q.      Was it your understand that she was

17   reconciling the Valley National Bank account?

18         A.      I didn't know who was reconciling

19   that account.  I assumed it was either Mary or

20   Kay.

21         Q.      You understood that all the

22   passenger money got paid into the Valley National

23   Bank escrow account, correct?

24         A.      Yes.

25         Q.      Did you understand that the purpose

```
 1                    KEILMAN
 2    of that account was a customer or consumer
 3    protection purpose?
 4         A.    Yes.
 5         Q.    And it was your understanding that
 6    the money was held in escrow so that if a
 7    passenger didn't fly, the passenger was able to
 8    recover its money?
 9         A.    Yes.
10         Q.    So it would be important that the
11    balance in the Valley National Bank account was
12    accurate, correct?
13         A.    Yes.
14         Q.    And for the account to be accurate
15    it needed to have in it all of the money the
16    passengers paid for future flights that have not
17    flown, correct?
18         A.    Yes.
19         Q.    What was your understanding about
20    who was verifying that the passenger payments
21    that had been made for flights that had not been
22    flown was in the Valley National Bank account?
23         A.    Say that again.  For flights that
24    weren't flown?
25         Q.    For flights that had not been flown.
```

KEILMAN

1

2   this.   I prepared it, but I'm not sure if it was

3   ever sent out or what we did with it.

4        Q.      And it is entitled Management

5   Discussion and Analysis of the Financial

6   Statements.

7              Do you recall if the information

8   came from a meeting of the founding members?

9        A.      It wasn't done at a meeting, but I

10  might have got information from each of the

11  founding members to fill in the narrative.

12       Q.      And the projections for 2008 is that

13  the company was expected to earn 1 to $2 million

14  and be a profitable company, correct?

15       A.      That's correct.

16       Q.      That didn't happen, though, did it?

17       A.      It didn't happen.

18       Q.      And is it your understanding that

19  Direct Air on a year-to-year basis never had

20  positive earnings?

21       A.      That's correct.

22       Q.      Is it possible in a financial

23  setting or in the financial world that a company

24  that had negative earnings every year could have

25  a positive balance sheet?

1                         KEILMAN

2    the same documents that follow the first page?

3         A.      These are just different time

4    periods, the same information.

5         Q.      You became aware at some point that

6    there was a shortfall in the escrow account,

7    correct?

8         A.      Yes.

9         Q.      Do you recall when it was that you

10   became aware?

11        A.      Probably in 2009 I guess.   I'm not

12   sure.

13        Q.      How did you first become aware that

14   there was a shortfall, and why do you think it

15   was in 2009?

16        A.      2009 is just what I recall.   I'm not

17   sure if that is correct, but I think that's when

18   I got it.   I know it would have been from Kay

19   Ellison who worked on the account.

20        Q.      Do you know how it was that Kay

21   Ellison first discovered that there was a

22   shortfall?

23        A.      No, I don't.   She used to work with

24   the Radixx reports and get information off of

25   Radixx, and that's how she found out.

```
 1                      KEILMAN
 2         Q.      There's been testimony in other 2004
 3    examinations that the shortfall was first
 4    uncovered because of gathering financials for the
 5    proposed Vision acquisition?
 6         A.      That could be.  I'm not sure.
 7         Q.      Is that your recollection?
 8         A.      I don't have a recollection.  I
 9    don't know when I found out, but that could be
10    true.  I'm not sure.
11         Q.      Your earlier testimony was that your
12    involvement in the company increased at the time
13    that there were attempts to be acquired.
14         A.      That's correct.
15         Q.      Do you recall Vision being
16    interested in acquiring Direct Air?
17         A.      Yes.
18         Q.      Were you involved in the efforts to
19    attract Vision?
20         A.      Judy and Kay had relations with
21    Vision.  They knew the management from other
22    dealings that they had.  I think we leased planes
23    from Vision before they approached us.  There was
24    a commonality in management that they thought
25    they'd get together and do a deal.
```

KEILMAN

1
2  the final shortfall number?

3      A.      Roughly it's the $18,771,319 less

4  about $6 million of -- less prepaid fuel, prepaid

5  ACMI, prepaid vision delay, credit card

6  processing, voucher reduction.  That amount,

7  those pieces, which adds up to about $6 million,

8  would offset the 18, so you'd have about $12

9  million of total escrow to be replaced.

10     Q.      Do you have any understanding of

11  what the bottom section related to family ties

12  is?

13     A.      Not really.  I get confused every

14  time I look at it.

15                 You do too I guess.

16                 MS. MURPHY:  It's been a common

17         answer this week for this document.

18     Q.      Are you aware that other founding

19  members were expecting you to be able to pay this

20  $5 million shortfall?

21     A.      I heard that for the first time

22  about two weeks ago.

23     Q.      Who did you hear that from?

24     A.      I think Kay or Judy, one of the two.

25  I'm not sure who.

KEILMAN

1

2     A.      Correct.

3     Q.      Prior to the deal falling apart, did

4  Jeff Conry make representations to you about what

5  TMC Avion would do when they acquire Direct Air?

6     A.      Not to me, but to -- Judy and Kay

7  relayed to me what he had said.

8     Q.      I'm sorry to interrupt.

9            So your understanding is Mr. Conry

10  made statements to Judy Tull and Kay Ellison and

11  then Kay Ellison and Judy Tull reported those

12  statements to you?

13     A.      Yes.

14     Q.      What were those statements?

15     A.      That TMC was going to move the

16  operation to Los Angeles, that they weren't going

17  to come up with airplanes we needed and wouldn't

18  be able to fund it properly, so we should talk to

19  these new guys, Avondale.  So Jeff Conry scared

20  the heck out of Judy and Kay.

21     Q.      But for Mr. Conry's statements,

22  would Direct Air have consummated the deal with

23  TMC Avion?

24     A.      I believe they would have.

25     Q.      Were you in favor of going through

```
 1                      KEILMAN
 2   with the deal with TMC Avion?
 3         A.      Yes.
 4         Q.      But for Mr. Conry's statement?
 5         A.      Before his statements, yes.
 6         Q.      Mr. Conry then introduced you to the
 7   Avondale entities and proposed a deal with them,
 8   correct?
 9         A.      Correct.
10         Q.      And ultimately that's the deal that
11   went through?
12         A.      Yes.
13         Q.      What was your involvement in the due
14   diligence related to that?
15         A.      I was pretty heavily involved.  Kay
16   organized it, but I was -- I worked very close
17   with Don Stukes and giving all the financial
18   information and stuff like that and actually
19   negotiated the deal.  The deal was supposed to be
20   the exact same deal that TMC offered us, but then
21   they modified it towards the end.
22              MS. MURPHY:  I am going to mark as
23          the next exhibit, 68, this yellow folder
24          which says "Due Diligence."
25              THE WITNESS:  Pretty thin.
```

```
1                      KEILMAN
2         A.      No, I did not.
3         Q.      On the second page, the paragraph
4    that starts "Fourth," the letter states, quote,
5    "Mr. Keilman was not an insider of the debtor,"
6    closed quote.
7              Do you know where that statement
8    comes from?
9         A.      Where is that, Jessie?
10        Q.      The paragraph that starts "Fourth."
11        A.      That refers to the time that
12   Avondale took over the company as of September
13   29, 2011 through March I was not involved with
14   the company other than being a friend to them,
15   but I wasn't involved.  I had no responsibilities
16   and no duties with the new company.
17        Q.      Was there a change to the title of
18   CFO for Direct Air?
19        A.      Yes, there was.  On the date of
20   closing, they named this guy George, I'm not sure
21   of his last name.  You may have it.
22        Q.      George McConoughy?
23        A.      That may be his last name.  He was
24   only around for a week or so, then Wayne Greene
25   came in, he became the CFO.
```

```
1                    KEILMAN
2  transfers of money to the ACMI carrier, the fuel
3  carrier and what she needed for operations.
4       Q.    Do you have any reason to believe
5  that the requests to pay the fuel carriers or for
6  ACMI were inflated in any way?
7       A.    I have no way of knowing that.
8       Q.    Until September 2011, you were a
9  little less than one-fifth owner of Direct Air,
10 correct?
11      A.    Correct.
12      Q.    And at a certain point in time in
13 2009 or 2010 you learned that there was a
14 multimillion dollar shortfall in the escrow
15 account, correct?
16      A.    Yes.
17      Q.    Why didn't you take any steps to
18 investigate the source, you personally, to make
19 sure that it didn't get worse?
20      A.    Because I thought the operations
21 would turn around and we'd start making money.
22 When that didn't happen, we looked for buyers to
23 buy out the company that could take over the
24 liability.
25      Q.    But those are talking about
```

1           KEILMAN

2   solutions.  I am talking about trying to

3   understand or fix the problem and how you got

4   there.  Why didn't you take any steps to do that?

5           A.     I want to answer you correctly.

6   Because I thought we could work our way out of

7   it, to be honest with you.  I thought the company

8   would turn around, the income that it would

9   generate would go back into the escrow account.

10  That not working, we sold the company to somebody

11  who would be able to take care of it.

12          Q.     Do you understand that the shortfall

13  arose because more money was being taken out of

14  the escrow account than was going in?

15          A.     I don't know if that's a hundred

16  percent correct.  We were taking money out that

17  we shouldn't have taken out, that's true, but I

18  don't know how much more money was going in than

19  taking out.

20          Q.     I'm sorry?

21          A.     Going in versus coming out.

22          Q.     Are you saying you were taking out

23  money that you shouldn't have?

24          A.     Yes.

25          Q.     And if you don't fix those problems,