# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

Southern Sky Air & Tours,  )    Case No.: 12-40944-MSH
LLC, d/b/a Direct Air,     )    Chapter 7
                           )
        Debtor,            )
_____)

COPY

# THE RULE 2004 EXAMINATION OF
# KAY ELLISON

Tuesday, November 5, 2013
9:39 a.m. –5:32 p.m.

The Rule 2004 Examination of KAY ELLISON, taken on
behalf of the Joseph H. Baldiga, Chapter 7 Trustee,
at the law offices of Boyd Goldfinch Law Firm, LLC,
located at 11019 Tournament Boulevard, Murrells
Inlet, South Carolina, on Tuesday, November 5, 2013.

*Prestige Court Reporting, Inc.*
413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 13

1  A: Uh-huh (affirmative response).

2  Q: So for the purposes of today, the Trustee is

3  waiving that privilege, and to the extent you

4  have any conversations with your counsel for

5  Direct Air, ---

6  A: Okay.

7  Q: --- we want to make sure that you tell us those

8  as part of today's conversation. I don't want

9  you to be nervous.

10  A: Oh, I'm, I'm fine.

11  Q: The purpose of today's examination is really to

12  understand what happened, ---

13  A: Okay.

14  Q: --- make sure we get the information on the

15  record, so that we don't need to keep coming back

16  to you and asking you the questions again and

17  that all the parties here can really understand

18  what happened and why.

19  A: Okay.

20  Q: I'd like to start with some of your personal

21  background. Can you tell me where you live?

22  A: I live in Myrtle Beach.

23  Q: How long have you lived in Myrtle Beach?

24  A: I've been here -- I've been back probably --

25  well, I lived here six years prior to going to

## *Prestige Court Reporting, Inc.*

413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

1   Florida.  I lived in Florida.  My, my mother-in-
2   law died and, and she had cancer and so I -- we
3   went down and, and helped Marshall's dad for a
4   while.  He's older and ailing.  So we lived --
5   I'm sorry, I'm, I'm going around trying to think
6   of the dates.  So we, we lived in Florida about a
7   year and a half.  We've been back here probably
8   four months.
9   Q:   Okay.  So you've just been residing in Myrtle
10       Beach the last four months continuously?
11   A:   Right.  Continuously, correct.  She's going to
12        say "Just answer the question."  I'm sorry.
13   Q:   Do you own the location where you live now?
14   A:   It's -- we, we have a mortgage on it, yes.
15   Q:   And you're married?
16   A:   Yes.
17   Q:   And your husband's name?
18   A:   Is Stanley Marshall Ellison.
19   Q:   Do you have any children?
20   A:   I do.
21   Q:   And can you tell me their names and ages?
22   A:   Seth is 29, Seth Ellison, and then, then Evan
23        Ellison, he's 27, and then our daughter, Blair,
24        it's Blair Hobble, H-O-B-B-L-E, and she is 26.
25   Q:   Did any of your children ever work for Direct

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 15

1    Air?

2    A: Evan.

3    Q: What did Evan do?

4    A: He worked at the airport, you know, he's just --

5    he was just a ticket agent, you know, at the

6    airport.

7    Q: And your husband was also one of the founders and

8    co-owners of Direct Air?

9    A: Yes, ma'am.

10   Q: What do you presently do for work?

11   A: I worked as -- well, I've been -- I went back to

12   culinary school. After, after closing the

13   company, I had to have a job, and so I worked

14   with -- when I was in Florida, I worked for

15   Panera as their catering coordinator, and then

16   when I came back here, I've been a waitress at

17   Lombardo's, and they just laid off for the

18   winter, so I, I do nothing right now.

19   Q: What was your job immediately prior to starting

20   Direct Air?

21   A: I worked for Hooters Air.

22   Q: In what capacity?

23   A: I was -- my husband and I were over reservations

24   and, and I did -- I was assistant administrator

25   for the system.

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 16

1    Q:   What did that job entail?

2    A:   Reservations.  You just, you know, you make sure

3         the calls are processed.  It's in the reservation

4         center.  It's on, on a day to day basis.  You,

5         you hire, you, you, you know, you make sure that

6         your numbers are where they should be.  It's just

7         the daily activities of running a reservation

8         center.  The assistant administration was -- I

9         was to load the system and, and put the flights

10        in, put the classes of service in, put all the

11        SSRs in, you know, everything that goes along

12        with being assistant administrator.

13   Q:   What system did Hooters Air use?

14   A:   Radixx.

15   Q:   How long did you use the Radixx system at Hooters

16        Air, the whole time you were there?

17   A:   Yes.

18   Q:   And how long was that?

19   A:   About three years.

20   Q:   How did you familiarize yourself with Radixx and

21        learn how to use the system?

22   A:   I used Radixx, you know, Hooters had an account

23        with TransMeridian, and I used Radixx at

24        TransMeridian.  I used Radixx -- I've used Radixx

25        before and other products.  There's another

**Prestige Court Reporting, Inc.**
413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 19

```
 1   Q:  Any other airline or transportation experience
 2       prior to that?
 3   A:  We had a reservation company and we were ---
 4   Q:  We?
 5   A:  My husband and I.
 6   Q:  And can you tell me about that reservation
 7       company?
 8   A:  The reservation company did -- we were originally
 9       the overflow center for World Tech., and, and
10       World Tech., when World Tech. decided that we
11       were doing a better job in the West Virginia
12       center than they were during the -- it was during
13       the Olympics during Atlanta.  They were having
14       struggles.  They decided to move the whole thing
15       and then they bought out our company.
16   Q:  At the time you had the reservation company, did
17       you own property where the reservation company
18       was located in West Virginia?
19   A:  You're talking about the Daniels Professional
20       Center?
21   Q:  Well, that is another property in West Virginia.
22       I'm looking to see is that the same building?
23   A:  That's the Daniels Professional Building, and I'm
24       only one member of -- Marshall and I had one
25       share of 15 shares in that building.
```

1    the revenue coming in. If you don't have lift,
2    of course, you don't have people. And then Bob
3    Keilman was -- had a relationship with Ed Warneck
4    and he brought him in as the financial, the CFO.
5    Q: I'm sorry. Ed Warneck had a relationship with Bob
6    Keilman and brought him in?
7    A: Yes, as the CFO and an investor.
8    Q: What's your understanding of everybody's roles
9    when the company was first started in terms of
10    titles, areas of expertise?
11    A: Well, Judy was the chief operating officer or
12    CEO. No, she was CEO. Ed was president. Bob
13    Keilman was CFO, and Marshall and I were both
14    vice-presidents. He was vice-president of
15    reservations. I was vice-president of systems,
16    so.
17    Q: Why did you both take vice-president titles?
18    A: It was just, you know, that was our -- we really
19    weren't really more of the financial or the, you
20    know, running at that time. We were more of the
21    reservations. That was our specialty, is the
22    reservations, is what we'd always done.
23    Q: Bob Keilman was an active member of the company?
24    A: Very much so.
25    Q: How often was he present in Myrtle Beach?

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 24

1   A: He was at least here a week, sometimes two weeks
2      a month. He would come and go.
3   Q: When he wasn't physically present in Myrtle
4      Beach, was he active by email and phone calls?
5   A: Yes.
6   Q: Would it be fair to say he was as involved in the
7      business as anyone else?
8   A: Yes.
9   Q: Why was it that Bob Keilman did not get the
10     salary the same as the other founding members?
11  A: I don't know. He just -- I have no clue.
12  Q: Who proposed the salary schedule for everybody?
13  A: Well, we -- it was, it was a group -- any
14     decisions were made as a group.
15  Q: Do you know who proposed the salary amounts?
16  A: I don't recall.
17  Q: Was Mr. Keilman getting a salary or was he
18     receiving consulting fees?
19  A: I don't recall. I don't think he received a
20     salary. I think he received consulting fees at
21     times, yes.
22  Q: And why would he receive consulting fees if he
23     was an owner and active in the business?
24  A: I can't -- I don't know.
25  Q: Do you know who would know the answer to that?

1   A:  Maybe Bob.  You could ask him.

2   Q:  What was the initial startup capital or seed

3        money for Direct Air?

4   A:  I can't remember all that.  Bob put money in; the

5        Creels put money in; the Brittains put money in;

6        Larry Young put money in.  I cannot remember the

7        exact amounts, and, and, you know, we brought the

8        equipment from the reservation center.  Each

9        person brought a part.  Ed brought his

10       relationship in the market to, you know, in

11       advertising and, and Judy brought her ability to

12       negotiate and her past history with the airlines

13       and, and knowledge of DOT and all that with her,

14       so.

15  Q:  What did Mr. Keilman bring?

16  A:  He brought his, his, you know, he's a CFO, the

17       financial side, the setup side, the -- and he

18       brought -- and he put seed money in, in the

19       beginning.

20  Q:  Was it your understanding that his title was just

21       for form or was he actually the CFO of the

22       company, as you understood it?

23  A:  He did the financial statements and he did all

24       the financial work, so I would say that would

25       make him the CFO, yes.

1    could -- no, I can't recall.  I just can't recall
2    what the amount was.
3    Q:  Were the investors in the beginning stages of
4    Direct Air silent investors, the Creels, Mr.
5    Young, the Brittains?
6    A:  Yes.
7    Q:  And the company was essentially run by the five
8    founding members ---
9    A:  Yes.
10   Q:  --- who had the largest share, collectively, of
11   the company?
12   A:  Yes.
13   Q:  After the acquisition, the founding five members
14   gave up what amounted to 55 percent of the
15   company to Avondale and those associated
16   entities; is that correct?
17   A:  We gave up 55 percent plus control of the
18   company.
19   Q:  And at a triggering event that would then turn to
20   95 percent and entirely without the founding five
21   members; is that correct?
22   A:  It would, it would take it down to them owning 95
23   percent, and the other five percent would still
24   be owned by the founding members, but they would
25   take out all the liabilities of the founding

1    A:  Yes.

2    Q:  Did you ever receive an explanation for why the

3        financials never reflected a balance in the

4        Valley National Bank?

5    A:  I understand that he did everything on a cash

6        basis, so, but I really don't understand the

7        difference, you know, in that respect, no.

8    Q:  But this was during the time where there was, in

9        fact, money in the Valley National Bank account,

10       that there were reports that it was either zero

11       or there were no indication of it on financials,

12       correct?

13   A:  What was zero?

14   Q:  Well, at the time that there was no reference of

15       it in the financials, there was, in fact, an

16       escrow account with money in it, correct?

17   A:  Yes.

18   Q:  Can you describe for us how the Radixx system

19       worked and how somebody would make a reservation,

20       how the booking occurred, and bring us through

21       that process?

22   A:  If you called the reservation center and you

23       would state the dates that you wanted to travel,

24       the reservationist would tell you what flights

25       were available, you'd book the reservation, or

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                          Page No: 51

1    choose to book or not to book.  They would, they
2    would go over all the, you know, the particulars
3    with you, and there was a system to how they read
4    the reservations, did all the things they needed
5    to do, and then they would -- they'd give them a
6    credit card, a number.  It'd be either American
7    Express, Master Card and Visa, they'd charge it,
8    and, and the reservation was made at that point.
9  Q:  What happened with the payment that was made for
10    the reservation?
11  A:  The money would drop into Valley National.
12  Q:  Into the escrow account?
13  A:  Yes, ma'am.
14  Q:  And Radixx was a system that generated the ticket
15    for the passenger; is that correct?
16  A:  It was a ticket, it was a ticketless airline, so
17    there was no ticket like you, you know, normally
18    have a ticket back in the old days.  It was a
19    ticketless airlines.
20  Q:  Customers still received an email or some sort
21    ---
22  A:  Confirmation number.
23  Q:  A confirmation number, and they use that
24    confirmation number to check in at the airport?
25  A:  Yes, ma'am.

1  that and basically was a manifest system, you

2  know, for the airports, and he was going to have

3  to implement that, because he didn't have the

4  manpower and he wasn't going to rewrite, you

5  know, the codes or whatever has to be done on his

6  side to do, you know, what had to be done at the

7  airport.  So we had a dot net system over here

8  and a Radixx system over here, which caused us

9  many, many problems.  On many occasions, you

10  would have a situation where a first passenger on

11  a record would, would show up and would show up

12  as a, you know, a different code completely.

13  They would -- even though that person had been

14  charged on the credit card, they would show up as

15  a payment due or something one -- that one record

16  on the first person especially happened when

17  there was four people on a record.  We had a heck

18  of a time with that.  Then we had situations

19  where, where people's, it was coming across, when

20  you come across with their SSRs, it would come

21  across as cash sometimes, but it wasn't cash, it

22  was an internal problem.

23  Q:  What's an SSR?

24  A:  A special services need like a seat, another bag,

25  another -- an upgrade, whatever.  They call those

1    SSRs in the, in the industry, special service
2    request and ---
3  Q: Are those also called ancillary fees?
4  A: They could be ancillary fees, yes, uh-huh
5    (affirmative response), a change fee, many
6    things. There's pages and pages of those. So it
7    was always a struggle. We had a very, very hard
8    time, because the two systems -- Ron had a, had a
9    tendency to -- he had a tendency to sell things
10   that weren't developed, you know, he would -- a
11   lot of, I think, computer programmers or
12   entrepreneurs will do that type of thing. He was
13   trying and he sold more things than he could
14   develop, so when he started working with Dubai
15   Air, he hired programmers that were -- when I
16   first started working with Ron, he had a in-house
17   group, but then he was very, I think, money-
18   strapped. This is just an opinion on my part,
19   and he started hiring the Indian programmers
20   from, you know, at night, because he would -- I
21   knew he was doing that, because I would have a
22   problem with the system, he'd say, "Well, we'll
23   get, we'll get back with you tomorrow."
24        And I'd say, "Ron, we got to solve these
25   problems."

1    Q:  --- Family Ties is a code.

2    A:  Okay.

3    Q:  And there's a code type, MEMB, memb.

4    A:  That's the membership fee.  That's an SSR, yes.

5    Q:  How did those codes get created?  Did you do it

6        yourselves or did you tell Radixx to do it?

7    A:  Well, it's -- FAM to ILY is built like a city

8        pair, you know, like if you had like MYR to ---

9    Q:  I understand.

10   A:  You know, it's built like ---

11   Q:  I understand that.

12   A:  So we would create ---

13   Q:  So what you're saying is ---

14   A:  Either Maryanne would create them, Shawn created

15       them sometimes, I created them, it'd just depend,

16       and on top of that, Radixx ---

17   Q:  Wait a minute.  I just want to slow down. ---

18   A:  Okay.  Okay.

19   Q:  --- because you're saying a couple of things.

20   A:  Okay.

21   Q:  So either you or Shawn or Mary would create what?

22   A:  Flights to put the passengers on.

23   Q:  Right.  I'm not asking about -- I understand that

24       when a passenger purchases a Family Ties voucher,

25       ---

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 96

1   A: Uh-huh (affirmative response).

2   Q: --- that would get inputted as FAM to ILY in the
3       system?

4   A: Yes, sir.

5   Q: Right?

6   A: Yes, sir.

7   Q: And that would be done by a reservation person at
8       Direct Air, correct?

9   A: Not always, no.

10   Q: If not, then who?

11   A: When they were built, the original flight was
12       built and FAM to ILY would be, for example, we
13       put it on the last day that they could use that
14       ticket, so say it was October 31st, okay? So
15       when we did it, there, there would be like, say,
16       10,000 seats put in there for the Family Ties,
17       which, which the Department of Transportation was
18       very, very aware of. So what they would do is
19       when the system couldn't handle 10,000 passengers
20       on the flight, but that's the only way that they
21       could put it in the system and have people to be
22       able to book. You couldn't have multiple
23       flights. That's the way Radixx developed --
24       Chris said that this is the only way we could do
25       it at Radixx. So then what Chris would do, when

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 109

1    Q:   And if Judy is pulling these expired vouchers out
2         in another report, is she able to do that before
3         the expiration date?
4    A:   No.  You have to leave it on there 'til they're
5         expired.
6    BY MR. REGAN:
7    Q:   And just to be clear, if someone has a voucher
8         and they're in the system as FAM to ILY and then
9         that individual then books a particular flight,
10        what is supposed to happen is the FAM to ILY is
11        going to be replaced with the actual flight
12        sequence.
13   A:   That's correct.
14   Q:   Correct?
15   A:   It's transferred.  It's, it's, it's rebooked into
16        another flight, so you're transferred from FAM to
17        ILY to the other flight, yes.
18   Q:   Is that referred to as a re-accommodation?
19   A:   It could be, yes.
20   Q:   And once that happens you'll no longer have the
21        ---
22   A:   FAM to ---
23   Q:   --- FAM to ILY ---
24   A:   That's correct.
25   Q:   --- associated with that passenger?

1   Q:   --- were not pulling ---

2   A:   No.  No.

3   Q:   I'm sorry, just for the court reporter, on a

4        regular basis you were not pulling reports and

5        emailing them to Judy?

6   A:   Sometimes I did and sometimes I didn't, you know,

7        she, she ---

8   MR. BOYD:                    EXCUSE ME, IS THAT JANUARY

9                                '05?

10  A:   She would pull her own reports.

11  MR. REGAN:                   YES, JANUARY 5.

12  A:   A lot of times she pulled her own reports.  I

13       would, you know, if she has a problem with, say,

14       her system was locking up or something, she'd

15       call me and say, "Kay, can you pull these reports

16       for me?"

17            I said, "Sure, what do you want me to

18       pull," you know.

19  BY MR. REGAN:

20  Q:   And there came a point, too, when you would also

21       provide the reports directly to Valley National,

22       correct?

23  A:   Me?  At the end, I did more, because Judy left

24       for a while.  She was sick for a while, too, very

25       sick.

1   so we can move through what we want to ask. What
2   is your understanding of the escrow requirements
3   for charter airlines like Direct Air?
4   A: That you're supposed to leave the airfare in.
5   Q: How would you define airfare?
6   A: Airfare would be the airfare portion, not the,
7   not the ancillaries.
8   Q: What was Direct Air's practice with respect to
9   what amount of money it left in versus what
10  amount of money it requested out at any time?
11  A: The only thing that it -- it left the airfare in.
12  We ran, we ran what was in the system and we left
13  the airfare. That was what was supposed to be
14  left in the system.
15  Q: You ran what in the system?
16  A: The reports, and, and we left, you know, when the
17  reports -- the only thing that we took out was
18  what we were allowed to take out by the reports
19  that we ran. I'm not sure that's what you're
20  asking. I'm a little confused here.
21  Q: Let me show you Exhibit 4.
22  A: Okay.
23  Q: And if you turn to any of the release requests,
24  so starting with the one that's the first page.
25  A: Okay.

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 222

```
1                                      WHO?
2    MS. ELLISON:                      VALLEY.  THAT'S HOW THEY
3                                      DID THEIR ACCOUNTS.
4    COURT REPORTER:                   CAN WE PAUSE FOR A SECOND
5                                      AND LET ME SWITCH FILES?
6    MS. MURPHY:                       ABSOLUTELY.
7                    ****OFF THE RECORD****
8    (ON THE RECORD.)
9    MS. MURPHY CONTINUES:
10   Q:  Clearly, one of the main issues that the Trustee
11       is concerned about is the shortfall in the escrow
12       account.  When did you first learn that there was
13       a shortfall?
14   A:  As well as my memory serves me, we were, you
15       know, looking at, and I, I didn't really balance
16       the escrow to the, you know, statements.  I never
17       got that, and, and, you know, Bob, and, you know,
18       I would think that, you know, I don't know what
19       he did, but anyway, basically, when we were
20       getting ready, Vision had come to us and talked
21       about buying us, merging.  We had a lot of
22       discussions with Vision.  They were one of the
23       airlines that flew for us, and so I got called
24       downstairs one day, and, and, and if the system
25       didn't work the way that people thought it should
```

1    work, they'd call me and say, "Kay, come down

2    here and, you know, tell me what's going on, run

3    this report for me," or do whatever.

4         I said, "Okay." So Bob and Judy and Ed

5    Warneck were in the office and they asked me to

6    come downstairs and they were -- and they said,

7    you know, "We're off." You know, we always knew

8    we were a little bit off. We thought about,

9    about, you know, you, you get off and there's a

10   couple ways that you get off some, and, and

11   they'd had discussions that we were off some, but

12   that was like, like a million dollars, which

13   would be things like -- and that's pretty

14   standard in our industry for things like if you

15   flew and charged back after the fact and we'd

16   already pulled the money out, there was no way to

17   get that back in. There was so many little

18   things like that overtime. The -- when JetPay

19   was taking out of, out of the, directly out of

20   the Valley account there was money that I think

21   that was there that should've been, you know,

22   that was an issue, and I think there was a time

23   where, you know, American Express taking out, and

24   then the -- we knew that any Family Ties

25   memberships that were out, you know, that was an

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                                    Page No: 224

1        issue, so.  Okay.
2     Q:  And how, again, would Family Ties memberships
3        impact the escrow account?
4     A:  Because if you draw it out of the escrow, it's
5        gone, the, the $60 is gone.
6    Q:  But shouldn't that be reflected, I mean, if
7        you've drawn it out and you're allowed to take it
8        out, shouldn't the escrow, ---
9     A:  See, I didn't balance the ---
10    Q:  --- the balance be what it should be?
11    A:  Well, I mean, I'm just saying that if, if you
12        would ever -- say you hadn't flown those
13        passengers and, and if some -- you have to -- you
14        would have to tell somebody that liability if
15        they were going to buy you.  You have to say,
16        "Hey, there's, you know, $60 times blank number
17        of passengers out that we've already used as
18        revenue."  That would be the prudent thing to do,
19        I would think.
20    Q:  Was your testimony earlier, though, that when you
21        pulled the membership fees from the Family Ties
22        flights that you would then, somebody would
23        delete the membership fee from Radixx?
24    A:  They would on some occasions, but there were some
25        on there that was not deleted, and we didn't

1    out that there was, initially found out there was

2    a shortfall?

3    A: Yes, ma'am.

4    Q: Did you have any understanding of what your

5    personal legal obligation would be to repay a

6    shortfall?

7    A: We discussed it, yes.

8    Q: Did you discuss it with counsel?

9    A: I think ---

10   Q: Again, the Trustee has waived the attorney-client

11   privilege for the company, so if you had

12   discussions as a owner of the company with

13   corporate counsel, then those discussions can be

14   repeated here.

15   A: Yes, we did.

16   Q: Who did you speak to?

17   A: I think, Reese, we spoke to you about it.  Did we

18   talk to you about it (Addressing Mr. Boyd)?

19   Q: And what do you recall about those discussions?

20   A: I don't really remember.  We just, you know, we

21   were concerned, and we had made the decision

22   whether, (a), we would, would either sell the

23   company, (b), Bob would make it whole, he had

24   money to do that or, you know, that was, that was

25   our major two things that we were going to do,

1      and we were going to find, (c), an airlines who

2      would, you know, come in as a commercial airlines

3      and take away the liability.  We didn't know what

4      else to do, and we diligently tried to figure out

5      what was going on with the system.

6    Q:  Do you have any specific knowledge of what the

7        amount of the shortfall was at any time other

8        than the spreadsheet that was prepared for the

9        acquisition?

10   A:  Just the day I went down and ran the report,

11       that, that we knew there was a shortfall at that

12       time.

13   Q:  Did you have discussions between the partners

14       after that time when you first found out about

15       the shortfall, about what the number was,

16       reconciling the books, how to proceed, things of

17       that nature?

18   A:  Yeah, we discussed what we were going to do, you

19       know, we, we, we knew that we either, (a), had to

20       -- as I told you before, we had to either put --

21       find a buyer, (b), Bob had to put $9,000,000 in,

22       'cause none of the rest of us have, you know,

23       that kind of money or any, you know, and Bob

24       understood that, or (c), that we would have to,

25       to find a airlines that had a certificate that

1  Q:  Did you let Valley National Bank know that you

2      were having a problem with a shortfall?

3  A:  No.

4  Q:  Did anyone advise Valley National Bank that there

5      was a shortfall?

6  A:  That wasn't my area, so I don't know. I wasn't

7      signed on the escrow accounts or anything. That

8      was really not my area.

9  Q:  Did you have discussions with the other founding

10     members, any of them, about making Valley

11     National Bank aware?

12 A:  No.

13 Q:  Did you have discussions with counsel about

14     making Valley National Bank aware?

15 A:  No, not that I know of, not that I can recall. I

16     can't recall every conversation that went on. I

17     just know we were very concerned about it.

18 Q:  Were you concerned about making sure nobody else

19     outside of Direct Air found out about the

20     shortfall?

21 A:  No, because we -- anybody that we went to to sell

22     the company or we talked to, we were very up-

23     front and forward about telling them exactly that

24     we had a shortfall.

25 Q:  I'm handing you what's been marked as Exhibit 14.

1  had -- and, you know, when, when -- I was gone
2  when they called and asked for this, and so when
3  they, they -- when, when they sent it to me, I
4  didn't even -- I had so many other issues going
5  on that I didn't have time to -- I was just doing
6  a pass-through. I didn't, I didn't feel like I
7  prepared this financial statement. I didn't own
8  the company. Trent asked Judy for it and Judy
9  wasn't there, so when they sent it to me, I sent
10 it on, and they had talked to them and said they
11 had till close of business day on Tuesday to get
12 it to them. So it, it was not my job.
13 Q: I'm just showing you a Profit & Loss from January
14    2007. It's got a checkmark and it says, "Checked
15    okay," on it, handwritten. Do you recognize that
16    handwriting?
17 A: Huh-uh (negative response), no.
18 Q: No?
19 A: Not my writing, no.
20 Q: And I'm going to show you ---
21 A: That looked like Mary's writing, maybe. Maybe
22    Mary.
23 Q: Maybe Mary Baldwin?
24 A: Yeah, maybe.
25 Q: Thank you. I'm going to show you what we marked

1  yesterday as Exhibit 13, and turn to the second

2  page.

3  A: Okay.

4  Q: You've seen that document before, ---

5  A: Yes.

6  Q: --- haven't you?

7  A: Yes, I prepared that document.

8  Q: And where did you get the information to prepare

9  it?

10  A: Out of Radixx.

11  Q: All the information here comes from Radixx?

12  A: Yes, ma'am.

13  Q: What reports did you run in order to get this

14  information?

15  A: Probably the Crosstab Report.

16  Q: And let me just make sure I can understand this

17  report.  Across the top, it says, "Number of

18  passengers?"

19  A: Uh-huh (affirmative response).

20  Q: That's the actual number of people ---

21  A: Booked, correct.

22  Q: --- booked on those flights?  These are for

23  advanced flights that had not happened, yet, for

24  people who had booked and paid for their flights;

25  is that correct?

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                                    Page No: 303

```
 1         would.
 2    Q:  But you've already taken your money for that
 3         voucher?
 4    A:  The vouchers, yes, we take it when it's earned.
 5         We would run a voucher -- those are voucher
 6         reports that you see in the books.  It's our
 7         money.
 8    Q:  I'm just having trouble finding out why this
 9         voucher reduction isn't already built into what
10         you're saying is the total of the net airfare or
11         total of the gross revenue.
12    A:  It's in there.  It's a voucher and you're -- and
13         we're subtracting it out, because we've already
14         -- we've taken that money.  So you're basically
15         saying right here that it's not money that really
16         has to be in escrow.  That's what we're telling
17         you.  It's included up here, but it's not money
18         that has to be in escrow.  I'm the one who did
19         this form, and, and we've always and every air
20         carrier takes voucher money out.  That's, that's
21         a standard.
22    Q:  Can you explain the bottom portion, the Family
23         Tie section?
24    A:  Sure.  We would say that usually, as an average,
25         that they use about -- 15 percent used funds
```

1    would use about 15 percent of the aircraft, you

2    know, we could -- we took it up a lot higher than

3    that, up to 50 percent, but usually, they'll,

4    they'll eat up in these parts of the aircrafts 15

5    percent, so -- before they expire.  So you have

6    an expiration date on 10/31 of '11.  You have a

7    net, which that's without the, the voucher or

8    without the Family Ties membership taken, that's

9    already been taken out of 622,394, then you have

10   expiring on 4/30/12, 4,102,640, then you have

11   expiring on 10/31 of 12, 2,352,002, which is

12   7,077,036, so you take the 5,000,000 and

13   7,000,000.  We've always said were 12,000,000

14   short.  That's where we are.  That's where we

15   came up with that number.

16   Q:  Did you explain these figures to anyone at

17       Avondale?

18   A:  Yes, I did.

19   Q:  Who?

20   A:  Donald, Donald Stukes.  Hank Torbert understood

21       them.  They all understood them.  Matter-of-fact,

22       I ---

23   Q:  Well, did you have a conversation with anybody

24       other than Donald Stukes?

25   A:  Yes, Hank Torbert.

*Prestige Court Reporting, Inc.*
413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 305

1   Q:  You actually spoke to Hank Torbert?

2   A:  Yeah.  Jeff, Jeff, Jeff Conry understood them.

3   Q:  Well, when you say he understood them, I'm

4       actually just looking for you to tell me whether

5       or not you had a conversation with them.

6   A:  Yes, we did.  Yes, we did, and ---

7   Q:  Did they tell you they ---

8   A:  --- on top of that, we have an email that I have

9       in your box that says, says that Donald Stukes

10      says, "We have received these numbers and we want

11      to have further conversation, look at these

12      numbers and understand these numbers, and on top

13      of that, we want to see the documentation that

14      backs up these numbers," which was -- they were

15      given.

16  Q:  What did you give them to back up those numbers?

17  A:  Well, they had all the Valley, they had the

18      Valley -- I didn't give them to them, Bob did,

19      the Valley National Bank and, and any of the

20      reports that was attached to make this happen.

21      They had it all.

22  Q:  What reports would those be?

23  A:  I pulled them ---

24  Q:  Or did they get them from Radixx?

25  A:  Yeah, I pulled them from Radixx, from the Radar

1   documents for that and sent it out to them, the

2   people out in California, and it was moving

3   along, moving along.

4   Q:   And then what caused that deal to break up?

5   A:   We, all at once, figured out or they, they -- it

6   was about May, and, and they sent out a guy named

7   ---

8   Q:   May of 2011?

9   A:   Yeah.  Let me think of the guy's name, Howard

10   Sanderson.  Howard Sanderson came out and did

11   their due diligence.  He was pushing forward on

12   the deal, and all at once, Jeff Conry comes --

13   they were communicating with us a lot, and Jeff

14   Conry -- it kind of went silent, and Jeff Conry

15   comes marching through the door and says, "As you

16   know, we've got a -- they're not, you know,

17   they're going to come in, they're going to get

18   rid of everybody there, we've -- I got a better

19   deal for you," telling Bob all this stuff, and

20   so, and he says, "These guys from, from Avondale,

21   they're getting USA 3000," which would've been a

22   big plus for any company.  That's a huge --

23   because you, when you get air buses, when you

24   have A320s and A319s, they're low fuel burning

25   aircrafts and they're very fuel -- of course,

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 311

1    they're very fuel efficient, you know, they --
2    and they've got more seats in them, so you could
3    do really well. So they said, "This is, this is
4    what you need, they're a scheduled carrier, we've
5    got it, it's almost finished, let's" -- and so
6    Jeff starts pushing to switch over, but it's
7    really strange, because he told the people from,
8    from up at -- from Sky King, even though he was
9    still working for them, he was saying, "I'm just
10   a consultant at Direct Air, I'm just here," and
11   he was a consultant for them at that time.  I
12   don't know.  There was a falling out of the ways,
13   and so -- so they all -- it was just like the
14   stories Jeff was saying never kind of met the,
15   you know, so.  So Marshall and I ---
16  Q:  Well, let me ---
17  A:  Okay.
18  Q:  --- just jump ahead and ---
19  A:  Okay.
20  Q:  --- ask some specific questions.  Did you
21   ultimately learn that Mr. Conry was not telling
22   you the truth about Sky King's intentions and Sky
23   King's financial condition, which he had
24   represented to you as being poor?
25  A:  Yes, they did.  We found out when -- when we

1    finally -- after -- he, he didn't even want Sky

2    King to know that we'd closed the deal, and after

3    sometime, we learned from the Yaris, you know,

4    Bob Keilman and I, when this -- when everything

5    started falling apart, they didn't produce the

6    aircrafts, they didn't get USA, I mean, I have

7    ---

8  Q:  When the Avondale people didn't do that?

9  A:  Right.  Avondale kept -- we have all these emails

10    that I have in my box, that I'm sorry you haven't

11    got to see, but, but they would say, "Well, you

12    know, the airplanes are coming, this is the date

13    they're going to be here, you load these

14    airplanes in there, don't you all sign any

15    contracts."  I mean, it's a kiss of death when

16    you don't sign contracts for airplanes, "Don't do

17    this stuff."

18  Q:  Right, and I do want to just move us along,

19    because I know ---

20  A:  Yeah, I'm hurrying.

21  Q:  --- we're getting short on time.

22  A:  I'm trying to get there real quick.

23  Q:  So I want to make sure we're focusing on the, you

24    know, the failed deal with the Yaris, because ---

25  A:  I'm trying -- yeah, I'm getting there.  So

1    anyway, at the end when this all fell apart,

2    okay, I'll just jump right to the Yaris.

3  Q: When it all fell apart with Avondale?

4  A: Yes, when they were just not producing, it was a

5    disaster and they, they had got us deeper, deeper

6    in debt, everything was just falling apart. Bob

7    Keilman and I -- I'd met the Yaris before, and so

8    Bob Keilman said, "Kay, let's get on an airplane,

9    let's go talk to them." And so we talked to

10   Kevin Robertson at Ober/Kaler, and Kevin said,

11   after he finished saying, you know, I felt like

12   this was not good, he said, "Here's the things

13   that you have to do," and there's a document, "to

14   try to take the company back." So we started

15   talking about taking the company back, because we

16   didn't -- and so Hank Torbert comes back and

17   says, "Well, they have Swift at this time," no

18   airplanes produced all these times, and Swift --

19   and you're tired of hearing that, but Swift says,

20   said to -- they said -- he comes back and he says

21   to Bob Keilman, I'm sure Bob will tell you this,

22   "You're going to have to rent all your air" --

23   "We'll let you out of the deal, but you're going

24   to have to rent all" -- they haven't even paid us

25   anything. "You're going to, you're going to have

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 314

1    to rent all your aircrafts, give us first right
2    of refusal on all your aircrafts," Bob is saying,
3    "Are you crazy, this is just crazy." So we get
4    on an airplane talking to lawyers, Judy stays
5    there.  That's when the Chemoil was blowing up.
6    We fly to, Bob and I, out to California and sit
7    down with the Yaris, and Bob Yari, I'm sure,
8    would talk to you, he would tell you that we
9    came, and they said, "We don't know where this
10   deal went, we wanted to do this deal so badly,
11   because we could've took Sky King, we would've
12   had stable flying and not did the Cuba flying,
13   Cuba flying, short cycle flying, we could've done
14   this deal with you all, we would've been way down
15   the road, we had every intention of doing this
16   deal," but Jeff Conry told us they didn't -- now
17   they're suing Jeff Conry and Scott Holland, I'm
18   sure you've got a copy of that suit, "because
19   Jeff Conry told us that you didn't -- we -- that,
20   that y'all had no interest in doing the deal with
21   us," So it was just one lie after another lie,
22   after another lie, after another lie, and this,
23   and this deposition with Donald Stukes, he says
24   the same stuff, I mean, he just backs it right
25   up.  He, he tells how it is.

THE DEPOSITION OF KAY ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 315

1 Q: And did the founding five meet and discuss Mr.

2    Conry's proposal that you use Avondale as the

3    acquiring entity and not Sky King?

4 A: Yes.  I was gone, Marshall and I were traveling,

5    I was getting ready to tell you that, and when I

6    got back, they called me, we were not in the

7    country, and so we were away, Marshall's 60th

8    birthday, and they called me and they said,

9    "Kay," -- I said, "Do we know these people, do we

10   know anything about these people?"

11 Q: Okay, but you had a discussion with the ---

12 A: Right.

13 Q: --- the five of you, and the five of you came to

14   an agreement that you were going to ---

15 A: If ---

16 Q: --- accept his proposal and move forward with the

17   Avondale transaction versus Sky King?

18 A: We didn't know Sky King was still on the table.

19   Sky King had went ---

20 Q: And the reason you didn't know Sky King was on

21   the table is because Jeff Conry told you it

22   wasn't on the table?

23 A: Right.

24 Q: And you found out that that information was later

25   false?

1    A:  Yes, ma'am.

2    Q:  But for Mr. Conry telling you that Sky King was

3        going to come in and terminate everybody and that

4        they weren't able to financially afford the

5        transaction, but that for that information from

6        Mr. Conry, would you have gone with Avondale as

7        an acquiring entity?

8    A:  If it wasn't for that information?

9    Q:  Yes.

10   A:  No.

11   Q:  So Mr. Conry was the reason that false

12       information, which turned out to be false

13       information that he gave you was the reason that

14       you went with Avondale?

15   A:  Yes.

16   Q:  And but for that information, you would've

17       consummated the deal with Sky King?

18   A:  Absolutely.

19   Q:  And those were discussions among all of the

20       founding members of Direct Air?

21   A:  Yes.

22   Q:  Were you on the Board of Directors of Direct Air

23       until it closed?

24   A:  Yes.  We only had two Board members when Avondale

25       bought Direct Air, and so did everybody else sit

# EXHIBIT 7



For Value Received, I hereby sell, assign and transfer
unto, partially, to Avondale Aviation I LLC, and
Stukes Atwood LLC, and otherwise surrender the Shares
represented by the within Certificate, and do hereby
irrevocably constitute and appoint
REESE R. BOYD III                              Attorney
to transfer the said Shares on the books of the within named
Corporation with full power of substitution in the premises.
Dated Sept. 29 A.D. 2011

In presence of

x Judy Trell



*For Value Received:...    hereby sell, assign, and transfer unto partially, to Avondale Aviation I LLC and Stukes Atwood LLC, and otherwise redeem the ——— Shares represented by the within Certificate, and do hereby irrevocably constitute and appoint Leese D. Byrd III ——— Attorney to transfer the said Shares, on the books of the within named Corporation, with full power of substitution, in the premises. Dated Sept 29 A.D. 2011*

*In presence of*



For Value Received, _____ hereby sell, assign and transfer unto partically to Avondale Aviation I LLC and Stukes Atwood LLC, and otherwise redeem the Shares represented by the within Certificate, and do hereby irrevocably constitute and appoint REESE R. BOYD III, _____ Attorney to transfer the said Shares on the books of the within named Corporation with full power of substitution in the premises.

Dated Sept. 29 A.D. 2011

In presence of
_____



For Value Received, _____ hereby sell, assign and transfer
unto partially to Avondale Aviation I LLC and Stokes
Atwood LLC, and otherwise redeem the _____ Shares
represented by the within Certificate, and do hereby
irrevocably constitute and appoint
REESE R. BOYD III _____ Attorney
to transfer the said Shares on the books of the within named
Corporation with full power of substitution in the premises.
Dated Sept. 29 _____ A.D. 2011

In presence of

_____          Kay D Ellison



*For Value Received,* _____ *hereby sell, assign, and transfer*
*unto* partially to Avondale Aviation I LLC and Stukes Atwood
LLC, and otherwise redeem the _____ *Shares*
*represented by the within Certificate, and do hereby*
*irrevocably constitute and appoint*
REESE R. BOYD III _____ *Attorney*
*to transfer the said Shares, on the books of the within named*
*Corporation with full power of substitution in the premises.*
*Dated* Sept. 29 _____ *A.D. 20*11

*In presence of*
_____ _____

NOTICE: THE SIGNATURE(S) TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME(S) AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.