1    airplanes, and we don't know the difference.  So
2    we lost our company to somebody who did nothing
3    but lie.
4    Q:  You were just talking about Direct Air as being a
5        producing company.
6    A:  It was.  It produced a lot of passenger and a lot
7        of economic growth to this community and to
8        Florida.
9    Q:  But it had a deficit of 12 million dollars.
10   A:  It wasn't -- Yes, it did.  But it was going to be
11       ---
12   Q:  I'm sorry.  You don't understand how it got to be
13       ten million ---
14   A:  That's right.
15   Q:  --- dollars short, right?
16   A:  That's correct.  Let me ---
17   Q:  Do you know if anybody at Direct Air understood
18       why it was 12 million dollars short?
19   A:  I don't think so.
20   Q:  And you've had discussions ---
21   A:  Yes.
22   Q:  --- with all of the founding members ---
23   A:  We have all been working on it for years.
24   Q:  How did you think an acquiring entity was going
25       to correct it if nobody knew how you got there?

1      out what the net credit card airfares were, where

2      the airfare's paid by credit card.

3  A:  Okay.

4  Q:  Because that's the money that should've -- credit

5      cards were what went to Valley National Bank.

6  A:  Right.

7  Q:  And the only thing that had to remain in there

8      was the airfare component.

9  A:  The net airfare.

10  Q:  So if we were able to find from Radixx,

11      hypothetically, a number that represented

12      payments made by credit card for only the airfare

13      component, that should tell you what should be in

14      the escrow account at any particular time, right?

15      If you could find that information, that's the

16      information to give you the number, right?  And

17      then you were talking about additional things you

18      can subtract out of that, but that's your

19      starting point for what should be in your escrow,

20      right?

21  A:  Say that again.

22  Q:  So your starting point for your escrow, and I'm

23      not talking about the less prepaid fuel and the

24      things like that, I'm talking about your starting

25      point. ---

1   BY MR. REGAN:

2   Q:  Separately from, you would've requested that ---

3   A:  No.  It was done -- The way -- Bob did it when he

4       did the financials, when he pulled from --

5       Remember, I told you he pulled the, the, the, on

6       the financials, he pulled the -- What's the word

7       I'm looking for?  I'm losing words.  What's the

8       ---

9   BY MS. MURPHY:

10  Q:  He pulled the baggage?

11  A:  Yeah.  But what's the -- Ancillaries, he pulled

12      the ancillaries into the report, and that's,

13      that's when it was reported.

14  BY MR. REGAN:

15  Q:  But in practice, did you take out baggage fees

16      prior to customer travel or did that usually come

17      out when you finally requested the funds after

18      completion of the flight?

19  A:  It came, it, it would normally come out with, on

20      the crosstab report when you pulled your

21      releases, and it has the, the ancillaries and it

22      has your taxes and stuff like this, on a weekly

23      basis.

24  Q:  And what was your basis for considering baggage

25      fees and other taxes as categories of funds that

THE DEPOSITION OF JUDY TULL
CASE NO: 12-40944-MSH, CHAPTER 7

1   did not need to remain in escrow?

2   A:  It's not airfare.  They didn't even exist when

3   the rules and regulations, like the Part 380,

4   were written.

5   Q:  My only question is, what's the basis for that

6   understanding, just your review of the

7   regulations?

8   A:  Yeah.  It's not airfare.  Unless it's airfare, it

9   doesn't have to be escrowed.

10  Q:  And that's based on your own reading of the

11  regulations?

12  A:  Right.  But if you wanted to, you could charge

13  them cash at the airports and you, you never

14  would even have to run it through the escrow,

15  through Valley if you didn't want to because it

16  doesn't have to be escrowed.  They usually, when

17  they booked, didn't buy their bag at the same

18  time they booked their record.  They would call

19  back and book their airfare.  They would book

20  their airfare and then like the week that they

21  were going to go, they would call back and say,

22  "I'm going to take one bag," or two bags, because

23  they didn't know at the time that they booked the

24  number of bags they were going to take.  So

25  normally what happened is when you pulled your

# EXHIBIT 9

*Direct Flights with Non Stop Memories ...*



**MYRTLE BEACH**
**DIRECT** *Air & Tours*

Southern Sky Air & Tours, Inc. DBA Myrtle Beach Direct Air & Tours

September 14, 2006

To:     Bob Halagarda/Lori Rooney
        Valley National Bank

From:   Judy Tull
        Southern Sky Air & Tours dba Myrtle Beach Direct Air & Tours

Subject: Southern Sky Air & Tours, dba Myrtle Beach Direct Air & Tours

Southern Sky Air & Tour, Inc. (the "Company"), dba Myrtle Beach Direct Air & Tours, is a charter air service offering all inclusive vacation, golf, and entertainment packages. Scheduled Public Charter Service to Myrtle Beach will commence in March 2007. We are in the process of finalizing our charter air contract with Sky King Airlines. Once the air contract is finalized I will forward DOT paperwork.  I am working with Stan Veron at Machen Enterprises for our $200,000 DOT Letter of Credit. Additionally we are working with Coastal Federal Bank in Myrtle Beach who will be the merchant processing bank. All transactions will be processed through the Radixx computer with funds dropping directly into the escrow account.

The company is owned and managed by a core management team consisting of five experienced men and women who have extensive experience in finance and the tour operator / aviation industry both in domestic and international operations. The company's corporate office is in Myrtle Beach.

Southern Sky Air & Tours™, Inc operates a Reservation / Call Center located in Beckley, West Virginia, with equipment provided for use by two of the Southern Sky Air & Tours™ partners. The center is capable and has handled as many as 20,000 incoming calls per day supporting as many as 100 reservation/sales agents on-line simultaneously. Information will be stored on privately owned server computers, linked to the Internet via high bandwidth routers.  Data will be managed through sophisticated database depositories that will dynamically serve web pages and responses to information requests.

## MANAGEMENT

The Company has assembled an experienced management and development team accomplished in the fields of tour operations and packaging, aviation charters and services, finance, marketing, technology, and general management.

### Judy Tull - Chief Executive Officer

Ms. Judy Tull, Chief Executive Officer, heads the team.  Ms Tull has over 30 years of experience in the aviation industry including executive positions with both airlines and tour operators.  She has extensive experience in aviation contract negotiations, marketing, media planning, flight scheduling, operations, pricing and station management. Ms. Tull was a co-founder of World Technology Systems which operated public charter programs. Sunjet and Myrtle Beach Jet Express between New York City and Florida and Myrtle Beach moving over 6,000 people per day.  Recently she played a key role and was instrumental in developing and managing the Hooters Air scheduled charter program.

### Ed Warneck - President

Edward Warneck, a seasoned veteran of entrepreneurial management, will assist in overseeing day-to-day operations.  Cur he is Chief Operating Officer/President of Championship Golf Tours and Wall Street Golf and Hospitality Association. Previou was a partner of Focus Strategies, Inc., specializing in marketing and fulfilment in the golf and hospitality industry. Mr. Wa will manage and coordinate package development, marketing, and Strategic Partner alliances.

Mr. Warneck has successfully owned and directed a leading all-inclusive golf packaging business since 1985. Besides the thousands of golfers booked by his companies', Championship Golf Tours has been the leading independent provider of passengers for Air South, Myrtle Beach Jet Express, and most recently, Hooters Air. He has a deep understanding of marke

2

and packaging in the golf and hospitality industries. With a history of creative marketing, he has made a significant mark in forming strong relationships with businesses within and outside Myrtle Beach. Many businesses seek his out-of-the box thin

Robert Kellman - Chief Financial Officer

Bob has been in the corporate arena his entire career. Bob, a CPA, worked six years with Deliotte & Touche and 23 years a Corporate Headquarters, Bank of New York, the last 17 years as their Comptroller/ Sr. Vice President. Heavily involved wit business planning and expense controls many as a result of mergers and acquisitions. Bob also was a member of numerou of Directors and sat on many board committees. His corporate business background rounds out our groups increased focus understanding corporate preferences and requirements for corporate entertaining, meetings, conferences, and strategies t enhance and strengthen business relationships and cost saving solutions. After retiring from the Bank of New York, Bob fo with partner Ed Warneck, Wall Street Golf & Hospitality Association. Bob was involved in the development of all operations business.

Kay Ellison – Vice President System Operations
Marshall Ellison – Vice President Reservations & Technology

Over the past 20 plus years, this husband/wife team have owned and operated successful tour operations to resort destinations. Their extensive experience in the tour operation industry have contributed into becoming a leader in providing aviation out-sourcing services Both have been recognized for their knowledge in vacation packaging, airline reservations, operations and aviation services and support. They have provided reservations services, customer service and airport support to World Technology for the public charter program of Sunjet, Myrtle Beach Jet Express, Transmerdian, Nations Air, Kiwi Air, Carnival Airlines and Air Jamaica Vacations and more recently to Hooters Air. They have hired, trained and directed the daily performance of over 500 employees in a national call center, handling over 20,000 calls per day. They also have extensive experience in developing aviation software.

Southern Sky Air & Tours™ is in a start-up position. Currently we do not have a financial statement as we are finalizing all agreements. Southern Sky Air & Tours™ has received private cash investments of $400,000.00 and a line credit of $600,000.00 with a local community bank. We are in the process of opening bank accounts. Our attorney, Clay Brittian, is handling the paperwork.

The following are our personal and business references:

The Creel Corporation - Alicia Bame, Jim Creel
MB Chamber of Commerce - Brad Dean
MB Golf Holiday - Mickey McCamish
MB National Group - Matthew Brittian
Coastal Federal Bank - David Roe - Sr. Vice President - Business Banking Resource Group

We are requesting you to send paperwork so that we may e
Thank you in advance for your assistance.



Sincerely,


*Judy Tull*
CEO


Contact Info: Judy Tull -        Cell 770-366-2018
                                 Fax 843-293-7506


After review, please forward all necessary paperwork.

# EXHIBIT 10

**FACSIMILE COVER SHEET**

# VALLEY NATIONAL BANK

DATE  _9/15/06_



**PLEASE DELIVER TO:**

NAME:  _Judy Toll_

COMPANY:  _Southern Sky Air_

FAX NO:  _843 293 7506_

FROM:  **VALLEY NATIONAL BANK**

**GLOBAL ESCROW**

TEL:  **212-973-6532   FAX:   212-840-7038**
**212-973-6534   Bob Halagarda**

COMMENTS:

_(1) Agreement_

_(2) W 9_

_(3) Corporate Resolution_

NUMBER OF PAGES INCLUDING COVER SHEET:  _17_

CONFIDENTIALITY: THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN CERTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM
DISCLOSURE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED
THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU
HAVE RECEIVED THIS IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL
MESSAGE BY MAIL. THANK YOU.

## COMMERCIAL DEPARTMENT
### RESOLUTION OF DIRECTORS REGARDING BANK ACCOUNT AND AUTHORIZED PARTIES

_Southern Sky Air Tours dba Myrtle Beach Direct Air & Tours_
(Name of Corporation)

I HEREBY CERTIFY to VALLEY NATIONAL BANK, that a meeting of the Board of Directors of _Myrtle Beach Direct_, a corporation organized under the laws of the State of _South Carolina_ duly called and held at the office of said corporation, No. _30 522 9162_ in the city of _Myrtle Beach_ State of _South Carolina_ on the _30th_ day of _June_ 2006.

The following resolutions were duly adopted and are now in full force and effect:

**DEPOSITS AND WITH-DRAWALS**

RESOLVED, that said Valley National Bank (hereinafter designated as the Bank), be designated as a depository of this corporation and that funds of this corporation deposited in said Bank be subject to withdrawal upon checks, notes, drafts, bills-of-exchange acceptances, undertakings or other orders for the payment of money when made, signed, drawn, accepted or endorsed on behalf of this corporation by the following officers and persons, to wit:

_Judy Tull, CEO - Ed Warnock, President - Robert Kailman, CFO_

(Titles of officers and/or other persons authorized to sign each of the above instruments: e.g. president, treasurer, etc.)

_all may do singly_

(also please indicate in what manner they are to sign the various instruments singly, any two or jointly, etc.)

RESOLVED, that the Bank is hereby authorized to pay any such instruments and also to receive the same from the payee or any other holder without inquiry as to the circumstances of issue or the disposition of the proceeds even if drawn to the individual order of any signing officer or person, or tendered in payment of his individual obligation.

**LOANS CREDITS AND SECURITY**

RESOLVED, that the following officers of the corporation and persons, to wit:

_Judy Tull, CEO, Ed Warnock, President, Robert Kailman, CFO_

(Titles of officers and/or other persons authorized to borrow money and obtain credit: e.g. president, treasurer, etc.)

_(jointly)_

(also please indicate in what manner they are to sign the various instruments, singly, any two or jointly, etc.)

are hereby authorized on behalf of this corporation to borrow money and to obtain credit for this corporation from the Bank on such terms as may see, to them advisable, and to make deliver

**notes,**

drafts, acceptances, agreements and any other obligations of this corporation therefore in form satisfactory to the Bank, and as security to pledge or assign and deliver stocks, bonds, bills property held by or belonging to this corporation, with full authority to endorse, assign or guarantee the same in the name of this corporation to exercise and deliver all instruments and affix the corporate seal; and also to discount with the Bank or sell to the Bank any bills receivable or other negotiable paper held by this corporation with full authority to endorse the same in the name of this corporation.

RESOLVED, that _Stanley Marshall Ellison_ Secretary of this corporation, be and is hereby authorized to certify to the Bank the names of the present officers of the corporation, and other persons authorized to sign for it and the offices respectively held by them, together with specimens of their signatures, and in case of any change of any holder or holders of such offices, the fact of such change and the names of any new officers and offices respectively held by them, together with specimens of their signatures; and

BE IT FURTHER RESOLVED, that the Bank be promptly notified in writing of any change or any holder or holders of such offices, and until so notified and receipt acknowledged by the Bank

EXHIBIT
VNB 43
11-13-13 JF

in writing, then the Bank shall be indemnified and saved harmless from any losses suffered or liability incurred by it in continuing to accept and honor checks, notes, etc., signed by the present officers of the corporation only, after such change without such notice.

RESOLVED, that the undersigned officers or any one of them be and are hereby authorized, on behalf of the corporation, to enter into any contract required by said bank governing the said account.

RESOLVED, that these resolutions be communicated to the Bank, and remain in full force until notice in writing of their rescission or modification, has been received by the Bank and receipt thereof acknowledged in writing by the Bank, and that _____ Secretary of this corporation, be hereby authorized to certify to the Bank the foregoing resolutions, and that the provisions thereof are in conformity with the charter and by-laws of the corporation.

I FURTHER CERTIFY that there is no provision in the charter or by-laws of said corporation limiting the power of the board of directors to pass the foregoing resolutions, and that the same are in conformity with the provisions of said charter and by-laws.

I HEREBY CERTIFY that the present officers of the corporation and the offices respectively held by them are as follows:

| NAME | OFFICE | SPECIMEN SIGNATURES |
|------|--------|---------------------|
| Judy Tall | CEO | |
| Ed Warmuth | Pres | |
| Robert Kasdman | CFO | |
| Stanly Marshall Ellison | Secretary | |
| Kay Ellison | VC | |

IN WITNESS WHEREOF, I have hereunto set my hand as Secretary of said corporation and Affixed the corporate seal this _____ day of _____ 20___

_____
Secretary of the Corporation

_____
Other Officer or Director

CEO
_____
Title

(Corporate Seal)

Note: In case the Secretary is authorized by the above resolutions to sign checks, notes, etc., then this certificate must also be signed by another officer of the corporation who is not authorized to sign checks, notes, etc., or a director of the corporation.

Note: Signature cards signed in accordance with the above authorization are to accompany this resolution.

# EXHIBIT 11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

Southern Sky Air & Tours,   )   Case No.: 12-40944-MSH
LLC, d/b/a Direct Air,     )   Chapter 7
                       )
        Debtor,    )
                       )



# THE RULE 2004 EXAMINATION OF
# ED WARNECK

Thursday, November 7, 2013
9:08 a.m. – 4:04 p.m.

The Rule 2004 Examination of ED WARNECK, taken on
behalf of the Joseph H. Baldiga, Chapter 7 Trustee,
at the law offices of Boyd Goldfinch Law Firm, LLC,
located at 11019 Tournament Boulevard, Murrells
Inlet, South Carolina, on Thursday, November 7, 2013.

*Prestige Court Reporting, Inc.*
413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

1       above water.

2    Q:  Is that through a specific media source, is ---

3    A:  No.  It's with a printing company, Minuteman

4        Press.

5    Q:  Have those been your only employment since Direct

6        Air closed?

7    A:  Yes.

8    Q:  While Direct Air was in operation, did you work

9        for anybody else?

10   A:  No.

11   Q:  Prior to Direct Air, what was your employment?

12   A:  I was, owned my own companies, a company called

13       Championship Golf Tours and another company

14       called Wall Street Golf & Hospitality, and I was,

15       I took on partners.  In the Wall Street Golf &

16       Hospitality, I was partners with Bob Keilman, and

17       Championship Golf, I started that company in 1984

18       or '85, and it was a golf packaging, providing

19       events and tournaments and golf vacations in

20       tourist destinations, and Wall Street Golf was

21       more focused on doing corporate entertaining,

22       running events and assisting in events for them,

23       obviously in the Wall Street market.

24   Q:  Did either of those companies sell airfare as

25       part of their packages?

1    asked, how did it get to that magnitude without

2    your oversight and supervision, because you were

3    a part owner of the company, correct?

4    A:  Yes, well, yes.

5    Q:  And it was during your tenure as a part owner of

6    the company that there was at least a 12 million

7    dollar shortfall in the escrow account, correct?

8    A:  So I hear, yes.

9    Q:  Getting back to ---

10   A:  But that was not my obligation to the company.

11   My, my role in the company, first of all, as a

12   partner, which was prior to September 29th,

13   although my title was president and marketing

14   director, that's where my role was, strictly in

15   marketing.  It was not involved at all in the

16   operations of the company.  It was not involved

17   in any of the financial decisions of the company.

18   My role was strictly marketing and growing the

19   airline, and that's what I did.

20   Q:  You held the title of president after the

21   Avondale acquisition, correct?

22   A:  Temporarily, temporarily.

23   Q:  And you're saying during that time the title of

24   president didn't mean anything?

25   A:  Didn't mean anything.  It didn't mean anything

1     when I was with Direct Air.

2    Q:  Did you hold the title of president of Direct

3        Air, as well?

4    A:  Prior to the sale, yeah; and after the sale for a

5        few months; but that was changed over to Kay.

6        Kay and Judy became members of that board.  Kay

7        was appointed as president of the company.

8    Q:  I just want to make sure, ---

9    A:  You know.

10    Q:  --- I'm walking you through the information.

11       You're giving me a lot here.  But you're trying

12       to tell me that you were the named president of

13       Direct Air and that had no consequence?

14    A:  Correct.

15    Q:  It gave you no responsibility on the financial

16       runnings of the company or the company's debt; is

17       that correct?

18    A:  I would say so, yes.

19    Q:  And it also meant that you did not need to have

20       any oversight into the finances of the company?

21    A:  No.  I was never allowed in that area.  I

22       couldn't determine who was being paid, you know,

23       checks, vendors.

24    Q:  Why not?

25    A:  I wasn't allowed.  You know, my job was to go out

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 43

```
1    and get marketing support from the communities,
2    which I did, and when it came time to pay for
3    those, I had to fight tooth and nail every week
4    to try to get them paid on a timely basis.  I
5    mean, I'm sure you have the accounts payable
6    schedules, and you can see how delinquent they
7    were on who they paid.  Those decisions were
8    never, never, never ever, once, even though I had
9    asked for checks to be paid to certain vendors,
10   that was not my, that was not my call, and at
11   most -- I can never remember them paying anyone
12   that I requested, and these were people I bought
13   advertising from all the time.  It got to be very
14   embarrassing.
15   Q: So you understood at a certain point, even
16      without access to detailed financials, that
17      Direct Air was not paying its bills; is that
18      correct?
19   A: You'd have to be blind and deaf and dumb not to
20      know that.
21   Q: How early did you come to that realization that
22      Direct Air wasn't paying its bills?
23   A: I don't know.  I don't know, early on.
24   Q: In the first year of operation?
25   A: No.  I don't think the first year, because Bob
```

1    was discussions with Mary and discussions with

2    Judy and Kay, you know.

3  Q:  At the point that vendors were not being paid,

4    did it make you aware that Direct Air was not

5    bringing in enough money to cover its expenses?

6  A:  I don't think I looked at it that way.

7  Q:  How did you look at it then?

8  A:  It was, I thought it was more of a control thing,

9    that they were just calling the shots, period,

10    and you know, it got to a point where even with

11    marketing and the ads that I was having created

12    by my staff, you know, they would override.  They

13    would micromanage and go around me to work with

14    my staff, you know.

15  Q:  So you didn't believe that Direct Air was in

16    financial trouble when they couldn't pay their

17    bills.  You thought it ---

18  A:  No.  I may have.  I mean, from time to time, I

19    knew that we were not doing, we weren't doing

20    well.

21  Q:  Do you have an understanding whether, on a yearly

22    basis, Direct Air was making or losing money?

23  A:  We were losing money.

24  Q:  Do you recall ---

25  A:  To what, to what magnitude, I don't know.

1   Q:  Do you recall any years in which Direct Air made

2       a profit?

3   A:  No.  I don't recall.

4   Q:  So it would be fair to say that your

5       understanding is Direct Air lost money every year

6       it operated?

7   A:  Yes.

8   Q:  And it sounds like from your testimony that

9       there's some level of distrust, and please feel

10      free to add a different word if that's not

11      accurate, between you and Judy Tull and Kay

12      Ellison.  Is that fair to say?

13  A:  Yeah, absolutely.  Well, bottom line is they

14      walked out.  I was left holding the bag and

15      facing the music here, and that's when eyes

16      really became open as to what was going on here.

17      I mean, their character showed.  I face the music

18      every day in this community, and it's very, very

19      difficult.

20  Q:  And did these feelings come about because of the

21      way Direct Air closed or was it something ---

22  A:  No.

23  Q:  --- that existed the whole time?

24  A:  It existed the whole time.

25  Q:  Why didn't you leave the company?

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 49

A:  I couldn't.  I felt that I -- First of all, there were circumstances financially.  I needed the income.  My wife developed terminal cancer in the early years.  That was a difficulty.  That was a problem.  I have a permanently disabled daughter that I'm taking care of.  And so, you know, here I'm the, the, the face of Direct Air and brought them into this community, not to count the friends of Bob's and mine that we brought in as investors, and we had an obligation to try to get the company whole, and that was the promises that were always made by Judy and Kay.

We counted on them.  They've done this before, you know, built airlines, and, and the whole point was, "We can get over the next hurdle.  We just need, you know, some more money in," and then that's when, you know, Bob was constantly throwing money in to address these issues, and Kay was very good at convincing everybody, you know.

So the objective was to sell the company, and so that's why we worked hard to keep flying and keep growing it, and, and that's what I did.  I grew the airline from zero to two million passengers.  That was my responsibility, the

1    strategic alliances building in all the

2    communities and improving economic impact and

3    conditions in the communities.  That's what I

4    did.

5  Q:  Marshall Ellison also described his role as part

6    with systems and part with marketing.

7  A:  What part?

8  Q:  That's my question to you.  What ---

9  A:  You could write what he did on the back of a

10    stamp.  He was a problem, and I'm sure, as you go

11    through your questions and whatnot with everybody

12    that you talk with, they'll all come to the same

13    conclusions that I'm giving you.

14  Q:  Why do you say that Marshall Ellison was a

15    problem?

16  A:  Because he was, he was the spouse of Kay, who was

17    the controlling partner of the company, and he

18    thought that he was invincible.  He, he knew

19    nothing about marketing.  It was obvious.  Staff

20    recognized it.  Staff would huddle around me

21    constantly, which would upset Kay because I was,

22    as she called it, building camps, because they

23    wouldn't go to him, and he really didn't do

24    anything.

25        I mean, he sat at a desk and he took care

1   and you know, I knew Myrtle Beach and the people

2   here, and I knew what they needed in this

3   community, at least I felt I did, and I felt that

4   I could grow the business here, and, and, and I

5   did, but that's where my focus was. I was very

6   passionate about that. I mean, I put more hours

7   in than anybody. I mean, it was not unusual for

8   me to come at 4:00 in the morning and work till

9   8:00 at night. I mean, so ---

10  Q:  So you didn't have an understanding about the

11      regulations. Did you rely on anyone at Direct

12      Air to know and understand the regulations about

13      charter airlines?

14  A:  I only knew what I was told by Judy and Kay.

15  Q:  And what did they tell you about regulations for

16      the charter airline that Direct Air would be

17      subject to?

18  A:  I knew about the escrow account, that money would

19      have to go into an escrow account until the plane

20      landed, and that was in general. Then there were

21      conditions around that.

22  Q:  What money needed to be put in an escrow account?

23  A:  Well, that's where the confusion is. You know,

24      to this day, I still don't have a hard core

25      answer on that because I never spoke with a DOT

1     attorney or regulatory person.  I only got my

2     information from Judy and Kay, and it, it

3     differed.  But I was told and, and Bob was told

4     and others were told that the escrow account, the

5     only thing that needed to remain, or could not be

6     used in escrow, I think, this is, I think, again,

7     was the fare, and all the other things were not

8     protected by escrow.  The ancillaries, the, you

9     know, seat assignments and children and, you

10    know, those, those fees, the Family Ties

11    membership fee, that money could be used.

12  Q:  And your understanding ---

13  A:  And that was, yes, ---

14  Q:  --- is based on a conversation with Judy or Kay?

15  A:  It was told to us.  It was, you know, it was

16     conversation that was ---

17  Q:  Told to you by who?

18  A:  Judy and Kay.  Kay, Judy -- Kay said that she

19     spoke to the DOT attorney and, you know, because

20     there was a question as to what we could use and

21     what we couldn't use, and I found out later on,

22     post-bankruptcy, that that was not the case, that

23     that conversation never happened at all.

24  Q:  Are you aware that Direct Air had DOT, Department

25     of Transportation attorneys or that they had --

1      more trips home or bring family in to see them.

2      It would be a nice gift to the community, and it

3      would serve our needs of at least not losing

4      money but breaking, making money on, on the

5      flight possibly going out, right? And so that's

6      how we started Family Ties, and it was just this

7      destination, Myrtle Beach, to the community, and

8      it was received, it was received very, very well.

9      When I first brought it up, it was, you know, I

10     think more people were not interested it. That

11     was the days when we did have a committee vote,

12     whether we wanted to do this or not, very, very

13     beginnings, before we started flying, right?

14             So I think -- I don't remember the

15     numbers, but it was something really ridiculous.

16     We, you know, advertised one ad in the paper for

17     a weekend and, "Come to the airport. Meet the

18     new owners of the airline that's a community

19     airline," and, "Have some cake and coffee," and

20     you know, "and you can buy these certificates,"

21     and we spent our time explaining to them and

22     really trying hard to be part of the community.

23             That's what we were trying to inspire and

24     to, "You can use these tickets," you didn't have

25     to have a flight, you didn't have to have a date.

1    You would pay a certain flat fee for it. It

2    included a membership program that they could,

3    that entitled them to buy as many certificates as

4    they wanted. I think maybe limited up to ten or

5    20 certificates, but they can put them in their

6    drawer, and if they wanted to bring their

7    grandson and granddaughter down for vacation,

8    they could send the certificates up to them and

9    bring them in, you know, that type of thing.

10              That's what the whole program was, and it

11   was received very well. We expected to sell, I

12   don't know, 7,000 tickets or something that

13   weekend, and we sold like 15,000 transactions or

14   something. It was an immediate hit, and it gave

15   us a boost of income, because we were, had the

16   membership fees that we can use, and it was

17   around --

18              I mean, it wasn't a genius move. It was

19   just -- Spirit, I think, at the time was having

20   these membership fees, that everybody was trying

21   to figure out how they were doing these low

22   fares, you know, by becoming a member of a Spirit

23   club or whatever. So all I did was try to find

24   where the need was, the benefit to the community,

25   and come up with a program that would work. From

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 108

1    charges, I guess you'd call them, right?  So Kay
2    moved down to Myrtle Beach with her family,
3    Marshall and sons and whoever else, and they
4    bought a house down here, and then she started
5    coming in to the office every day, and then at
6    that point, she basically decided that we could
7    run the sales more often, and so the annual sale
8    became the, "Annual Sale Back by Popular Demand,"
9    or extended or, I mean, you've seen the ads, I'm
10   sure.  I mean, it got to a point at the end that
11   we were having sales every day just about, either
12   an extension or a new sale.
13   Q:  Were you part of any decisions about when to
14       offer a Family Ties sale?
15   A:  Only the initial one.
16   Q:  Only the very first Family Ties sale?
17   A:  Only the very first one.  Then after that, Kay
18       would come in to the office, in to my office or
19       she would go right over to the marketing
20       department and say, you know, "This is what we're
21       doing.  Create an ad," you know.
22   Q:  It was your understanding at the time that the
23       membership fee for the Family Ties tickets could
24       be immediately used ---
25   A:  Yes.

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7                                   Page No: 109

1    Q:    --- by Direct Air?

2    A:    Yes.

3    Q:    In other words, that Family Ties membership

4          portion did not have to go and stay in the escrow

5          account until the flight was flown?

6    A:    Oh, correct.   It could be used right away.

7    Q:    And where did your understanding of that come

8          from?

9    A:    That was expressed either -- I don't remember who

10         in particular, Judy or Kay..

11   Q:    Do you know where they got their understanding

12         from?

13   A:    Clueless, I mean, that was not my world.  My

14         world was down the hall in marketing, and I

15         didn't want to be bothered in that.  I mean, I

16         had enough.

17   Q:    And did you understand that each Family Ties

18         ticket ---

19   A:    Yeah.

20   Q:    --- included a membership fee?

21   A:    Yes.

22   Q:    Of approximately 40 to $60, correct?

23   A:    I think it varied, yes.  I'm not sure what the

24         first one was.  I don't know if it was that steep

25         or not.  I really don't recall.

1   Q:  So Family Ties was essentially a way that Direct

2       Air could generate revenue that it could use

3       immediately from the membership fees, correct?

4   A:  Yeah.  But that was not the intent from the

5       onset.  It was more of solving a problem of the

6       flight being profitable or breaking even, the

7       return flight, right, to generate an outbound

8       flow of traffic.  After that and it was

9       successful and I guess it was recognized that

10      there was, you know, additional revenue coming in

11      from this, maybe somewhere where we may have

12      needed an influx of cash or something later on

13      down the road, I don't know timelines here, I

14      don't know when we had the second one, it

15      could've been a year later, you know, or six

16      months later, it was determined that we should

17      have another sale.

18  Q:  To generate revenue ---

19  A:  And I think -- Yeah, I would think that that --

20      Yeah, it wasn't because of the, at least I don't

21      think it was, or maybe it's just something I

22      suspected.  I really don't know.  I don't think

23      so.  It just was made obvious that we need to

24      have another sale.  So I don't know what other

25      people's motives were, but I suspected, I guess,

1    that it was for additional revenue, as, as well

2    as boosting sales.

3    Q:   Additional revenue coming from the membership

4         fees, correct?

5    A:   Yeah, and, and filling seats, you know, because

6         we were, we were opening up new destinations.   I

7         mean, we went from three destinations to 18

8         destinations, from zero sales to two million

9         sales in a five-year period.  So as new, new

10        cities and destinations were added -- In the

11        beginning, also, remember, it was only Myrtle

12        Beach going to somewhere.  Then after that,

13        after, you know, our initial launch and whatnot,

14        Judy and Kay opened up other destinations, excuse

15        me, outside of Myrtle Beach, and then Kay or Judy

16        introduced, "We're going to have a sale for that

17        destination in the Family Ties sale," but then it

18        was even tied in with the launching of the city,

19        you know, to create a buzz.

20   Q:   Are you aware whether anyone at Direct Air did an

21        analysis of what price needed to be charged in

22        the Family Ties tickets in order to cover costs?

23   A:   No, because I think it was always changing.  I

24        mean, you know, I know we took increases on it

25        towards the end, but I think that was just -- I

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7

1   A:  Correct.

2   Q:  And at some point, you understood that there was

3       a shortfall?

4   A:  Correct.

5   Q:  And that was prior to the closing down of the

6       business?

7   A:  Yes.

8   Q:  And even prior to the acquisition by Avondale?

9   A:  Yes.

10  Q:  And was it approximately at the time that Direct

11      Air was looking to be acquired by Vision that you

12      first learned about the shortfall?

13  A:  I'm not sure if Vision was the first airline that

14      came in.  I don't know if Vision was the first

15      airline, but yeah, that's when I first learned

16      that, you know, we were using the escrow money.

17  Q:  But a shortfall, the term itself should mean that

18      there was supposed to be a certain amount of

19      money and there was less than that.  Is that your

20      understanding ---

21  A:  Oh, no.

22  Q:  --- of the word shortfall?

23  A:  I never knew of that, you know, no.  I thought

24      you meant that money was taken, shortfall meaning

25      money was taken legitimately, they just, you

1    really reaching into my memory on this, it may

2    have come up during the sale of the airline,

3    maybe.  I'm really reaching, you know.

4    Q:  So it's your ---

5    A:  I don't, I really don't -- I can't swear to it,

6        to be honest with you.

7    Q:  So it's your testimony today, you can't

8        specifically recall any conversations with

9        counsel in which a shortfall was addressed?

10   A:  Correct.

11   Q:  Were you involved in the due diligence process of

12       bringing Avondale onboard?

13   A:  No.  What, what was involved, you mean, in the

14       due diligence?

15   Q:  No.  Were you directly involved in the ---

16   A:  Oh, no.

17   Q:  --- due diligence process?

18   A:  Absolutely not, no.  Directly involved, I think I

19       had one conversation with Vision one time to

20       explain to them about the marketing.  In the very

21       beginning, they wanted to know how the marketing

22       was done, et cetera.

23   Q:  And Vision was an early suitor for Direct Air?

24   A:  Yes.  And then there was Sky King.  I don't

25       recall any conversations with Sky King.  And then

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7

1  A:  Yeah, okay.

2  Q:  The date is September 12, 2011.

3  A:  Yes.

4  Q:  And it has an attachment, Escrow 2011 to 2012.

5      Do you recall receiving this email?

6  A:  I don't know.  This would be something I would

7      just, wouldn't be interested in, you know.  I

8      don't know if she was -- I don't know what the

9      purpose of it is to begin with.  We all had

10     business cards, unless there's a different phone

11     number.  No, that's the right number.

12 Q:  If you could, turn to the attachment to the

13     email.

14 A:  Yes.

15 MS. MURPHY:                AND FOR COUNSEL ON THE

16                            PHONE, THIS IS EXHIBIT F TO

17                            THE ASSET PURCHASE

18                            AGREEMENT.

19 Q:  It's a spreadsheet entitled 2011 and 2012 Escrow

20     Revenue as of 9/12/2011.  Have you seen this

21     spreadsheet before?

22 A:  No.  I don't recall ever seeing that, no.

23 Q:  Despite the fact that the email suggests that you

24     were sent a copy of it?

25 A:  I may not have even looked at it, but I don't

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 158

1    recall ever seeing this.

2    Q:   Do you have any understanding about what the

3         information in this spreadsheet represents?

4    A:   Well, by title, it's indicating escrow revenue,

5         that money that was put into the escrow account,

6         and I would imagine this would have to balance

7         out to the escrow balance. It's showing, it

8         looks like, the makeup of it, how much was pre-

9         purchased baggage, which would be ancillaries,

10        right? Gross revenue, I would imagine was the

11        amount of the deposit. I don't know. Passengers

12        to purchase bags, that's probably an assumption

13        based upon performance, of what our passengers

14        did in the past, of how many bags they may have,

15        you know, normally taken and what they would pay

16        for it, because as time went on, you started

17        paying for bags and, like I said, everything but

18        sitting down, right? Bag cost, $35, maybe that's

19        what we were charging at the time to, for a bag,

20        and it would generate additional revenue.

21   Q:   Let's take ---

22   A:   Which may tie-in with the, remember, I said a few

23        moments ago that Kay had explained there was

24        revenue that was coming in when there was a

25        discussion on, of the escrow account with Hank?

1    Q:  Yes.

2    A:  Well, additional revenue there, that looks like

3        some sort of a forecast that Kay must have done

4        based upon, on seats or something, right?  That's

5        what I'm looking at now, and I don't know if I'm

6        right or not, but that's how I would read this.

7    Q:  Do you see the block at the bottom entitled,

8        "Family Ties"?

9    A:  Yeah.

10   Q:  Have you ever seen the information like this for

11       the Family Ties program?

12   A:  No.  No, I have not.

13   Q:  You mentioned that Hank Torbert came in

14       indicating he had airplanes?

15   A:  Yeah.  That was part of, you know, when he

16       presented to us he was interested in the airline,

17       he had indicated that he had access to a hundred

18       million dollars, which was, you know, music to

19       our ears, that he had aircraft, which was the

20       same type aircraft, the A319's or 20's that we

21       had used from Virgin America and Jet Blue, which

22       everybody loved and it was great performance, you

23       know.  Fuel burn went from, I think it was 1100

24       gallons an hour or something like that down to

25       800 gallons an hour.  I mean, we knew that the

1  brought the money to the table that they were

2  supposed to bring, and there were conflicts.

3       We kept leasing planes from them, and we

4  couldn't get them to come to close, and it was

5  aggravating Judy and Kay and the rest of us, and

6  finally, Jeff Conry had called Judy and Kay, and

7  I witnessed that call. I happened to be sitting

8  in Judy's office that day discussing some

9  marketing issues and the call came through, and

10  Jeff was telling Judy that Sky King was looking

11  to close the deal eventually and then they were

12  going to move the company to California and the

13  fact that none of us would move to California, we

14  would be in violation, la la la, la la la, and in

15  other words, they were going to throw the

16  original deal out and we would lose the company.

17  I don't have to tell the hair on the back that

18  went on Judy and Kay at that point and

19  immediately withdrew the deal.

20       Jeff, at the same time, said, "By the

21  way, I've met some investors. I know they have a

22  lot, a lot of money. They don't have any

23  experience in airlines, and they're looking to

24  get involved in a company like yours," and blah,

25  blah, blah. And so that was the first mention,

1    knew any of this or if this was Jeff and, and
2    Donald, because they had a problem in the past.
3    I don't know the details of it.

4  Q:  You mentioned that Jeff Conry made statements to
5    Judy and Kay that you heard regarding Sky King's
6    intention to, after closing the deal with Direct
7    Air, essentially clean house. Is that a fair way
8    to characterize it?

9  A:  No, clean house in a, in a way that we would
10    refuse to move, which would break the contracts.

11  Q:  Did Jeff Conry make any representations that
12    you're aware of regarding Sky King's financial
13    inability to fund the deal?

14  A:  Oh, no. They had more money than air. They own
15    some movie company and making big movies, and you
16    know, this was just something he, I think it was
17    explained that one of the Yari Brothers always
18    had a passion for air or something. I don't
19    know.

20  Q:  Did you subsequently learn or were you
21    subsequently told that Jeff Conry's
22    representations about Sky King's intention were
23    false?

24  A:  You know, I don't recall ever -- I never heard it
25    from Sky -- Wait a minute. I don't remember.

1   Q:  And what was the information that Jeff Conry was

2       conveying during this conversation?

3   A:  That they were going to skin us alive if we went

4       through the deal, and so that's all they had to

5       hear, that they were being, you know, scammed,

6       right? And so Jeff said, "By the way, I've run

7       into these people who've got a lot of money," and

8       that's when he explained about Avondale. I don't

9       know if he used the name Avondale. And he

10      indicated that they were a minority group and

11      they had all this, a million dollars investment

12      money, blah, blah, blah, and he would see if he

13      could get more information and maybe -- and then

14      he called back and said, "Would you like to

15      schedule a meeting with them?"

16          And we said, "Sure," and that's, I think

17      that may have been around June or July, but I'm,

18      I'm not sure on dates.

19   Q:  With regards to the operations and finances of

20      Direct Air, what changes were made after the

21      acquisition? How did the company look different?

22   A:  Well, from, from each area, I guess, you know,

23      you have to answer for, my business went on as

24      usual, with marketing. Nothing really changed

25      there. From operations, I guess there were

THE RULE 2004 EXAMINATION OF ED WARNECK
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 211

1   differences because there was a different

2   reporting system, and ---

3   Q:  Did you have -- I'm sorry to interrupt.  Did you

4       have the same ability to make decisions about

5       marketing and strategy as you had before the

6       acquisition?

7   A:  I never had the power to make the decisions

8       without getting approval.

9   Q:  So it wasn't ---

10  A:  Even an ad.

11  Q:  So, after the acquisition, it wasn't that big of

12      a change because it was simply a different

13      reporting structure for you too?

14  A:  No.  It may have been a little bit easier for me.

15      I think that Jeff gave me more leeway.  In fact,

16      it was pointed out that, you know, Marshall, you

17      know, even, even though he was involved, he had

18      certain destinations that I guess he would try to

19      handle, it was being done more by the people in

20      that destination, but -- And so Jeff said, "Look,

21      here's what I want you to do.  Tell me the

22      destinations that you want, and let him take care

23      of his, and eventually he'll sink," which struck

24      me kind of, you know, odd, but I took all the

25      ones that I had developed, you know, all the big