# EXHIBIT 12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

Southern Sky Air & Tours,   )   Case No.: 12-40944-MSH
LLC, d/b/a Direct Air,      )   Chapter 7
                      )
        Debtor,      )
                      )

**COPY**

## THE RULE 2004 EXAMINATION OF
## STANLEY MARSHALL ELLISON

Wednesday, November 6, 2013
10:08 a.m. – 12:08 p.m.

The Rule 2004 Examination of STANLEY MARSHALL ELLISON, taken on behalf of the Joseph H. Baldiga, Chapter 7 Trustee, at the law offices of Boyd Goldfinch Law Firm, LLC, located at 11019 Tournament Boulevard, Murrells Inlet, South Carolina, on Wednesday, November 6, 2013.

*Prestige Court Reporting, Inc.*
413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

1    Beach would be a good, a good marketing area, a

2    good way to start, although it is seasonal, and

3    at some point we decided that because it is

4    seasonal, we had to do something with the

5    aircraft in the offseason, so that's when decided

6    to fly to, to Florida, to offset, because they're

7    opposite seasons.

8    Q: And were you involved in any decisions about what

9    type of entity Direct Air would be, incorporated

10   and then subsequently and LLC?

11   A: Not really, no.

12   Q: Did you have any understanding of why the company

13   changed entity status?.

14   A: That, that was, I think, you know, that was made

15   primarily by Bob, Bob Keilman. He, he was the

16   CFO, and he had a much better, you know,

17   understanding and experience of all of that, so

18   ---

19   Q: What was your understanding of Bob Keilman's

20   level of involvement and his job at Direct Air?

21   A: Well, Bob was, as I said, his official title was

22   CFO. He, he had been a former vice-president of

23   a bank, the Bank of New York, I believe it was,

24   he was a CPA, and he was the primary investor

25   when, when we formed the company,

THE RULE 2004 EXAMINATION OF STANLEY MARSHALL ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No: 15

1  Q:  Was he an active participant in the day-to-day

2      running of the business?

3  A:  Well, yeah.  I mean, Bob, Bob was, was involved

4      in, in all aspects of the business.  He commuted

5      back and forth from his home in New Jersey, but

6      he was aware of, you know, what, what the company

7      did.  He was intimately aware of everything, I

8      would say.

9  Q:  What do you understand his role to be with

10     respect to preparing company financials?

11 A:  That, that was, that was the biggest part of his

12     responsibility, would have been on the financial

13     side, because that was his background and

14     expertise, but I think that there were a lot of

15     things that, that spilled over that Bob was

16     involved with.  He, he wanted to be aware of

17     everything, you know.  I talked to him many times

18     about the things that, that I was doing, and, and

19     so he was, he's, he's the type of person, he has

20     that type of personality.  He is a communicator,

21     and it's, it's just a matter of sitting down and,

22     and talking about it and letting him know.  I

23     would say that Bob, you know, he just had, he had

24     a vested interest in the company, and so he

25     wanted to make sure that we were, we were all

1    growing in the same direction, I'll say.

2    Q:  Was he part and parcel of all the business

3    decisions?

4    A:  Yes, I would say so.

5    Q:  So he was more than just an investor?

6    A:  Oh, yeah, yeah.

7    Q:  Are you aware of loans that Mr. Keilman made to

8    the company?

9    A:  I know that there was an initial loan or

10    investment when the company started, and then

11    after the company was in business for, you know,

12    periods of time, that he was, he, he continued to

13    provide loans for the operation of the company,

14    yes.

15    Q:  I'm showing you what we've previously marked as

16    Exhibit 17 in Kay Ellison's deposition; I'd ask

17    you to take a look. It's a four-page document.

18    A:  (Pauses while reviewing document.) Uh-huh

19    (affirmative response).

20    Q:  And I would represent to you that the first two

21    pages are single sheets. The last two pages were

22    in Direct Air's files, stapled together. With

23    respect to the first page, entitled, "Promissory

24    Note," is that your signature above the line

25    saying, "Stanley Marshall Ellison"?

1    was a profit in any given month, but that would

2    be, that would be less than probably most months.

3    Q:  Can you recall any instance in which financials

4        were changed from a loss to show a positive?

5    A:  Changed?

6    Q:  Yes, changed.

7    A:  I wouldn't know about that.

8    Q:  You are aware at some point that Direct Air

9        experienced a shortfall in its escrow account?

10   A:  Yes.

11   Q:  Can you explain to me your understanding of the

12       purpose and the operation of the escrow account?

13   A:  We, as a group, knew that there was a shortfall

14       as we went along. We didn't know, at least I

15       didn't know the reason for it. We just knew that

16       there was, we felt like that there, we were

17       short, and we wanted to try to understand why so

18       that we could try to correct it.

19   Q:  And can you explain to me your understanding of

20       the purpose and operation of the escrow account?

21   A:  The purpose and the operation? Probably not, I

22       mean, it wasn't an area that I was involved with,

23       and I wouldn't really be able to say, you know,

24       what that was.

25   Q:  Did you understand that there were Department of

THE RULE 2004 EXAMINATION OF STANLEY MARSHALL ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 27

1          Transportation regulations that required charter

2      airlines to escrow passenger funds until flights

3      were flown?

4  A:  Yes.

5  Q:  And you understood that Direct Air had its escrow

6      account for that purpose at Valley National Bank?

7  A:  Yes.

8  Q:  Did you understand that after flights were

9      completed, Direct Air would send a request for

10      release of funds to Valley National Bank to

11      release money to its operating accounts?

12  A:  Uh-huh (affirmative response).  That's how it

13      works.

14  Q:  Were you ever involved in the process of

15      . requesting a release of funds for Direct Air?

16  A:  No.

17  Q:  Do you have any knowledge of how that process

18      works?

19  A:  No.

20  Q:  Do you understand that the process of obtaining

21      money from the escrow account relied upon

22      financial figures from Radixx?

23  A:  From Radixx, yes.

24  Q:  And you understood at the same time that Radixx

25      financial information had irregularities in it?

1  A:  Well, I understood it, as I said, from a

2      indirect, you know, like I said, I wasn't, that

3      wasn't an area that I worked with or I was

4      responsible for.  So I just knew that there were

5      issues with the reservation system with Radixx.

6  Q:  Including financial issues about the numbers that

7      Radixx was reporting; is that correct?

8  A:  Yeah.  As I said, the reports changed.  It was a

9      change over time.  When we started out with

10     Radixx, up until, you know, in the five or six

11     years, it was a constant change, and in that

12     change, there were, there were issues that, that

13     came about where there were, reports didn't,

14     didn't match.

15 Q:  Well, I'm not questioning what type of reports

16     they had.  I'm questioning whether you understood

17     that there were financial irregularities and

18     inaccuracies in the numbers.

19 A:  As I said earlier, from a broad statement from;

20     from, from my, where I was, my perspective, I

21     heard, you know, Bob, and I heard that there were

22     inconsistencies.

23 Q:  When was the first time you learned that there

24     was a shortfall in the escrow account?

25 A:  I think that when, when we -- Our, our goal was

1   to eventually merge with another airline. We

2   had, we had passengers and another airline would

3   have the equipment. Because we were operating,

4   we didn't, we didn't own our own equipment, it's

5   kind of like when you, when you rent a car, it

6   costs you a lot more to, to rent a car than it

7   does if you owned the car. We were renting

8   aircraft, and so our operating costs were

9   significantly higher than our competition's, and

10   so it was our goal to merge with another carrier

11   that could, we could put our passengers with

12   their equipment.

13       And to go back to your question, I know,

14   I'm -- One of those, one of those carriers, one

15   of those airlines was Vision, and we did, we, we

16   were required to put together the due diligence

17   and, and, for that possibility of merging with

18   Vision. And when you say, "When was that?" I

19   mean, that would've been, I mean, I'm just

20   guessing, but could've been 2000 -- See, we

21   started, actually started flying, see, six,

22   seven, eight, nine, ten, -- We started flying in

23   2007, so probably 2009, 2010. I'm, I'm, I'm

24   trying to guess, pull a year out, but I can't

25   remember exactly.

1   money in and out of the escrow account.  So is it

2   your understanding that a shortfall meant that

3   there was too much passenger funds taken out of

4   the escrow account than there should have been?

5   A:  That's what a shortfall is.  As I said, we didn't

6   ---

7   Q:  And so that's your understanding of what the

8   shortfall here was?

9   A:  Well, we didn't know.  As I said, we didn't know

10   exactly how the shortfall occurred.  We, we

11   wanted to get a better handle on that and

12   understand it, but that would've been in, you

13   know, a different area than, than I worked in.

14   Q:  So would it be fair to say that you're not aware

15   of any practices or checks and balances or

16   procedures put into place after you learned about

17   the shortfall to specifically control the money

18   going in or out of the escrow account?

19   A:  I don't ---

20   MR. BOYD:                    OBJECTION TO FORM.

21   A:  I wouldn't, I wouldn't know.  I mean, there

22   could've been things that were done that, that

23   maybe I don't know about.

24   Q:  Okay.  And that's a sufficient answer.  Thank

25   you.  Did you ever have any dealings with the

1   Q:  Initially.

2   A:  Yes.

3   Q:  And you subsequently learned from Jeff Conry that

4        Sky King did not have the financial ability to

5        consummate the deal and that they had intended to

6        terminate all the Direct Air employees and

7        personnel when they completed the acquisition?

8   A:  Well, yeah.  That -- He was like a double agent.

9        I mean, he ---

10  Q:  And did you understand those things because Mr.

11       Conry told them to you or were they relayed by

12       another person?

13  A:  Probably, probably relayed.  I didn't have a good

14       -- I wouldn't say I had a bad relationship with

15       the Avondale group, but I wasn't, I just, I just

16       didn't feel good about it.

17  Q:  And because of Mr. Conry's representations

18       regarding Sky King, their financial inability to

19       consummate the deal and their plans to terminate

20       everybody when they came, is that the reason that

21       you ultimately decided to go with the Avondale

22       offer?

23  A:  I think it would be all of the above, including

24       we were told by the Avondale group that they had

25       a deal with USA3000 and with Airbuses, and a

1      fleet of Airbuses, I mean, there were pro formas

2      that were, that were run by, by the operations

3      and financial side of the company and ---

4   Q:  And but for those representations by Mr. Conry,

5      you would have closed the Sky King deal; is that

6      correct?

7   A:  We, we would have closed -- Oh, you mean not gone

8      with the Sky King or, or would have gone with

9      Avondale?

10   Q:  But for Mr. Conry's representations, so if he had

11      not made those representations, you would have

12      closed the deal with Sky King; is that correct?

13   A:  Yes, I believe so.

14   Q:  Did you have any involvement in the due diligence

15      process by Avondale?

16   A:  No, ma'am.

17   Q:  I'm showing you what's been pre-marked as Exhibit

18      13 in Judy Tull's deposition.  Do you recall

19      seeing that document before?

20   A:  No.

21   Q:  No?

22   A:  No, ma'am.

23   Q:  Are you aware that this document was provided to

24      Avondale as part of the due diligence process, as

25      well as attached to the asset purchase agreement

1       daily financial reports from Valley National

2       Bank.

3   A:  No, ma'am.

4   MS. MURPHY:            I'D LIKE TO TAKE A FIVE-

5                         MINUTE BREAK.

6             *****OFF THE RECORD*****

7   (ON THE RECORD)

8   MS. MURPHY CONTINUES:

9   Q:  Getting back to some of the questions just before

10      the break which was about the acquisition.  Can

11      you tell how your job changed before and after

12      the acquisition?

13  A:  Well, before the acquisition, I had a number of

14      markets that I was responsible for, and for the

15      most part, the sales were good.  The sales were

16      in line with what they should have been.  But the

17      thing about marketing is it's not something that,

18      I mean, every, every day or every month, you

19      know, there's always seats to fill, always, you

20      know, planes that, that we're obligated for, and

21      so you could, you could, you could do a good job

22      for a particular month, but then you have to

23      start all over again and do it, and so you always

24      had that pressure.  It's like there's always a

25      weight on you.

1   And so once, once the, the company was
2   under the acquisition, I still, I still did that
3   for the most part, but there was a lot of, I
4   mean, for instance, it made it more difficult
5   because there was no yield management. What the,
6   what the new company did was they went in and
7   they set up a template. They said that, "We want
8   to make, we want our net profit to be higher on
9   each, each flight, each seat," and so they set
10  the, the fares at a particular level and, where
11  before, part, to, to, to keep the sales going, I
12  did, would, would work with the yield management
13  side to say, "This is, we need to adjust the
14  fares to have sales," but they made the sales so
15  high that -- the seats, I mean, so high, that the
16  sales really dropped off.
17  Q: Who is yield management, who handled that?
18  A: Really, the, the, the company, the company did as
19  a whole, but I would look at it from the
20  marketing side, and, and because we would set it
21  up, each flight would for the most part be the
22  same based on what we thought would, would be
23  positive for the company and with, with some ---
24  Q: Positive cash flow or ---
25  A: Positive sales, yes. And if there needed to be

1    to generate income and revenue for the company to

2    use in its daily business operations.

3    MR. BOYD:                      OBJECTION TO FORM.

4    A:  I mean, it, it was, it was, it was a membership.

5       It was a sale.  So that was revenue for the

6       company.

7    Q:  It didn't actually cost $60 per ticket to

8       administer the Family Ties program, I mean, this

9       was just a revenue generator, like any other

10      service fee, correct?

11   A:  I guess so.

12   MR. BOYD:                      OBJECTION TO FORM.  YOU CAN

13                                  ANSWER.

14   A:  I mean, ---

15   Q:  Well, let me ask another question about the

16      program.  Was it intended that people would use

17      every single certificate or was there an expected

18      rate of expired certificates that would not have

19      to be flown?

20   A:  It was expected and assumed that people would use

21      all of their certificates.  That didn't always

22      happen, and people knew that if they didn't use

23      it, that that would, it had a time limitation and

24      that they would lose the ability to do that, and,

25      and which caused some, you know, conflict because

THE RULE 2004 EXAMINATION OF STANLEY MARSHALL ELLISON
CASE NO: 12-40944-MSH, CHAPTER 7                                    Page No:  62

1    A:  That would've been, Aaron Goerlich was our

2        Department of Transportation attorney, and he,

3        he, he -- the Department of Transportation put

4        that in writing, that we had approval for that.

5        I think that's the way it happened.

6    Q:  Do you recall seeing a writing from the

7        Department of Transportation indicating that?

8    A:  There was a letter, yes.  I don't -- Whether or

9        not I saw the letter, I know there was ---

10   Q:  That's my question.

11   A:  --- a letter.

12   Q:  Do you recall seeing the letter?

13   A:  I don't know that I saw the letter, but I knew

14       that there was a letter because we talked about

15       it.

16   Q:  Was your understanding primarily from

17       communications of Mr. Goerlich?

18   A:  Well, yeah.  He would've been the person who

19       would have, he would've been the, the attorney

20       who, who, who got that approval or the letter or

21       permission to, however you want to describe it.

22   BY MS. MURPHY:

23   Q:  How did Family Ties' fares compare to regular

24       ticket prices?

25   A:  How did they compare to regular?  I think it was

1    a good deal.

2    Q:  So my ---

3    A:  People, a lot of people loved it.

4    Q:  My understanding is that the Family Ties, the

5        cost for a ticket was about 140 to $150.  Is that

6        accurate?

7    A:  Uh-huh (affirmative response).

8    Q:  I'm sorry.  You'll need to say yes or no.

9    A:  Yes, ma'am.

10   Q:  Thank you.  And that was about the same price

11       people would pay for a non-Family Ties ticket?

12   A:  Well, I think it would've been, it would've been,

13       across the board, it was probably lower than the

14       competition, although the competition had sales,

15       too.

16   Q:  I'm sorry.  I don't understand that.  Are you

17       saying that on average, because I understand that

18       there are less expensive flights and more

19       expensive flights, but are you saying, on

20       average, your Family Ties rate was a little bit

21       less than the rate Direct Air would charge a non-

22       Family Ties ticket?

23   A:  Was lower than -- Well, yeah, it would have been

24       lower because, because our lowest fare was

25       typically $99, and there was only, you know, so

# EXHIBIT 13

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

Southern Sky Air & Tours,    )    Case No.: 12-40944-MSH
LLC, d/b/a Direct Air,       )    Chapter 7
                             )
                Debtor,      )
                             )
_____)

# THE RULE 2004 EXAMINATION OF
# MARY BALDWIN

Thursday, November 7, 2013
10:24 a.m. – 4:56 p.m.

The Rule 2004 Examination of MARY BALDWIN, taken
on behalf of the Joseph H. Baldiga, Chapter 7
Trustee, at the law offices of Boyd Goldfinch Law
Firm, LLC, located at 11019 Tournament Boulevard,
Murrells Inlet, South Carolina, on Thursday, November
7, 2013.

*Prestige Court Reporting, Inc.*
413 Paul Street
Conway, South Carolina 29527
(843) 248-5252

THE DEPOSITION OF MARY BALDWIN
CASE NO: 12-40944-MSH, CHAPTER 7                    Page No: 31

1   Q:  And I would note that the third line item from
2       the top says Sky King?
3   A:  Yes.
4   Q:  Or Sky King wire?
5   A:  Right, that's the airline.
6   Q:  And that's what you're referring to ---
7   A:  Exactly.
8   Q:  --- if you needed to check to make sure that a
9       vendor had gotten paid, that's how the
10      information would show up on this ---
11  A:  Exactly.  Because sometimes they would call and
12      I, the calls would get routed to me and they
13      would say "We didn't get our wire," and I'd say
14      "Well, give me a minute, let me check."  And I
15      would go to Kay and see if, you know, their's
16      were there.
17  Q:  And that is the only use you made of the daily
18      financial report ---
19  A:  That's correct.
20  Q:  --- from Valley National Bank?
21  A:  That's correct.
22  Q:  Are you aware at some time there became a
23      shortfall in the escrow account?
24  A:  I heard them talking about a shortfall.  Most of
25      the time that information, they would never

1   reveal what the shortfall really was until -- I

2   only knew of the shortfall when we were closing.

3   We -- It was a shock to all of the employees.  We

4   had no knowledge of, you know, that was kept

5   separate.

6   Q:  We've had the opportunity to speak to several of

7   the founding members, and they've described that

8   the company was run, prior to the acquisition by

9   Avondale, that the founders ran the company

10   essentially by committee, and they all joined in

11   and made decisions together. Do agree with that

12   characterization?

13   A:  I would have to say no.  We had partners who had

14   areas that they covered.  Kay and Judy was

15   operations, escrow and reservations management.

16   Marshall was marketing and systems management,

17   then Ed was mostly marketing.  Now, they met on a

18   regular basis, but employees were not privy to

19   those meetings.  The only time employees were

20   privy to those meetings was when it involved,

21   say, somebody coming in wanting to offer

22   something to the employees or if a new airline

23   came in and they wanted to, you know, wanted to

24   work with Direct Air, sometimes the employees

25   would be involved in, like a luncheon kind of

THE DEPOSITION OF MARY BALDWIN
CASE NO: 12-40944-MSH, CHAPTER 7

Page No: 44

1   A: Uh-huh (affirmative response).

2   Q: How often was he down in Myrtle Beach prior to

3       the acquisition?

4   A: Probably on a monthly basis, sometimes bimonthly.

5       It depend on, you know, really what was going on.

6       Sometimes he'd have to come and stay, you know, a

7       week, two weeks, but, you know, he was always

8       available through, via email and telephone so --

9       but he down quite often.

10  Q: So if he wasn't physically here, he was still

11      present and able to give direction electronically

12      and remotely?

13  A: Right.

14  Q: And he in fact did do those things?

15  A: Yes. I, I would not make any decisions without

16      consulting with him, or if I ran into a problem

17      which was, you know, quite often, I would call

18      him, you know, and tell him what that problem was

19      because that was the sane part of it. He was the

20      sane part of it.

21  Q: Sane?

22  A: (Indicates affirmatively.)

23  Q: Are you aware of documentation of Mr. Keilman's

24      additional money to Direct Air that were

25      documentation of loans?