# EXHIBIT 26

## Escrow Analysis

| | Escrow Runoff | Estimated Expenses | New Bookings | Escrow Balance | Escrow Required | Escrow Shortfall |
|---|---|---|---|---|---|---|
| 2-Nov | | | | 4,800,000 | 19,500,000 | 14,700,000 |
| Nov 3 / Nov 9 | 425,000 | 534,000 | 500,000 | 4,766,000 | 19,575,000 | 14,809,000 |
| Nov 10 / Nov16 | 360,000 | 970,000 | 600,000 | 4,396,000 | 19,815,000 | 15,419,000 |
| Nov 17 / Nov 23 | 900,000 | 1,000,000 | 700,000 | 4,096,000 | 19,815,000 | 15,519,000 |
| Nov 24 / Nov 30 | 1,000,000 | 1,300,000 | 500,000 | 3,296,000 | 19,115,000 | 15,819,000 |
| Dec 1 / Dec 7 | 400,000 | 1,250,000 | 650,000 | 2,696,000 | 19,365,000 | 16,669,000 |
| Dec 8 / Dec 14 | 300,000 | 1,200,000 | 650,000 | 2,146,000 | 19,715,000 | 17,569,000 |
| Dec 15 / Dec 21 | 900,000 | 1,300,000 | 650,000 | 1,496,000 | 19,465,000 | 17,969,000 |
| Dec 22 / Dec 28 | 1,400,000 | 1,550,000 | 600,000 | 546,000 | 18,665,000 | 18,119,000 |
| Dec 29 / Jan 4 | 1,400,000 | 1,800,000 | 700,000 | -554,000 | 17,965,000 | 18,519,000 |
| Total | 7,085,000 | 10,904,000 | 5,550,000 | -554,000 | 17,965,000 | 18,519,000 |

Escrow Required for Flights Booked:

| | |
|---|---|
| Nov. - Dec | 5,470,000 |
| Jan - Feb | 3,099,000 |
| March - April | 5,460,000 |
| May - June | 1,953,000 |
| July - Oct | 3,550,000 |
| Total | 19,532,000 |

# EXHIBIT 27



June 7, 2011

Sent via Fax:  310-234-2975

VIA OVERNIGHT COURIER

TMC Avion, Inc.
10850 Wilshire Boulevard, 6th Floor
Los Angeles, California 90024
Attention:  Bob Yari, President

Re:  Purchase Agreement dated April 22, 2011 (the "Purchase Agreement") by and among TMC Avion, Inc. ("TMC"), Southern Sky Air and Tours, LLC ("Southern Sky"), and the other parties thereto

Dear Mr. Yari,

The undersigned hereby terminate the Purchase Agreement pursuant to Section 9.1(d) thereof, effective immediately.

In addition, the undersigned hereby instruct TMC to return to Southern Sky or destroy in accordance with Section 11.3(b) of the Purchase Agreement all information provided by or on behalf of Southern Sky to TMC in connection with the Contemplated Transactions.

Capitalized terms used in this letter but not defined herein have the respective meanings specified in the Purchase Agreement.

Please contact Bob Keilman or Judy Tull if you have any questions.

The Partners of Direct Air

*[signature]*

*[signature]*

Corporate: 843 916 9700          1600 Oak Street North, Suite B,  Myrtle Beach, SC 29577          Fax: 843 448 79

# EXHIBIT 28

## <u>MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made as of September 29, 2011 (the "**Effective Date**") by and among: (i) Avondale Aviation I, LLC, a South Carolina limited liability company ("Aviation"); (ii) Stukes Atwood, LLC, a New York limited liability company ("**Stukes Atwood**" and together with Aviation, "**Buyer**"); (iii) each of the individuals identified on <u>Exhibit A</u> (each individually a "**Seller**" and collectively, the "**Sellers**"); and (iv) Southern Sky Air & Tours, LLC (d/b/a Direct Air), a South Carolina limited liability company (the "**Company**").

### RECITALS

Sellers desire to sell, and Buyer desires to purchase, up to 95% of the issued and outstanding membership units of Company (the "**Units**"), for the consideration and on the terms set forth in this Agreement.

### AGREEMENT

The parties, intending to be legally bound, agree as follows:

## 1.   DEFINITIONS

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"**Additional Purchase Trigger**" means the completion or delivery by Buyer of any one of the following: (i) the consummation of an acquisition (whether through purchase of equity or assets, merger or consolidation) of an operating airline with a valid Airline Operating Certificate ("AOC") using funding from Buyer or another acquisition company (other than the Company); (ii) commencement of the application process for the Company to obtain an AOC and schedule licensing authority from DOT; or (iii) the receipt of a Consumer Protection Bond in the amount no less than $3.0 million for the benefit of the Company.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person, where "control" and its derivatives shall mean, with respect to any Person, (a) the legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the voting interest of such Person, or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, "Affiliate" includes all Subsidiaries.

"**Applicable Contract**" means any Contract (a) to which the Company is a party, (b) under which the Company has or may acquire any rights, (c) under which the Company has or may become subject to any obligation or liability, or (d) by which the Company or any of the assets owned or used by the Company is or may become bound.

"**Balance Sheets**" has the meaning specified in Section 3.4.

"**Business**" means the business of the Company as conducted and as proposed to be conducted by Sellers as of the Effective Date.

"**Closing Date**" means the date and time as of which the Closing actually takes place.

"**Consent**" means any approval, consent, ratification, license, permit, waiver, or other authorization (including any Governmental Authorization).

"**Contemplated Transactions**" means all of the transactions contemplated by this Agreement.

"**Contract**" means any agreement, contract, obligation, promise, note, bond, mortgage, indenture, guarantee, license, franchise agreement, instrument or other undertaking (whether written or oral and whether express or implied).

"**Contribution Agreement**" means the Contribution Agreement of even date herewith by and among Buyer and Sellers, as amended or supplemented from time to time.

"**Disclosure Letter**" means the disclosure letter delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"**Employment Agreements**" has the meaning specified in Section 2.4(a)(iii).

"**Encumbrance**" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, warrant, voting trust, right of way, encroachment, license to third parties, lease to third parties, security agreement or any other restriction or limitation on use of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"**Facilities**" mean any real property, leaseholds, or other interests currently or formerly owned or operated by the Company and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently or formerly used, owned or operated by the Company.

"**GAAP**" means generally accepted United States accounting principles, consistently applied.

"**Governmental Authorization**" means any Consent issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"**Governmental Body**" means any: (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any agency which is empowered to grant legal protective status to Intellectual

2

Property, including, without limitation, the United States Patent and Trademark Office, the United States Copyright Office, and their foreign equivalents.

"**IRC**" means the Internal Revenue Code of 1986 or any successor law, and regulations issued by the IRS pursuant to the Internal Revenue Code or any successor law.

"**IRS**" means the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

"**Material Adverse Change**" means a material adverse change in the Company's Business, affairs, operations, or financial condition; provided, however, that none of the following shall be taken into account of determining whether, and no change, event, development, occurrence, circumstance or effect resulting from any of the following shall be taken into account of determining whether, a Material Adverse Change has occurred: (i) changes in the national or world economy or financial markets that impact the industry as a whole, (ii) changes in conditions that affect the industries in which the Company conducts its Business taken as a whole, and (iii) any effect resulting from an outbreak or escalation of hostilities involving the United States, the declaration by the United States of a national emergency or war, or the occurrence of any act of terrorism that impact the industry generally.

"**Order**" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"**Ordinary Course of Business**" means an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

"**Organizational Documents**" means (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

"**Permitted Encumbrances**" means (a) Encumbrances for Taxes, assessments or other governmental charges not yet delinquent, (b) materialmen's, mechanics', repairmen's, landlords', and similar Encumbrances arising against the Company or any Seller in the Ordinary Course of Business solely to the extent based on payments which are not yet due, (c) Encumbrances arising by virtue of any common law or statutory provision relating to bankers' liens, rights of set-off or similar rights and remedies as to deposit or securities accounts maintained in the ordinary course of Business, and (d) Encumbrances listed in Part 1 of the Disclosure Letter. "**Permit**" means

3

permits (including occupancy permit), certificate, licenses, consent or authorization of any Governmental Body.

"**Person**" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"**Redemption Agreement**" means the Irrevocable Waiver and Consent to Sale of Membership Units Agreements dated as of September 29, 2011 pursuant to which the Company shall redeem the outstanding equity interests of certain holders of Units of the Company as more fully specified therein.

"**Related Person**" means, with respect to a particular individual: (a) each other member of such individual's Family; (b) any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family; (c) any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest (defined below); and (d) any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual: (a) any Affiliate of such specified Person; (b) any Person that holds a Material Interest in such specified Person; (c) each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity); (d) any Person in which such specified Person holds a Material Interest; (e) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and (f) any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "**Family**" of an individual includes (i) the individual, (ii) the individual's spouse and former spouses, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "**Material Interest**" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least 10% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 10% of the outstanding equity securities or equity interests in a Person.

"**Representative**" means with respect to a particular Person, any member, manager, director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"**Restated LLC Agreement**" means that certain Amended and Restated Operating Agreement of the Company entered into by the Company, Buyer and the Sellers as of the date hereof, which

shall amend and restate the Company's existing Operating Agreement dated May 23, 2007 by and among the Company and the Sellers.

"**Securities Act**" means the Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"**Sellers' Knowledge**" means the actual knowledge of any of the Sellers, in each case after conducting a reasonably comprehensive investigation.

"**Subsidiary**" means with respect to any Person (the "**Owner**"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries.

"**Tax**" means any tax (including any income tax, capital gains tax, value-added tax, sales tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"**Threatened**" means a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

## 2.   SALE AND TRANSFER OF SHARES; CLOSING

   **2.1   Purchase and Sale of the Initial Units.**   Subject to the terms and conditions of this Agreement, at the Closing, each Seller will sell, assign, transfer and deliver to Buyer, and Buyer will purchase from each Seller, the number of Units set forth opposite such Seller's name on Exhibit A under the heading "Initial Units." The Initial Units and any Subsequent Purchase Units (defined in Section 2.5 below) are referred to herein, collectively, as the "**Purchased Units**".

   **2.2   Purchase Price.**   The purchase price (the "**Purchase Price**") for the Purchased Units is (a) Seven Hundred and Fifty Thousand Dollars ($750,000), payable by Buyer to the

order of the Sellers through execution and delivery at Closing of a promissory note in the form of Exhibit B hereto (the "Note"), plus (b) a contingent amount of Two Hundred and Fifty Thousand Dollars ($250,000) to be paid in cash by the Buyer to the Sellers (based on such Seller's percentage ownership of the Units as of immediately prior to the Closing after giving effect to the transactions contemplated by the Redemption Agreements) if the Company performs over the twelve (12) month period commencing on the Closing Date in a manner consistent with the projected financial statements to be mutually agreed to by Buyer and a majority of the Sellers as soon as practicable after the date hereof (the "Deferred Payment"). The Deferred Payment shall be made to the Sellers in accordance with the payment instructions set forth in the Note.

**2.3    Closing.**  Subject to satisfaction of the contingencies set forth in Section 2.4 hereof, the purchase and sale of the Initial Units (the "Closing") provided for in this Agreement will take place at the Company's offices at 10:00 a.m. (local time) on the date hereof, or at such other time and place as the parties may agree. Failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

**2.4    Closing Obligations.**  At the Closing:

(a)    Sellers will deliver to Buyer:

(i)    An assignment instrument in a form satisfactory to Buyer, assigning, transferring, setting over and conveying the Initial Units to the Purchaser;

(ii)    the Restated LLC Agreement, duly executed by the Company and the Sellers;

(iii)    employment agreements in a form mutually acceptable to Sellers and Buyer, duly executed by each of Sellers (other than Robert Keilman) (collectively, "**Employment Agreements**");

(iv)    a certified copy of the Redemption Agreement and the related notes and other documents executed in connection therewith, which in each case shall be in a form satisfactory to Buyer, duly executed by all parties thereto; and

(v)    the Contribution Agreement, duly executed by the Sellers;

(vi)    the Unit certificates, with duly executed assignments;

(vii)    legal opinion in a form satisfactory to Buyer, duly executed by counsel to Sellers; and

(viii)    such other documents as are reasonably requested by Buyer to be delivered to effectuate the Contemplated Transactions.

(b)    Buyer will deliver to Sellers:

6

(i)      the Note;

(ii)     the Employment Agreements, duly executed by Buyer;

(iii)    the Contribution Agreement, duly executed by Aviation and Hank L. Torbert;

(iv)     a counterpart signature page to the Restated LLC Agreement, duly executed by Buyer;

(v)      evidence of a commitment by Avondale Ventures, LLC to provide the Company with a line of credit in an amount not less than $2.5 million that will be used to fund the Company's operations based upon an operational budget approved by the Company's Board of Managers; and

(vi)     such other documents as are reasonably requested by the Sellers to be delivered to effectuate the Contemplated Transactions.

**2.5    Subsequent Purchases.**  If any Additional Purchase Trigger occurs prior to 5:00 p.m. (Myrtle Beach, South Carolina time) on September 29, 2012 (the "**Additional Purchase Trigger Deadline**"), then, effective as of the consummation of such Applicable Purchase Trigger (the "**Effective Date**"), each Seller shall be deemed to have sold, assigned, and transferred to Buyer, and Buyer shall be deemed to have purchased from each Seller for no additional consideration, the number of Units (subject to adjustment for equity splits, combinations, recapitalizations and similar events) set forth opposite such Seller's name on Exhibit A under the heading "Subsequent Purchase Units" (the "**Subsequent Purchase**"). Notwithstanding anything to the contrary contained in the Restated LLC Agreement, until the Additional Purchase Trigger Deadline, no Seller will transfer, sell or otherwise dispose of any Units without the prior written consent of Buyer. Upon satisfaction of the Additional Purchase Trigger, the Sellers shall take such steps and execute and deliver such agreements, documents, instruments and certificates as may be necessary or appropriate to evidence the transfer of the Subsequent Purchase Units from the Sellers to Buyer, and Schedule 1 of the Restated LLC Agreement shall be amended to reflect the Subsequent Purchase without any further action or approval by the Sellers required.  As a condition precedent to the Additional Purchase Trigger, Aviation shall take such steps and execute and deliver such agreements, documents, instruments, and certificates as may be necessary or appropriate to evidence Aviation's assumption of 100% of the Sellers' respective obligations with respect to the Company's escrow account, credit card accounts, Department of Transportation bond, Airport bonds, and credit facility with Wachovia Bank (and, in each case, the Sellers' complete release therefrom) (the "**Aviation Guaranty Assumption**").  If the Additional Purchase Trigger does not occur prior to the Additional Purchase Trigger Deadline, then the provisions of this Section 2.5 immediately and automatically shall terminate and be of no further force and effect.

**3.     REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers (severally and not jointly) represent and warrant to Buyer as follows (except to the extent such representations and warranties are qualified by the Disclosure Letter) as of the date hereof up to the Effective Date.

### 3.1   Organization And Good Standing.

(a)   The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation, with full power and authority to conduct its Business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts.

(b)   The Company is duly qualified to do business as a foreign entity and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification. Part 3.1 of the Disclosure Letter contains a complete and accurate list of the other jurisdictions in which the Company is authorized to do business, and its capitalization (including the identity of each equity holder and the number of Units held by each).

(c)   Sellers have delivered to Buyer copies of the Organizational Documents of the Company, as currently in effect.

### 3.2   Authority; No Conflict

(a)   This Agreement and all other instruments and agreements executed by the Sellers and the Company as set forth herein (collectively, the "**Transaction Documents**") constitute the legal, valid, and binding obligations of the Sellers or the Company, as applicable, enforceable against the Sellers and the Company, as applicable, in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting the enforcement of creditors' rights generally, or by general equitable principles (whether considered in a proceeding at law or in equity). The Company and the Sellers have the absolute and unrestricted right, power, authority, and capacity to execute and deliver the Transaction Documents and to perform their respective obligations under this Agreement and the other Transaction Documents.

(b)   Except as set forth in Part 3.2 of the Disclosure Letter, neither the execution and delivery of this Agreement or the other Transaction Documents, nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

(i)   contravene, conflict with, result in a violation of or default under: (A) any provision of the Organizational Documents of the Company, or (B) any resolution adopted by the board of managers (or similar body) or the equity holders of the Company;

(ii)   contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Company or any Seller, or any of the assets owned or used by the Company, may be subject;

8

(iii)    contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Company or that otherwise relates to the Business of, or any of the assets owned or used by, the Company;

(iv)    contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; or

(v)    result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Company.

Except as set forth in Part 3.2 of the Disclosure Letter, neither the Company nor any Seller is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or any other Transaction Document or the consummation or performance of any of the Contemplated Transactions.

**3.3    Capitalization; Ownership.**  The authorized equity securities of the Company consist of One Thousand (1,000) membership units, of which all units are issued and outstanding and constitute the Units. Sellers are and will be on the Closing Date the record and beneficial owners and holders of the Units, free and clear of all Encumbrances, and such Units represent one hundred percent (100%) of the equity and/or membership interests of the Company. As of immediately prior to the Contemplated Transactions, each Seller owns the number of Units set forth opposite such Seller's name on <u>Exhibit A</u> under the heading "Total Units." All of the outstanding equity securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and are not subject to, nor were they issued in violation of, any preemptive rights. None of the outstanding equity securities or other securities of the Company was issued in violation of the Securities Act or any other Legal Requirement. There are no outstanding or authorized options, warrants, rights, subscriptions, claims of any character, agreements, obligations, convertible or exchangeable securities, or other commitments contingent or otherwise, relating to the Units of, or other equity or voting interest in, the Company, pursuant to which the Company is or may become obligated to issue, deliver or sell or cause to be issued, delivered or sold, Units, any other equity or voting interest in, the Company or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any Units of or other equity or voting interest in, the Company. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the Units of, or other equity or voting interest in, the Company. The Company has no authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the holders of Units of the Company on any matter.  Except for this Agreement, the Restated LLC Agreement, and the Redemption Agreement, there are no Contracts to which the Company is a party or by which it is bound to (i) repurchase, redeem or otherwise acquire any capital stock or Units of, or other equity or voting interest in, the Company or any other Person or (ii) vote or dispose of any Units of, or other equity or voting interest in, the Company.  Except as set forth in the Restated LLC

9

Agreement, there are no irrevocable proxies and no voting agreements with respect to any Units, or other equity or voting interest in, the Company. The Company does not have any Subsidiaries nor does it own any other shares of capital stock of, or other equity or voting interest in, any other Person or any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire, any shares of the capital stock of or other equity or voting interest in, any other Person.

       **3.4**    **Financial Statements.** Sellers have delivered to Buyer (i) unaudited consolidated balance sheets of the Company as at December 31 in each of the years 2007 through 2010 (including the notes thereto)(the "**Balance Sheets**") and the unaudited balance sheet of the Company as at July 31, 2011 (the "**Interim Balance Sheet**"), and the related unaudited consolidated statements of income, changes in unit holders' equity, and cash flow for each of the fiscal years then ended. Such financial statements and notes fairly present in all material respects the financial condition and the results of operations, changes in members' equity, and cash flow of the Company as at the respective dates of and for the periods referred to in such financial statements, all in accordance with GAAP (excluding exceptions noted in footnotes to such statements, and, in the case of interim financial statements, subject to normal year-end audit adjustments). The financial statements referred to in this Section 3.4 reflect the consistent application of such accounting principles throughout the periods involved. No financial statements of any Person other than the Company are required by GAAP to be included in the consolidated financial statements of the Company.

       **3.5**    **Books And Records.** The books of account, minute books, member record books, and other records of the Company, all of which have been made available to Buyer, are complete and correct in all material respects and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls. At the Closing, all of those books and records will be in the possession of the Company at its office located in Myrtle Beach, South Carolina.

       **3.6**    **Properties.**

       (a)    All of the material properties and assets purchased or otherwise acquired by the Company since the date of the Interim Balance Sheet (except for personal property acquired and sold since the date of the Interim Balance Sheet in the Ordinary Course of Business and consistent with past practice) are listed in Part 3.6 of the Disclosure Letter. The Company owns or has the exclusive right to use all of the material tangible personal properties and assets necessary for the conduct of its Business as currently conducted. All of the tangible personal property used in the Business of the Company is in good operating condition and repair, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used.The Company does not own any real property. The Company is the tenant under the leases set forth on Part 3.6(b) of the Disclosure Letter. There are no other leases or subleases of real property to which the Company is a party (as lessee or lessor). The Company has valid leasehold interests in all leased real property described in Part 3.6(b) of the Disclosure Letter, free and clear of any and all Encumbrances except for Permitted Encumbrances. The leases described therein are in full force and effect; all rents and additional rents due to date on such lease have been paid; the lessee has been in peaceable possession since the commencement of the original term of such lease and is not in default thereunder and no waiver, indulgence or

postponement of the lessee's obligations thereunder has been granted by the lessor; and there exists no default or event, occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any further event or condition, would become a material default under such lease. The Company has not violated any of the terms or conditions under any such lease in any material respect, and, to the Sellers' Knowledge, all of the covenants to be performed by any other party under any such lease have been fully performed.

3.7     **Condition and Sufficiency of Assets.**  The buildings, plants, structures, and equipment used by the Company are structurally sound, are in good operating condition and repair (normal wear and tear excepted), and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The building, plants, structures, and equipment used by the Company are sufficient for the continued conduct of the Company's Business after the Closing in substantially the same manner as conducted prior to the Closing. All of the tangible personal property used in the Business is in good operating condition and repair, ordinary wear and tear excepted, and is adequate and suitable for the purposes for which it is presently being used.

3.8     **Accounts Receivable.**  All accounts receivable of the Company that are reflected on the Balance Sheet or on the accounting records of the Company as of the Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or on the accounting records of the Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Balance Sheet represented of the Accounts Receivable reflected therein Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable. There is no material contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.8 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

3.9     **Inventory.**  All inventory of the Company, whether or not reflected in the Balance Sheet or the Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date, as the case may be. All inventories not written off have been priced at the lower of cost or net realizable value on a first in, first out basis. The quantities of each item of inventory (whether raw materials, work-in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Company.

11

**3.10   No Undisclosed Liabilities.**   Except as set forth in Part 3.10 of the Disclosure Letter, the Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise), except for liabilities or obligations reflected or reserved against in the Balance Sheet, current liabilities incurred in the Ordinary Course of Business since the respective dates thereof, and performance obligations under Contracts that are not required by GAAP to be reflected in the Balance Sheet.

**3.11   Taxes.**

(a)   The Company has filed or caused to be filed (on a timely basis since 2006) all Tax Returns that are or were required to be filed by or with respect to it, pursuant to applicable Legal Requirements. Sellers have delivered to Buyer copies of, and Part 3.11 of the Disclosure Letter contains a complete and accurate list of, all such Tax Returns filed since 2006. The Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by Sellers or the Company, except such Taxes, if any, as are listed in Part 3.11 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided in the Balance Sheet and the Interim Balance Sheet.

(b)   The United States federal and state income Tax Returns of the Company subject to such Taxes have been filed with the IRS or relevant state tax authorities for all taxable years through 2010. Part 3.11 of the Disclosure Letter contains a complete and accurate list of all audits of all such Tax Returns, including a reasonably detailed description of the nature and outcome of each audit. All deficiencies proposed as a result of such audits have been paid, reserved against, settled, or, as described in Part 3.11 of the Disclosure Letter, are being contested in good faith by appropriate proceedings. Part 3.11 of the Disclosure Letter describes all adjustments to the United States federal income Tax Returns filed by the Company or any group of corporations including the Company for all taxable years since 2006, and the resulting deficiencies proposed by the IRS. Except as described in Part 3.11 of the Disclosure Letter, neither the Company nor any Seller has given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Company or for which the Company may be liable.

(c)   The charges, accruals, and reserves with respect to Taxes on the respective books of the Company are adequate (determined in accordance with GAAP) and are at least equal to the Company's liability for Taxes. There exists no proposed tax assessment against the Company except as disclosed in the Balance Sheet or in Part 3.11 of the Disclosure Letter. No consent to the application of Section 341(f)(2) of the IRC has been filed with respect to any property or assets held, acquired, or to be acquired by the Company. All Taxes that the Company is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(d)   All Tax Returns filed by (or that include on a consolidated basis) the Company are true, correct, and complete in all material respects. There is no tax sharing agreement that will require any payment by the Company after the date of this Agreement.

12

(e)     The Company is not, or within the five-year period preceding the Closing Date has not been, an "S" corporation.

**3.12   No Material Adverse Change.**   Since the date of the Interim Balance Sheet, there has not been any Material Adverse Change, and no event has occurred or circumstance exists that would, or would reasonably be likely to, result in a Material Adverse Change.

**3.13   Employee Benefits.**   The Company does not maintain any "employee benefit plan" as defined in the Employee Retirement Income Security Act of 1974, as amended.

**3.14   Compliance With Legal Requirements; Governmental Authorizations.**

(a)     Except as set forth in Part 3.14 of the Disclosure Letter:

(i)     the Company is, and at all times since January 1, 2000 has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its Business or the ownership or use of any of its assets;

(ii)     no event has occurred or circumstance exists that (with or without notice or lapse of time) (A) would or would reasonably be expected to constitute or result in a material violation by the Company of, or a material failure on the part of the Company to comply with, any Legal Requirement, or (B) may give rise to any obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any material remedial action of any nature; and

(iii)     the Company has not received, at any time since June 23, 2006, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential material violation of, or material failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Company to undertake, or to bear all or any material portion of the cost of, any material remedial action of any nature.

(b)     Part 3.14 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by the Company or that otherwise relates to the Business of, or to any of the assets owned or used by, the Company. Each Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter is valid and in full force and effect. Except as set forth in Part 3.14 of the Disclosure Letter:

(i)     the Company is, and at all times since June 23, 2006 has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.14 of the Disclosure Letter;

(ii)     no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a material violation of or a material failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter, or (B) result directly or indirectly in the revocation, withdrawal, suspension,

cancellation, or termination of, or any material modification to, any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter;

(iii) the Company has not received, at any time since June 23, 2006, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential material violation of or material failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or material modification to any Governmental Authorization; and

(iv) all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.14 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

(c) The Governmental Authorizations listed in Part 3.14 of the Disclosure Letter collectively constitute all of the Governmental Authorizations necessary to permit the Company to lawfully conduct and operate its Business in the manner it currently conducts and operates its Business and to permit the Company to own and use its assets in the manner in which it currently owns and uses such assets.

3.15   Legal Proceedings; Orders.

(a) Except as set forth in Part 3.15 of the Disclosure Letter, there is no pending Proceeding:

(i) that has been commenced by or against the Company or that otherwise relates to or may materially affect the Business of, or any of the assets owned or used by, the Company; or

(ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Sellers' Knowledge (1) no such Proceeding has been Threatened, and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Sellers have delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.15 of the Disclosure Letter.

(b) Except as set forth in Part 3.15 of the Disclosure Letter:

(i) there is no Order to which the Company, or any of the assets owned or used by the Company, is subject;

(ii) no Seller is subject to any Order that relates to the Business of, or any of the assets owned or used by, the Company; and

(iii)     no member, manager, officer, director, agent, or employee of the Company is subject to any Order that prohibits such member, manager, officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the Business of the Company.

(c)     Except as set forth in Part 3.15 of the Disclosure Letter:

(i)     the Company is, and at all times since June 23, 2006 has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

(ii)     no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a material violation of or failure to comply with any term or requirement of any Order to which the Company, or any of the assets owned or used by the Company, is subject; and

(iii)     the Company has not received, at any time since June 23, 2006, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential material violation of, or material failure to comply with, any term or requirement of any Order to which the Company, or any of the assets owned or used by the Company, is or has been subject.

3.16    **Absence Of Certain Changes And Events.**  Except as set forth in Part 3.16 of the Disclosure Letter, since December 31, 2010, the Company has conducted its Business in the Ordinary Course of Business and there has not been any:

(a)     except as provided in the Restated LLC Agreement or the Redemption Agreement, change in the Company's authorized or issued membership interests or Units; grant of any membership interest or Unit option or right to purchase membership interests or Units of the Company; issuance of any security convertible into such membership interests or Units; grant of any registration rights; purchase, redemption, retirement, or other acquisition by the Company of any membership interests or Units; or declaration or payment of any dividend or other distribution or payment in respect of the membership interests or Units, including tax distributions;

(b)     except as provided in the Restated LLC Agreement, amendment to the Organizational Documents of the Company;

(c)     payment or increase by the Company of any bonuses, salaries, or other compensation to any member, manager, stockholder, director, officer, or employee (except in the Ordinary Course of Business) or entry into any employment, severance, or similar Contract with any Seller, member, manager, stockholder, director, officer, or employee;

(d)     adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of the Company;

(e)      damage to or destruction or loss of any asset or property of the Company, whether or not covered by insurance, materially and adversely affecting the properties, assets, Business, financial condition, or prospects of the Company, taken as a whole;

(f)      entry into, termination of, or receipt of notice of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Company of at least $10,000, or (iii) any Contract for any capital expenditure, or (iv) any Contract pursuant to which the Company assumes, incurs, or modifies any indebtedness or any mortgage, pledge, conditional sale or other title retention agreement, including any Encumbrance or charge of any kind to attach upon any of the properties or assets of the Company, whether now owned or hereafter acquired, or (v) any Contract pursuant to which the Company incurs or guarantees any indebtedness;

(g)      sale (other than sales of inventory in the Ordinary Course of Business and dispositions of obsolete inventory and equipment in the Ordinary Course of Business), lease, or other disposition of any asset or property of the Company or mortgage, pledge, or imposition of any Encumbrance on any asset or property of the Company, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

(h)      cancellation or waiver of any claims or rights with a value to the Company in excess of $10,000;

(i)      acquired any business or Person, by merger or consolidation, purchase of substantial assets or equity interests, or by any other manner, in a single transaction or series of related transactions;

(j)      prepared any Tax Returns in a manner which is inconsistent with the past practices of the Company with respect to the treatment of items on such Tax Returns;

(k)      conducted its cash management customs and practices (including the collection of receivables and payment of payables) other than in the Ordinary Course of Business;

(l)      paid, discharged, settled or satisfied any claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than payments, discharges or satisfactions in the ordinary course of business and consistent with past practice;

(m)      material change in the accounting methods used by the Company; or

(n)      entered into any Contract or letter of intent, whether oral or written, by the Company to do any of the foregoing.

**3.17    Contracts; No Defaults.**

(a)      Part 3.17(a) of the Disclosure Letter contains a complete and accurate list, and Sellers have delivered to Buyer true and complete copies, of:

16

(i)      each Applicable Contract that involves performance of services or delivery of goods or materials by the Company of an amount or value in excess of $10,000;

(ii)      each Applicable Contract that involves performance of services or delivery of goods or materials to the Company of an amount or value in excess of $10,000;

(iii)      each Applicable Contract that was not entered into in the Ordinary Course of Business and that involves expenditures or receipts of the Company in excess of $10,000;

(iv)      each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements having a value per item or aggregate payments of less than $10,000 and with terms of less than one year);

(v)      each collective bargaining agreement and other Applicable Contract to or with any labor union or other employee representative of a group of employees;

(vi)      each joint venture, partnership, strategic alliance, co-marketing, co-promotion, joint development and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Company with any other Person;

(vii)      each Applicable Contract providing for payments to or by the Company based on sales, purchases, or profits, other than direct payments for goods or services;

(viii)      each power of attorney that is currently effective and outstanding;

(ix)      each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Company to be responsible for consequential damages;

(x)      each Applicable Contract for capital expenditures in excess of $10,000;

(xi)      each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Company other than in the Ordinary Course of Business;

(xii)      all Contracts pursuant to which an Affiliate of the Company is a party and pursuant to which the Company receives any benefit, including services (including payroll, information technology, etc.), the right to use any Intellectual Property

17

of a third Person or to exercise any Intellectual Property Right with respect to Intellectual Property of a third Person;

      **(xiii)**   all Contracts pursuant to which any Person is granted the right to use any Company IP or to exercise any Intellectual Property Rights with respect to any Company IP;

      **(xiv)**   all Contracts to which the Company is a party and which grants rights or imposes obligations or restrictions on any Seller or any Affiliate of the Company, including (i) any license pursuant to which any Person is granted the right to use any Intellectual Property owned or licensed by any Affiliate of the Company or exercise any Intellectual Property Rights with respect to such Intellectual Property, (ii) any agreements which would require Buyer or Company to pay additional royalties or other fees following the Closing, (iii) any agreement which would require any Affiliate of the Company to grant any rights to any third Persons, including any discounts; and (iv) any agreement which restricts the Company or any Affiliate of the Company from engaging in any business or from dealing with any third Person (whether such third Person is a potential customer or supplier);

      **(xv)**   all Contracts pursuant to which Company Licensed IP is licensed to the Company, excluding "click wrap" or "shrink wrap" agreements for commercially available "off the shelf" software; and

      **(xvi)**   all Contracts involving a loan (other than accounts receivable from trade debtors in the ordinary course of business) or advance to (other than travel and entertainment allowances to the employees of the Company extended in the ordinary course of business), or investment in, any Person or any Contract relating to the making of any such loan, advance or investment;

      **(xvii)**   all Contracts involving indebtedness of the Company;

      **(xviii)** all Contracts under which any Person (other than the Company) has directly or indirectly guaranteed indebtedness of the Company;

      **(xix)**   all Contracts granting or evidencing a Encumbrance on any properties or assets of the Company, other than a Permitted Encumbrance;

      **(xx)**   any management service, consulting, financial advisory or any other similar type Contract and any Contracts with any investment or commercial bank or any accounting firm or group;

      **(xxi)**   all Contracts limiting the ability of the Company to engage in any line of business or to compete with any Person;

      **(xxii)**   all Contracts (other than this Agreement and any other Transaction Document) with (A) any Seller, any other Affiliate of the Company or any Affiliate of any Seller (other than the Company) or (B) any current or former officer or director of the Company;

**(xxiii)** all Contracts (including letters of intent) involving the future disposition or acquisition of assets or properties, or any future merger, consolidation or similar business combination transaction, whether or not enforceable; and

**(xxiv)** all Contracts involving any resolution or settlement of any actual or threatened litigation, arbitration, claim or other dispute.

**(xxv)** each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

**(b)** Except as set forth in Part 3.17(b) of the Disclosure Letter:

**(i)** no Seller (and no Related Person of any Seller) has or may acquire any rights under, and no Seller has or may become subject to any obligation or liability under, any Contract that relates to the Business of, or any of the assets owned or used by, the Company; and

**(ii)** no member, manager, officer, director, agent, employee, consultant, or contractor of the Company is bound by any Contract that purports to limit the ability of such member, manager, officer, director, agent, employee, consultant, or contractor to (A) engage in or continue any conduct, activity, or practice relating to the Business of the Company, or (B) assign to the Company or to any other Person any rights to any invention, improvement, or discovery.

**(c)** Except as set forth in Part 3.17(c) of the Disclosure Letter, each Contract identified or required to be identified in Part 3.17(a) of the Disclosure Letter is in full force and effect and is valid and enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting the enforcement of creditors' rights generally, or by general equitable principles (whether considered in a proceeding at law or in equity).

**(d)** Except as set forth in Part 3.17(d) of the Disclosure Letter:

**(i)** the Company is, and at all times since June 23, 2006 has been, in material compliance with all applicable terms and requirements of each Contract under which the Company has or had any obligation or liability or by which the Company or any of the assets owned or used by the Company is or was bound;

**(ii)** to the Sellers' Knowledge, each other Person that has or had any obligation or liability under any Contract under which the Company has or had any rights is, and at all times since June 23, 2006 has been, in material compliance with all applicable terms and requirements of such Contract;

**(iii)** no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a material violation or material breach of, or give the Company or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; and

(iv)     the Company has not given to or received from any other Person, at any time since June 23, 2006, any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential material violation or material breach of, or default under, any Contract (other than violations or breaches that have been cured as of the date hereof).

(e)     There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Company under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation.

(f)     The Contracts relating to the sale, design, manufacture, or provision of products or services by the Company have been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that is or would be in violation of any Legal Requirement.

The Sellers have made available to Buyer true and complete copies, including all amendments, of each Contract set forth in Part 3.17 of the Disclosure Letter.

### 3.18    Insurance.

(a)     Sellers have delivered to Buyer:

(i)     true and complete copies of all policies of insurance to which the Company is a party or under which the Company, or any member, manager or director of the Company, is or has been covered at any time since June 23, 2006;

(ii)     true and complete copies of all pending applications for policies of insurance; and

(iii)     any statement by the auditor of the Company's financial statements with regard to the adequacy of such entity's coverage or of the reserves for claims.

(b)     Part 3.18(b) of the Disclosure Letter describes any self-insurance arrangement by or affecting the Company, including any reserves established thereunder.

(c)     Part 3.18(c) of the Disclosure Letter sets forth, by year, for the current policy year and each of the five (5) preceding policy years:

(i)     a summary of the loss experience under each policy;

(ii)     a statement describing each claim under an insurance policy for an amount in excess of $50,000, which sets forth:  (A) the name of the claimant; (B) a description of the policy by insurer, type of insurance, and period of coverage; and  (C) the amount and a brief description of the claim; and

(iii)     a statement describing the loss experience for all claims that were self-insured, including the number and aggregate cost of such claims.

(d)     Except as set forth on Part 3.18(d) of the Disclosure Letter:

(i)     All policies to which the Company is a party or that provide coverage to any Seller, the Company, or any member, manager or director or officer of the Company:  (A) are valid, outstanding, and enforceable, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting the enforcement of creditors' rights generally, or by general equitable principles (whether considered in a proceeding at law or in equity); (B) are issued by an insurer that is financially sound and reputable; (C) taken together, provide adequate insurance coverage for the assets and the operations of the Company for all risks to which the Company are normally exposed; (D) are sufficient for compliance with all Legal Requirements and Contracts to which the Company is a party or by which any of them is bound; (E) will continue in full force and effect following the consummation of the Contemplated Transactions; and (F) do not provide for any retrospective premium adjustment or other experienced-based liability on the part of the Company.

(ii)     Neither the Company nor any Seller has received (A) any refusal of coverage or any notice that a defense will be afforded with reservation of rights, or (B) any notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder; and to the Sellers' Knowledge, no event or occurrence, condition or act (including the purchase of the Purchased Units hereunder) exists, which with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such policies.

(iii)     The Company has paid all premiums due, and have otherwise performed all of its material obligations, under each policy to which the Company is a party or that provides coverage to the Company or member, manager or director thereof.

(iv)     The Company has given notice to the insurer of all material claims that may be insured thereby.

**3.19   Environmental Matters.**

(a)     The Company:  (i) is not in material violation of any Environmental Law or has received notice that any such material violation exists; (ii) has not placed, deposited or Released any Hazardous Substances upon or under any real property, except in compliance with Environmental Laws; and (iii) has not received notice from any Governmental Body (other than notices that have been fully complied with or withdrawn) requiring the removal of any alleged Hazardous Substance, or advising of any pending or contemplated search or investigation of any real property owned or leased by the Company, or alleging that the Company is responsible for any Environmental, Health and Safety Liabilities; and (iv) is not liable for any Environmental, Health and Safety Liabilities.

21

(b)    As used in this Section 3.19, the following terms have the meanings set forth below.

"**Environment**" means soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"**Environmental, Health, and Safety Liabilities**" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to: (a) any environmental, health, or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products); (b) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law; (c) financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions ("Cleanup") required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or (d) any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law. The terms "removal," "remedial," and "response action," include the types of activities covered by the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq., as amended ("**CERCLA**").

"**Environmental Law**" means any Legal Requirement that requires or relates to: (a) advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment; (b) preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment; (c) reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated; (d) assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of; (e) protecting resources, species, or ecological amenities; (f) reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances; (g) cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or (h) making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

"**Hazardous Materials**" means any waste, material or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant or by other words of similar meaning or regulatory effect,

22

under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos or asbestos-containing materials, mold, polychlorinated biphenyls and radioactive substances.

"**Occupational Safety and Health Law**" means any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"**Release**" means any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"**Threat of Release**" means a substantial likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

### 3.20    Employees.

(a)    Part 3.20 of the Disclosure Letter contains a complete and accurate list of the following information for each member, manager, employee or director of the Company, including each employee on leave of absence or layoff status: employer; name; job title; current compensation paid or payable and any change in compensation since January 1, 2011; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Company's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock/unit bonus, stock/unit option, cash bonus, employee stock/unit ownership (including investment credit or payroll stock/unit ownership), severance pay, insurance, medical, welfare, or vacation plan, or any other employee benefit plan.

(b)    No member, manager, employee or director of the Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such member, manager, employee or director and any other Person ("**Proprietary Rights Agreement**") that adversely affects in any material respect (i) the performance of his or her duties as a member, manager, employee or director of the Company, or (ii) the ability of the Company to conduct its Business. To Sellers' Knowledge, no member, manager, director, officer, or other key employee of the Company intends to terminate his or her employment with the Company.

(c)    Part 3.20 of the Disclosure Letter also contains a complete and accurate list of the following information for each retired member, manager, employee or director of the Company, or their dependents, receiving benefits or scheduled to receive benefits in the future: name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage, and other benefits.

### 3.21    Labor Relations; Compliance.    Since June 23, 2006, the Company has not been or is a party to any collective bargaining or other labor Contract. Since June 23, 2006, there has not been, there is not presently pending or existing, and to the Sellers' Knowledge, there is not Threatened, (a) any strike, slowdown, picketing, work stoppage, or employee grievance process,

(b) any Proceeding against or affecting the Company relating to the alleged violation of any Legal Requirement pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission, or any comparable Governmental Body, organizational activity, or other labor or employment dispute against or affecting any of the Company or its premises, or (c) any application for certification of a collective bargaining agent. To the Sellers' Knowledge, no event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute. There is no lockout of any employees by the Company, and no such action is contemplated by the Company. The Company has complied in all material respects with all Legal Requirements relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing. The Company is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

### 3.22    Intellectual Property.

(a)    As used in this Section 3.19, the following terms have the meanings set forth below.

"**Company IP**" means Company Owned IP and Company Licensed IP.

"**Company Owned IP**" means Intellectual Property which is owned by any of the Company.

"**Company Licensed IP**" means Intellectual Property which is licensed to any of the Company.

"**Company Registered IP**" means (i) Company Owned IP which is issued by or registered with a Governmental IP Agency, and (ii) Company Licensed IP which is registered with a Governmental IP Agency and for which Company has the responsibility to maintain such registration (e.g., prepare filings, correspond with the applicable Governmental IP Agency, etc.). Company Registered IP specifically includes domain names.

"**Intellectual Property**" means: (a) inventions and discoveries (whether or not patentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, invention disclosures, and other rights of invention, worldwide, including without limitation any reissues, divisions, continuations and continuations-in-part, provisionals, reexamined patents or other applications or patents claiming the benefit of the filing date of any such application or patent (**"Patents"**); (b) trademarks, service marks, trade names, trade dress, logos, product names and slogans, including any common law rights, registrations, and applications for registration for any of the foregoing, and the goodwill associated with all of the foregoing (**"Trademarks"**); (c) copyrightable works, all rights in copyrights, including moral rights, copyrights, website content, and other rights of authorship and exploitation, and any applications, registrations and renewals in connection therewith (**"Copyrights"**); (d) all mask works (**"Mask Works"**); (e) trade secrets and confidential business and technical information, including,

without limitation, web site user information, customer and supplier lists and related information, pricing and cost information, business and marketing plans, advertising statistics, any other financial, marketing and business data, technical data, specifications, schematics and know-how ("**Trade Secrets**"); (f) other similar intangible assets, including domain names, toll free numbers and vanity numbers; (g) to the extent not covered by subsections (a) through (f), above, software and web sites (including all related computer code and content); (h) any other proprietary, intellectual property or other intangible property rights; and (i) international equivalents of any of the foregoing.

(b)    Part 3.22(b) of the Disclosure Letter sets forth a true, correct and complete list of, and separately identifies (a) all Company Registered IP, (b) all material Company Owned IP which is not Company Registered IP (other than trade secrets, know-how and goodwill attendant to the Intellectual Property and other Intellectual Property not reducible to schedule form);

(c)    Except as set forth in Part 3.22(c) of the Disclosure Letter: (i) Company IP, excluding exclusive rights to any of such Company IP which the Company has granted to third Persons, constitutes all Intellectual Property used by the Company to conduct the Business or necessary to conduct the Business; (ii) to Sellers' Knowledge, the Company has not violated, interfered with, infringed upon or misappropriated any Intellectual Property or Intellectual Property Rights of any third Person in conducting the Business; and (iii) the Company is not using any tangible materials (including software) that it has received from a third Person that it does not have a license to use in the manner in which it is being used.

(d)    Except as set forth in Part 3.22(d) of the Disclosure Letter, the Company (including management level employees with direct responsibility for Intellectual Property matters) is not subject to any pending, nor has received written notice of any, charge, complaint, claim, demand, or other such notice: (i) alleging that the Company has violated, interfered with, infringed upon or misappropriated any Intellectual Property or Intellectual Property Rights of any third Person (including any claim that the Company must license or refrain from using any Intellectual Property of any third Person); (ii) challenging the Company's rights in the Company IP, including, without limitation, the right to use, transfer, or license any Company IP or otherwise exercise any Intellectual Property Rights with respect to Company IP; and (iii) challenging the validity or enforceability of any Company IP.  To the Sellers' Knowledge, there is no valid basis for any such claim.

(e)    Except as set forth on Part 3.22(e) of the Disclosure Letter, the Company own all right, title and interest in the Company Owned IP, free and clear of any Encumbrances, and except for the licenses to Company IP which are listed in Part 3.17 of the Disclosure Letter, no other Persons have any right, title or interest in the Company Owned IP or any right to use such Company Owned IP, or any option to a license to use such Company Owned IP.

(f)    Except as set forth on Part 3.22(f) of the Disclosure Letter:  (i) all Company Registered IP is valid and in full force and effect; (ii) all necessary registration, maintenance and renewal fees due as of the Effective Date in connection with such Company Registered IP have been made and any such registration, maintenance and renewal fees due after the Effective Date and within ninety (90) days after the Closing Date are set forth in Part 3.22(f)

25

of the Disclosure Letter; and (iii) all necessary documents, recordations and certificates required in connection with such Company Registered IP have been filed with the applicable Governmental Bodies and are valid and in full force and effect and any such documents, recordations and certificates which must be filed after the Effective Date and within ninety (90) days after the Closing Date are set forth in Part 3.22(f) of the Disclosure Letter.

   **(g)** To the Sellers' Knowledge, no third Person (including any employee or former employee) has violated, interfered with, infringed upon or misappropriated any Company IP in any material respect.

   **(h)** The Company has taken reasonable precautions to protect the Company IP, including, where appropriate, registering Company IP, and, in the case of Trade Secrets, taken reasonable measures to protect the secrecy, confidentiality and value of such Trade Secrets. Except as set forth in Part 3.22(h) of the Disclosure Letter, there have been no material unintended disclosures of Company Trade Secrets. To the extent that any Company Owned IP has been developed or created by an employee, independent contractor or other third Person (each an "**IP Participant**"), the Company has entered into a written assignment agreement with each such IP Participant irrevocably granting exclusive ownership of all such Intellectual Property and all Intellectual Property Rights therein to the Company.

   **(i)** With respect to privacy and security agreements, contractual commitments, privacy requirements and Legal Requirements applicable to the Company (the "**Privacy Commitments**"), (i) the Company is in material compliance with all applicable Privacy Commitments; (ii) the transactions contemplated by this Agreement will not violate any Privacy Commitments; (iii) the Company has not received inquiries from the Federal Trade Commission or any other federal or state Governmental Body (or their foreign equivalents) regarding Privacy Commitments and/or the Company's compliance therewith; (iv) the Company has not received any written (including email) complaints from any web site user regarding Privacy Commitments, or the Company' compliance with Privacy Commitments; (v) with respect to the Company privacy statements included in the Privacy Commitments, such privacy statements have not been rejected by any applicable certification organization which has reviewed such privacy statement or to which any such privacy statements has been submitted; (vi) the Company has not experienced the cancellation, termination or revocation of any privacy or security certification; and (vii) the Privacy Commitments do not require any notices to be sent to individuals or others informing such individuals or others of the transactions contemplated by this Agreement.

   **3.23** **Certain Payments.** Since June 23, 2006, neither the Company nor any Seller, member, manager, director, officer, agent, or employee of the Company, or any other Person associated with or acting for or on behalf of the Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of the Company or any Affiliate of the Company, or (iv) in violation of any Legal Requirement, (b) established or maintained any fund or asset that has not been recorded in the books and records of the Company.

**3.24   Suppliers.**Part 3.24 of the Disclosure Letter sets forth each of the top ten (10) suppliers of the Company for the fiscal year ended December 31, 2010. The relationships of the Company with each such supplier are good commercial working relationships and no such supplier has canceled or otherwise terminated, or threatened to cancel or otherwise terminate, its relationship with the Company.  To the Sellers' Knowledge, the Company has not received any notice that any such supplier may cancel or otherwise materially and adversely modify its relationship with the Company or limit its services, supplies or materials to the Company, or its usage or purchase of the services of the Company either as a result of the transactions contemplated hereby or otherwise.**Bank Accounts and Powers of Attorney.**  Set forth in Part 3.26 of the Disclosure Letter is an accurate and complete list showing (a) the name and address of each bank in which the Company has an account or safe deposit box, the number of any such account or any such box and the names of all Persons authorized to draw thereon or to have access thereto and (b) the names of all Persons, if any, holding powers of attorney from the Company and a summary statement of the terms thereof.

**3.26   Permits.**  The Company has obtained and possesses all Permits and has made all registrations or filings with or notices to any Governmental Body necessary for the lawful conduct of its Business as presently conducted, or necessary for the lawful ownership of its properties and assets or the operation of its Business as presently conducted.  All such Permits are in full force and effect.  Set forth in Part 3.27 of the Disclosure Letter is a list of all material Permits.  The Company is in material compliance with all such Permits.  No Proceeding to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Permit is pending or, to the Sellers' Knowledge, Threatened.  No administrative or governmental action or Proceeding has been taken or to the Sellers' Knowledge Threatened, in connection with the expiration, continuance or renewal of any such Permit, and, to the Sellers' Knowledge, there is no valid basis for any such Proceeding.

**3.27   Disclosure.**

(a)    No representation or warranty of Sellers in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)    To the Sellers' Knowledge, except as set forth in this Agreement or the Disclosure Letter, there is no currently existing circumstance or condition with specific application to any Seller or the Company (other than general economic or industry conditions) that is reasonably likely to cause a material adverse effect on the assets, Business, prospects, financial condition, or results of operations of the Company (on a consolidated basis).

**3.28   Relationships With Related Persons.**    No Seller or any Related Person of Sellers or of the Company has, or since the first day of the next to last completed fiscal year of the Company has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Business. No Seller or any Related Person of Sellers or of the Company is, or since the first day of the next to last completed fiscal year of the Company has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has (i) had business dealings or a material financial interest in any transaction with the Company, or (ii) engaged in competition with the Company with respect

27

to any line of the products or services of the Company in any market presently served by the Company. Except as set forth in Part 3.29 of the Disclosure Letter, no Seller or any Related Person of Sellers or of the Company is a party to any Contract with, or has any claim or right against, the Company.

**3.29   Brokers Or Finders.**   Sellers and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

## 4.   REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

**4.1   Organization And Good Standing.**   Aviation is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of South Carolina. Stukes Atwood is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of New York.

**4.2   Authority; No Conflict.**

**(a)**   This Agreement and each of the other Transaction Documents executed by Buyer constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting the enforcement of creditors' rights generally, or by general equitable principles (whether considered in a proceeding at law or in equity). Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations under this Agreement and such Transaction Documents.

**(b)**   Except as set forth in Schedule 4.2 hereto, neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the Contemplated Transactions pursuant to: (i) any provision of Buyer's Organizational Documents; (ii) any resolution adopted by the board of directors or the stockholders of Buyer; (iii) any Legal Requirement or Order to which Buyer may be subject; or (iv) any Contract to which Buyer is a party or by which Buyer may be bound. Except as set forth in Schedule 4.2 hereto, Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

**4.3   Sufficient Funds.**   Buyer has sufficient funds to enable it to consummate the Contemplated Transactions.

**4.4   Investment.**   Buyer (a) understands that the Units have not been, and will not be, registered under the Securities Act, or under any state securities laws, and are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering, (b) is acquiring Units hereunder solely for its own account for investment purposes, and not with a view to the distribution thereof, (c) is a sophisticated investor with knowledge and

experience in business and financial matters, (d) has received certain information concerning the Company and has had the opportunity to obtain additional information as desired in order to evaluate the merits and the risks inherent in holding Units, (E) is able to bear the economic risk and lack of liquidity inherent in holding Units, and (F) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act.

**4.5     Brokers Or Finders.** Other than obligations arising under agreements with ASI Advisors LLC, its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

## 5.     SELLER COVENANTS

### 5.1     NON-COMPETITION; NON-INTERFERENCE

**(a)**     For a period of five (5) years after the date of this Agreement, no Seller shall engage in any Competitive Business (defined below) in the United States, either directly or indirectly, whether as a manager, owner, operator, partner, member, equityholder, lender, principal, employee, director, officer, consultant, agent or otherwise; provided, however, that this Section 5.1 shall not prohibit a Seller from investing or holding not more than 1% of the outstanding capital stock or other ownership interests of any Person whose equity securities are listed on a national securities exchange, so long as such Seller has no active participation in the business of such Person.

**(b)**     Each Seller will not, for a period of three (3) years after the date of this Agreement, directly or indirectly, for whatever reason, whether for his or her own account or for the account of any other Person, solicit or attempt to solicit any employee of Buyer or the Company to leave the employ of Buyer or the Company, as applicable, and work in a Competitive Business.

**(c)**     Each Seller will not, for a period of three (3) years after the date of this Agreement, directly or indirectly, for whatever reason, whether for his or her own account or for the account of any other Person, divert, or attempt to divert, engage or attempt to engage any Person which is or has been furnished services by the Company, from doing business with the Company or otherwise to change his, her or its relationship with the Company.

**(d)**     The Company and the Sellers acknowledge that in view of the nature of the Business and the business objectives of Buyer in acquiring the Units, the foregoing territorial and time limitations are reasonable and properly required for the adequate protection of Buyer and its Subsidiaries and that in the event that any such territorial or time limitation is deemed unreasonable and is then reduced by a court of competent jurisdiction, then, as reduced, the territorial and/or time limitation shall be enforced.

**(e)**     Each Seller further acknowledges, as applicable, that (i) the foregoing territorial and time restrictions are essential to protect the goodwill and going concern value of the Company's Business, (ii) the goodwill and going concern value of the Company's Business comprise an essential portion of the consideration received by Buyer under this Agreement for which Buyer is paying the Purchase Price and (iii) Buyer would not enter into this Agreement

29

without such Seller's agreement to the provisions of this Section 5.1. Each Seller acknowledges that the remedy at law for any breach by such Seller of the agreements contained in this Section 5.1 will be inadequate and that Buyer will be entitled to seek injunctive relief. The Sellers and Buyer acknowledge that this Section 5.1 constitutes an independent and severable covenant and if any or all of the provisions of this Section 5.1 are held to be unenforceable for any reason whatsoever, it will not in any way invalidate or affect the remainder of this Agreement, which will remain in full force and effect.

(f) For the purposes of this Agreement, **"Competitive Business"** means the charter airline and tour business including but not limited to public charter operations, tour operations, Part 121 or Part 135 airline operations and commercial schedule service operations.

5.2 **CONFIDENTIALITY.** The Sellers acknowledge that they are in possession of Confidential Information (as defined below) of special value to the Company. For purposes of this Section 5.2, the term "**Confidential Information**" means all material information specific to the business, operations and affairs of the Company (other than information which is generally available to the public, except as a result of a breach by the Sellers of this Agreement, or general industry knowledge), including, without limitation, the Company's secrets and information about its business, financial condition, prospects, products, technology, know-how, merchandising and advertising programs and plans, and the names of its suppliers and customers and the specific terms of their dealings with them as they may exist from time to time, which the Sellers or their Representatives have obtained, or which has been disclosed to the Sellers or their representatives as a result of their association with, the Company. The Sellers agree that they shall, and that they shall cause their Representatives to, keep all such Confidential Information strictly confidential and use such Confidential Information only for purposes related to their interests in the Company or implementing this Agreement. Notwithstanding the foregoing, a Seller may disclose Confidential Information pursuant to a subpoena or other order issued by a court of competent jurisdiction or governmental agency (whether pursuant to deposition, interrogatory, request for documents, civil investigative demand, or similar process), but only if such Seller notifies Buyer in writing in advance of such disclosure and cooperates with Buyer (at Buyer's sole expense) in the event Buyer elects to legally contest and avoid such disclosure. In any event, such Seller may disclose only such portion of the Confidential Information that such Seller is legally required to disclose.

5.3 **SELLER RELEASE.** In consideration of the payment of the Purchase Price hereunder, each Seller, for itself and its successors, assigns and all other Persons acting on its behalf, hereby irrevocably releases and forever discharges Buyer and the Company as of the date of this Agreement from any and all suits, claims, controversies, rights, promises, debts, liabilities, demands, obligations, costs, expenses, actions and causes of actions of every nature, character and description, in law or in equity, whether known or unknown, vested or contingent, suspected or unsuspected, which such Seller may own or hold or has at any time heretofore owned or held against Buyer or the Company, other than claims arising out of this Agreement and the other Transaction Documents and, in the case of Robert Keilman, amounts owed by the Company to him and described in the Redemption Agreement or Part 3.17(a) of the Disclosure Letter (collectively, the **"Released Claims"**). Each Seller, for itself and its successors, assigns and all other Persons acting on its behalf, covenants not to bring any Proceeding or to make any demand or claim of any type against Buyer or the Company relating to or in connection with the

30

Released Claims. Each Seller, for itself and its successors, assigns and all other Persons acting on its behalf, waives any rights and benefits conferred by any applicable Legal Requirement existing under any state or political subdivision thereof which would invalidate all or any portion of the release contained herein because such release may extend to claims which such Seller does not know or suspect to exist in its favor as of the date of this Agreement.

## 6.   INDEMNIFICATION; REMEDIES

**6.1   Survival.** Except as set forth below, all representations and warranties in this Agreement, the Disclosure Letter, and any certificate or document delivered pursuant to this Agreement will survive the Closing for a period of eighteen (18) months and shall thereafter terminate and be of no further force or effect. Notwithstanding the foregoing, the representations contained in Sections 3.1(a), 3.2(a), 3.3, 3.11, 3.26, 4.1, 4.2 and 4.5 shall survive until thirty (30) days after the expiration of the applicable statute of limitations period. Notwithstanding the foregoing, if, at any time prior to the expiration of the applicable survival period set forth above, any indemnified party (acting in good faith) delivers to the indemnifying party a claim notice alleging any inaccuracy in or breach of any such representation or warranty, and asserting a claim for recovery under this Section 6 based on such inaccuracy or breach, then the claim asserted in such claim notice (and the representations and warranties on which such claim is based) shall survive the applicable expiration date until such time as such claim is fully and finally resolved.

**6.2   Indemnification And Payment Of Damages By Sellers.** Subject to the limitations set forth in Section 6.4 below, from and after the Closing and for so long as any representation, warranty, covenant or agreement survives as provided for in Section 6.1, Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Company, and their respective Representatives, equity holders, controlling persons, and affiliates (collectively, the "**Buyer Indemnified Persons**") for, and will pay to Buyer Indemnified Persons the amount of, any loss, liability, claim, damage (including special, punitive, exemplary, indirect, incidental and consequential damages, but solely to the extent that such special, punitive, exemplary, indirect, incidental, and/or consequential damages are payable by a Buyer Indemnified Person to a third party pursuant to a third party claim against such Buyer Indemnified Person for which such Buyer Indemnified Person is otherwise entitled to indemnity under this Section 6), expense (including costs of investigation and defense and reasonable attorneys' fees), whether or not involving a third-party claim (collectively, "**Damages**"), arising, directly or indirectly, from or in connection with:

**(a)**   the failure of any representation or warranty made by Sellers in this Agreement, the Disclosure Letter, or any other certificate or document delivered by Sellers pursuant to this Agreement to be true and correct in all respects as of the Closing Date;

**(b)**   any breach of any covenant or obligation of the Company or any Seller in this Agreement; or

**(c)**   any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any

31

such Person with any Seller or the Company (or any Person acting on their behalf) in connection with any of the Contemplated Transactions.

**6.3     Indemnification And Payment Of Damages By Buyer.** Buyer will indemnify and hold harmless Sellers and their respective Representatives (collectively, the "**Seller Indemnified Persons**"), and will pay to Seller Indemnified Persons the amount of, any Damages arising, directly or indirectly, from or in connection with (a) the failure of any representation or warranty made by Buyer in this Agreement or in any certificate or document delivered by Buyer pursuant to this Agreement to be true and correct in all respects as of the Closing Date, (b) any breach by Buyer of any covenant or obligation of Buyer in this Agreement, or (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

**6.4     Limitations on Indemnity.**

**(a)**     Notwithstanding anything to the contrary contained in this Agreement, in the absence of fraud or willful misconduct on the part of a Party, (i) Sellers will have no obligation to indemnify any Buyer Indemnified Persons for, and Buyer will have no obligation to indemnify any Seller Indemnified Persons for, any Damages arising under Section 6.2(a) or 6.3(a) unless and until the aggregate amount of such Damages incurred or suffered by such Buyer Indemnified Persons or Seller Indemnified Persons, as applicable, exceeds $50,000 (at which point the indemnifying Party will be obligated to indemnify Buyer Indemnified Persons or Seller Indemnified Persons, as applicable, for all such Damages in excess of such amount, subject to the limitations contained in this Section 6.4), (ii) the maximum aggregate amount of indemnifiable Damages which may be recovered from Buyers, on the one hand, and Sellers collectively, on the other hand, shall be an amount equal to the Purchase Price, and (iii) solely for the purposes of determining the amount of any Damages arising under Section 6.2(a) or 6.3(a) (as opposed to determinations of whether a breach of a representation or warranty has occurred), any materiality thresholds or qualifiers will be disregarded.

**(b)**     Except with respect to the Buyer Indemnified Person's right to offset amounts payable hereunder in respect of all or any Seller's indemnification obligations hereunder against amounts outstanding under the Note as provided below in Section 6.5 (the "**Buyer Set Off Right**"), (i) no Seller shall be liable for more than such Seller's pro rata share (based on such Seller's percentage ownership of the Units as of immediately prior to the Closing after giving effect to the transactions contemplated by the Redemption Agreements) of the amount of any Damages, and (ii) the aggregate amount of any Seller's indemnification obligations under this Agreement shall not exceed such Seller's pro rata share (based on such Seller's percentage ownership of the Units as of immediately prior to the Closing after giving effect to the transactions contemplated by the Redemption Agreements) of the Purchase Price actually received by such Seller; provided, however, that no Seller shall have any liability or indemnification obligations under this Agreement or otherwise with respect to any breach of the provisions of Section 5 above by any other Seller where the claim can be attributed to a distinct Seller and the Buyer Set Off Right shall not apply to any Damages resulting therefrom, except to the extent of the breaching Seller's allocable share (based on such Seller's percentage ownership

of the Units as of immediately prior to the Closing after giving effect to the transactions contemplated by the Redemption Agreements) of payments due under the Buyer Note.

**(c)**     Buyer Indemnified Persons first shall recover any Damages pursuant to the Buyer Set Off Right before seeking to recover such Damages directly from the Sellers (or any of them).

**(d)**     The amount of Damages payable by an indemnifying party under this Section 6 shall be reduced by (i) any insurance proceeds or other reimbursement arrangements with any third party, by way of indemnification or otherwise, actually recovered by the Indemnified Person with respect to the claim for which indemnification is sought, and (ii) any tax benefits that are actually realized by the Indemnified Person with respect to the claim for which indemnification is sought. No Indemnified Person shall be entitled to assert a claim for indemnification hereunder to the extent such Indemnified Person had knowledge of such claim prior to the Closing. Each Indemnified Person shall take reasonable steps to mitigate the Damages for the matter for which it is seeking indemnification hereunder.

**(e)**     No claim for indemnification under this Section 6 may be made after the expiration of the applicable representation, warranty, covenant or agreement, as provided for in Section 6.1 unless a timely claim notice was provided as provided in Section 6.1.

**6.5    Right Of Set-Off.**

**(a)**     Subject to the provisions of Section 6.5(b) below, Buyer may set off any amount to which any Buyer Indemnified Person may be entitled under this Section 6 against amounts otherwise payable to Sellers pursuant to Section 2.2 including amounts outstanding under the Note (subject to the limitation set forth in Section 6.4(b) above).  Neither the exercise of, nor the failure to exercise, such right of set-off will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it.

**(b)**     Buyer shall provide each Seller with ten (10) days prior written notice of Buyer's intention to effect an offset pursuant to Section 8.6(a) above (each an "Offset Notice"). If a majority of the Sellers disputes Buyer's right to effect such offset pursuant to Section 8.6(a) above, the Sellers shall so notify Buyer in writing within ten (10) days after each Seller's receipt of the applicable Offset Notice. Any dispute as to Buyer's right to effect an offset pursuant to Section 6.5(a) above shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect by a single arbitrator selected in accordance with such rules.   The arbitration proceedings shall be held in Myrtle Beach, South Carolina or another mutually acceptable venue.  Each of Sellers and Buyer shall bear all of its own expenses and the arbitrators' fees and expense shall be shared equally by the parties to the arbitration; provided, however, that at the conclusion of the arbitration, the arbitrator may award costs and expenses (including the costs of the arbitration previously advanced and the fees and expenses of attorneys, accountants and other experts) to the prevailing party.  The arbitrator may not limit, expand or otherwise modify the terms of this Agreement. The decision of the arbitrator shall (i) be rendered in writing and delivered to Buyer and Sellers, and (ii) be final, binding and conclusive and entitled to be enforced to the fullest extent permitted by law and entered in any court of competent jurisdiction.  To the extent practicable, the decision

of the arbitrators shall be rendered no more than thirty (30) days following commencement of proceedings with respect thereto.  The parties, their representatives, other participants and the arbitrator shall hold the existence, content and result of the arbitration in confidence.

### 6.6    Procedure For Indemnification--Third Party Claims.

(a)    Promptly after receipt by an indemnified party of notice of any Proceeding against it which may be subject to the indemnification obligations set forth in this Section 6, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give written notice to the indemnifying party of such claim, stating the amount of the Damages, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises, but the failure to so notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnified party's failure to give such notice.

(b)    If any Proceeding referred to in Section 6.6(a) is brought against an indemnified party and it gives notice to the indemnifying party of such Proceeding, the indemnifying party will be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnified party determines in good faith that the indemnified party and the indemnifying party have a conflict of interest with respect to such Proceeding, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel reasonably satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it conducts such defense in good faith, be liable to the indemnified party under this Section 6 for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent (which consent shall not be unreasonably withheld, conditioned, or delayed) unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; (iii) the indemnifying party will have no liability with respect to any compromise or settlement of such claims effected without its consent; and (iv) the indemnified party shall, at the indemnifying party's expense, cooperate with the indemnifying party in such defense and make available to the indemnifying party all witnesses, pertinent records, materials and information in the indemnified party's possession or under the indemnified party's control relating thereto as is reasonably required by the indemnifying party. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume

34

the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

(c)      Notwithstanding the foregoing, if an indemnified party determines in good faith that it is reasonably likely that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld, conditioned or delayed).

(d)      Sellers hereby consent to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Sellers with respect to such a claim anywhere in the world.

6.7     **Procedure For Indemnification--Other Claims.**  A claim for indemnification for any matter not involving a third-party claim may be asserted by written notice to the party from whom indemnification is sought, which written notice shall state the amount of the Damages, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises.  Upon receipt of a claim notice under this Section 6.7, the indemnifying party shall have 30 days to object to the applicable claim for indemnification by delivery of a written objection to the indemnified party specifying in reasonable detail the basis for such objection (an "**Objection Notice**").  If the indemnifying party timely delivers an Objection Notice, the parties shall in good faith seek to resolve any dispute within the 15-day period following delivery of the Objection Notice.  If the indemnified party and the indemnifying party shall succeed in reaching agreement on their respective rights with respect to any of such claims, the indemnified party and the indemnifying party shall promptly prepare and sign a memorandum setting forth such agreement.  Should the indemnified party and the indemnifying party be unable to agree as to any particular item or items or amount or amounts, then the indemnified party and the indemnifying party shall resolve their dispute by litigation in an appropriate court of competent jurisdiction. The party which receives a final determination in such dispute shall be indemnified and held harmless for all reasonable attorney and consultant's fees or expenses by the other party.

6.8     **Exclusive Remedy.**  Except with respect to (i) claims for fraud, (ii) equitable relief, and (iii) claims under Section 5 of this Agreement (subject to the limitations set forth in Section 6.4 above), from and after the Closing, the rights of Buyer Indemnified Persons and the Seller Indemnified Persons, as applicable, under this Section 6 shall be the sole and exclusive remedies of Buyer Indemnified Persons and Seller Indemnified Persons, as applicable, with respect to claims under, or otherwise relating to this Agreement.

6.9     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE UNITS AND THE BUSINESS ARE TRANSFERRED WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY

OR REPRESENTATION AS TO (A) THE CONDITION, VALUE, MERCHANTABILITY OR FITNESS OR SUITABILITY FOR ANY SPECIFIC PURPOSE AS TO ANY OF THE COMPANY'S ASSETS, (B) THE OPERATION OF THE COMPANY AND THE BUSINESS BY BUYER AFTER THE CLOSING, OR (C) THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE COMPANY OR THE BUSINESS BY BUYER AFTER THE CLOSING.

**6.10   Nature of Indemnity Payments**.   All indemnification payments under this Section 6 shall be treated as adjustments to the Purchase Price for tax purposes.

**7.      General Provisions.**

**7.1      Expenses.** Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants.

**7.2      Public Announcements.**   Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer determines. Sellers and Buyer will consult with each other concerning the means by which the Company' employees, customers, and suppliers and others having dealings with the Company will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

**7.3      Notices.**   All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to the other parties):

| Sellers: | Buyer: |
|---|---|
| C/O Direct Air<br>1600 Oak Street, Suite B<br>Myrtle Beach, SC 29577<br>Attention: Kay Ellison, Member<br>Facsimile: _____ | C/O Avondale Ventures, LLC<br>1629   K   Street,   NW,   Suite   300<br>Washington,   DC   20006<br><br>Attention: Hank L. Torbert<br>Facsimile: (866) 437-2418 |

**7.4      Jurisdiction; Service Of Process.**   Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of South Carolina, or, if it has or can acquire jurisdiction, in the United States District Court for the District of South Carolina, and each of the

parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

**7.5    Further Assurances.** The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

**7.6    Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**7.7    Entire Agreement And Modification.** This Agreement supersedes all prior agreements between the parties with respect to its subject matter (including the Letter of Intent between Buyer and Sellers dated July 12, 2011) and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

**7.8    Disclosure Letter.** The section numbers in the Disclosure Letter correspond to the section numbers in the Purchase Agreement; provided, however, that any information disclosed in this Disclosure Letter under any section number shall be deemed to be disclosed and incorporated under any other section number if such disclosure would be appropriate and the relevance of such disclosure is reasonably apparent.

**7.9    Assignments, Successors, And No Third-Party Rights.** Sellers may not assign any of their rights under this Agreement without the prior consent of Buyer. Buyer shall have the right to assign its rights under this Agreement to an Affiliate of Buyer, provided that no such assignment shall relieve Buyer of its obligations hereunder. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

**7.10    Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**7.11    Section Headings, Construction.**  The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**7.12    Time Of Essence.**  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**7.13    Governing Law.**  This Agreement will be governed by the laws of the State of South Carolina without regard to conflicts of laws principles.

**7.14    Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement, and may be delivered via facsimile or electronic transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**BUYER:**                                    **COMPANY:**

AVONDALE AVIATION I, LLC                SOUTHERN SKY AIR & TOURS, LLC

_____              _____
Name:  Hank L. Torbert                   Name:  Judy Tull
Title:  Manager                          Title:  Manager

STUKES ATWOOD, LLC                       **SELLERS:**

_____              _____
Name:  Donald L. Stukes                  Stanley Ellison
Title:  Manager


                                         _____
                                         Edward Warneck


                                         _____
                                         Kay Ellison


                                         _____
                                         Robert Keilman


39