# EXHIBIT 29

A
  V

July 13, 2011

Southern Sky Air & Tours, LLC
D/B/A Direct Air
1600 Oak Street, Suite B
Myrtle Beach, SC 29577

Attention: Judy Tull

**PRIVATE AND CONFIDENTIAL**

Dear Judy:

Avondale Ventures, LLC ("Avondale") is pleased to submit the following proposal whereby Avondale or a newly formed acquisition vehicle controlled by Avondale (the "Purchaser") will acquire up to 95% of the units of Southern Sky Air & Tours, LLC doing business as Direct Air ("Direct") or referred to as (the "Company") from Southern Sky Air & Tours, LLC, (the "Seller"). We are enthusiastic about the growth prospects for Direct. We appreciate how a process like this can be a distraction from the operation and growth of the Company and we are committed to working hand in hand with you to complete this transaction expeditiously.

The basic terms and conditions of our proposal are as follows:

    _Purchase Price._ Our proposal contemplates initially acquiring 55% of all of the outstanding units of the Company (the "Transaction"). Our purchase price for the units of the Company will be $1,000,000 USD to be paid as follows: (a) $500,000 in a lump-sum payment at closing; and (b) $500,000 on the first anniversary date of the closing. The Purchaser, with its 55% unit interest, will also assume 55% of any DOT escrow liability as of the closing date.

1. _Form of Consideration._ The Purchase Price will be paid as follows in two installments of $500,000 with the first payment due at closing and the second payment due one year after the closing. In addition, to the cash purchase price The Purchaser agrees to the Company having a subordinated note in the amount of $900,000 payable to a select group of founding investors to be paid over a three year period with no accrued interest.

| Sources | | Uses | |
|---|---|---|---|
| Cash from Avondale | $1.20 | Purchase Price | 1.90 |
| Seller Note | .90 | Transaction Expenses | .20 |

A
V

| Total Sources | $2.10 | Total Uses | $2.10 |

2.  **Purchaser Obligations/Performance.** The Purchaser will be responsible to complete and/or deliver one of the following post-closing items within a period of one year from the closing:

    i.   Acquire using the funding from Avondale or other acquisition company an operating airline with a valid and clean Airline Operating Certificate (AOC) that has a Schedule Service license authority from DOT in good standing.

    ii.   Commence a process to secure a new Airline Operating Certificate (AOC) and valid Schedule Service Certificate with DOT.

    iii.   Secure a Consumer Protection Bond in the amount no less than $2.0 million (but preferred) $5.0 million for the benefit of the Company.

At such time that Avondale completes either item i, or ii, or iii as detailed above, Avondale or the Purchaser will increase its unit interest to 95% on a dilutive basis and correspondingly the Seller will reduce their unit interest to 5% on an anti-dilutive basis.

The Purchaser will provide the Company with an appropriate credit facility at an amount no less than $2.5 million that will be used to fund operations based upon a mutually agreed upon operational budget.

3.  **Board of Directors.** Immediately upon closing, assuming a 55% ownership stake by the Purchaser and a 45% ownership stake by the Seller, the Board of Directors will consist of five members with three Board seats represented by Avondale or their designated person(s) and two Board seats represented by Southern Sky Air & Tours, LLC. Upon the event of the Purchaser achieving the Purchase Obligation/Performance benchmark, as detailed above, and obtaining a 95% ownership stake, Southern Sky Air & Tours, will resign their two Board seats, allowing the Purchaser to have all five Board seats.

4.  **Profit/Loss Sharing.** There will be no profit distributions to any equity owner unless and until 100% of the DOT escrow liability is liquidated or covered by a bond or not required resulting from an airline purchase which has DOT schedule service authority.

Profit and loss distributions after the event detailed above will be as follows:

    a)  If the capital structure is at 55% Avondale and 45% Seller, the profits will be split per the equity interests; and

    b)  If the Purchaser meets the performance standards as detailed above, and thereby owns 95% of the company, the profits will be split 20% of the EBITDA for the first full calendar year post closing, 15% of the EBITDA for the second calendar year, 10% of the EBITDA for the third calendar year, and 5% of the EBITDA thereafter consistent with the Seller equity interest.

5.  **Management/Equity Incentives.** We look forward to working the senior management team to realize our collective, ultimate vision for the Company. In this regard, we expect that Direct senior management will continue with the Company. The Buyer will execute

A V

Employment Agreements with four (4) Managing Partners for a period of three years --with mutually agreed upon current base salaries. As part of the Employment Agreements, all current owners will enter into a Noncompetition Agreement for a period of four years. Our investment philosophy is based upon partnering with management teams to achieve both operating and financial goals.

6. Credit Card Processing. The current owners will remain as guarantors on the credit card processing account for a period of no more than six months post closing. At such time or earlier, or at such time when the Purchaser becomes a 95% owner of the Company, Avondale or the acquisition company will assume full responsibility for the credit card processing account.

7. Conditions. We have initiated our business and financial due diligence. Our proposal is subject to the following conditions:

*Avondale or principal will become an immediate additional guarantor of JetPay  7/14/11*

*D/A/date*

*Avondale/date*

(a) *Due Diligence* – Our diligence items are: (i) accounting, financial, and tax due diligence; (ii) business due diligence; (iii) insurance due diligence; and (iv) legal and regulatory due diligence. We will work diligently to complete our due diligence within 10 working days days after the execution of this agreement.

(b) *Approvals* – Purchaser will require the receipt of all necessary regulatory approvals and the requisite approvals from the Company' board of directors and security holders/shareholders as well as specified third party consents to the change of control.

(c) *Definitive Agreement* – We will provide a marked copy of a Purchase Agreement, an initial draft of which would be provided by the Seller. The Purchase Agreement would include customary representations, warranties, covenants (including noncompetition agreement from owners), indemnifications, and escrows.

8. Timing. Our team of advisors are ready to conduct due diligence upon your response. We are confident that we can finalize our due diligence within the time period stated above and complete the Transaction within 31 days after the execution of this agreement. Purchaser desires to close the Transaction within a mutually agreeable time period.

9. Exclusivity. In consideration of the resources to be committed to the Transaction, the Company, Seller, and their respective advisors and representatives shall not solicit other offers to purchase the stock or assets of the Company or otherwise complete any similar transaction. If such an offer is received by Seller, Seller will promptly notify Purchaser. This exclusivity provision will expire on the earlier of the termination of this letter as described in Section 8 or the execution of the Purchase Agreement.

10. Confidentiality. Each of the parties hereto agrees that, without the prior written consent of the other, it will not and will direct its representatives not to, directly or indirectly, disclose to any person the existence of this letter, the fact that discussions or negotiations are taking place concerning a possible transaction involving the Company, or any of the terms, conditions or other facts contained in this letter or otherwise relating to any such possible transaction, including the status thereof.

11. Termination. This letter may be terminated and the Transaction may be abandoned: (i) at any time by the mutual agreement of the parties hereto or (ii) by any party hereto, if the Purchase Agreement has not been executed by the parties within 45 business days from the date of the execution of this letter agreement or both parties mutually agree to extend the exclusivity period in writing.

12. Expenses. Each party shall bear all of its own costs and expenses incurred in connection with this LOI and the transaction contemplated hereby, including, without limitation, the fees and expenses of any financial advisors, counsel, accountant, or other representatives retained by such party.

13. Governing Law. Each of the parties hereto agree that this letter and the respective rights and duties and obligations hereunder shall be governed and construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of law thereof. Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any state or Federal court sitting in New York over any action or proceeding arising out of or relating to this letter, and each of the parties hereto irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such court.

Finally, we want to emphasize both the speed and certainty of our proposal. We plan to commit extensive internal and external resources to complete our diligence in an expeditious manner. If you have any questions regarding this proposal, please call me at (202)-321-6671. We'd be happy to discuss our valuation or any other aspect of our proposal at your convenience either via conference calls or meetings. This letter will expire if not executed prior to 3:00pm EST on July 14, 2011. Thank you for your consideration of our offer.



Sincerely,

Avondale Ventures, LLC

By: _____

Name:      Hank Torbert
Title:      Managing Director

Agreed and Accepted as of the ___ day of July 2011:

Southern Sky Air & Tours, LLC

By: _____

Name:      Judy Tull
Title:      Managing Partner

# EXHIBIT 30

| | |
|---|---|
| **From:** | Kay Ellison |
| **Sent:** | Monday, September 12, 2011 5:23 PM |
| **To:** | Judy Tull; Ed Warneck; Bob Keilman |
| **Subject:** | Escrow Avondale |
| **Attachments:** | Escrow 2011-2012 9122011.xls |

NEW

--



Corporate Office:    843-916-9700



## 2011-2012 Escrow Revenue as of 9/12/2011

Exhibit F

| Dates | # Pax | Gross Rev | Net | Pre Purchased Baggage | Pax to Purchase Bags | Bag Cost | Additional Revenue |
|---|---|---|---|---|---|---|---|
| Sep | 8,336 | $866,953 | $526,630 | 1,474 | 5,203 | $35 | $182,105 |
| Oct | 32,543 | $3,464,204 | $2,129,970 | 9,428 | 15,130 | $35 | $529,550 |
| Nov | 29,224 | $3,215,428 | $2,028,270 | 7,244 | 14,358 | $35 | $502,530 |
| Dec | 29,125 | $3,297,533 | $2,150,216 | 5,288 | 11,673 | $35 | $408,555 |
| Jan | 15,837 | $1,789,011 | $1,159,290 | 2,626 | 8,600 | $35 | $301,000 |
| Feb | 15,973 | $1,758,867 | $1,137,572 | 2,914 | 8,514 | $35 | $297,990 |
| Mar | 19,826 | $2,314,585 | $1,462,426 | 4,851 | 11,053 | $35 | $386,855 |
| Apr | 19,343 | $2,002,834 | $1,266,463 | 3,113 | 10,549 | $35 | $369,215 |
| May | 210 | $16,521 | $25,751 | 67 | 92 | $35 | $3,220 |
| June | 95 | $3,753 | $6,406 | 31 | 64 | $35 | $2,240 |
| July | 217 | $24,414 | $15,307 | 81 | 88 | $35 | $3,080 |
| Aug | 77 | $9,655 | $6,028 | 18 | 59 | $35 | $2,065 |
| Sep | 10 | $888 | $539 | 0 | 6 | $35 | $210 |
| Oct | 8 | $693 | $437 | 1 | 5 | $35 | $175 |
| | | | | | | | |
| Total | 170,824 | $18,771,319 | $11,916,295 | 37,136 | 85,394 | | $2,988,790 |
| Less Present Escrow | | | $3,284,117 | | | | |
| Less Prepaid Fuel | | | $542,345 | | | | |
| Less Prepaid ACMI | | | $256,034 | | | | |
| Less Prepaid Vision delay | | | $183,329 | | | | |
| Less Credit Card Processing(3%) | | | $894,741 | | | | |
| Less Voucher Reduction | | | $1,296,000 | | | | |
| Shortage | | | $5,475,729 | | | | |
| | | | | | | | |
| Family Ties | | | | | | | |
| (Used Funds-15% of Aircraft) | | | | | | | |
| Expiration 10/31/11 | 11,596 | $926,341 | $622,394 | 305 | 7,339 | | $258,965 |
| Expiration 4/30/12 | 75,701 | $6,431,007 | $4,102,640 | 1,966 | 47,927 | | $1,677,445 |
| Expiration 10/31/12 | 43,210 | $3,696,066 | $2,352,002 | 1,822 | 26,902 | | $941,570 |
| | | | | | | | |
| Totals | 130,507 | $11,053,414 | $7,077,036 | 4,093 | | | $2,877,980 |

# EXHIBIT 31

Exhibit F

Exhibit "F"

## 2011-2012 Escrow Revenue as of 9/12/2011

| Dates | # Pax | Gross Rev | Net | Pre Purchased Baggage | Pax to Purchase Bags | Beg Cost | Additional Revenue |
|---|---|---|---|---|---|---|---|
| Sep | 8,336 | $966,953 | $826,630 | 1,474 | 5,203 | $35 | $182,105 |
| Oct | 32,543 | $3,464,204 | $2,129,970 | 9,428 | 15,130 | $35 | $529,550 |
| Nov | 28,224 | $3,215,429 | $2,029,270 | 7,244 | 14,358 | $35 | $502,530 |
| Dec | 29,125 | $3,297,533 | $2,150,216 | 5,288 | 11,673 | $35 | $408,555 |
| Jan | 15,837 | $1,789,011 | $1,159,280 | 2,626 | 8,600 | $35 | $301,000 |
| Feb | 15,973 | $1,758,667 | $1,137,572 | 2,914 | 8,514 | $35 | $297,980 |
| Mar | 19,628 | $2,314,585 | $1,462,426 | 4,851 | 11,053 | $35 | $396,855 |
| Apr | 19,343 | $2,002,834 | $1,268,453 | 3,113 | 10,549 | $35 | $269,215 |
| May | 210 | $16,521 | $25,761 | 67 | 92 | $35 | $3,220 |
| June | 85 | $9,753 | $6,406 | 31 | 64 | $35 | $2,240 |
| July | 217 | $24,414 | $15,307 | 81 | 88 | $35 | $3,080 |
| Aug | 77 | $9,655 | $6,028 | 18 | 59 | $35 | $2,065 |
| Sep | 10 | $986 | $639 | 0 | 6 | $35 | $210 |
| Oct | 8 | $693 | $437 | 1 | 6 | $35 | $175 |
| **Total** | 170,624 | $18,771,316 | $11,916,265 | 37,138 | 85,394 | $35 | $2,906,780 |
| Less Present Escrow | | | $3,204,117 | | | | |
| Less Prepaid Fuel | | | $542,345 | | | | |
| Less Prepaid ACMI | | | $256,034 | | | | |
| Less Prepaid Vision deleg | | | $183,329 | | | | |
| Less Credit Card Processing (3%) | | | $894,741 | | | | |
| Less Voucher Reduction | | | $1,295,000 | | | | |
| Shortage | | | $5,475,728 | | | | |

Family Ties
(Used Funds-15% of Aircraft)

| | # Pax | Gross Rev | Net | Pre Purchased Baggage | Pax to Purchase Bags | Beg Cost | Additional Revenue |
|---|---|---|---|---|---|---|---|
| Expiration 10/31/11 | 11,586 | $926,341 | $822,384 | 305 | 7,339 | $35 | $258,985 |
| Expiration 4/30/12 | 75,701 | $8,431,007 | $4,102,840 | 1,966 | 47,927 | $35 | $1,677,445 |
| Expiration 10/31/12 | 43,210 | $3,696,066 | $2,352,002 | 1,822 | 28,902 | $35 | $941,570 |
| Totals | 130,507 | $11,053,414 | $7,077,836 | 4,093 | | | $2,877,660 |

# EXHIBIT 32

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| **In re:** | |
| **SOUTHERN SKY AIR & TOURS, LLC** | **Chapter 7** |
| **d/b/a DIRECT AIR,** | **Case No. 12-40944-MSH** |
| **Debtor.** | |

### §341 CREDITOR'S MEETING FOR DIRECT AIR – 06/13/2012

Joseph H. Baldiga: Folks, we are here for the Direct Air Chapter 7 341 Creditors' Meeting for Case No. 12-40944. We are taping these proceedings so, and you can obtain a copy of the recording, if anybody wants a copy of the recording later on, not from me, but from the United States' Trustee's Office which administers the Bankruptcy system and the U.S. Trustee's program and it's not really my boss, but they're in charge of getting a trustee appointed in certain cases. Um, so you can get a copy of that. If you want a copy, you can call them at 508-793-0555 and you can ask for somebody there and they'll get you a copy of the tape. Ok? And they'll know how to help you with that. So a couple of the ground rules before we start, I am going to swear in the Debtor's principal, Mr. Torbert, when we go I'll have them all introduce themselves. He is here accompanied by two attorneys from Reimer and Braunstein, Debtor's counsel,

Alan Braunstein: And from Dave Nickless' office

Susan Crist: Oh, Dave Nickless

Baldiga: I'm sorry, yes, I see, so a couple ground rules, this meeting is not intended to be the be all and end all of this case. We're really just at the beginning stages of this case. We have a lot of investigating to do. I've retained my law firm, Mirick O'Connell, and we've retained forensic accountants Verdolino & Lowey, um, we're going to be investigating for a long time in this case, what happened in the case, what led to the company going out of business. So just FYI, so don't see this meeting as the only chance for anybody to have to ask about things or wonder what things happened and get answers. Ok. This meeting is not intended, excuse me, I've been here doing these meetings since about 8:30 this morning, this meeting is not intended as a way for creditors to ask specifics about their particular claim. I'm not going to know the specifics of your claim. If you want to ask about specifics of your claim, this really isn't the place to do it. If you think you have a claim, you should file a claim with the Bankruptcy Court. If you have questions about how to file a claim, then you can contact me outside this meeting, um, my paralegal, Kim DelleChiaie, has been sending claim forms out to folks, so I can give you her information. She'll love this, but her number is 508-860-1595. And again that's Kim, one of my paralegals, and her number is 508-860-1595. She's not there to answer questions about your claim, she's there to help you file a claim. It's going to be a long time in this case before we

Torbert:  Mr. Wayne Green.  And Mr. Green served as a consultant to us and worked with the management team, really to help them figure out the very basic things relative to this company. Route analysis, meaning which routes were profitable and which were not, which is big concern of us, of ours, not all the routes were profitable, quite frankly, and that was harming the business.

Baldiga:  What did Avondale pay for their investment?

Torbert:  Ah, we committed to invest 2.5

Baldiga:  2.5 million?

Torbert:  Um hum.

Baldiga:  Ok.  And what did you put in to start?

Torbert:  We put in $460,000 we also secured a line of credit to help the company in the amount of 3 million dollars.

Baldiga:  And what did you do to help line up that line of credit?

Torbert:  We actually gave a corporate guaranty of the holding company that held the stock.

Baldiga:  Who was the lender?

Torbert:  The lender was Chemoil.  I know, a fuel provider.

Baldiga:  Ok.  And what kind of due diligence did Avondale do before it made its investment?

Torbert:  Well, obviously, interviewing the management team, obviously evaluating all the financials that they provided.  We did get, you know, various disclosures from the business.  We also, I personally went and talked with certain people in the industry and asked them what they thought about this company, and quite frankly, many people were impressed by the book of business.  This is a very difficult thing to do servicing these markets.  Very difficult.

Baldiga:  And was there anything in conjunction with the due diligence which gave your team reason for pause to doing the investment?

Torbert:  Um, no.  Initially, no, there was, no there wasn't.  I mean, you know, our issue was we thought that this business needed again a better financial system so you knew what was going on on a real time basis.  That was a significant concern.

Baldiga:  And did Avondale conclude that the company was cash flow positive at the time? When you made its investment?

Torbert: Um, and ah, you know, furthermore, from our standpoint, we had a plan to work with this company.

Baldiga: So was there an awareness of Avondale's part that there was a shortfall in the account?

Torbert: Yes. There was an awareness that there was a shortfall. We had quite frankly been told that the shortfall would burn off as the flights occurred. Secondarily, what we thought was a very smart move was to merge this business with what they call a scheduled flight carrier, which we had already initiated, which would eliminate the escrow account and allow this company to not have that concern.

Baldiga: So how much did you think the shortfall was at the time you made your investment?

Torbert: Ah, we were, it was represented that there was approximately 5 million.

Baldiga: Ok.

Torbert: Now again, you know,

Baldiga: What did you do to verify that?

Torbert: Again we relied on the management team's representations, ah, which is why we could only get certain pieces of information.

Baldiga: Why? You were taking 55%?

Torbert: We did the best we could in terms of due diligence, ah, that we could.

Baldiga: So, what did you do to verify that that was the shortfall?

Torbert: We verified the account as best we could. We verified, ah, ah, um, the financials that were presented to us and we talked with, you know, go ahead

Baldiga: What was the explanation for the shortfall?

Torbert: Basically the business had, you know, had like many companies during this time, had some issues and had, you know

Baldiga: What issues?

Torbert: Quite frankly it's been a difficult year for the business and had crept into its shortfall, crept into its account. Now I don't

Baldiga: But how would they do that?

Torbert: Yah. We can verify it but I would assume that most of them were being paid.

Baldiga: Why would you assume that?

Torbert: Well we also had a payment plan with TSA.

Baldiga: No I understand but that was for I thought

Torbert: Beginning when we made our investment we assumed and worked with them, were told representations were made again when we closed the deal there were representations and warranties made.

Baldiga: Sure. But then comes January and all of a sudden you find out that the 5 million short fall has turned into a 12 million short fall.

Torbert: End of January February.

Baldiga: Right.

Torbert: Correct.

Baldiga: So did that maybe prompt you to think that maybe the TSA representations were false too?

Torbert: Absolutely. All of the reps quite frankly beginning in February which is again why we hired the CPA, I didn't think anything was right.

Baldiga: Ok.

Torbert: To be you know and I know

Baldiga: I'm glad. I'm glad you

Torbert: No. No. No. No. But I want to be very clear. That's why we hired the CPA. And that's why I asked him to go down there cause again given the situation you didn't want to make accusations, accuse anyone of anything before verifying it.

Baldiga: At that point you don't think really?

Torbert: Mmhmm.

Baldiga: Still at that point you were giving them the benefit of the doubt?

Torbert: No. We were trying to figure out a solution. At that point they had considered buying back the business and talked to us about it.

Baldiga: But, not until March?

Torbert: Not until March.

Boyd: Did the old management team, Mr. Torbert, not object to the increasing use of the Family Ties sales at that time?

Torbert: You know, quite frankly, I don't recall cause I wasn't down there so

Baldiga: Did it raise concerns?

Torbert: To me, no, but

Baldiga: Did they raise concerns to anyone on your team?

Torbert: They may have raised concerns you know, I'm not certain, so

Baldiga: But, it's possible they did.

Torbert: It's possible.

Baldiga: What would their concerns have been?

Torbert: One they wanted more money in the business. So period. But this is a way they had sustained themselves for a year and again we had not received the financial information we requested. So for all intensive purposes we thought this was as represented to us a legitimate way for us to continue doing business as we received their financial information and evaluate the company

Baldiga: But you didn't do any independent analysis as to whether or not this met DOT requirements? You relied on representations. I'm not saying that's right or wrong I'm just asking.

Torbert: Yes we did. Yes we did. They were the experts. We relied on them and quite frankly they built this business. Did we begin to make moves to inquire about every aspect of the business, in February, yes we did.

Boyd: Did you fire Ms. Tull or did somebody from the new management team did somebody from the new team fire Judy Tull?

Torbert: No she was not fired. She actually resigned. And to be clear I have her resignation. I have all you know when we asked that Miss. Kay Ellison be the one point of contact because were having all different people calling me or calling whoever and which is very disorganized for a management team, we asked there to be one point person that filters everything through to workers and management team. Miss. Tull, one of your clients, expressed deep concern with that decision with Kay Ellison. So did Mr. Warnick. Again I you know she at that point I asked

her well are you resigning from the company. She said yes I am. I said ok then I guess I will accept your resignation. She was not fired. Quick frankly you know at that point we believed she had to deep of knowledge of the entity to fire at that point.

Boyd: Last question, Mr. Torbert, is the ChemOil facility debt obligation whatever word _____ is it secured by a lien over the assets of Swift Air?

Torbert: No. There's no lien.

Boyd: Is there a lien over the Swift Air certificate? _____.

Torbert: By?

Baldiga: Who is Swift Air?

_____: Swift Air my understanding Joe is an airline based in Arizona. Is this an Avondale controlled entity?

Torbert: King Williams.

Baldiga: Ok. And what connection does Avondale and King Williams what connection is there between Swift Air and Direct Air?

Torbert: There is no direct connection.

Baldiga: What indirect connection.

Torbert: Well other than similar ownership no. I mean we had at one point in time had hoped that Swift could be another vendor to Direct Air and fly as the other carriers could as a vendor.

Baldiga: Supplying planes?

Torbert: Yes.

Baldiga: Ok.

Torbert: Correct. On behalf yah.

Baldiga: Are there any inter-related debt?

Torbert: Inter-related debt no.

Baldiga: Or any obligations

Torbert: No.

# EXHIBIT 33

EXECUTION COPY

## PROMISSORY NOTE

### (THIS NOTE DOES NOT BEAR INTEREST)

September 29, 2011                                                                 $750,000
Myrtle Beach, South Carolina

     **WHEREAS**, the undersigned is party to that certain Membership Interest Purchase Agreement dated as of September 29, 2011 by and among Avondale Aviation I, LLC, a South Carolina limited liability company (the "Maker"), Southern Sky Air & Tours, LLC d/b/a "Direct Air", a South Carolina limited liability company (the "Company") and the members of the Company party thereto (collectively, the "Members"), as the same may be amended from time to time (the "Purchase Agreement");

     **WHEREAS**, capitalized terms used herein but not otherwise defined herein shall have the meaning set forth in the Purchase Agreement;

     **WHEREAS**, this promissory note (this "Note") is being delivered by Maker pursuant to Section 2.2 of the Purchase Agreement evidencing payment of the Purchase Price to the Sellers thereunder.

     **NOW THEREFORE, FOR VALUE RECEIVED**, the Maker hereby promises to pay to KAY ELLISON, MARSHALL ELLISON, ROBERT KEILMAN, JUDY TULL, AND EDWARD WARNECK (individually or collectively, as the context may require, the "Holder"), the principal amount of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000) as provided herein.

1.   <u>Payment Terms</u>.  The principal amount of this Note shall be paid as follows:

    1.1          <u>Principal</u>.

        1.1.1      Three (3) monthly payments, each in the amount of $10,416.50, with the first such installment being due and payable on October 7, 2011, with subsequent installments being due and payable on the 1st of every month thereafter, with the final installment being due and payable on January 1, 2012;

        1.1.2      Thirty-three (33) monthly payments, each in the amount of $20,833.33, with the first such installment being due on February 1, 2012, with subsequent installments being due and payable on the 1st of every month thereafter, with the final installment being due and payable on October 1, 2014; and

        1.1.3      In addition to amounts payable under Sections 1.1.1 and 1.1.2, one payment in the amount of $31,250.61 to be made at any time on or prior to November 1, 2014.

    1.2          <u>Interest</u>.  This Note shall bear no interest.

1.3        <u>Voluntary Prepayments</u>.  At any time during the term of this Note, the Maker may voluntarily prepay all or part of the outstanding principal amount of this Note without penalty or premium.

1.4        <u>Payments</u>.  All payments under this Note shall be made in immediately available U.S. funds, shall be allocated among the Holder pro rata based on such Holder's percentage ownership of the Company's outstanding membership interests as of immediately prior to the Closing after giving effect to the transactions contemplated by the Redemption Agreements, and shall be made via wire transfer to the accounts specified on <u>Schedule 1</u> hereto, or such other account as may be directed in writing by the applicable Holder.

2.    <u>Events of Default; Remedies</u>.

2.1 The following shall constitute an "Event of Default" hereunder:  (a) the Maker fails to make any payment hereunder and such failure shall have continued for a period of five (5) Business Days after notice by Holder of such failure to pay; (b) the occurrence of any of the following events or occurrences:  (i) Maker's admitting in writing its inability to pay its debts generally as they become due; (ii) Maker's commencement of a voluntary bankruptcy case under Title 11 of the United States Code as from time to time in effect, or by its authorizing, by appropriate proceedings of its Board of managers or other governing body, the commencement of such a voluntary case; (iii) Maker's filing an answer or other pleading admitting or failing to deny the material allegations of a petition filed against it commencing an involuntary case under said Title 11, or seeking, consenting to or acquiescing in the relief therein provided, or by its failing to controvert timely the material allegations of any such petition; (iv) the entry of an order for relief in any involuntary case commenced against Maker under said Title 11, which order is not dismissed within sixty (60) days; (v) Maker's seeking relief as a debtor under any applicable law, other than said Title 11, of any jurisdiction relating to the liquidation or reorganization of debtors or to the modification or alteration of the rights of creditors, or by its consenting to or acquiescing in such relief; (vi) the entry of an order by a court of competent jurisdiction (A) finding Maker to be bankrupt or insolvent, (B) ordering or approving Maker's liquidation, reorganization or any modification or alteration of the rights of its creditors, or (C) assuming custody of, or appointing a receiver or other custodian for, all or a substantial part of Maker's property, which order is not dismissed within sixty (60) days; or (vii) Maker's making an assignment for the benefit of, or entering into a composition with, its creditors, or appointing or consenting to the appointment of a receiver or other custodian for all or a substantial part of its property; or (c) Maker shall dissolve, liquidate, or terminate its existence.

2.2 Upon the occurrence of an Event of Default hereunder, the Holder may, at its option, (a) declare the unpaid principal balance of this Note to be immediately due and payable, and (b) exercise any or all other rights and remedies available to the Holder under this Note or applicable law.

2.3 Upon the occurrence of any Event of Default hereunder and/or the maturity of this Note (whether by acceleration, declaration, extension, or otherwise), the unpaid principal balance of this Note shall bear interest, for so long as such Event of Default continues or until payment in full of the indebtedness evidenced by this Note has been made, at the fixed annual rate of ten percent (10%) per annum (or, if lower, the maximum rate permitted by applicable law).

2.4 The rights, powers and remedies of the Holder under this Note shall be in addition to all rights, powers and remedies given to the Holder by virtue of any statute, rule of law, or other agreement, and shall be cumulative, and may be exercised successively or concurrently.

2.5 Maker will pay all costs, expenses, and fees (including, without limitation, reasonable attorneys' fees) incurred by the Holder in connection with the enforcement of this Note after the occurrence of an Event of Default.

3. Set-Off Right. This Note is subject to set off as provided in Section 6.5 of the Purchase Agreement.

4. Standard Waivers. Except as otherwise expressly provided herein, demand, presentment, notice, notice of demand, notice for payment, protest and notice of dishonor are hereby waived by the Maker. The Holder shall not be deemed to waive any of its rights hereunder unless such waiver be in writing and signed by the Holder. Any failure on the part of the Holder at any time to require the performance by the Maker of any of the terms or provisions hereof, even if known, shall in no way affect the right thereafter to enforce the same, nor shall any failure of the Holder to insist on strict compliance with the terms and conditions hereof be taken or held to be a waiver of any succeeding breach or of the right of the Holder to insist on the strict compliance with the terms and conditions hereof.

5. Binding Agreement; Assignment. The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. This Note may not be assigned by any party hereto without the prior written consent of the other party hereto.

6. Notices. Any notice to be given hereunder shall be in writing and shall be sent to the Holder or the Maker, as the case may be, as provided in Section 7.3 of the Purchase Agreement.

7. Governing Law. This Note shall be governed by, and construed in accordance with, the laws of the State of South Carolina, without regard to the conflicts of law principles thereof.

8. Jurisdiction; Service Of Process. This Note shall be subject to the provisions of Section 7.4 of the Purchase Agreement, the terms of which are incorporated herein by reference.

9. Severability. It is the desire and intent of the parties that the provisions of this Note be enforced to the fullest extent permissible under applicable law and public policy. Accordingly, in the event that any provision of this Note is held to be invalid, prohibited or unenforceable for any reason, such provision shall be ineffective, without invalidating the remaining provisions of this Note. Notwithstanding the foregoing, if such provision could be

3

more narrowly drawn so as not to be invalid, prohibited or unenforceable, it shall be so narrowly drawn, without invalidating the remaining provisions of this Note.

10. <u>Entire Agreement; Amendments; and Conflicts</u>. This Note, the Purchase Agreement and the other Transaction Documents contain the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters. No amendment to, or modification or waiver of, any of the terms of this Note shall be valid unless in writing and signed by the party against whom enforcement of such amendment, modification or waiver is sought. In the event of any conflict between the provisions of this Note and the Purchase Agreement, the provisions of this Note shall govern.

11. <u>Titles and Subtitles</u>. The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

IN WITNESS WHEREOF, the Maker has caused this Note to be executed by its duly authorized officer on the day and year first written above written.

AVONDALE AVIATION I, LLC

By: _____

Hank L. Torbert, President

GUARANTY

The undersigned ("Guarantor") hereby absolutely, unconditionally, and irrevocably guarantees the prompt payment and performance (and not merely collection) of Maker's obligations under the foregoing Promissory Note (collectively, the "Guaranteed Obligations"). This Guaranty has the effect of rendering Guarantor a surety and the equivalent of a co-obligor with Maker with respect to the Guaranteed Obligations.

Guarantor agrees that, until the Guaranteed Obligations have been satisfied in full, Guarantor shall not be released by or because of the taking of, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action. Without limiting the generality of the foregoing, Guarantor waives the benefits of any provision of law requiring that one or more beneficiaries hereunder exhaust any right or remedy, or take any action, against Maker, any other guarantor of Maker's obligations, any other person and/or property. In addition, Guarantor waives any and all presentments, notices, and demands whatsoever with respect to this Guaranty or with respect to any of the Guaranteed Obligations.

Guarantor represents and warrants to each addressee set forth above that (A) Guarantor has the power and authority to execute, deliver, and perform its obligations under this Guaranty, and (B) this Guaranty has been duly executed and delivered by Guarantor and constitutes the legal, valid, and binding obligation of Guarantor, enforceable in accordance with its terms.

This Guaranty shall be governed by and construed in accordance with the internal laws of the State of South Carolina, without giving effect to its conflicts of laws provisions. Any action, suit, or proceeding arising out of or relating to this Guaranty shall be brought only in the courts of the State of South Carolina or of the United States District Court for the District of South Carolina, if a basis for federal jurisdiction exists, and Guarantor hereby consents to the personal jurisdiction of such courts in connection herewith.

Hank L. Torbert

5

# EXHIBIT 34

## COMMERCIAL DEPARTMENT
### RESOLUTION OF DIRECTORS REGARDING BANK ACCOUNT AND AUTHORIZED PARTIES

Southern Skys Air and Tours dba Direct Air
(Name of Corporation)

I HEREBY CERTIFY to VALLEY NATIONAL BANK, that a meeting of the Board of Directors of Southern Skys Air and Tours dba Direct, a corporation organized under the laws of the State of South Carolina duly called and held at the office of said corporation, No. _____ in the city of Myrtle Beach, State of South Carolina on the 13 day of March 2011.

The following resolutions were duly adopted and are now in full force and effect:

**DEPOSITS AND WITH-DRAWALS**

RESOLVED, that said Valley National Bank (hereinafter designated as the Bank), be designated as a depository of this corporation and that funds of this corporation deposited in said Bank be subject to withdrawal upon checks, notes, drafts, bills-of-exchange acceptances, undertakings or other orders for the payment of money when made, signed, drawn, accepted or endorsed on behalf of this corporation by the following officers and persons, to wit:

Henk L Torbert
(Titles of officers and/or other persons authorized to sign each of the above instruments: e.g. president, treasurer, etc.)

Single
(also please indicate in what manner they are to sign the various instruments, singly, any two or jointly, etc.)

RESOLVED, that the Bank is hereby authorized to pay any such instruments and also to receive the same from the payee or any other holder without inquiry as to the circumstances of issue or the disposition of the proceeds even if drawn to the individual order of any signing officer or person, or tendered in payment of his individual obligation.

**LOANS CREDITS AND SECURITY**

RESOLVED, that the following officers of the corporation and persons, to wit:

Henk L Torbert
(Titles of officers and/or other persons authorized to borrow money and obtain credit: e.g. president, treasurer, etc.)

Single
(also please indicate in what manner they are to sign the various instruments: singly, any two or jointly, etc.)

are hereby authorized on behalf of this corporation to borrow money and to obtain credit for this corporation from the Bank on such terms as may see, to them advisable, and to make deliver

**notes.**

drafts, acceptances, agreements and any other obligations of this corporation therefore in form satisfactory to the Bank, and as security to pledge or assign and deliver stocks, bonds, bills property held by or belonging to this corporation, with full authority to endorse, assign or guarantee the same in the name of this corporation to exercise and deliver all instruments and affix the corporate seal: and also to discount with the Bank or sell to the Bank any bills receivable or other negotiable paper held by this corporation with full authority to endorse the same in the name of this corporation.

RESOVED, that Reginald Conner Secretary of this corporation, be and is hereby authorized to certify to the Bank the names of the present officers of the corporation, and other persons authorized to sign for it and the offices respectively held by them, together with specimens of their signatures, and in case of any change of any holder or holders of such offices, the fact of such change and the names of any new officers and offices respectively held by them, together with specimens of their signatures; and

BE IT FURTHER RESOLVED, that the Bank be promptly notified in writing of any change or any holder or holders of such offices, and until so notified and receipt acknowledged by the Bank

VNB 00069

in writing, then the Bank shall be indemnified and saved harmless from any losses suffered or liability incurred by it in continuing to accept and honor checks, notes, etc., signed by the present officers of the corporation only, after such change without such notice.

RESOLVED, that the undersigned officers or any one of them be and are hereby authorized, on behalf of the corporation, to enter into any contract required by said bank governing the said account.

RESOLVED, that these resolutions be communicated to the Bank, and remain in full force until notice in writing of their rescission or modification has been received by the Bank and receipt thereof acknowledged in writing by the Bank, and that _Southern Ships Air and Icins_ Secretary of this corporation, be hereby authorized to certify to the Bank the foregoing resolutions, and that the provisions thereof are in conformity with the charter and by-laws of the corporation.

I FURTHER CERTIFY that there is no provision in the charter of by-laws of said corporation limiting the power of the board of directors to pass the foregoing resolutions, and that the same are in conformity with the provisions of said charter and by-laws.

I HEREBY CERTIFY that the present officers of the corporation and the offices respectively held by them are as follows:

| NAME | OFFICE | SPECIMEN SIGNATURES |
|------|--------|---------------------|
| Hank L Torbert | Mytle Buch | |
| | | |
| | | |
| | | |
| | | |

IN WITNESS WHEREOF, I have hereunto set my had as Secretary of said corporation and Affixed the corporate seal this ___13th___ day of ___March___ 20_13_.

_____
Secretary of the Corporation

_____
Other Officer or Director

_____
Title

(Corporate Seal)

- Note: In case the Secretary is authorized by the above resolutions to sign checks, notes, etc., then this certificate must also be signed by another officer of the corporation who is not authorized to sign checks, notes, etc., or a director of the corporation.
- Note: Signature cards signed in accordance with the above authorization are to accompany this resolution.

VNB 00070