UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| In re: | |
|---|---|
| SOUTHERN SKY AIR & TOURS, LLC d/b/a DIRECT AIR, | Chapter 7<br>Case No. 12-40944-MSH |
| Debtor. | |

AFFIDAVIT OF PENELOPE A. BLEY
IN SUPPORT OF TRUSTEE'S REPORT ON
DIRECT AIR'S OPERATIONS AND SHORTFALL

I, Penelope A. Bley, having first been duly sworn, do hereby depose and say as follows:

1. I am a senior analyst at Verdolino & Lowey, P.C. ("V&L"), a full-service accounting firm, and have been so since 1999. I have 35 years of work experience in diverse aspects of bookkeeping and accounting, including forensic accounting. I have been employed in numerous positions in the accounting field, including but not limited to those in Accounting and Information Technology, as Chief Accountant and as Controller. I also have experience in Database Architecture and Creation, Computer Forensics, and Internal Audit. My curriculum vitae is attached hereto as **Exhibit A.**

2. The U.S. Bankruptcy Court-appointed Chapter 7 Trustee, Joseph H. Baldiga, Esq. (the "Trustee"), of the bankruptcy estate ("Estate") of Southern Sky Air & Tours, LLC d/b/a Direct Air ("Direct Air") employed V&L as the Estate's general accountant as well as to assist in the Trustee's investigation of the financial operations of Direct Air. The Trustee, both directly and through counsel, requested that V&L analyze Direct Air's financial operations and determine the amount of funds that should have

been in Direct Air's depository accounts at any point in time. The Trustee also requested that V&L investigate the sources of any shortfall in Direct Air's depository accounts.

3. I had primary responsibility for the manner, method and conduct of V&L's analysis of Direct Air's data and records. I directly participated in the research, review and analysis of data, as well as supervised and directed other V&L staff doing so.

4. In light of the foregoing, I have personal knowledge of the matters stated herein.

5. In May, 2012, V&L took possession of approximately 270 boxes of Direct Air's books and records retrieved from Direct Air's office in Myrtle Beach, South Carolina. From that date forward, V&L has been the keeper of the physical records for Direct Air and securely maintained the records in its possession, custody and control.

6. Direct Air utilized QuickBooks Online for financial accounting and reporting. Through contact with the Direct Air's Director of Accounting and Finance, Mary Baldwin, V&L obtained full access to the QuickBooks Online database.

7. Direct Air used an online reservations system developed by Radixx Solutions International ("Radixx International") called Radixx Air Enterprise software ("Radixx") for booking and tracking of flights, reservations and payments by customers. I contacted Radixx International and spoke with Greg Gent and Ron Peri to learn about Radixx and obtain access to Direct Air's Radixx records.

8. Pursuant to my request, on or about July 26, 2013, I obtained an export of data from Direct Air's Radixx records. This export contained text files from the Radixx database comprising nearly 15 million records associated with Direct Air flight segments ("Segments"). In aviation terminology and in Radixx, the term Segment is used rather

than "flight". A Segment is a portion of a flight between two airports, counted per seat. Each seat on a non-stop flight represents one Segment, whereas each seat on a flight with one layover represents two Segments. The exported Radixx records included, among other data: "Flight Number", "Booking Date", "Departure Date", "Charges", "Payment", "Payment Method", fee types (including special service requests called "Ancillary Fees", such as "Membership Fees", "Service Code" and "Tax Code"), and changes to the reservations ("Reaccommodation"). Due to the number of customer records and the personal information contained therein, the export omitted some of the data in Direct Air's Radixx database. Specifically, personal customer information including but not limited to credit card and debit card numbers, full names and addresses were not obtained from Radixx by V&L or the Trustee.

9. I created a Microsoft Access Database, importing each of the exported Radixx text files into its own table. I then mapped relationships between the tables and cross reference fields with input from Radixx personnel.[1] This allowed me to analyze data patterns and analyze the data in several different ways. By way of example, this method allowed me to combine data from other sources to directly compare Radixx data to bank activity. By creating a Microsoft Access Database for the Radixx data, V&L was not limited to the reports available in Radixx, but could access, organize and compile the exported Radixx data in various formats.

10. Amongst the boxes of Direct Air's records, and through subpoenas served by Trustee's counsel on certain banks, V&L was able to obtain and analyze statements for all of Direct Air's bank accounts. These records show that Direct Air opened two

---

[1] In database parlance, mapped relationships are links connecting a field or fields in one table to a field or fields in another table that refer to the same data or transaction.

{Practice Areas/CORP/15008/14190/A2523858.DOCX}

3

linked depository accounts ("depository accounts") pursuant to applicable U.S. Department of Transportation ("DOT") Regulations at Valley National Bank ("VNB") on or about October 27, 2006 and maintained those accounts throughout the duration of Direct Air's operations. VNB account ending #4734 received customer payments for advance reservations and VNB account ending #4554 was a money market account into which funds were transferred to earn a higher rate of interest. In addition, Direct Air maintained operating accounts at a number of different banks.

11. Also among the boxes of Direct Air's records were binders of Direct Air's requests for funds to be released from their depository accounts at VNB. Direct Air submitted requests to pay its air carriers for flight operations directly from its depository accounts and submitted requests to release flight revenue to Direct Air after the flight was completed. It is the latter request ("release request") that is the focus of this affidavit. A sample Direct Air release request is attached as **Exhibit B**. Direct Air's release requests directed the transfer of funds from Direct Air's depository accounts to Direct Air's operating accounts at other banks. On average, Direct Air submitted one release request per week to release funds to itself or in part to its vendors. Direct Air was in operation for 263 weeks (each, an "Operating Week").

12. I directed and supervised other V&L staff in the review of Direct Air's bank account statements and the comparison of statement activity to the activity as recorded in QuickBooks. At the outset of our investigation, I copied Direct Air's QuickBooks database in the form in which I first gained access to it in order to preserve the original content. Using a copy of this QuickBooks file, I instructed V&L staff to make additional entries and corrections in QuickBooks so that the data in the copied file

would agree with Direct Air's bank statements (the "Corrected QuickBooks"). Once the Corrected QuickBooks was prepared, I reconciled each of the bank accounts to the related bank statements. I then ran reports from the Corrected QuickBooks to use for comparison to the Radixx data and Direct Air's release requests.

13. Based on the Corrected QuickBooks and Direct Air's bank statements, I calculated that Direct Air's depository accounts at VNB received a total of $209,410,162.22 in deposits during Direct Air's lifespan and VNB released a total of $208,393,226.31 from Direct Air's depository accounts over this same period of time. The difference between deposits and withdrawals from Direct Air's depository accounts is $1,016,935.91, which is equal to the ending balance in Direct Air's depository accounts at VNB as of March 15, 2012 when Direct Air filed its bankruptcy petition (the "Petition Date").

14. I then prepared a spreadsheet summarizing the monthly activity in Direct Air's depository accounts at VNB, which is attached hereto as **Exhibit C**. The combined depository accounts at VNB held a minimum of $151,206.39 (August 2008) to a maximum of $4,221,674.51 (November 2008) at the end of a month. On average, the month end balance in the combined depository accounts at VNB was $1,591,712.78 (see also **Exhibit C**).

15. As stated above and based on our review of VNB bank statements, I calculated that Direct Air's depository accounts at VNB actually received deposits of $209,410,162.22. See **Exhibit C**. These deposits were nearly all from customer credit and/or debit card payments (collectively, "credit card" payments). There is no distinction between credit and debit transactions in the data I analyzed. The only other customer

{Practice Areas/CORP/15008/14190/A2523858.DOCX}

5

payments deposited into the depository accounts at VNB were four (4) checks for special charter flights totaling $439,904.60. Direct Air's depository accounts did not receive cash or any other form of customer payment. Interest income in the amount of $33,297.31 was the other source of deposits into the depository accounts at VNB. On occasion, air carriers refunded money to Direct Air into its depository accounts at VNB. These refunds from carriers were offset against the outflows from the Direct Air depository accounts at VNB in order to properly isolate and analyze the deposits from customer bookings.

16. Next, I prepared a spreadsheet summarizing customer Charges by Payment Method per Radixx, which is attached hereto as **Exhibit D**. Pursuant to Radixx records, customer payments made by credit card (American Express, MasterCard, Visa or Discover Card) totaled $209,232,443.98. Not accounted for in Radixx were the four (4) checks for special charters referenced above that were paid to Direct Air totaling $439,904.60. Together with interest income of $33,297.31, these deposits to Direct Air's depository accounts totaled $209,705,645.89. This amount then needed to be adjusted down for the amount of customer credit card charges that were recorded in Radixx over the last few days of Direct Air's business but were not actually funded prior to the Petition Date, or any time thereafter. The amount of the adjustment for unfunded credit card charges is $213,833.80.

17. In total, based on Radixx records, and after adjusting for unfunded credit card charges, I calculated that Direct Air's depository accounts at VNB should have received deposits of $209,491,812.09. After comparing this to the actual total of $209,410,162.22 deposited into Direct Air's depository accounts at VNB per the bank

statements and QuickBooks file, we calculated the variance to be $81,649.87, or 0.03899%, which is less than 1/20 of one percent (see also **Exhibit D**). From a statistical standpoint, a variance this nominal over the span of five (5) years suggests that the Radixx data reflecting customer payments is reasonably accurate and statistically reliable for use in further comparison and analysis.

18. Customer payments made by MasterCard, Visa or Discover Card were processed by JetPay Merchant Services, LLC ("JetPay") and funded by Merrick Bank Corporation ("Merrick") into Direct Air's depository accounts at VNB. During the first few months that Direct Air accepted reservations, JetPay deducted its credit card processing fees from the funds deposited into Direct Air's depository accounts. In February 2007, however, JetPay reversed all of the fees deducted from the depository accounts to that point, re-deposited that amount in Direct Air's depository accounts at VNB, and withdrew its fees on a monthly basis from a Direct Air operating account going forward. American Express Travel Related Services Company, Inc. ("AMEX") processed and funded its own credit card transactions. At all times, AMEX withdrew its monthly processing fees from the depository accounts at the beginning of the following month. As of the Petition Date, based on VNB bank statements, AMEX had deducted credit card processing fees associated with Advance Bookings from Direct Air's depository accounts at VNB in the amount of $813,481.19.

19. On average, JetPay and AMEX charged credit card processing fees were equal to 3.3% of the value of the payments processed.

20. I was able to extract individual transactions from the available data and to create totals of transactions by Flight, Departure Date, Booking Date, Payments, Payment

Method, Service Code and Tax Code. At the end of each month, I calculated the advance bookings by credit card ("Advance Bookings"). Only those paid by credit card are considered here due to the fact that only those transactions would move through the depository accounts at VNB. Advance Bookings were Flights with Departure Dates after the end of a month when payments were made during or prior to that month. In other words, these were reservations that a customer had made and paid for, but that the customer had not completed as of the end of a month. As my previous analysis of the deposits into the depository accounts at VNB had revealed, only credit card payments and four (4) checks were funds actually paid by customers and deposited into Direct Air's depository accounts at VNB. Accordingly, my analysis of Advance Bookings only included customers paying by credit card or check. Funds for Advance Bookings should have been equal to the amounts in Direct Air's depository accounts at the end of each month in connection with flights not yet completed. Advance Bookings as of the Petition Date were $33,005,883.69 (see also **Exhibit C**).

21.    Upon information and belief, the DOT Regulations permit withdrawal from depository accounts in advance of flights for credit card processing fees and air carrier payments. As of the Petition Date, as identified in paragraph 18 above, Direct Air's depository accounts had been reduced by credit card processing fees associated with Advance Bookings through AMEX in the amount of $813,481.19.

22.    As of the Petition Date, based on release requests and bank statements, Direct Air had paid $572,269.00 to Xtra Air as the air carrier for flights scheduled for the upcoming weeks. Throughout Direct Air's operations, it was necessary for Direct Air to

{Practice Areas/CORP/15008/14190/A2523858.DOCX}

8

pay several of its other air carriers up to two weeks in advance for the air carrier's upcoming flight schedule.

23. In order to determine the required balance in Direct Air's depository accounts at VNB, an additional adjustment to Advance Bookings must be made for credit card funds that had been processed but not yet funded. As identified in paragraph 16 above, as of the Petition Date, unfunded customer credit card charges totaled $213,833.80. After making these adjustments, the required balance in Direct Air's depository accounts at VNB as of the Petition Date should have been $31,406,299.70. Taking into account the actual balance of the depository accounts of $1,016,935.91, the net shortfall from Direct Air's depository accounts at VNB as of the Petition Date was $30,389,363.79 (see **Exhibit E**).

24. In order to determine the approximate shortfall in Direct Air's depository accounts at VNB throughout Direct Air's operations, I took the Advance Bookings less the balance in the depository accounts at VNB at the end of each month of operations ("Shortage"). This is shown on **Exhibit C**. The Shortage figure did not and would not need to include unfunded credit card charges, since those charges were all eventually funded (until the last few days of Direct Air's operations). The Shortage figure does not adjust for credit card processing fees and air carrier advances, which is why the figure is an approximation of the shortfall.

25. In order to determine the sources of the shortfall, I analyzed Direct Air's books and records, release requests, bank statements and Radixx data, and various other pieces of information such as total flight revenue figures from the Charter Escrow Detail Reports, and later Cross Tab reports, from Radixx (each, a "Radixx Report").

26. One source of the shortfall was Direct Air's Family Ties program. Thousands of customers flew using Family Ties vouchers, which included a membership fee as part of the cost for each voucher. Family Ties vouchers were entered as records in Radixx similar to the way records were entered for flights paid for by non-voucher payments (i.e., credit card). The total revenue in the Radixx Reports contained the full amount of customers' Payments, including fees coded as Family Ties memberships. Therefore, release requests based on Radixx Report totals would also release funds for customers' Family Ties membership fees. During my review of Direct Air records, I saw separate release requests that were specifically for Family Ties membership fees. VNB records show that VNB promptly paid the amounts requested from Direct Air's depository accounts for the Family Ties membership fees. Because Family Ties membership fees were being released from Direct Air's depository accounts along with the release request for the completed flights, the separate request for release of the Family Ties membership fees was duplicating the release of these family tie funds. Direct Air separately requested Family Ties membership fees on thirty five (35) different occasions, resulting in duplicate withdrawals of Family Ties membership fees of $12,175,928.50. A spreadsheet summarizing these release requests is attached hereto as **Exhibit F**.

27. In conversations with the Trustee's counsel and Radixx International personnel, it was posited that improper "ghost" customers or Segments might exist in Radixx. These ghost customers could be records added to a Flight after a Departure Date, thereby increasing the amount of revenue reported per Flight. I queried the Radixx data for records that contained Booking Date and/or a Payment Date more than twenty-four (24) hours after a Departure Date. I found 64,172 such records totaling

$8,323,734.82. Common characteristics of these records were that they were made in large groups, the charges for each record were for the exact same amount and the payment method was cash, for which there were no bank records or corresponding cash deposits. The records were typically added the day before or the day that Direct Air printed a Radixx Report showing flight revenue totals to support a release request. A majority of these added records were cancelled after the Radixx Report was run. This was determined by comparing the Booking Date and the Cancellation Date for each record on the date the Radixx Report was printed. The Charter Escrow Detail Report includes the date printed in the top right corner; the Cross Tab report shows the date and time printed in the bottom left corner. I prepared a listing of the ghost customer records from Radixx by Departure Date, which is attached hereto as **Exhibit G**. I also summarized these records by Booking Agent, which is attached hereto as **Exhibit H**. The cancellation of these records would eliminate customer Payments from total revenue numbers in Radixx. However, these totals are available by searching specifically for these cancelled transactions, as I did. Radixx retained a log of all activity, including cancellations. The additional revenue associated with "ghost" customer records is $8,323,734.82.

28.     To further investigate additional sources of the shortfall, I reviewed many of the release requests and compared the total revenue and payment method to the information recorded in Radixx for the same Operating Week. On 188 different release requests reviewed, the total revenue collected by Direct Air, as reported to VNB, includes all Payment Methods, including "CASH", "INVC", "VCHR", "PDUE", "TCHK". I prepared a listing of Radixx records showing all Payment Methods by Operations Week,

which is attached as **Exhibit I**. Only credit card payments and four (4) checks for special charters were deposited in Direct Air's VNB depository accounts. The money associated with the "other payment methods" was never deposited into the depository accounts at VNB. Over the course of Direct Air's operations, Direct Air requested and VNB paid $5,543,750.80 from Direct Air's depository accounts for revenue reportedly collected from Payment Methods other than credit cards and the four (4) special charter checks.

29. In conclusion, based on the review of available bank statements and records from Radixx, Direct Air's depository accounts received deposits totaling $209,410,162.22 and VNB released $208,393,226.31 to Direct Air, leaving a balance of $1,016,935.91 in Direct Air's depository accounts on the Petition Date. With Advance Bookings on the Petition Date of $33,055,883.69, taking into account permissible withdrawals of these funds for advance air carrier payments of $572,269.00 and credit card processing fees of $813,481.19, and unfunded credit card payments of $213,833.80, the balance in Direct Air's depository accounts as of the Petition Date should have been $31,406,299.70. The depository accounts had a balance of only of $1,016,935.91, resulting in a shortfall of $30,389,363.79. Contributing to the shortfall, $12,175,928.50 was separately requested and released for Family Ties membership fees, that duplicated fees released for completed flights on which Family Ties vouchers were redeemed. Furthermore, $8,323,734.82 was requested and released for "ghost" records that do not represent actual passengers or revenue to Direct Air. Lastly, a portion of the shortfall is due to funds that were never deposited to the depository accounts at VNB but requested and released by VNB totaling $5,543,750.80. Collectively, these funds account for $26,043,414.12, or 85.5%, of the shortfall.

{Practice Areas/CORP/15008/14190/A2523858.DOCX}

12

30. V&L was also asked to review how the funds released from Direct Air's depository accounts at VNB were used. All of the funds VNB released from Direct Air's depository accounts were paid by wire to Direct Air's operating accounts at other banks or to Direct Air's vendors, and accounted for on VNB bank statements as well as on statements from the receiving banks. Based on information from available bank statements and the Corrected QuickBooks, I compiled a list of every business and person who received payments from Direct Air during its operations. I scrutinized payments to 127 businesses which received in excess of $45,400.00 and payments to 43 individuals who received over $17,400.00. Direct Air did not make any payments to businesses or individuals that appeared to be fraudulent or entirely unrelated to Direct Air's business operations. I saw no evidence of money transfers to off-shore accounts nor did I see large amounts of cash (unidentified payee) transfers. Payments to businesses and individuals seemed consistent with other records reviewed including payroll and vendor invoices.

I declare under penalty of perjury that, to the best of my knowledge, information and belief, that the foregoing is true and correct.

*[signature]*
Penelope A. Bley

Dated: February 28, 2014